# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FRANZ BOENING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0430 (EGS) |
| | ) | |
| CENTRAL INTELLIGENCE AGENCY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MOTION TO DISMISS UNDER RULE 12
## AND MOTION FOR SUMMARY JUDGMENT UNDER RULE 56

Plaintiff Franz Boening, a former employee of the defendant Central Intelligence Agency ("CIA" or "Agency"), sought to publish a memorandum he authored while employed at the Agency. As he was required to do by a Secrecy Agreement he voluntarily signed, plaintiff submitted that memorandum to the CIA for prepublication review. After determining that the memorandum contained classified information, the Agency denied plaintiff permission to publish it as written. Plaintiff was instructed that, if he wished to publish the memorandum, he must delete classified material (or provide open-source, pinpoint citations for those assertions), remove the memorandum from its official-looking government format, and add a disclaimer stating that the views expressed were his own and did not represent the views of the Agency or the U.S. Government. Plaintiff refused to make the requested changes and, instead, filed this action alleging that the CIA violated the First Amendment of the United States Constitution and the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.*

Defendant respectfully moves this Court, pursuant to Fed. R. Civ. P. 12, to dismiss plaintiff's two APA claims. Defendant also moves that this Court award summary judgment, pursuant to Fed.

R. Civ. P. 56, on plaintiff's First Amendment claim.   For all the reasons set forth in the accompanying Memorandum of Points and Authorities in support of this motion, defendant requests that this court find that:

(1)     plaintiff's claim that the CIA violated the APA by taking longer than 30 days to complete prepublication review of his memorandum is moot and, in any event, lacks merit;

(2)     plaintiff lacks standing to allege that the CIA violated the APA when it determined that he was not an "authorized holder" of the classified information contained in his memorandum and, in any event, this claim lacks merit;

(3)     plaintiff has no First Amendment right to publish classified information; and

(4)     the CIA properly determined that, in its current form, plaintiff's memorandum contains classified information that, if disclosed, could cause serious damage to national security.

Dated: <u>July 20, 2007</u>                                 Respectfully submitted,

                                                                          PETER D. KEISLER
                                                                          Assistant Attorney General

                                                                          JEFFERY A. TAYLOR
                                                                          United States Attorney

                                                                          VINCENT M. GARVEY
                                                                          Deputy Branch Director

<u>Of Counsel:</u>                                                **/s/ Michael P. Abate**
Vesper Mei                                                        MICHAEL P. ABATE
Office of the General Counsel                          (IL Bar No. 6285597)
Central Intelligence Agency                             Attorney, Civil Division
Washington, DC  20505                                   U.S. Department of Justice
                                                                          P.O. Box 883
                                                                          20 Massachusetts Ave., N.W., Room 7302
                                                                          Washington, D.C. 20530
                                                                          Telephone: (202) 616-8209
                                                                          Facsimile: (202) 616-8470

                                                                          *Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FRANZ BOENING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0430 (EGS) |
| | ) | |
| CENTRAL INTELLIGENCE AGENCY, | ) | |
| | ) | |
| Defendant. | ) | |
|  | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS UNDER RULE 12 AND MOTION FOR SUMMARY JUDGMENT UNDER RULE 56

PETER D. KEISLER
Assistant Attorney General

JEFFERY A. TAYLOR
United States Attorney

VINCENT M. GARVEY
Deputy Branch Director

Of Counsel:
VESPER MEI
Office of the General Counsel
Central Intelligence Agency
Washington, DC 20505

MICHAEL P. ABATE (IL Bar No. 6285597)
Trial Attorney, Civil Division
U.S. Department of Justice
20 Massachusetts Ave., N.W., Room 7302
Washington, D.C. 20530
Telephone: (202) 616-8209
Facsimile: (202) 616-8470

*Attorneys for Defendants*

<u>TABLE OF CONTENTS</u>

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.    Plaintiff's Secrecy Agreement and Controlling Regulations . . . . . . . . . . . . . . . . 4

        A.    Plaintiff's Secrecy Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.    Classification Challenges for Official Documents . . . . . . . . . . . . . . . . . . 5

        C.    Prepublication Review Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    II.    Factual Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.    2001 Review of the Memorandum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        B.    2004 Review of Plaintiff's Memorandum . . . . . . . . . . . . . . . . . . . . . . . 12

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    I.    This Court Lacks Jurisdiction To Consider Plaintiff's
        APA Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        A.    Plaintiff's First APA Claim (30 Day Requirement)
            is Moot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        B.    Plaintiff Lacks Standing to Bring His Second APA
            Claim (Authorized Holder) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        C.    Plaintiff's Allegation That the CIA Lacked Authority to
            Require Him to Include a Disclaimer Lacks Merit . . . . . . . . . . . . . . . . 23

    II.    Defendant Is Entitled to Summary Judgment on Plaintiff's First
        Amendment Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        A.    Plaintiff Has No First Amendment Right To Publish
            Classified Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        B.    The Government's Classification Decisions Are Entitled
            To Utmost Deference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

C.    The Information In Plaintiff's Memorandum Is Properly
Classified . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

D.    The Classified Information In The Plaintiff's Memorandum
Has Not Been Officially Released By The Government Into
The Public Domain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

III.    PLAINTIFF'S COUNSEL IS NOT ENTITLED TO SEE THE
CLASSIFIED MATERIALS AT ISSUE IN THIS CASE . . . . . . . . . . . . . . . . . . 40

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## TABLE OF AUTHORITIES

CASES                                                                                  PAGES

Afshar v. Dep't of State, 702 F.2d 1125 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . .  37, 38

Alliance for Democracy v. Federal Election Comm'n,
       335 F. Supp. 2d 39 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Aptheker v. Secretary of State, 378  U.S. 500 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

Borg-Warner Protective Serv. Corp. v. EEOC, 81 F. Supp.2d 20
       (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

CIA v. Sims, 471 U.S. 159 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Center For Biological Diversity v. Gutierrez, 451 F. Supp. 2d 57
       (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Center for Law and Educ. v. Dep't of Educ., 396 F.3d 1152
       (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

Center for Nat'l Sec. Studies, et al. v. U.S. Dep't of Justice,
       331 F.3d 918 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29, 31, 38

Chicago & Southern Air Lines v. Waterman S.S. Corp.,
       333 U.S. 103 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

Clarke v. United States, 915 F.2d 699 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Colby v. Halperin, 656 F.2d 70 (4th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

Cruz v. American Airlines, 150 F. Supp. 2d 103 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . .  22

Dep't of the Navy v. Egan, 484 U.S. 518 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27, 28

Dimond v. Dist. of Columbia, 792 F.2d 179 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . .  21

Earth Pledge Foundation v. CIA, 988 F. Supp. 623 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . .  35

Federation for Am. Immigration Reform v. Reno, 897 F. Supp. 595
          (D.D.C. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

Fitzgibbon v. CIA, 911 F.2d 755 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37, 38

Frugone v. CIA, 169 F.3d 772 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

Haig v. Agee, 453 U.S. 280 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

Halkin v. Helms, 598 F.2d 1 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

Halperin v. CIA, 629 F2d 144 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

Hayden v. National Security Council, et al., 608 F.2d 1381
          (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

Hong v. Doe, 484 U.S. 305 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

Jerome Stevens Pharmaceuticals, Inc. v. Food & Drug Admin.,
          402 F.3d 1249 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

Klaus v. Blake, 428 F. Supp. 37 (D.D.C. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

* Knopf v. Colby, 509 F.2d 1362 (4th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33, 37, 39

Krikorian v. Dep't of State, 984 F.2d 461 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . .   29

Lewis v. Continental Bank Corp., 494 U.S. 472 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

Los Angeles v. Lyons, 461 U.S. 95 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18, 22

Lynom v. Widnall, 222 F. Supp. 2d 1 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

* McGehee v. Casey, 718 F.2d 1137 (D.C. Cir.1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   passim

Military Audit Project v. Casey, 656 F.2d 724 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . .   36, 38

NLRB v. Wyman-Gordon Co., 394 U.S. 759 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

Phillippi v. CIA, 655 F.2d 1325 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

Preiser v. Newkirk, 422 U.S. 395 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

Public Citizen v. Dep't of State, 11 F.3d 198 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . .   37

Public Citizen v. U.S. Dist. Court for Dist. of Columbia,
  486 F.3d 1342 (D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

Renne v. Geary, 501 U.S. 312 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

* Salisbury v. United States, 690 F.2d 966 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . .  passim

* Snepp v. United States, 444 U.S. 507 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

* Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998) . . . . . . . . . . . . . . . .  3, 16, 18, 22

* Stillman v. CIA, 319 F.3d 546 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 15, 27, 41

* Stillman v. CIA, No. 01-1342 (D.D.C. Mar. 30, 2007) . . . . . . . . . . . . . . . . . . . . . . . . .  passim

United States v. Curtiss-Wright Export Corp., 299 U.S. 304 (1936) . . . . . . . . . . . . . . . . . . .  28

* United States v. Marchetti, 466 F.2d 1309 (4th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . .  passim

Weaver v. U.S. Information Agency, 87 F.3d 1429 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . .  24

## STATUTES, REGULATIONS, AND EXECUTIVE ORDERS

5 U.S.C. § 701 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

50 U.S.C. § 403q(d)(5)(G)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

32 C.F.R. § 1907.01(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

32 C.F.R. § 1907.02(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5, 20

32 C.F.R. § 1907.03 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

32 C.F.R. § 1907.21 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

32 C.F.R. § 2001.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Exec. Order No. 12958, as amended . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

## LEGISLATIVE MATERIALS

S. Rep. No. 1200, 93rd Cong., 2d Sess. 12 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

## INTRODUCTION

Plaintiff, a former employee of the Central Intelligence Agency ("CIA" or "Agency"), signed a Secrecy Agreement ("Agreement") when he accepted employment with the CIA. That Agreement obligates plaintiff to submit to the CIA for prepublication review "all information or materials . . . which contain any mention of intelligence data or activities, or contain data which may be based upon information classified pursuant to Executive Order." Declaration of Scott A. Koch ("Koch Decl.") ¶ 9 & Exh. A ¶ 5. The purpose of this prepublication review is to allow the CIA to determine whether prepublication submissions, authored by those with access to classified material, contain information whose disclosure could damage national security interests. *Id.* ¶ 17.

The present dispute concerns a memorandum authored by plaintiff while he was employed by the CIA. According to plaintiff's Complaint, that memorandum, dated May 10, 2001 ("May 10, 2001 Memorandum" or "Memorandum"), alleges that the CIA maintained a "special relationship with a foreign individual who committed unlawful human rights violations and criminal acts." Compl. ¶ 7. Plaintiff submitted this Memorandum to the CIA's Office of Inspector General ("OIG") as a whistleblower complaint. After being reviewed by other components of the CIA, the Memorandum was classified because of its contents. Plaintiff attempted to challenge the decision to classify his Memorandum by filing an official "classification challenge" with the CIA's Agency Release Panel ("ARP"), the entity tasked with adjudicating complaints that the Agency improperly classified official CIA documents. The ARP determined that such whistleblower complaints are personal writings, and not official Agency documents. Therefore, the ARP informed plaintiff that it had no authority to consider his challenge and that he should, instead, submit the Memorandum for prepublication review as a

"nonofficial" publication.  Plaintiff unsuccessfully appealed the ARP's determination that it had

no authority to consider his classification challenge.

Plaintiff then submitted that May 10, 2001 Memorandum for prepublication review.[1]

After reaffirming that the Memorandum contained classified information, the CIA attempted to

work with plaintiff to help him produce an unclassified version.  The Agency requested that

plaintiff (1) delete classified material from the May 10, 2001 Memorandum (or provide specific

open-source citations for each of the pieces of classified information that plaintiff believed to be

unclassified), (2) remove the Memorandum from its official-looking government format, and (3)

add a disclaimer stating that the views expressed were his own and did not represent the views of

the Agency or the U.S. Government.  Plaintiff refused to make these changes.  Instead, he filed

the present action alleging that the CIA violated the First Amendment and the Administrative

Procedures Act ("APA") by denying him permission to publish the Memorandum as written.

Plaintiff initially alleges that the CIA violated the First Amendment by denying him

permission to provide the Memorandum to the National Security Archive, a public interest group.

This claim must fail.  The First Amendment does not give plaintiff the right to publish classified

information.  *See Snepp v. United States*, 444 U.S. 507, 510 n.3 (1980) (per curiam); *Stillman v.

CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003); *McGehee v. Casey*, 718 F.2d 1137, 1143 (D.C.

Cir.1983); *United States v. Marchetti*, 466 F.2d 1309, 1317 (4th Cir. 1972).   Plaintiff's

Memorandum, as written, does indeed contain classified information.   *See* Unclassified

---

[1] In November 2004, plaintiff sought permission to publish a total of three whistleblower
complaints and an additional employment grievance. *See* Compl. ¶ 5.  Two of those whistleblower
complaints – one dated March 24, 2003, and another dated May 20, 2004 – were published prior to
the filing of this case and were never at issue in this litigation. *Id.* The January 16, 2003 employment
grievance, while mentioned in the Complaint, is no longer at issue in this litigation because the CIA
determined that plaintiff is free to release it in full.  *See* Koch Decl. ¶ 33 n.8.

Declaration of Ralph S. DiMaio ("Unclassified DiMaio Decl.") ¶ 5, 13-14; Classified *in camera, ex parte* Declaration of Ralph S. DiMaio ("Classified DiMaio Decl.").[2]  Therefore, the CIA is entitled to summary judgment on this First Amendment claim.

Plaintiff also alleges two violations of the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq*.  Because this Court lacks jurisdiction to consider either challenge – the first is moot, and plaintiff lacks standing to bring the second – it must dismiss them pursuant to Federal Rule of Civil Procedure 12(b)(1) without considering the merits of either claim.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

First, plaintiff contends that the CIA violated the APA by taking longer than 30 days to review his prepublication submission.  Plaintiff lacks standing to bring this challenge because it is moot.  This Court rejected an identical contention in *Stillman v. CIA*, finding that, because that plaintiff had already received his final determination from the Publication Review Board ("PRB"), there was no further relief this Court could order.  *See Stillman v. CIA*, No. 01-1342, slip op. at 7 (D.D.C. Mar. 30, 2007).  The same is true here.  Moreover, even if this claim were not moot, it would fail because CIA regulations do not guarantee that the Agency will respond to all prepublication submissions within 30 days, and because the Agency did not unreasonably delay its review of plaintiff's Memorandum.

Second, plaintiff claims that the CIA violated the APA by concluding that he is not an "authorized holder" of the information contained in his Memorandum.  This argument is a red herring.  It falsely suggests that plaintiff's inability to bring a classification challenge resulted

---

[2] This Classified *in camera, ex parte* DiMaio Declaration  has been lodged for secure storage and transmission to the Court with the United States Department of Justice, Litigation Security Group.  A Notice of Lodging of this Classified Declaration (providing contact information for the Litigation Security Group) is being filed along with this Motion.

solely from the CIA's determination that he was not an authorized holder of the information in his Memorandum when, in fact, that decision also resulted from the CIA's determination that whistleblower complaints represent an author's personal views and, therefore, must be submitted for prepublication review – the process used for "nonofficial" documents – instead of for official classification challenges.   Thus, even if plaintiff were correct that he is an authorized holder of the classified information in his Memorandum, that would not entitle him to challenge the classified status of this unofficial document in front of the ARP.   Put simply, plaintiff's claim that he was wrongly denied "authorized holder" status fails to allege any concrete injury remediable by this Court.   Consequently, plaintiff lacks Article III standing to bring this claim (which would fail, in any event, because he does not meet the definition of an "authorized holder" of the classified information at issue in this case).

## BACKGROUND

I.   PLAINTIFF'S SECRECY AGREEMENT AND CONTROLLING REGULATIONS

### A.      Plaintiff's Secrecy Agreement

Plaintiff Franz Boening joined the CIA in 1980.   *See* Compl. ¶ 3; Koch Decl. ¶ 7.   At that time, he executed a Secrecy Agreement that obligates him to protect classified information concerning the intelligence activities of the United States Government.   *See* Koch Decl. ¶ 7 & Exh. A.   This Agreement, which continues to bind plaintiff even though he no longer works for the CIA, prohibits plaintiff from disclosing information or material "obtained . . . in the course of . . . employment or other service with the Central Intelligence Agency" that (1) is classified, (2) he knows, or has reason to know, should be classified, or (3) identifies any person or organization who has or has had a relationship with the United States government that the government has taken affirmative measures to conceal.   *Id.* ¶ 7-8.   To ensure protection of

classified material, the Agreement requires plaintiff to submit for the CIA's review any materials that "contain any mention of intelligence data or activities, or contain data which may be based upon information classified pursuant to Executive Order." *Id.* ¶ 9 & Exh. A ¶ 5. Plaintiff may not take any additional steps toward publication of information subject to this Agreement "without written permission to do so from the [CIA]." *Id.*

## B.    Classification Challenges for Official Documents

Executive Order 12958, as amended,[3] allows an authorized holder of information to challenge the classification of documents that he "in good faith" believes to be improperly classified. Exec. Order 12958 § 1.8(a). A classification "challenge," which is defined as "a request in the individual's official, not personal, capacity and in furtherance of the interests of the United States," is to be directed to the CIA's Agency Release Panel ("ARP"). 32 C.F.R. §§ 1907.02(d), 1907.03. After considering the challenge, the ARP will report its decision to the authorized holder, the originator of the document, and other interested parties. *See* 32 C.F.R. §§ 1907.21 - .26. The ARP's decision may be appealed to the Interagency Security Classification Appeals Panel ("ISCAP"). *Id.* §§ 1907.26, 1907.31.

## C.    Prepublication Review Process

CIA prepublication review protects against disclosure of material that reasonably could be expected to cause damage to national security. *See* Koch Decl. ¶ 10. This process is governed by internal CIA regulation. Two different versions of that regulation are relevant to this case. In

---

[3] Executive Order 12958 was amended by Executive Order 13292, effective March 25, 2003. *See* Exec. Order No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003). All citations to Exec. Order No. 12958 ("Executive Order") are to the Order as amended by Exec. Order No. 13292. *See* Exec. Order 12958, 3 C.F.R. § 333 (1996), reprinted as amended in 50 U.S.C.A. § 435 note at 180 (West Supp. 2006).

May 2001 and November 2004, when plaintiff submitted his Memorandum for review, that prepublication process was governed by a regulation that became effective on March 14, 1995 ("1995 Regulation"). *See* Koch Decl. ¶ 13 n.3 & Exh. B.[4] The 1995 Regulation required current CIA employees to submit "material intended for nonofficial publication" to the Agency "through their supervisory chain of command to their Deputy Director or Head of Independent Office." *Id.* ¶ 13 & Exh. B ¶ 2.d.(1).[5] Additionally, if an employee was unsure whether material required review by the PRB, he could "elect first to make submissions directly to the Chair of the PRB only for determining of the necessity for Agency review." *Id.*

Under that 1995 Regulation, the Agency could deny permission for nonofficial publication of any material obtained during the course of employment with the CIA that had not "been placed in the public domain by the U.S. Government and if disclosure reasonably could be expected to harm the national security interests of the United States." *Id.* ¶ 14 & Exh. B ¶ 2.i.(1). If an author believed "that information intended for nonofficial publication is unclassified because it has already appeared in public," the Agency could ask an author to "identify any open sources for information that, in the Agency's judgment, originates from classified sources" and require the author "to cite the source in a footnote." *Id.* Exh. B ¶ 2.c.(5); *see also id.* Exh. B ¶ 2.i.(3) ("The Board may give permission to publish contingent on the author's citation of open sources in a footnote."). An author's "refusal to identify such public sources or otherwise to

---

[4] All relevant portions of the internal CIA regulations are attached to the Koch Declaration. Other portions of those regulations, containing protected CIA information not related to this case, have been redacted. *See* Koch Decl. ¶ 13 n.4.

[5] Former employees were required to submit materials directly to the Prepublication Review Board ("PRB" or "Board"). *See* Koch Decl., Exh. B ¶ 2.d.(4). This provision did not apply to plaintiff when he submitted his Memorandum in November 2004, because he still worked for the Agency at that time. *See* Compl. ¶ 3.

cooperate may result in refusal of authorization to publish the information in question." *Id.* Exh. B ¶¶ 2.c.(5), 2.i.(3). Finally, the Agency could not deny permission solely on the grounds that the material would be "embarrassing to or critical of the Agency." *Id.* ¶ 14 & Exh. B ¶ 2.i.(2).

The CIA amended the prepublication review regulation in July 2005 ("2005 Regulation"), after plaintiff submitted his Memorandum for prepublication review but before the Agency reached a final determination. *See id.* Exh. C. Like the 1995 version, the 2005 Regulation authorized the Agency to review materials to ensure that they contain no classified information, and prevented the Agency from denying permission to publish information "solely because the material may be embarrassing or critical of the Agency." *Id.* Exh. C ¶ 2.f.(2). Unlike the 1995 Regulation, however, an employee no longer needed to submit nonofficial materials through his supervisory chain of command. Instead, materials for both current and former employees were to be submitted directly to the PRB Chair. *Id.* ¶ 15 & Exh. C ¶ 2.f.(1). In addition, the PRB itself was re-structured. *See id.* ¶ 16 (describing change in PRB's membership).

The PRB attempts to prioritize short, time-sensitive submissions such as op-ed pieces, letters to the editor, or resumes. *See* Koch Decl. ¶ 18. Although the PRB attempts to review all submissions within 30 days, lengthy or complex submissions – especially those involving intelligence sources or methods – may require a substantially longer time period for review. *See id.* Neither the 1995 Regulation nor the 2005 Regulation guaranteed final adjudication of a prepublication review request within any set time period. *Id.* Exh. B (1995 regulation) ¶ 2.e.(4) ("The Agency will make every effort to complete the initial review within of submitted material and respond to authors within 30 days of receipt by the PRB or other reviewing official."); *id.* Exh. C (2005 regulation) ¶ 2.d.(4) ("As a general rule, the PRB will complete prepublication review for nonofficial publications within 30 days of receipt of the material . . . . Lengthy or

complex submissions may require a longer period of time for review, especially if they involve intelligence sources and methods issues.").

## II.    FACTUAL INFORMATION

This case concerns a 25-page memorandum dated May 10, 2001 that was addressed to "Office of Inspector General, Central Intelligence Agency," with copies to "the Director of Central Intelligence; the Executive Director of the CIA; the Office of Congressional Relations; the Deputy Director for Operations; the Chief, Latin America Division, Directorate of Operations; and the Counter-Narcotics Center," and is identified as coming from "Franz Boening, Central Intelligence Agency." Koch Decl. ¶ 19. This document purports to be a whistleblower complaint detailing, in plaintiff's words, "perceived violations of the law committed by the CIA" with regard to an alleged "special relationship with a foreign individual who committed unlawful human rights violations and criminal acts." Compl. ¶¶ 6-7. This document was accompanied by three "annexes," one of which purports to be a two-page "Classified Annex." Koch Decl. ¶ 19. It also contained a "Bibliography" listing some fifty-five sources, although generally speaking the document did not match these sources to specific allegations in the memorandum. *Id.* An unredacted copy of this memorandum (and its annexes) is attached to, and its contents are described in, the Classified DiMaio Declaration.

### A.    2001 Review of the Memorandum

On May 10, 2001, plaintiff submitted a copy of his Memorandum to the CIA's Office of Inspector General ("OIG") for a determination of whether it presented an "urgent concern" that should be reported to Congress under Section 17(d)(5) of the CIA Act, 50 U.S.C. § 403q(d)(5).[6]

---

[6] "Urgent Concern" is defined to mean either (1) "[a] serious or flagrant problem, abuse,
(continued...)

The OIG determined that the Memorandum did not constitute an "urgent concern." *See* Koch Decl. ¶ 21. The Information Review Officer of the Directorate of Information ("DO/IRO"), which was the CIA directorate whose equities were implicated by the Memorandum, was then asked to perform a classification review of that document prior to its dissemination outside the Agency. *Id.* ¶ 22. The DO/IRO, who held original classification authority, reviewed the document and placed brackets around the portions he deemed classified. *Id.*[7]

Plaintiff then indicated his intent to publish the May 10, 2001 Memorandum by providing it to the National Security Archive, a public interest group. *See* Koch Decl. ¶ 23. As portions of the document were now classified, plaintiff sought to challenge that classification under the procedures set forth in Executive Order 12958 and supporting CIA regulations. Thus, on July 2, 2001, plaintiff submitted the Memorandum to the Agency Release Panel for a formal classification challenge. *Id.* The ARP, in turn, referred the document to the Agency Classification Management Review Panel ("ACRMP") for consideration of whether the document was properly classified. *Id.* ¶ 24. On July 25, 2001, the ARCMP unanimously agreed that each paragraph marked classified (save one) was properly labeled as such. *Id.* The ACRMP met a second time on September 4, 2001, to consider specific issues raised in plaintiff's July 2,

---

(...continued)

violation of law or Executive order, or deficiency relating to the funding, administration, or operations of an intelligence activity involving classified information, but does not include differences of opinions concerning public policy matters"; (2) "[a] false statement to Congress, or a willful withholding from Congress, on an issue of material fact relating to the funding, administration, or operation of an intelligence activity"; or (3) [a]n action, including a personnel action . . . constituting reprisal or threat of reprisal prohibited . . . in response to an employee's reporting an urgent concern in accordance with this paragraph." 50 U.S.C. § 403q(d)(5)(G)(i).

[7] Subsequent to its review by the DO/IRO, the May 10, 2001 Memorandum was provided to the congressional oversight committees, who made no further inquiries regarding the matter. *See* Koch Decl. ¶ 22.

2001 challenge (submitted to the ARP), and again found that the Memorandum was appropriately classified.  *Id.*  On September 12, 2001, the ACRMP wrote to the Chair of the ARP, setting forth its decision with regard to plaintiff's classification challenge.  *Id.* ¶ 25.  After seeing that determination, plaintiff appealed the ACRMP's decision to the ARP.  *Id.*  Although informal efforts were made to work with plaintiff to revise the Memorandum in a way that it would express only his personal opinions and would not reveal classified information, those efforts were unsuccessful.  The ARP then scheduled a formal appeal.  *Id.*

Before that ARP appeal occurred, a new Executive Secretary was appointed to the ARP ("ES/ARP").  *Id.* ¶ 26.  Considering the matter anew, the ES/ARP questioned whether whistleblower complaints under the Intelligence Community Whistleblowers Protection Act of 1998 are properly the subject of classification challenges under Exec. Order No. 12958.  *Id.*  The Agency determined that these sorts of complaints, because they express personal views, are not official Agency documents and thus fall outside the jurisdiction of the ARP.  *Id.* ¶ 27. Instead, the ARP determined that they should be reviewed for nonofficial publication – *i.e.*, submitted for prepublication review.  *Id.*  To facilitate that process, the ARP forwarded the materials to the Information Review Officer for the directorate in which plaintiff worked, the Directorate of Science and Technology ("DS&T/IRO").  (As noted *supra*, the 1995 Regulation required CIA employees to submit nonofficial writings to their supervisory chain of command for prepublication review).  *Id.* ¶ 28.

As part of the prepublication review of this Memorandum, the DS&T/IRO sought an advisory opinion from the Agency Release Panel.  *Id.* ¶ 29.  The ARP concluded that the document was properly classified at the SECRET level, and so informed the DS&T/ISO.  *Id.* ¶ 30.  The DS&T/IRO then reviewed the documents himself, in light of the ARP opinion, and

concluded that the May 10, 2001 memorandum was properly classified and could not be approved for nonofficial publication as written. *Id.* Plaintiff received notice of this decision on June 24, 2003. *Id.*

Disagreeing with the conclusion that this document was not properly subject to a classification challenge under Executive Order 12958, plaintiff submitted his Memorandum to the ISCAP, which (as noted *supra*) is the entity that hears appeals from classification challenges adjudicated by the ARP. *Id.* ¶ 31. J. William Leonard, the Executive Director of both the ISCAP and the National Archives and Records Administration's Information Security Oversight Office ("ISOO"), sent plaintiff a letter on February 4, 2004, informing plaintiff that he could not bring a classification challenge to the document because he was not an "authorized holder" of the information. *Id.* ¶ 32; *see also* Exec. Order 12958 (providing that only "authorized holders" may challenge the classification of a document).

Despite this conclusion that plaintiff was not an authorized holder, Mr. Leonard informed plaintiff that he nevertheless exercised his own independent authority to consider whether the Memorandum was properly classified:

> Notwithstanding my determination above, I did pursue your complaint pursuant to § 5.2(b)(6) of the [Executive] Order which charges me with the responsibility to "consider and take action on complaints and suggestions from persons within or outside the Government with respect to the administration of the program established under (the) Order." Specifically, I pursued your complaint that the CIA improperly classified information contrary to the provisions of the Order.

> I have determined that the information satisfies the standards set forth in § 1.1 of the Order. I further determined that the information concerned intelligence activities, sources and methods and thus satisfied the criteria set forth in § 1.4 of the order. Finally, based upon information made available to me, I have concluded that the CIA's classification decision in this instance was not in order to circumvent any of the prohibitions and limitations of § 1.7 of the Order. In view of the above, I have determined that the CIA's classification of the

-11-

information in question is appropriate and find no merit in support of your complaint.

*Id.* ¶ 32 & Exh. D.  Mr. Leonard also encouraged plaintiff to "continue working with" the CIA to "develop an unclassified version of [his] original complaint."  *Id.*

### B.    2004 Review of Plaintiff's Memorandum

After receiving notice that he could not bring a formal classification challenge – and that, in any event, such a challenge was meritless – plaintiff submitted the May 10, 2001 Memorandum directly to the PRB in November 2004 for prepublication review.  *See* Koch Decl. ¶ 33.  On August 13, 2005, plaintiff retired from the CIA.  *Id.*  Subsequently, on November 25, 2005, he contacted the new Chairman of the PRB to inquire into the status of the review of his Memorandum.  *Id.* ¶ 34.  The Chairman responded to plaintiff in a letter dated January 5, 2006, notifying plaintiff that if he wanted to publish his Memorandum, he must "rewrite [his] 'M Documents' outside of a government memo format" and "include specific, open source citations (author, title, source, date, page) for statements you wish to make."  *Id.* ¶ 34 & Exh. E.  The Chairman specified that these citations "must be placed in the body of the text linked to specific sentences and paragraphs."  *Id.*

After plaintiff failed to make these requested changes, the PRB determined that the Memorandum could not be published in its current form, because it contained classified information. In a June 20, 2006 letter, the PRB provided plaintiff with a detailed list of redactions required before plaintiff could publish his document.  *See* Koch Decl. ¶ 35 & Exh. F.

The PRB required plaintiff to include a disclaimer stating that the contents of the May 10, 2001 Memorandum represented his own views, and not those of the Agency. *Id.* ¶ 35 & Exh. F at 14.[8]

Plaintiff responded to the PRB by email on June 29, 2006, insisting that his May 10, 2001 Memorandum was based on overt sources, and challenging the PRB's conclusion that he may not mention the subject of his 2001 Memorandum by name. *See* Koch Decl. ¶ 36. In that same email plaintiff also inquired into the PRB's decision with respect to the "Classified Annex" which he submitted along with his May 10, 2001 Memorandum. *Id.* The following day, the PRB responded to plaintiff with an email informing him that he could still seek to publish his Memorandum if he would remove it from the official-looking format and attribute each assertion in the Memorandum to specific, open-source materials. *Id.* ¶ 37 & Exh. G. The PRB stressed that these citations were necessary because CIA employees with access to classified systems could obtain classified information on a wide range of subjects – including those subjects they do not work on for the Agency. *Id.* Again, plaintiff failed to delete the classified information or rewrite the Memorandum in a way that included sufficient citations to open sources. *See* Koch Decl. ¶ 36 (plaintiff "has not to date[] revised his memorandum to include specific open source citations linked to each sentence and paragraph as required by the CIA").

---

[8] That required disclaimer read:

"All statements of fact, opinion, or analysis expressed are those of the author and do not reflect the official positions or views of the CIA or any other U.S. Government agency. Nothing in the contents should be construed as asserting or implying U.S. Government authentication of information or Agency endorsement of the author's views. This material has been reviewed by the CIA to prevent the disclosure of classified information."

Koch Decl. ¶ 35 & Exh. F. As noted *infra*, this disclaimer is required by the prepublication review regulation. *Id.* Exh. C ¶ 2.b.(4).

On August 11, 2006, the PRB sent plaintiff a final letter in response to his question concerning the "Classified Annex."  The PRB informed plaintiff that all of the material in that annex "is inappropriate for disclosure in the public domain (i.e., is considered to be classified information)." *Id.* ¶ 38 & Exh. H.

Plaintiff then filed this lawsuit, alleging that the Agency's refusal to grant permission to publish the May 10, 2001 Memorandum violated the First Amendment and the APA.

## STANDARD OF REVIEW

Defendant moves this court to dismiss this action in part under Federal Rule of Civil Procedure 12(b), and to award summary judgment to defendant in part pursuant to Federal Rule of Civil Procedure 56.

In reviewing a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), courts must "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (citation and internal quotation marks omitted).  "It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Id.* (citation and internal quotation marks omitted); *see also Center For Biological Diversity v. Gutierrez*, 451 F. Supp. 2d 57, 64 (D.D.C. 2006) (party that seeks to invoke the federal court's jurisdiction "bears the burden of establishing by a preponderance of the evidence that the Court possesses jurisdiction").  When considering such a motion under Rule 12(b)(1), the court "may consider materials outside the pleadings" without converting that motion into a motion for Summary Judgment under Fed. R. Civ. P. 56. *Jerome Stevens Pharmaceuticals, Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *see also Borg-Warner Protective Serv. Corp. v. EEOC*, 81 F. Supp.2d 20, 23 (D.D.C. 2000) ("[A] court may consider such materials

outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case."); *Federation for Am. Immigration Reform v. Reno*, 897 F. Supp. 595, 600 n.6 (D.D.C. 1995).

Federal Rule of Civil Procedure 56 mandates that summary judgment be entered for a party who shows that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246 (1986). "[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In deciding a motion for summary judgment in cases involving the government's classification decisions about national security information, district courts must give the government sufficient opportunity to present detailed *in camera* affidavits, and accord substantial weight to those affidavits concerning the classified nature of the information in question. *See Stillman*, 319 F.3d at 548-49 (in prepublication review cases "*in camera* review of affidavits, followed if necessary by further judicial inquiry, will be the norm" with the "appropriate degree of deference" given to the Executive Branch's classification decisions); *Cf. Salisbury v. United States*, 690 F.2d 966, 970 (D.C. Cir. 1982) (court accorded substantial deference to the government's classification decisions in a FOIA case involving national security information). Because of the Executive Branch's unique expertise concerning the adverse effects of the disclosure of national security information, so long as the government's declarations are submitted in good faith and contain "reasonable specificity demonstrating a logical connection between the deleted  information and the reasons for classification," the judiciary "cannot second-guess [the government's] judgments" with respect to its classification decisions. *McGehee*, 718 F.2d at 1148-49.

Applying these standards, this Court should grant defendants' Motion to Dismiss plaintiff's Administrative Procedure Act ("APA") claims. In addition, because there are no genuine issue of material fact, this Court should award summary judgment on plaintiff's First Amendment claim.

## ARGUMENT

### I.    THIS COURT LACKS JURISDICTION TO CONSIDER PLAINTIFF'S APA CLAIMS

Plaintiff's Complaint alleges two causes of action under the Administrative Procedures Act ("APA"). The first claim contends that the CIA violated the APA by failing to adjudicate plaintiff's prepublication request within thirty (30) days. *See, e.g.*, Compl. ¶ 30-34. The second APA count alleges that the CIA acted arbitrarily and capriciously when it determined that plaintiff was not an "authorized holder" of the information whose classification he wished to challenge under Executive Order 12958. The court lacks jurisdiction over both these APA claims. The first – as this court noted in response to an identical allegation in the *Stillman* litigation – is moot. The second fails because plaintiff has no standing to bring it; he cannot meet either the injury or redressability prongs of Article III's standing analysis. Because mootness and standing are both jurisdictional concerns, this Court need not – indeed, cannot – consider the merits of plaintiff's APA claims. *See Steel Co.*, 523 U.S. at 94 ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)); *Public Citizen v. U.S. Dist. Court for Dist. of Columbia*, 486 F.3d 1342, 1349 (D.C. 2007) (courts must address jurisdiction – or a "non-merits threshold ground for dismissal" – before adjudicating a claim on its merits).

Therefore, both of plaintiff's APA claims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).

### A.    Plaintiff's First APA Claim (30 Day Requirement) is Moot

Plaintiff alleges that the CIA violated the APA by taking longer than 30 days to review his submission.  *See* Compl. ¶¶ 31-34.[9]  This claim must be dismissed for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) because it is moot.  The mootness doctrine, derived from Article III's case or controversy requirement, limits federal courts "to deciding 'actual, ongoing controversies.'" *Clarke v. United States*, 915 F.2d 699, 700-01 (D.C. Cir. 1990) (en banc) (quoting *Honig v. Doe*, 484 U.S. 305, 317 (1988)); *accord Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (a federal court has no "power to render advisory opinions [or] . . . 'decide questions that cannot affect the rights of litigants in the case before them.'") (citation omitted).  A court lacks subject matter jurisdiction over a case that has become moot.  *See Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990).

There is no doubt that Plaintiff's first APA claim is moot.  As this court noted in rejecting an identical claim in *Stillman*, "[plaintiff]'s APA claim is moot because there is no further relief that this Court can provide as to that claim.   [Plaintiff] has already received the final classification decision that he sought from the defendant agencies." *Stillman v. CIA*, No. 01-

---

[9] In addition to alleging that the CIA took longer than 30 days to process his request, plaintiff's first APA count also advances an unrelated assertion that the CIA lacked the authority to require plaintiff to insert a disclaimer stating that the opinions expressed in his Memorandum were his own, and not those of the Agency.  Even if this Court interprets that passing assertion to be a separate claim under the APA (*i.e.*, a third APA count in the Complaint), it should dismiss that challenge under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  As noted *infra*, this contention fails as a matter of law because the regulations governing CIA prepublication review – regulations plaintiff voluntarily agreed to abide by when he executed his Secrecy Agreement – expressly require the *exact disclaimer language* plaintiff refused to insert in his Memorandum.  That regulation, moreover, comports with the First Amendment.

1342, slip op. at 7 (D.D.C. Mar. 30, 2007) (dismissing APA claim for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1)).  The same is true here as in *Stillman*: the PRB has already issued its final decision, and thus there is no further relief this Court could grant.  *See* Koch Decl. ¶¶ 34, 37 & Exh. F.  Nor, despite plaintiff's cursory allegation, does this case fall into the narrow exception to the mootness doctrine for cases that are capable of repetition yet evade review.  *See* Compl. ¶ 34.  That "capable of repetition" doctrine applies "only in exceptional situations, and generally only where the named plaintiffs can make a reasonable showing that [he or she] will again be subjected to the alleged illegality."  *Alliance for Democracy v. Federal Election Comm'n*, 335 F. Supp. 2d 39, 44 (D.D.C. 2004) (Sullivan, J.) (quoting *Los Angeles v. Lyons*, 461 U.S. 95 (1983)).  Plaintiff makes no allegation that he will be likely to suffer this harm again in the future; instead, he offers only a general assertion that "[t]he CIA routinely fails to abide by the 30 day deadline."  *See* Compl. ¶ 34.  This generalized grievance is plainly insufficient to meet the standard for invoking the "capable of repetition" exception to Article III's "case" or "controversy" requirement.  Thus, this Court must dismiss this APA claim under Rule 12(b)(1) without considering the merits of plaintiff's allegation.  *See Steel Co.*, 523 U.S. at 94.

Finally, even if this claim were not moot, this court should dismiss it pursuant to Rule 12(b)(6), or in the alternative award summary judgment to the CIA, because there is no regulation requiring the CIA to adjudicate all prepublication requests within 30 days, and because the CIA did not unreasonably delay action on plaintiff's submission.  Neither the regulation in effect at the time plaintiff first submitted his Memorandum, nor the revised 2005 Regulation, guarantees that prepublication review will be completed within a set time frame.  Instead, these regulations provide an aspirational goal for processing of such prepublication requests.  *See* Koch Decl., Exh. B (1995 regulation) ¶ 2.e.(4) ("The Agency will *make every effort* to complete the

initial review within of submitted material and respond to authors within 30 days of receipt by the PRB or other reviewing official.") (emphasis added); *id.* Exh. C (2005 regulation) ¶ 2.d.(4) ("As a general rule, the PRB will complete prepublication review for nonofficial publications within 30 days of receipt of the material. . . .  Lengthy or complex submissions *may require a longer period of time for review*, especially if they involve intelligence sources and methods issues.") (emphasis added).   Moreover, as described at length *supra*, the CIA did not unreasonably delay the processing of plaintiff's request.   On the contrary, the length and complexity of the process was due to the fact that plaintiff first submitted the Memorandum for a classification challenge (rather than prepublication review), requiring the ARP to address the threshold questions of whether a whistleblower complaint is a personal (as opposed to official) document, and whether plaintiff was an "authorized holder" of the information in that Memorandum.   Additionally, even after plaintiff resubmitted the Memorandum for prepublication review, the Board engaged in negotiations attempting to convince plaintiff to make changes that would allow publication of the Memorandum.   Only after it became clear that plaintiff refused to make those changes did the PRB issue its final decision.   *See, e.g.*, Koch Decl. ¶¶ 34-37.

**B.    Plaintiff Lacks Standing to Bring His Second APA Claim (Authorized Holder)**

Plaintiff's second APA claim alleges that the CIA acted arbitrarily and capriciously when it determined that he was not an "authorized holder" of the information in his Memorandum.  *See* Compl. ¶¶ 39-42.   According to plaintiff, this allegedly erroneous conclusion denied him "standing to challenge the CIA's classification decisions regarding the documents/information at issue."  Compl. ¶ 41.  This argument is a red herring, for it falsely implies that plaintiff's lack of

"authorized holder" status was the sole reason for the ARP's (and ISCAP's) refusal to entertain his classification challenge. In fact, that refusal to entertain plaintiff's classification challenge also rested on a determination that the May 10, 2001 Memorandum was a document purporting to express plaintiff's personal views – as opposed to being an official Agency document – and was therefore not properly the subject of an official classification challenge. *See* Koch Decl. ¶ 27 ("[T]he CIA concluded that [plaintiff]'s complaint was a 'personal record' created in his personal capacity, and the CIA could not, therefore, review it pursuant to the classification challenge provisions of [the Executive Order]."); 32 C.F.R. § 1907.02(d) (classification challenges may only be brought "in the individual's official, *not personal*, capacity and in furtherance of the interests of the United States" (emphasis added)). Put another way, "authorized holder" status is a necessary, but not sufficient, prerequisite for bringing an official classification challenge.

Plaintiff's Complaint does not challenge the CIA's determination that he drafted this document in his personal capacity – on the contrary, it concedes that the materials in question constitute "personal documents." Compl. ¶ 26; *see also id.* ¶ 8 (claiming that Memorandum contained plaintiff's "personal assessment of this individual"); Koch Decl. ¶ 26 ("Because a whistleblower complaint was, by its nature, a personal communication between a federal employee, the IG, and/or Congress, it represented the employee's personal views, not official agency views."). Therefore, even if he were correct that he was an authorized holder (which he is not, for reasons explained *infra*), plaintiff still would not be entitled to challenge the classification of the document under the procedures set out in the Executive Order. Thus, plaintiff has failed to allege any concrete injury following from the allegedly erroneous determination that he is not an "authorized holder." Because mere allegations of error, untethered from any substantive harm, are insufficient to satisfy Article III, plaintiff lacks

standing to pursue this APA claim. *See Center for Law and Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005) ("Appellants have failed to show that the alleged procedural violation caused actual injury to Appellants' concrete interests such that they satisfy Article III's requirement of standing."); *Dimond v. Dist. of Columbia*, 792 F.2d 179, 191 (D.C. Cir. 1986) ("We can divine no causal connection between the procedural violation and the injury flowing from the substantive provisions of the 1982 No-Fault Insurance Act. We conclude, therefore, that the District Court properly dismissed this pendent claim for lack of Article III standing.").

Moreover, even if being denied "authorized holder" status were a concrete injury, that injury is not redressable because there is no meaningful relief that plaintiff could obtain from this Court. If this Court were to agree that plaintiff was an "authorized holder" of the information in his memorandum – which he clearly is not, for the reasons noted *infra* – the proper remedy would be to remand so that the Agency Release Panel could adjudicate the merits of the classification challenge. *See Lynom v. Widnall*, 222 F. Supp. 2d 1, 5 (D.D.C. 2002) ("In a civil action brought pursuant to the APA, remand to the administrative agency is commonly the only available or appropriate remedy."). But, as noted, the ARP already opined that the Memorandum was properly classified. *See* Koch Decl. ¶ 29. Similarly, the Executive Director of the ISCAP – the entity to which ARP determinations may be appealed – also concluded that the Memorandum is properly classified. *See* Koch Decl. ¶ 32 & Exh. D.[10] Hence, any such remand would be a

---

[10] When notifying plaintiff that he could not bring an official classification challenge because he was not an authorized holder of the classified information in his Memorandum, J. William Leonard (Executive Director of both ISOO and ISCAP) nonetheless exercised his independent authority under § 5.2(b)(6) of the Executive Order to "consider and take action on complaints from persons within or outside the Government with respect to the administration of the program established under (the) Order." Koch Decl., Exh. D. As part of that independent review, he determined that the Memorandum was properly classified by the CIA. *Id.*

-21-

hollow, meaningless exercise. *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 (1969) ("To remand would be an idle and useless formality . . . . There is not the slightest uncertainty as to the outcome of a proceeding before the Board . . . . It would be meaningless to remand."). And where there is no meaningful relief to be afforded, courts lack jurisdiction to consider the claims. *See Cruz v. American Airlines*, 150 F. Supp. 2d 103, 119 (D.D.C. 2001) ("[E]ven if the Court were to issue the requested declaratory and injunctive order, the Cruz Plaintiffs would receive no meaningful relief . . . . Because they have failed to demonstrate how the requested relief redresses this injury, Plaintiffs lack standing to bring this claim."). Because it therefore lacks jurisdiction, this Court must dismiss this APA claim under Rule 12(b)(1) without considering the merits of plaintiff's allegation. *See Steel Co.*, 523 U.S. at 94.

Finally, even if this court did have jurisdiction to consider this APA (Authorized Holder) claim, it should dismiss plaintiff's contention under Rule 12(b)(6), or in the alternative award summary judgment to the CIA, because the Agency did not err in determining that plaintiff is not an authorized holder of the classified information in his Memorandum. An "authorized holder" is defined as "any individual, including an individual external to the agency, who has been granted access to *specific classified information*." 32 C.F.R. § 2001.14 (emphasis added); *see also* 32 C.F.R. § 1907.01(b) (authorized holder is one who "holds a security clearance from or has been authorized by the Central Intelligence Agency to possess and use on official business classified information."). Executive Order 12958, as amended, requires that three prerequisites must be met before a person may access specific classified information. "A person may have access to classified information provided that: (1) a favorable determination of eligibility for access has been made by an agency head or the agency head's designee; (2) the person has signed an approved nondisclosure agreement; and (3) the person has a need-to-know the information."

Exec. Order 12958 § 4.1(a). In other words, the person must have been determined eligible for access, must have signed a secrecy agreement (like the one plaintiff executed), and must have a "need-to-know" the specific information in question.

It is this last element that defeats plaintiff's contention that he was an authorized holder of the classified information in his Memorandum. The Agency determined that plaintiff did not have a "need-to-know" this particular classified information. *See* Classified DiMaio Decl. ¶ 8; Koch Decl. ¶ 32 n.7; *id.* Exh. D (letter from J. William Leonard) ("[T]he CIA has represented that any access to classified information you gained and which you included in your original complaint was not granted in accordance with your duties at the CIA. They have further represented that you did not have a need-to-know . . . the specific classified information accessed in preparation of your original complaint.").[11] Hence, pursuant to the Executive Order, plaintiff was not authorized to access that classified information, and therefore the CIA correctly determined he was not an authorized holder of that information.

### C.    Plaintiff's Allegation That the CIA Lacked Authority to Require Him to Include a Disclaimer Lacks Merit

Finally, as noted *supra*, plaintiff's first APA claim (30 Day Requirement) makes a passing allegation that the CIA was powerless to require him to include a disclaimer in his

---

[11] Plaintiff argues that the CIA's determination that he was not an "authorized holder" of the information in his Memorandum is tantamount to a concession that this information is not classified. *See* Compl. ¶ 18. This is not so. Employees with access to classified systems can obtain classified information on a wide variety of subjects – even those they do not work on for the Agency. Koch Decl. ¶ 37 & Exh. G. Indeed, the contention that the information in plaintiff's possession cannot be classified is exceedingly strange because he attached to his Memorandum a document that he styled a "Classified Annex." The CIA determined that this document did, indeed, contain classified information. *See* Koch Decl. ¶ 37 & Exh. H. The fact that plaintiff was not an "authorized holder" of that classified information does not negate the fact that the information is in fact classified.

Memorandum indicating that the views expressed therein were his own and not the Agency's.  If

the Court construes this as an independent APA claim (distinct from the rest of that APA Count

contending that the CIA failed to abide by the alleged 30-day requirement), it should dismiss this

claim under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

As noted *supra*, Plaintiff signed a Secrecy Agreement that requires him to submit his nonofficial

writings to the Agency for prepublication review.  The regulation governing that prepublication

review process clearly requires plaintiff to include the *exact disclaimer* that the PRB instructed

plaintiff to insert.  It states:

> Authors are required, unless waived in writing by the PRB, to publish the
> following disclaimer:
>
> > All statements of fact, opinion, or analysis expressed are those of
> > the author and do not reflect the official positions or views of the
> > Central Intelligence Agency (CIA) or any other U.S. Government
> > agency.  Nothing in the contents should be construed as asserting
> > or implying U.S. Government authentication of information or
> > Agency endorsement of the author's views.  This material has been
> > reviewed by the CIA to prevent the disclosure of classified
> > information.

*See* Koch Decl. Exh C, ¶ 2.b.(4).  Yet plaintiff refused.  *See id.* ¶ 35.

Moreover, plaintiff's challenge to the disclaimer would fail as a matter of law even if the

CIA regulation did not expressly require it.  Such disclaimers are less restrictive of First

Amendment rights than prepublication review requirements themselves.  *See Weaver v. U.S.*

*Information Agency*, 87 F.3d 1429, 1453-54 (D.C. Cir. 1996) (Wald, J., dissenting) (requirement

that authors insert "a specific statement to the effect that the opinions and views expressed are

the employee's own and not necessarily those of the agency" is a less restrictive alternative to a

scheme of prepublication review).  Because prepublication review of the writings of current and

former CIA employees is clearly constitutional, *see, e.g.*, *Snepp*, 444 U.S. at 510 n.3, *a fortiori*, a less-restrictive disclaimer requirement must also pass constitutional muster.

Finally, even if such a disclaimer could violate the First Amendment in certain contexts, It would still be constitutional in the context of the CIA's prepublication review process. The Supreme Court has noted that the CIA, in order to protect national security interests, retains latitude to impose requirements that might otherwise violate the First Amendment. "[E]ven in the absence of an express [secrecy] agreement" the CIA could "protect substantial government interests by imposing reasonable restrictions on employee activities that in other contexts might be protected by the First Amendment." *Id.* The need to ensure that current and former CIA employees who have or had access to sensitive national security information do not publish personal documents appearing to be official Agency records (which carry in the imprimatur of the U.S. Government), certainly qualifies as a "substantial government interest[]." And it is an interest that is directly implicated in this case. As noted, plaintiff's Memorandum is styled as a document from "Franz Boening, Central Intelligence Agency," and was distributed to various senior agency officials. *See* Koch Decl. ¶ 19. Plaintiff himself describes the Memorandum as being "drafted for the consumption of the Director, CIA, and numerous senior CIA officials." Compl. ¶ 6. Hence, a reader might easily mistake the Memorandum as having been created as part of official Agency business. Indeed, even the CIA's Agency Release Panel initially assumed, because plaintiff submitted the Memorandum "in an official looking format . . . apparently in his capacity as a CIA employee," that it constituted an official document that could be subject to a classification challenge under the Executive Order. Koch Decl. ¶ 23. In light of that ambiguity, the CIA's request that plaintiff remove the Memorandum from its current format

and include an explicit disclaimer was reasonable and, therefore, not in violation of the First Amendment or APA.[12]

## II. DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FIRST AMENDMENT CLAIMS

### A. Plaintiff Has No First Amendment Right To Publish Classified Information

Plaintiff's First Amendment claim fails for the simple reason that his Memorandum contains properly classified information. Plaintiff is bound by a Secrecy Agreement designed to prevent the unlawful disclosure of classified information relating to the government's foreign relations and intelligence activities, sources, and methods. *See* Koch Decl., ¶ 7-10 & Exh. A. That Agreement – which he signed knowingly and voluntarily – requires plaintiff to submit any nonofficial (*i.e.*, personal) writings to the CIA for review prior to publication. *Id.* It is well-settled that this prepublication review requirement passes constitutional muster. *See, e.g., Snepp,* 444 U.S. at 510 n.3 (prepublication review requirement imposed upon government employees with access to classified information is not an unconstitutional prior restraint); *McGehee*, 718 F.2d at 1146 (upholding against First Amendment challenge the CIA's prepublication review scheme). The cases upholding this sort of prepublication review recognize that "[t]he Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." *Snepp*, 444 U.S. at 510 n.3; *see also*

---

[12] Moreover, contrary to plaintiff's suggestion, *see* Compl. ¶ 19, the CIA's request that plaintiff include this disclaimer and remove the Memorandum from its official-looking format is not inconsistent with the conclusion that whistleblower memoranda are nonofficial (*i.e.*, personal) documents. On the contrary, the CIA's reasonable request that plaintiff eliminate any suggestion that the Memorandum is an official Agency document follows *directly from* the conclusion that whistleblower complaints are personal, rather than official, documents.

*Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988) (government has a compelling interest in protecting the confidentiality of secret information).  And it is equally well-settled that, even in the absence of such a Secrecy Agreement, plaintiff would have no First Amendment right to publish properly classified information.  *See Stillman*, 319 F.3d at 548 ("If the Government classified the information properly, then [plaintiff] simply has no first amendment right to publish it"); *see also Snepp*, 444 U.S. at 510 n. 3 ("[E]ven in the absence of an express [secrecy] agreement – the CIA could have acted to protect substantial government interests by imposing reasonable restrictions on employee activities that in other contexts might be protected by the First Amendment");  *McGehee*, 718 F.2d at 1143 ("[T]he CIA censorship of "secret" information contained in former agents' writings and obtained by former agents during the course of CIA employment does not violate the first amendment"); *Stillman*, slip op. at 11 (D.D.C. 2007) ("Courts have uniformly held that current and former government employees have no First Amendment right to publish properly classified information to which they gain access by virtue of their employment.").

Because plaintiff has no First Amendment right to publish classified information, the only relevant question presented by plaintiff's First Amendment claim is whether the information contained in his Memorandum is properly classified.  As demonstrated herein and in the Classified DiMaio Declaration, plaintiff's Memorandum contains properly classified information.  Therefore, his First Amendment claim must fail.

### B.    The Government's Classification Decisions Are Entitled To Utmost Deference

The Executive Branch's classification decisions are entitled to substantial deference.  *See, e.g.*, *Salisbury*, 690 F.2d at 973 (The classification of information "is a matter as to which the

agency has a large measure of discretion").  This judicial deference is rooted in three well-established principles.

First, the primacy of the Executive Branch in matters of national security and foreign relations is enshrined in the Constitution and in judicial precedent:

> In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation . . . the nature of transactions with foreign nations, moreover, requires caution and unity of design, and their success frequently depends on secrecy and dispatch . . . [The President] has his agents in the form of diplomatic, consular and other officials.  Secrecy in respect of information gathered by them may be highly necessary, and the premature disclosure of it productive of harmful results.

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319, 320 (1936) (internal quotations marks omitted); *see also Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial.  Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative").  Accordingly, courts have recognized that the Executive Branch's ability to maintain secrecy is essential.  *See Curtiss-Wright Export Corp.*, 299 U.S. at 320.  Moreover, the Executive Branch's familiarity with matters of foreign relations and national security means that it has accumulated an expertise on the impact of the disclosure of particular classified information.  *See Egan*, 484 U.S. at 529 (judgments as to harm that would result in the disclosure of certain information "must be made by those with the necessary expertise in protecting classified information"); *Salisbury*, 690 F.2d at 970 ("'[e]xecutive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of public disclosure of a particular classified record'" (quoting S. Rep. No. 1200, 93rd Cong., 2d Sess. 12 (1974)).

Second, in contrast to the Executive Branch's experience, courts have recognized that judges are in no position to second-guess the national security and foreign relations concerns articulated by the Executive Branch.  As the D.C. Circuit recently explained:

> America faces an enemy just as real as its former Cold War foes, with capabilities beyond the capacity of the judiciary to explore . . . . It is abundantly clear that the government's top counterterrorism officials are well-suited to make this predictive judgment. Conversely, the judiciary is in an extremely poor position to second-guess the executive's judgment in this area of national security.

*Center for Nat'l Sec. Studies, et al. v. U.S. Dep't of Justice*, 331 F.3d 918, 928 (D.C. Cir. 2003).

The Fourth Circuit reached a similar conclusion when it explained that:

> [t]he significance of one item of information may frequently depend upon knowledge of many other items of information.  What may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context.  The courts, of course, are ill-equipped to become sufficiently steeped in foreign intelligence matters to serve effectively in the review of secrecy classifications in that area.

*Marchetti*, 466 F.2d at 1318; *see also Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999) ("Mindful that courts have little expertise in either international diplomacy or counterintelligence operations, we are in no position to dismiss the CIA's facially reasonable concerns" about the harm that disclosure could cause to national security); *Krikorian v. Dep't of State*, 984 F.2d 461, 464 (D.C. Cir. 1993) ("'Judges, moreover, lack the expertise necessary to second-guess such agency opinions in the typical national security FOIA case.'" (citation omitted)); *McGehee*, 718 F.2d at 1149 ("[J]udicial review of CIA classification decisions, by reasonable necessity, cannot second-guess CIA judgments on matters in which the judiciary lacks expertise").

Only the nation's intelligence community has a complete picture of which disclosures pose a danger to national security.  Courts commonly refer to this as the "mosaic theory" of intelligence:

> It requires little reflection to understand that the business of foreign intelligence gathering in this age of computer technology is more akin to the construction of a mosaic than it is to the management of a cloak and dagger affair.  Thousands of bits and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling clarity how the unseen whole must operate. . . . 'The courts, of course, are ill-equipped to become sufficiently steeped in foreign intelligence matters to serve effectively in the review of secrecy classifications in that area.'

*Halkin v. Helms*, 598 F.2d 1, 8 (D.C. Cir. 1978) (quoting *Marchetti*, 466 F.2d at 1318); *see also McGehee*, 718 F.2d at 1148-49 ("Due to the mosaic-like nature of intelligence gathering, for example, what may seem trivial to the uninformed may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in context." (internal quotations and citations omitted)).  In short, it is the nation's intelligence experts who are in a position to determine what particular fact or bit of information may compromise national security in a particular context.  If there is no reason to question the credibility of the experts, a court should hesitate to substitute its judgment of the sensitivity of the information for that of the government.  Third, judicial deference to executive classification decisions is especially important because of the severity of the consequences that may result from the disclosure of classified information.  "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation."  *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Secretary of State*, 378 U.S. 500, 509 (1964)).  Consequently, the Executive Branch has a "compelling interest in withholding national security information from unauthorized persons in the course of executive business," *Egan*, 484 U.S. at 527 (citing cases), as well as

-30-

preserving the confidentiality essential to the effective operation of our foreign relations and foreign intelligence. *See CIA v. Sims*, 471 U.S. 159, 175 (1985); *see also Snepp*, 444 U.S. at 512 n.7 ("[T]he CIA . . . is an agency thought by every President since Franklin D. Roosevelt to be essential to the security of the United States and – in a sense – the free world.  It is impossible for a government wisely to make critical decisions about foreign policy and national defense without the benefit of dependable foreign intelligence."); *Center for Nat'l Sec. Studies*, 331 F.3d at 929 ("'Things that did not make sense to the District Judge would make all too much sense to a foreign counter-intelligence specialist who could learn much about this nation's intelligence-gathering capabilities from what these documents revealed about sources and methods'" (citation omitted)).

### C.      The Information In Plaintiff's Memorandum Is Properly Classified

Applying the proper amount of deference to the declarations submitted by CIA to explain its classification determinations with respect to plaintiff's Memorandum, it is clear that the Agency's decision satisfies the Executive Order's standards for classification.

Executive Order 12958, as amended, contains four conditions for the classification of information: (1) the information must be classified by an "original classification authority"; (2) the information must be "owned by, produced by or for, or is under the control of" the government; (3) the information must fall within one of the authorized classification categories under section 1.4 of the order; and (4) the original classification authority must "determine[] that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and must be "able to identify or describe the damage."  Exec. Order No. 12958, as amended by Exec. Order 13292, § 1.1, 68 Fed. Reg. 15315 (2003).   All four requirements have been met here.

### 1. Original Classification Authority

CIA officials with original classification authority have reviewed plaintiff's Memorandum and determined that it is properly classified. The Executive Order defines "Original Classification Authority" as those individuals "authorized in writing . . . by agency heads or other officials designated by the President, to classify information in the first instance." *Id.*, § 6.1(cc). Ralph S. DiMaio, the Information Review Officer for the CIA's National Clandestine Service, possesses this original classification authority. *See* Unclassified DiMaio Decl. ¶ 3. He has determined that the information in plaintiff's memorandum is properly classified at the SECRET level. *Id.* ¶ 5, 13; *see also* Classified DiMaio Decl. ¶ 10. Moreover, the DO/IRO, who initially reviewed the Memorandum and determined that it was classified, possessed original classification authority. *See* Koch Decl. ¶ 22.

### 2. Under the Control of the Government

The information at issue in plaintiff's Memorandum is information within the "control of the government." The Executive Order defines "control" as "the authority of the agency that originates information . . . to regulate access to information." Exec. Order 12958, as amended, § 6.1(s). Here, plaintiff voluntarily signed a Secrecy Agreement in which he agreed not to disclose classified government information that he was given access to or obtained during the course of his affiliation with the CIA. *See* Koch Decl., Exh A. That agreement remains binding on plaintiff even after the termination of his relationship with the U.S. Government. *See* Koch Decl. ¶ 7 & Exh. A. Plaintiff was also required under his Secrecy Agreement to submit any writings that he had prepared for public disclosure to the government for prepublication review. *Id.* Thus, the portions of the plaintiff's Memorandum either describing the government's intelligence activities, sources and methods or impacting foreign relations fall within the purview of his

Secrecy Agreement's prepublication review requirements, and are therefore under the "control" of the government, thereby satisfying the second condition of the Executive Order.  *See* Unclassified DiMaio Decl. ¶10.

Plaintiff's passing assertions that he did not have access to the classified information in his Memorandum while employed at the CIA, *see* Compl. ¶ 8, are insufficient to defeat the Agency's control over that information.  As the Fourth Circuit stated in *Knopf v. Colby*, 509 F.2d 1362, 1371 (4th Cir. 1975), *cert. denied* 421 U.S. 992 (1975), former government employees should not "be heard to say that he did not learn of information during the course of employment if the information was in the Agency and he had access to it."  Indeed, even if plaintiff could prove that he never accessed the information contained in his Memorandum, that fact still would not negate the Agency's control.  The Fourth Circuit made this point in no uncertain terms in a follow-up case to the *Knopf* litigation, holding that former CIA employees bound by secrecy agreements "cannot disclose classified information to which they had access during their public service, *even though they may have acquired such information elsewhere*."  *Colby v. Halperin*, 656 F.2d 70, 72 (4th Cir. 1981) (emphasis added).

       3.     *Within A Classification Category of Section 1.4*

The information in plaintiff's Memorandum falls squarely within one or more of the classification categories under § 1.4 of the Executive Order.   Under § 1.4 of the Order, information shall be considered for classification if it concerns at least one of the following:

> (a) military plans, weapons systems, or operations;
> (b) foreign government information;
> (c) intelligence activities (including special activities), intelligence sources or methods, or cryptology;

(d) foreign relations or foreign activities of the United States, including confidential sources;
(e) scientific, technological, or economic matters relating to the national security, which includes defense against transnational terrorism;
(f) United States Government programs for safeguarding nuclear materials or facilities;
(g) vulnerabilities or capabilities of systems, installations, projects or plans relating to the national security, which includes defense against transnational terrorism; or
(h) weapons of mass destruction.

Exec. Order 12958, as amended, § 1.4. As described more fully in the Agency's declarations, the information at issue in plaintiff's Memorandum, which, in his words, "include[s] the name and country of origin that was the subject of [plaintiff]'s memorandum," Compl. ¶ 11, is either (1) foreign government information (falling under § 1.4(b) of the Executive Order); (2) information concerning intelligence activities, sources, or methods (falling under § 1.4(c)); or (3) information concerning foreign relations or foreign activities of the United States, including confidential sources (falling under § 1.4(d)). *See* Unclassified DiMaio Decl. ¶ 11, 14.

### 4.    *Identifiable Harm To National Security*

Finally, as explained in both the classified and unclassified declarations submitted in this case, disclosure of the information contained in plaintiff's Memorandum could reasonably be expected to cause serious damage to national security.[13]  *See* Unclassified DiMaio Decl. ¶ 12; Classified DiMaio Decl. ¶ 10.

The government's judgment that the publication of information contained in plaintiff's Memorandum could cause serious harm to our national security is neither vague nor speculative.

_____

[13] The information at issue in plaintiff's Memorandum is information classified at the "Secret" level. *See* Unclassified DiMaio Decl. ¶ 5, 13. Executive Order 12958, as amended, provides that "Secret" level classification shall be applied to information, "the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security that the original classification authority is able to identify or describe." Exec. Order 12958, as amended, § 1.2(a)(2).

*Contra* Compl. ¶ 25.  Courts have held that, in cases concerning national security, the harm alleged by the government need not "rise to the level of certainty," but must merely be "real and serious enough to justify the classification decision."  *McGehee*, 718 F.2d at 1150.  As the D.C. Circuit noted:

> A court must take into account . . . that any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm rather than an actual past harm. If we were to require an actual showing that particular disclosures . . . have in the past led to identifiable concrete harm, we would be overstepping by a large measure the proper role of a court in a national security FOIA case.

*Halperin v. CIA*, 629 F2d 144, 149 (D.C. Cir. 1980); *see also Earth Pledge Foundation v. CIA*, 988 F. Supp. 623, 628 (D.D.C. 1996), *aff'd* 128 F.3d 788 (D.C. Cir. 1997) (citing *Halperin*); *Klaus v. Blake*, 428 F. Supp. 37, 38 (D.D.C. 1976) ("The national security issue is necessarily speculative.  Intelligence deals with possibilities.  Our knowledge of the attitudes of and information held by our opponents is uncertain. Determinations of what is and what is not appropriately protected in the interests of national security involves an analysis where intuition must often control in the absence of hard evidence. This intuition develops from experience quite unlike that of most Judges.").

Thus, the law simply requires that a responsible Executive Branch official make a reasoned judgment that it is in the interest of the United States to maintain the confidentiality of the information relating to intelligence activities, sources and methods, and foreign relations of the United States at issue in plaintiff's Memorandum.   The declarations submitted in this case do precisely that, and they explain that disclosure of the information identified in the Memorandum could reasonably be expected to seriously damage national security by undermining that confidentiality.

As noted, plaintiff contends that the material redacted from his memorandum concerns, *inter alia*, "the name and country of origin" of the individual with whom plaintiff alleges the CIA "maintained a special relationship." Compl. ¶¶ 7, 11. This type of information clearly implicates the United States' concerns surrounding the protection of intelligence sources and methods, as well as information relating to foreign relations or foreign activities. Courts have repeatedly recognized that disclosing such information can result in substantial harms to the United States' interests. *See, e.g.*, *Snepp*, 444 U.S. at 512 ("[T]he [government] obtains information from the intelligence services of friendly nations and from agents operating in foreign countries. The continued availability of these foreign sources depends upon the [government's] ability to guarantee the security of information that might compromise them . . ."); *Salisbury*, 690 F.2d at 971-72 (upholding classification decision to protect future efficacy of an intelligence method); *Military Audit Project v. Casey*, 656 F.2d 724, 747 (D.C. Cir. 1981) (court protected dates on which GLOMAR explorer activities were conducted because "it would seem obvious that a foreign intelligence agency would be in a better position to crack the CIA's funding system if it know the dates on which secret actions took place"); *Curtiss-Wright Export Corp.*, 299 U.S. at 320-321 ("'[t]he nature of foreign discussions requires caution, and their success must often depend on secrecy; and even when brought to a conclusion a full disclosure of all the measures, demands, or eventual concessions which may have been proposed or contemplated would be extremely impolitic; for this might have a pernicious influence on future discussions, or produce immediate inconveniences, perhaps danger and mischief, in relation to other powers.'" (citation omitted)); *McGehee*, 718 F.2d at 1149-50 ("We also believe, on the basis of plausible scenarios put forward in the CIA affidavit, that the United States could suffer significant strategic and diplomatic setbacks as a result of the disclosure" of the information at issue).

-36-

**D.    The Classified Information In The Plaintiff's Memorandum Has Not Been Officially Released By The Government Into The Public Domain**

Plaintiff alleges that he has a First Amendment right to publish the classified material in his Memorandum because that information "was supported by open source material." Compl. ¶ 23. The implication of this argument is that, so long as some of the information contained in the Memorandum has been publicly discussed, it cannot properly be deemed classified. This allegation misunderstands the law; information is not considered to be "in the public domain *unless there had been official disclosure of it.*" *Knopf*, 509 F.2d at 1370 (emphasis added). "Official disclosure" does not simply mean public discussion of the information by overt sources. On the contrary, the D.C. Circuit applies a three-part test to determine whether information has entered the public domain: (1) the information at issue must be as specific as the information that has been publicly disclosed; (2) the disputed information must exactly match the information publicly disclosed, *e.g.*, it must involve the same time period or same operation; and (3) the information sought to be released must already have been publicly released through "an official and documented disclosure." *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990) (citing *Afshar v. Dep't of State*, 702 F.2d 1125, 1133 (D.C. Cir. 1983)). Moreover, the plaintiff, not the government, bears the burden of proving that each of these three elements has been met. *See Afshar*, 702 F.2d at 1130.

This official public disclosure requirement has been applied consistently and stringently by this Circuit in cases where plaintiffs seek the release of classified information. *See Public Citizen v. Dep't of State*, 11 F.3d 198, 202 (D.C. Cir. 1993) (cataloging cases and describing "stringency" of the test). Indeed, even in instances where the government has revealed some classified information about a topic, the D.C. Circuit has consistently held that the government

may not be compelled to release other, still-classified information about that very same subject. *See Ctr. for Nat'l Security Studies*, 331 F.3d at 930-31 ("The disclosure of a few pieces of information in no way lessens the government's argument that complete disclosure would provide a composite picture of its investigation and have negative effects on its investigation."); *Salisbury*, 690 F.2d at 971 ("The fact of disclosure of a similar type of information in a different case does not mean that the agency must make its disclosure in every case."); *Military Audit Project*, 656 F.2d at 752-53 (rejecting the suggestion that "because the government has revealed some documents it previously considered too sensitive to release, it now must reveal all").

This distinction "between official and unofficial disclosures" is "critical." *Fitzgibbon*, 911 F.2d at 765. Courts will find official disclosures only where the government itself has released the information in question. *See* Exec. Order 12958, as amended, § 1.1(b) ("Classified information shall not be declassified automatically as a result of any unauthorized disclosure of identical or similar information."). Disclosure by media reports, or even in books written by former intelligence officers, has been deemed insufficient to constitute public disclosure. *See Knopf*, 509 F.2d at 1370 (unofficial revelations and/or speculation in the press does not constitute official disclosure); *Military Audit Project*, 656 F.2d at 743 (same); *Afshar*, 702 F.2d at 1133 (information contained in books written by former government officials in their personal capacities are not official and documented disclosures by an agency for purposes of determining whether information has been publicly disclosed by the government); *Phillippi v. CIA*, 655 F.2d 1325, 1330-31 (D.C. Cir. 1981) (same).

Indeed, if anything, the fact that plaintiff is a former CIA employee only heightens the need for CIA to insist that any personal writings cite to specific, open-source materials. As the Fourth Circuit explained:

-38-

It is one thing for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position to know of it officially to say that it is so. The reading public is accustomed to treating reports from uncertain sources as being of uncertain reliability, but it would not be inclined to discredit reports of sensitive information revealed by an official of the United States in a position to know of what he spoke.

*Knopf*, 509 F.2d at 1370; *see also id.* ("It is true that others may republish previously published [press] material, but such republication by strangers to it lends no additional credence to it. [Plaintiffs] are quite different, for their republication of the material would lend credence to it, and, unlike strangers referring to earlier unattributed reports, they are bound by formal agreements not to disclose such information."). For this reason, as noted *supra*, CIA regulations specifically provide that the PRB can demand that employees provide open source citations for classified information that they maintain is in the public domain, and that failure to provide such citations is by itself grounds to deny permission to publish. *See, e.g.*, Koch Decl., Exh. B ¶¶ 2.c.(5), 2.i.(3).

In the present case, plaintiff cannot demonstrate that the information contained in his Memorandum has been officially released to the public. Defendant can not provide further detail in this public brief because the public disclosure arguments themselves risk disclosing the information that the government must protect. *See Hayden v. National Security Council, et al.*, 608 F.2d 1381, 1384 (D.C. Cir. 1979). However, as described in the Classified DiMaio Declaration, the material in question remains properly classified by the CIA. *See* Classified DiMaio Decl. ¶ 10.

In light of the fact that the information in plaintiff's Memorandum is properly classified and has not been officially released into the public domain, the CIA did not run afoul of the First Amendment when it denied plaintiff the right to publish his Memorandum. On the contrary, it

acted reasonably and attempted to find a way to accommodate plaintiff's desire to publish his Memorandum, while at the same time protecting the properly classified information. The Agency provided plaintiff a clear path toward publication of that Memorandum, stating that he could do so as long as he would (1) either delete, or provide specific open-source pinpoint citations for, each piece of classified information in his Memorandum, (2) remove the memorandum from its official-looking government format (*i.e.*, the fact that it was styled as being written by a CIA employee and sent to various senior CIA officials), and (3) include a disclaimer stating that the opinions expressed therein were his own personal views and not those of the Agency itself. *See* Koch Decl. ¶¶ 34-37 & Exh. F. Plaintiff refused to make those changes, however. *See* Koch Decl. ¶ 36 (plaintiff "has not to date[] revised his memorandum to include the specific open source citations linked to each sentence and paragraph as required by the CIA"). Plaintiff left the CIA with two stark choices: permit him to publish the Memorandum as written, which contains classified information, or deny him permission to publish it. Because the CIA properly chose the latter approach over the former, defendant is entitled to summary judgment on plaintiff's First Amendment claim.

## III.    PLAINTIFF'S COUNSEL IS NOT ENTITLED TO SEE THE CLASSIFIED MATERIALS AT ISSUE IN THIS CASE

Almost as an aside, plaintiff asserts that his counsel must be allowed access to "certain documents asserted to be classified by the CIA." *See* Compl. ¶ 43. This request should be refused. The D.C. Circuit in *Stillman* outlined the procedures to be used in prepublication cases such as the present dispute. This court must "inspect the [materials submitted for prepublication review] and consider any pleadings and declarations filed by the Government, as well as any materials filed by [plaintiff]" in order to determine "whether it can, consistent with the protection

of [plaintiff]'s first amendment rights to speak and to publish, and with the appropriate degree of deference owed to the Executive Branch concerning classification decisions, resolve the classification issue without the assistance of plaintiff's counsel." *Stillman*, 319 F.3d 546, 548-49 (D.C. Cir. 2003). The D.C. Circuit made clear that principles of constitutional avoidance require this Court to attempt to resolve the classification issues in this *ex parte* manner before addressing the question of whether plaintiff has a constitutional right for his counsel to assist the court in making that determination. *Id.* As the defendant's affidavits provide the Court with sufficient information to determine that plaintiff's Memorandum is properly classified in its current form, *see supra*, this court need not reach the constitutional question the D.C. Circuit reserved in *Stillman*.[14]

## CONCLUSION

For all the foregoing reasons, this Court should dismiss plaintiff's APA claims, and should award summary judgment to the defendant on plaintiff's First Amendment claim.

Dated: <u>July 20, 2007</u>                    Respectfully Submitted,

                                               PETER D. KEISLER
                                               Assistant Attorney General

                                               JEFFERY A. TAYLOR
                                               United States Attorney

                                               VINCENT M. GARVEY
                                               Deputy Branch Director

Of Counsel:                                    **/s/ Michael P. Abate**
Vesper Mei                                     MICHAEL P. ABATE
Office of the General Counsel                  (IL Bar No. 6285597)
Central Intelligence Agency                    Trial Attorney, Civil Division

---

[14] If the court were to reach the merits of that constitutional question, defendant requests the right to submit additional briefing on that narrow point.

Washington, DC  20505                    U.S. Department of Justice
                                         P.O. Box 883
                                         20 Massachusetts Ave., N.W., Room 7302
                                         Washington, D.C. 20530
                                         Telephone: (202) 616-8209
                                         Facsimile: (202) 616-8470

                                         *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of July 2007, I caused the foregoing Defendant's Motion to Dismiss Under Rule 12 and Motion for Summary Judgment Under Rule 56 to be served on plaintiff's counsel of record electronically by means of the Court's ECF system.

/s/ Michael P. Abate

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| FRANZ BOENING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 07-0430 (EGS) |
| | ) |
| CENTRAL INTELLIGENCE AGENCY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DEFENDANT'S LOCAL RULE 7(h) STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to LCvR 7(h), defendant submits this statement of material facts as to which there is no genuine issue:

1.    Plaintiff Franz Boening was employed by defendant Central Intelligence Agency ("CIA" or "Agency") from 1980 until 2005.  *See* Declaration of Scott A. Koch ("Koch Decl.") ¶¶ 7, 32; Compl. ¶ 3.

2.    In 1980, plaintiff executed a Secrecy Agreement that obligates him to submit to the Agency any materials that "contain any mention of intelligence data or activities, or contain data which may be based upon information classified pursuant to Executive Order."  Koch Decl. ¶ 9 & Exh. A ¶ 5.  The Agreement forbids plaintiff from taking any additional steps towards publication of such materials "without written permission to do so from the [CIA]."  *Id.*

3.    On May 10, 2001, plaintiff submitted a memorandum with three annexes and a bibliography ("May 10, 2001 Memorandum") to the CIA's Office of Inspector General for review as an "urgent concern" under section 17(d)(5) of the CIA Act, 50 U.S.C. § 403q(d)(5).

-1-

*See* Koch Decl. ¶¶ 19-20. The OIG determined that the May 10, 2001 Memorandum did not represent an "urgent concern." *Id.* ¶ 21.

4.     The Information Review Officer of the Directorate of Operations ("DO/IRO"), who possessed original classification authority, then reviewed the document and placed brackets around the portions he deemed classified. *See* Koch Decl. ¶ 22.

5.     Plaintiff challenged the CIA's determination that the document was classified by filing a classification challenge with the Agency Release Panel ("ARP") under Executive Order 12958, as amended. *See* Koch Decl. ¶ 23.

6.     The Agency determined that plaintiff's Memorandum was not properly subject to a classification challenge under the Executive Order because it was a personal record, rather than official Agency document. *See* Koch Decl. ¶ 27. The ARP then forwarded the Memorandum to the Information Review Officer for the Directorate of Science and Technology ("DS&T/IRO") for prepublication review as a nonofficial document. *Id.* ¶ 28. The DS&T/IRO concluded that the document was properly classified and could not be published in its current form. *Id.* ¶ 30.

7.     Plaintiff appealed the ARP's decision that it could not adjudicate the classification challenge to the Interagency Security Classification Appeals Panel ("ISCAP"). *See* Koch. Decl. ¶ 31. The Executive Director of the ISCAP informed plaintiff by letter dated February 4, 2004 that plaintiff could not challenge the Memorandum's classification because he was not an "authorized holder" of the information contained therein. *Id.* ¶ 32 & Exh. D. Nevertheless, he exercised his own independent authority to consider such a classification challenge and determined that the CIA properly classified the Memorandum. *Id.*

8.     On November 22, 2004, plaintiff submitted the May 10, 2001 Memorandum to the CIA for prepublication review as a nonofficial document. *See* Koch Decl. ¶ 33.

9.      By letter dated January 5, 2006, the Chairman of the CIA's Publication Review Board ("PRB") notified plaintiff that if he wanted to publish his May 10, 2001 Memorandum he would have to rewrite that Memorandum "outside of the government memo format stating in [his] own words what [he] desire[s] to communicate," and that he would have to provide "specific, open source citations (author, title, source, date, page) for the statements [he] wish[es] to make."  Koch Decl. ¶ 34 & Exh. E.  The Chairman specifically instructed plaintiff that the citations "must be placed in the body of the text linked to specific sentences and paragraphs." *Id.*

10.     When Plaintiff failed to make the necessary changes, the PRB made a final decision with respect to the Memorandum as he submitted it in November 2004.  The PRB denied permission to publish the document in that form, notifying plaintiff that if he wished to publish them he would have to (1) delete specific information identified by the PRB, and (2) include a disclaimer stating that his writings constitute his own opinions and do not represent the views of the Agency or the U.S. Government.  *See* Koch Decl. ¶ 35 & Exh. F.

11.     Plaintiff responded to the PRB by email on June 29, 2006 stating that his May 10, 2001 Memorandum was based on open sources and challenging the PRB's assertion that the subject of that memorandum could not be mentioned by name.  *See* Koch Decl. ¶ 36.  Plaintiff also inquired into the PRB's review of the "Classified Annex" he submitted along with his memorandum.

12.     The Chairman of the PRB responded on June 30, 2006, informing Plaintiff that he could still "get[] [his] message out" if he would rewrite his May 10, 2001 Memorandum "in a different format, outside the official-looking memo-type one it currently is in" and if he would "attribute those statements to open sources."  Koch Decl. ¶ 37 & Exh. G.

-3-

13.     The Chairman of the PRB wrote to plaintiff on August 11, 2006 informing him that the material contained in the "Classified Annex" was properly classified.  *See* Koch Decl.¶ 38 & Exh. H.

14.     The CIA has determined that plaintiff's Memorandum contains information that:

(a)     has been classified by officials with original classification authority, including Ralph S. DiMaio and the DO/IRO (who initially reviewed the Memorandum), *see* Unclassified DiMaio Decl. ¶ 3; Classified DiMaio Decl. ¶ 5, 13; Koch Decl. ¶ 22;

(b)     remains under the control of the CIA, *see* Unclassified DiMaio Decl. ¶ 10;

(c)     falls within at least one of three of the categories of classified information under § 1.4 of Executive Order 12958, as amended, including: (i) § 1.4(b) (foreign government information); (ii) § 1.4(c) (information concerning intelligence activities, sources, or methods; and (iii) § 1.4(d) (information concerning foreign relations or foreign activities of the United States, including confidential sources), *see* Unclassified DiMaio Decl. ¶ 11, 14; and

(d)     if disclosed, could reasonably be expected to cause serious damage to the national security, *see* Unclassified DiMaio Decl. ¶ 12; Classified DiMaio Decl. ¶ 10.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFERY A. TAYLOR
United States Attorney

-4-

VINCENT M. GARVEY
Deputy Branch Director

Of Counsel:                                        **/s/ Michael P. Abate**
Vesper Mei                                         MICHAEL P. ABATE
Office of the General Counsel                      (IL Bar No. 6285597)
Central Intelligence Agency                        Trial Attorney, Civil Division
Washington, DC  20505                              U.S. Department of Justice
                                                   P.O. Box 883
                                                   20 Massachusetts Ave., N.W., Room 7302
                                                   Washington, D.C. 20530
                                                   Telephone: (202) 616-8209
                                                   Facsimile: (202) 616-8470

                                                   *Attorneys for Defendants*

Dated: July 20, 2007

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| FRANZ BOENING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 07-0430 (EGS) |
| | ) |
| CENTRAL INTELLIGENCE AGENCY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**ORDER**

The Court, having fully considered Defendant's Motion to Dismiss Under Rule 12 and for Summary Judgment Under Rule 56 , finds Defendant's Motion to be well-taken, and it is hereby ORDERED:

(1)    Summary Judgment is granted to defendant on plaintiff's First Amendment claim (Count One of the Complaint) pursuant to Fed. R. Civ. P. 56;

(2)    Counts Two and Three of the Complaint (Administrative Procedure Act) are dismissed pursuant to Fed. R. Civ. P. 12.

IT IS SO ORDERED, this _____ day of _____, 2007.

_____
HON. EMMET G. SULLIVAN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRANZ BOENING,                      )
                                    )
            Plaintiff,              )
                                    )
      v.                            )      Civil Action No.
                                    )      1:07CV00430 (EGS)
CENTRAL INTELLIGENCE AGENCY,        )
                                    )
            Defendant.              )
_____)

## DECLARATION OF SCOTT A. KOCH
## INFORMATION AND PRIVACY COORDINATOR
## CENTRAL INTELLIGENCE AGENCY

I, SCOTT A. KOCH, hereby declare and say:

1.    I am the Chief, Public Information Programs

Division (PIPD), Information Management Services (IMS),

Office of the Chief Information Officer (CIO), Central

Intelligence Agency (CIA). I also serve as the CIA

Information and Privacy Coordinator (Coordinator). I have

held these positions since 9 August 2004.

2.    I have served with the United States Government

for approximately sixteen years and, in addition to my

current positions, have held other supervisory positions

with the CIA in the field of information review and

release. Under a written delegation of authority pursuant

to section 1.3(c) of Executive Order 12958,[1] I hold original

_____

[1] Executive Order 12958 was amended by Executive Order 13292, effective
March 25, 2003. See Exec. Order No. 13292, 68 Fed. Reg. 15315 (Mar.
28, 2003). All citations to Exec. Order No. 12958 are to the Order as

classification authority at the TOP SECRET level.
Therefore, I am authorized to make original classification
and declassification decisions.

3.   In my capacity as Chief of PIPD/IMS, I have
overall supervisory responsibility for the CIA's
Publications Review Board (PRB). The PRB reviews any
written, oral, electronic, or other presentation intended
for publication or public dissemination, whether personal
or official, that mentions CIA or intelligence data or
activities or material on any subject about which the
author has had access to classified information in the
course of his or her contact with the CIA. As part of my
official duties, I have overall responsibility for ensuring
that CIA administratively processes prepublication reviews
in accordance with the law and as efficiently as possible
with the personnel and resources available.

4.   In my capacities as Chief of PIPD/IMS and
Coordinator, I serve as the Executive Secretary of the
Agency Release Panel (ARP), which adjudicates
classification challenges filed with the CIA.  The
Coordinator, as Executive Secretary of the ARP, normally is

---

amended by Exec. Order No. 13292.  See Exec. Order No. 12958, 3 C.F.R.
333 (1996), *reprinted as amended in* 50 U.S.C.A. § 435 note at 180 (West
Supp. 2006).

the initial reception point for all classification challenges filed with the CIA.

    5.   Through the exercise of my official duties, I am familiar with this civil action and plaintiff's requests both through the Agency Release Panel (ARP) and the Publications Review Board (PRB) for approval to publish the memorandum that is the subject of this case.  I make the following statements based upon my personal knowledge, and information made available to me in my official capacity.

    6.   I am submitting this declaration to explain to the Court the procedures by which plaintiff submitted his May 10, 2001, memorandum for classification review by the CIA, and the processes that followed.  Parts I, II, and III of this declaration set forth plaintiff's obligations under his secrecy agreement, and the procedures for submitting official and nonofficial documents to the CIA for classification review.  Part IV of this declaration describes the review processes that plaintiff's memorandum actually underwent.  The May 10, 2001, memorandum was submitted twice to the CIA for classification review, once in May 2001 and again in November 2004, and was substantively reviewed at least five separate times inside the CIA, and at least once by authorities outside the CIA.

Each time it was reviewed, it was deemed properly
classified.

## I.   **PLAINTIFF'S SECRECY AGREEMENT AND OBLIGATIONS**

7.   As a condition of employment in a position of
special confidence and trust relating to the national
security, all CIA employees are required to sign a "Secrecy
Agreement" that obligates them to protect such information
from unauthorized disclosure.   The agreement applies both
during employment with the CIA and at all times thereafter.
Franz Boening signed such a secrecy agreement with the CIA
at the time of his employment in 1980.   This agreement is
Exhibit A to this declaration.

8.   Specifically, Mr. Boening agreed never to disclose
information or material "obtained . . . in the course of
. . . employment or other service with the Central
Intelligence Agency" that is classified, that he knows, or
has reason to know, should be classified, or that
identifies any person or organization who has or has had a
relationship with the United States government that the
government has taken affirmative measures to conceal.   Ex.
A.

9.   In furtherance of the secrecy agreement's
nondisclosure provision, the agreement also contains a
requirement that all current and former employees submit

materials that contain any mention of intelligence data or

activities, or that contain data that may be based upon

information classified pursuant to Executive Order, to the

CIA for review before nonofficial public disclosure of the

material.  Current and former employees must also receive

written permission from the CIA before taking any steps

toward public disclosure.  The agreement provides:

> As a further condition of the special confidence and
> trust reposed in me by the Central Intelligence
> Agency, I hereby agree to submit for review by the
> Central Intelligence Agency all information or
> materials . . . which contain any mention of
> intelligence data or activities, or contain data which
> may be based upon information classified pursuant to
> Executive Order, which I contemplate disclosing
> publicly or which I have actually prepared for public
> disclosure, either during my employment or other
> service with the Central Intelligence Agency or at any
> time thereafter prior to discussing it with or showing
> it to anyone who is not authorized to have access to
> it.  I further agree that I will not take any steps
> toward public disclosure until I have received written
> permission to do so from the Central Intelligence
> Agency.

Id.

10.  The prepublication review requirement extends,

but is not limited, to books, academic journal articles,

magazine articles, newspaper columns, letters to the

editor, book reviews, screenplays, speeches, interviews,

testimony, court filings, and other written or oral

disclosures.  Prior to approval for publication, such

5

materials and information shall not be disclosed to any other person.

11. Plaintiff's secrecy agreement notes that the purpose of the requirement is to allow the CIA to determine whether the materials intended for public disclosure contain information that the employee is required to protect. In signing the secrecy agreement, Plaintiff indicated that he understood that the CIA would respond to his requests for prepublication review within "a reasonable time."

## II. CLASSIFICATION CHALLENGES FOR OFFICIAL DOCUMENTS

12. Executive Order 12958, as amended, allows "[a]uthorized holders of information who, in good faith, believe that its classification status is improper" to bring a challenge "in accordance with agency procedures." E.O. 12958, Sec. 1.8(a). Through this provision, an authorized holder may "seek a review or otherwise challenge the classified status of information to further the interests of the United States Government." 32 C.F.R. § 1907.01(b). An authorized holder means "any member of any United States executive department . . . who holds a security clearance from or has been specifically authorized by the Central Intelligence Agency to possess and use on official business classified information." 32 C.F.R.

§ 1907.02(b).  A challenge is defined as "a request in the individual's official, not personal, capacity and in furtherance of the interests of the United States."  32 C.F.R. § 1907.02(d).  Such a challenge is to be directed to the CIA's Agency Release Panel, which would consider the challenge and communicate its decision to the authorized holder.  32 C.F.R. §§ 1907.03, 1907.21-1907.26.  An authorized holder of information has a right of appeal from the decision of the Agency Release Panel to the Interagency Security Classification Appeals Panel (ISCAP).  32 C.F.R. § 1907.31.

### III.  **THE PRB PROCESS**

13.  Prior to July 2005,[2] when the CIA revised its internal regulations,[3] all current and former Agency employees, and others obligated by contract, were required to submit for prior CIA review all materials intended for

---

[2] Mr. Boening made the submissions of the May 10, 2001 memorandum at issue here prior to the July 2005 revision of the CIA's internal regulations.  He received final notification of the PRB's decision in 2006, after the July 2005 revision.  Where relevant, this declaration will also discuss the regulations as set forth after the July 2005 revision occurred.

[3] Attached hereto as Exhibits B and C are true and accurate copies of the CIA's internal regulations governing the Prepublication Review process.  Exhibit B is dated and effective 14 March 1995 through 22 July 2005, and Exhibit C is dated and effective 22 July 2005 through 4 December 2006.  The regulations have been redacted to remove protected CIA information, none of which is related to the above-captioned matter.

nonofficial publication.[4]  Ex. B at 2.b.(1).  The regulation
required current employees to submit "material intended for
nonofficial publication through their supervisory chain of
command to their Deputy Director or Head of Independent
Office."  Id. at 2.d.(1).  Employees could also "elect
first to make submissions directly to the Chair of the PRB
only for determination of the necessity for any Agency
review."  Id.  If an employee chose the former method of
submission, his or her management could then submit the
material to the PRB for decision on publication.
Alternatively, the employee's Deputy Director or Head of
Independent Office could determine that public release of
the material was authorized, approve publication of the
material with deletions and/or changes, or disapprove
publication altogether.  Id. at 2.d.(2).

    14.  The Agency could deny permission for nonofficial
publication of any information obtained during the course
of employment with the CIA that had not "been placed in the
public domain by the U.S. Government and if disclosure
reasonably could be expected to harm the national security
interests of the United States."  Id. at 2.i.(1).  It could
not deny permission to publish solely because the statement

---

[4] Nonofficial publication is a work by anyone who has signed a CIA
secrecy agreement, who has prepared the work as a private individual,
and who is not acting in an official capacity.  Ex. C at 2.b.(6).

could be "embarrassing to or critical of the Agency." Id.
at 2.i.(2). In addition, for a current employee, the
Agency could "deny permission to publish statements or
expressions of opinion that could reasonably be expected to
impair the author's performance of duties, interfere with
the authorized functions of the CIA, or have an adverse
impact on the foreign relations or security of the United
States." Id. at 2.i.(4).

15. In July 2005, the Agency revised its
prepublication review guidelines. Ex. C. Under the new
guidelines, the PRB itself was to review submissions of
nonofficial, personal works both current and former
employees wrote. The new regulation eliminated the role a
current employee's managers formerly played. Id.

16. Prior to July 2005, the PRB consisted of a Chair
and senior representatives from the Directorate of
Operations, the Directorate of Administration, the
Directorate of Science and Technology, the Directorate of
Intelligence, the Office of the Associate Deputy Director
for Administration/Information Services, the Office of
Personnel Security, the office responsible for overseeing
the cover status of Agency employees, and a legal
representative. Ex. B at 2.e.(1). After the July 2005
revision, the PRB consisted of a Chair and an Executive

9

Secretary, as well as senior representatives from the
Director of CIA Area, the Directorate of Operations (DO),
the Directorate of Support, the Directorate of Science and
Technology, the Directorate of Intelligence, Security
Center, the office responsible for overseeing the cover
status of Agency employees, and a legal representative.
Ex. C at 2.c.(1).

    17.  The Agency adopts and implements all lawful
measures to protect from unauthorized disclosure
information that, if disclosed, could damage the national
security, and to ensure that individuals with access to
such information understand and comply with their
obligation not to disclose it.  Prior agency review of
material intended for nonofficial publication is a key
component of efforts to prevent unauthorized disclosures.
The purpose of prepublication review by the PRB is twofold:
to assist individuals in meeting their obligations and to
ensure that they do not disclose information damaging to
the national security.  In conducting prepublication
review, the Agency identifies information for deletion or
revision only to the extent necessary to protect
information the disclosure of which could harm national
security.

18.   In reviewing materials, the PRB prioritizes
short, time-sensitive submissions, such as editorial
opinions or letters to the editor, to ensure review as
expeditiously as possible.  Although the PRB attempts to
complete review of other nonofficial publications within 30
days of receipt, lengthy or complex submissions that
involve intelligence sources and methods may require a
longer time period for review, as CIA internal regulations
outline.  CIA's regulations do not, therefore, require the
completion of prepublication review within 30 days of
receiving a submission.

**IV.   HISTORY OF PLAINTIFF'S REQUESTS**

    **A.   May 10, 2001 Submission of May 10, 2001
Memorandum.**

19.   On May 10, 2001, Franz Boening provided copies of
his 25-page May 10, 2001 memorandum (with three addenda,
one a two-page "Classified Annex") to the Office of
Inspector General (OIG) Duty Officer.  The memorandum was
addressed to "Office of the Inspector General, Central
Intelligence Agency" and it was from "Franz Boening,
Central Intelligence Agency."  The memorandum further
indicated that Boening was providing informational copies
to the Director of Central Intelligence; the Executive
Director of the CIA; the Office of Congressional Relations;

the Deputy Director for Operations; the Chief, Latin

America Division, Directorate of Operations; and the

Counter-Narcotics Center.  The memorandum included a

"Bibliography," which listed fifty-five sources, but by and

large did not match those sources to portions of the

memorandum.  The author styled the memorandum as an "urgent

concern" under "the Whistleblower Provisions" "of the 1999

Intelligence Authorization Act."  The classified *in camera,*

*ex parte* Declaration of Ralph S. DiMaio includes a further

description, as well as an unredacted copy, of this

memorandum.

        20.  Two OIG Special Investigators initiated a review

of Mr. Boening's complaint in accordance with Section

17(d)(5) of the CIA Act with respect to an "urgent concern"

to the Inspector General (IG).  50 U.S.C. § 403(q)(5).

That provision allows a CIA employee to report information

to the IG prior to possible submission to Congress.  In

accordance with that provision, the IG had fourteen days

from the date of the receipt of the complaint or

information to determine whether the complaint or

information appeared credible.

        21.  After reviewing Mr. Boening's complete

memorandum, the accompanying package of documents submitted

to OIG, as well as additional CIA information, OIG

concluded that there was no urgent concern presented by Mr.

Boening's May 10, 2001, memorandum.

22.    After Mr. Boening's submission to OIG, a

classification review of the documents by the Directorate

of Operations[5] Information Review Officer (DO/IRO), the

component whose equities were implicated by plaintiff's

memorandum, was requested, prior to any possible

dissemination outside the Agency.    The DO/IRO, who held

original classification authority, reviewed the documents

and bracketed the portions that he deemed classified in

accordance with the CIA National Security Classification

Guide.    Subsequent to the DO/IRO's identification of

classified information, the appropriate Congressional

oversight committees were provided with copies of the May

10, 2001, memorandum and addenda.    Congress made no further

requests or inquiries of the CIA on this issue.

23.    Mr. Boening then indicated that he wished to

further publish his complaint by providing it to the

National Security Archive, a non-governmental public

interest advocacy group.    Because Mr. Boening believed that

his memorandum was unclassified, he requested that it be

reviewed under the classification challenge provisions of

---

[5] The Directorate of Operations (DO) is now the National Clandestine
Service (NCS).

13

E.O. 12958 and the CIA implementing regulations.   By

memorandum dated July 2, 2001, Mr. Boening submitted his

complaint to the Agency Release Panel (ARP) for

classification review under the procedures permitting an

authorized holder to challenge the classification of an

official document.   Considering the document on its face,

i.e., as a document submitted in an official-looking format

by Franz Boening, apparently in his capacity as a CIA

employee, the ARP initially assumed, without further

analysis, that Mr. Boening was an authorized holder of the

information.

        24.   On July 25, 2001, the Agency Classification

Management Review Panel (ACMRP), to which the ARP referred

Mr. Boening's challenge for initial determination and

review (with right of appeal to the ARP), met to review Mr.

Boening's challenge to the classification of his May 10,

2001 memorandum.   The ACRMP reviewed the information in

each paragraph that had been identified as classified, and

unanimously agreed with all of the prior classification

decisions except one.   The ACRMP reconvened on September 4,

2001 in order to address specific points Mr. Boening made

in his July 2, 2001 classification challenge.   Once again,

the ACRMP found that the material in question was

appropriately classified.

25.   In a September 12, 2001, memorandum to the Chair
of the Agency Release Panel, the ACRMP set forth its
decision on Mr. Boening's classification challenge.   In
doing so, the ACRMP also assumed that Mr. Boening's
complaint met the threshold legal criteria for the
classification challenge to occur, i.e., that he was an
authorized holder of the information presenting a
classification challenge in his official capacity.   Upon
receiving the results of the ACMRP's decision, Mr. Boening
appealed the Panel's decision to the ARP.   During the
pendency of the appeal, informal efforts were undertaken in
an attempt to work with Mr. Boening to assist him in
revising his complaint so that it would express his
personal opinions without revealing classified information.
These efforts proved unavailing, and the ARP formally
scheduled Mr. Boening's appeal for consideration.   In the
meantime, a new Executive Secretary of the ARP (ES/ARP) was
appointed.

26.   Upon receiving and reviewing the May 10, 2001,
memorandum and the additional materials submitted with it,
the new ES/ARP questioned whether that memorandum was in
fact an official document related to Mr. Boening's official
duties with the Agency, and thus, whether it properly was
subject to a classification challenge under E.O. 12958, as

15

amended.  In so doing, the ES/ARP focused on Mr. Boening's

views that his complaint was not an official expression of

the CIA, which, in turn, led the ES/ARP to question whether

a whistleblower complaint was actually reviewable under the

classification challenge provisions of the Executive Order

and CIA implementing procedures.  As a result, the Agency

reexamined whether jurisdiction existed for a CIA employee

complaint under the Intelligence Community Whistleblowers

Protection Act of 1998 to be reviewed under the

classification challenge provisions of Executive Order

12958 and CIA implementing regulations.

      27.  After reexamining the jurisdictional question,

the CIA concluded that Mr. Boening's complaint was a

"personal record" created in his personal capacity, and the

CIA could not, therefore, review it pursuant to the

classification challenge provisions of Exec. Order 12958

and CIA implementing regulations.  Because a whistleblower

complaint was, by its nature, a personal communication

between a federal employee, the IG, and/or Congress, it

represented the employee's personal views, not official

agency views.  Further, in making this type of personal

communication to Congress, the employee was not conducting

or facilitating agency business.  In addition, Mr. Boening

himself had indicated that his complaint was not an

official expression of agency views.  As a result, the

Agency concluded that Mr. Boening's document was a personal

record that he created in his personal capacity.

Consequently, the ES/ARP advised Mr. Boening that neither

the ACMRP nor the ARP had jurisdiction to review the

classification of his complaint, and that the

classification of his complaint needed to be reviewed under

the procedures that applied to any nonofficial writing by a

current employee about the Agency that was intended for

publication.

       28.  After determining that the ARP lacked

jurisdiction to review Mr. Boening's complaint, the ARP

forwarded the documents to the Information Review Officer

for the Directorate of Science and Technology (DS&T/IRO).

The DS&T was the Directorate of which the Foreign Broadcast

Information Service (FBIS), where Mr. Boening worked, was a

part.  The DS&T/IRO was the DS&T official designated under

then-current CIA internal regulations to review nonofficial

documents written by current employees submitted for

prepublication review.

       29.  To better inform his judgment, the DS&T/IRO

requested, and received, an advisory opinion on the

classification of Mr. Boening's document from the Agency

Release Panel.  The ARP concluded that Mr. Boening's

document was currently and properly classified at the
SECRET level.

30.    The DS&T/IRO subsequently reviewed Mr. Boening's
document himself, considered the ARP's advisory opinion
concerning that document, and, in his official capacity as
the designated DS&T approving official for nonofficial
documents intended for nonofficial publication that were
authored by current DS&T employees, determined both that
Mr. Boening's document was currently and properly
classified, and that it could not be approved for
unclassified nonofficial publication as written.    Mr.
Boening was provided with this decision via email dated
June 24, 2003.

31.    After learning of the CIA's determination that
his document was not an "official document" produced in his
official capacity as a CIA employee, Mr. Boening submitted
his document to the Interagency Security Classification
Appeals Panel (ISCAP), as contemplated in the Executive
Order, which governs classification challenges by
authorized holders of official documents.

32.    After considering Mr. Boening's submissions,
J. William Leonard, the Executive Director of the
Information Security Oversight Office (ISOO), the entity
that provides program and administrative support for ISCAP,

and who also serves as the Executive Director of ISCAP,
told Mr. Boening, by letter dated February 4, 2004, that he
had determined that Mr. Boening was not an authorized
holder of the information that he had accessed in
preparation of his complaint, and that Mr. Boening as a
result lacked standing to make a classification challenge
to ISCAP in accordance with the Executive Order.[6]
Nonetheless, Mr. Leonard exercised his independent
authority to consider whether the CIA had improperly
classified information contrary to provisions of the
Executive Order.  He determined that the CIA's
classification of the information in question was
appropriate.  Ex. D.

  **B.    November 2004 Submission of May 10, 2001
          Memorandum.**

    33.  By memorandum dated November 22, 2004, Mr.
Boening again submitted his May 10, 2001, memorandum for
processing for official release and/or approval, this time
to the CIA's Publications Review Board (PRB), for

---

[6] As noted in Leonard's letter, the CIA had determined that Mr. Boening
did not have a need-to-know the classified information in question, and
that any access to classified information that Mr. Boening had gained
and used in his memorandum was not granted in accordance with his
duties at the CIA.

consideration as a nonofficial document.[7]  On August 13,

2005, Mr. Boening retired from federal service.

34.  By email dated November 25, 2005, Mr. Boening

contacted the new Chairman of the PRB seeking information

on the status of his documents.  By letter dated 5 January

2006, the Chairman responded, notifying Mr. Boening that

the PRB "requires that you rewrite your 'M Documents'

outside of a government memo format stating in your own

words what you desire to communicate.  As mentioned in our

previous messages, what you resubmit must include specific,

open source citations (author, title, source, date, page)

for the statements you wish to make.  These citations must

be placed in the body of the text linked to specific

sentences and paragraphs."  Ex. E.

35.  When Mr. Boening did not revise his documents as

suggested, the PRB substantively considered Mr. Boening's

submissions and responded to Mr. Boening by letter dated

20 June 2006.  That letter set forth the final decision of

the PRB with respect to the review of the documents Mr.

Boening submitted, and included a detailed list of

---

[7] At that time, Mr. Boening also submitted additional memoranda dated 16
January 2003, 24 March 2003 and 20 May 2004.  The March 2003 and May
2004 memoranda are not at issue in this lawsuit.  Complaint, ¶ 5.  The
PRB considered the 16 January 2003 memorandum when Mr. Boening was a
current CIA employee, and the redactions on that memorandum relate to
Mr. Boening's status as a then-current employee; now that he is no
longer a CIA employee, the document can be released in full.  This re-
reviewed document is being provided to plaintiff.

redactions required prior to publication of the May 10,

2001 memorandum.   The Board also required the following

disclaimer:

> All statements of fact, opinion, or analysis
> expressed are those of the author and do not
> reflect the official positions or views of the
> CIA or any other U.S. Government agency.   Nothing
> in the contents should be construed as asserting
> or implying U.S. Government authentication of
> information or Agency endorsement of the author's
> views. This material has been reviewed by the CIA
> to prevent the disclosure of classified
> information.

Ex. F.

36.   By email dated 29 June 2006, Mr. Boening

contacted the PRB, stating that he had demonstrated that

the "M documents" were based on open sources, and

challenging the PRB's assertion that the subject of the

memorandum could not be mentioned by name.   He still had

not, however, and has not to date, revised his memorandum

to include the specific open source citations linked to

each sentence and paragraph as required by the CIA.   Mr.

Boening also sought information on the "Classified Annex"

to the 10 May 2001 memorandum that he had submitted, and

which had not been addressed by the PRB.

37.   The PRB responded by email the following day,

stating:

> As we have told you a number of times in the
> past, if you rewrite your M story in a different

21

format, outside of the official-looking memo-type
one it currently is in[,] and attribute those
statements to open sources in the new format (as
you basically have), there should be no problem
with you getting your message out.  The deletions
noted in our letter pertain to the information as
presented in the old format and not to the
information itself.
    As you should be well aware, anyone with
access to classified systems can easily access
classified information on a wide variety of
subjects, including those they don't work on.

He also stated that the PRB would look into the issue of

the Classified Annex.  Ex. G.

    38.  By letter to Mr. Boening dated 11 August 2006,

the PRB Chairman wrote that the PRB had located the "2001

classified annex" document that Mr. Boening had created

when employed by the Agency.  He further stated that a

classification review of the May 10, 2001 document had been

completed, and "The Board determined that, in accordance

with the terms of your secrecy agreement, all of the

information contained within the document is inappropriate

for disclosure in the public domain (i.e., is considered to be classified information)." Ex. H.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of July, 2007.


Scott A. Koch, Ph.D.
Information and Privacy Coordinator
Central Intelligence Agency

Declaration of Scott A. Koch
Information and Privacy Coordinator
Central Intelligence Agency

# Exhibit A

Secrecy Agreement

1. I, FRANZ W. BOENING (print full name), hereby agree to accept as a prior condition of my being employed by, or otherwise retained to perform services for, the Central Intelligence Agency, or for staff elements of the Office of the Director of Central Intelligence (hereinafter collectively referred to as the "Central Intelligence Agency"), the obligations contained in this agreement.

2. I understand that in the course of my employment or other service with the Central Intelligence Agency I may be given access to information which is classified in accordance with the standards set forth in Executive Order 12065 as amended or superseded, or other applicable Executive Order, and other information which, if disclosed in an unauthorized manner, would jeopardize foreign intelligence activities of the United States Government. I accept that by being granted access to such information I will be placed in a position of special confidence and trust and become obligated to protect the information from unauthorized disclosure.

3. In consideration for being employed or otherwise retained to provide services to the Central Intelligence Agency, I hereby agree that I will never disclose in any form or any manner any of the following categories of information or materials, to any person not authorized by the Central Intelligence Agency to receive them:

a. information which is classified pursuant to Executive Order and which I have obtained during the course of my employment or other service with the Central Intelligence Agency;

b. information, or materials which reveal information, classifiable pursuant to Executive Order and obtained by me in the course of my employment or other service with the Central Intelligence Agency but which, because of operational circumstance or oversight, is not formally marked as classified in accordance with such Executive Order and which I know or have reason to know has not been publicly acknowledged by the Agency;

c. information obtained by me in the course of my employment or other service with the Central Intelligence Agency that identifies any person or organization that presently has or formerly has had a relationship with a United States foreign intelligence organization, which relationship the United States Government has taken affirmative measures to conceal.

4. I understand that the burden will be upon me to learn whether information or materials within my control are considered by the Central Intelligence Agency to fit the descriptions set forth in paragraph 3, and whom the Agency has authorized to receive it.

5. As a further condition of the special confidence and trust reposed in me by the Central Intelligence Agency, I hereby agree to submit for review by the Central Intelligence Agency all information or materials including works of fiction which contain any mention of intelligence data or activities, or contain data which may be based upon information classified pursuant to Executive Order, which I contemplate disclosing publicly or which I have actually prepared for public disclosure, either during my employment or other service with the Central Intelligence Agency or at any time thereafter, prior to discussing it with or showing it to anyone who is not authorized to have access to it. I further agree that I will not take any steps toward public disclosure until I have received written permission to do so from the Central Intelligence Agency.

6. I understand that the purpose of the review described in paragraph 5 is to give the Central Intelligence Agency an opportunity to determine whether the information or materials which I contemplate disclosing publicly contain any information which I have agreed not to disclose. I further understand that the Agency will act upon the materials I submit and make a response to me within a reasonable time.

7. I understand that all information or materials which I may acquire in the course of my employment or other service with the Central Intelligence Agency which fit the descriptions set out in paragraph 3 of this agreement are and will remain the property of the United States Government. I agree to surrender all materials reflecting such information which may have come into my possession or for which I am responsible because of my employment or other service with the Central Intelligence Agency, upon demand by an appropriate official of the Central Intelligence Agency, or upon the conclusion of my employment or other service with the Central Intelligence Agency.

8. I agree to notify the Central Intelligence Agency immediately in the event that I am called upon by judicial or congressional authorities to testify about, or provide, information which I have agreed herein not to disclose.

9. I understand that nothing contained in this agreement prohibits me from reporting intelligence activities which I consider to be unlawful or improper directly to the Intelligence Oversight Board established by the President or to any successor body which the President may establish. I recognize that there are also established procedures for bringing such matters to the attention of the Agency's Inspector General or to the Director of Central Intelligence. I further understand that any information which I may report to the Intelligence Oversight Board continues to be subject to this agreement for all other purposes and that such reporting does not constitute public disclosure or declassification of that information.

10. I understand that any breach of this agreement by me may result in the Central Intelligence Agency taking administrative action against me, which can include the temporary loss of pay or termination of my employment or other service with the Central Intelligence Agency. I also understand that if I violate the terms of this agreement, the United States Government may institute a civil proceeding to seek compensatory damages or other appropriate relief. Further, I understand that the disclosure of information which I have agreed herein not to disclose can, in some circumstances, constitute a criminal offense.

11. I understand that the United States Government may, prior to any unauthorized disclosure which is threatened by me, choose to apply to any appropriate court for an order enforcing this agreement. Nothing in this agreement constitutes a waiver on the part of the United States to institute a civil or criminal proceeding for any breach of this agreement by me. Nothing in this agreement constitutes a waiver on my part of any possible defenses I may have in connection with either civil or criminal proceedings which may be brought against me.

12. In addition to any other remedy to which the United States Government may become entitled, I hereby assign to the United States Government all rights, title, and interest in any and all royalties, remunerations, and emoluments that have resulted or will result or may result from any divulgence, publication or revelation of information by me which is carried out in breach of paragraph 5 of this agreement or which involves information prohibited from disclosure by the terms of this agreement.

13. I understand and accept that, unless I am provided a written release from this agreement or any portion of it by the Director of Central Intelligence or the Director's representative, all the conditions and obligations accepted by me in this agreement apply both during my employment or other service with the Central Intelligence Agency, and at all times thereafter.

14. I understand that the purpose of this agreement is to implement the responsibilities of the Director of Central Intelligence, particularly the responsibility to protect intelligence sources and methods, as specified in the National Security Act of 1947, as amended.

15. In any civil action which may be brought by the United States Government for breach of this agreement, I understand and agree that the law of the Commonwealth of Virginia shall govern the interpretation of this agreement.

16. Each of the numbered paragraphs and lettered subparagraphs of this agreement is severable. If a court should find any of the paragraphs or subparagraphs of this agreement to be unenforceable, I understand that all remaining provisions will continue in full force.

17. I make this agreement in good faith, and with no purpose of evasion.

Signature

Oct 22, 1980

Date

The execution of this agreement was witnessed by the undersigned, who accepted it on behalf of the Central Intelligence Agency as a prior condition of the employment or other service of the person whose signature appears above.

## WITNESS AND ACCEPTANCE:

Signature

Printed Name

Date

Declaration of Scott A. Koch
Information and Privacy Coordinator
Central Intelligence Agency

# Exhibit B

1995 Regulation



## 2. AGENCY REVIEW OF MATERIAL INTENDED FOR NONOFFICIAL PUBLICATION

**SYNOPSIS.** This regulation sets forth policy and procedures that govern the submission and review of material intended for nonofficial publication by current and former Agency employees and others obligated to protect from unauthorized disclosure certain information they obtain as a result of their affiliation with CIA. It also reflects the responsibilities for prepublication review of the Publications Review Board ("PRB" or "Board") and other Agency components.

a. **AUTHORITY.** The National Security Act of 1947, as amended; the CIA Act of 1949, as amended; and Executive Order 12333 require the Director of Central Intelligence to protect intelligence sources and methods from unauthorized disclosure. Executive Order 12356 requires protection of classified information from unauthorized disclosure. Employees and others who have been authorized access to information the public disclosure of which could harm the national security incur special obligations to protect such information. These obligations have been embodied in secrecy agreements.

b. **GENERAL**

(1) Based on the above obligations and responsibilities, this regulation requires all current and former Agency employees, and others obligated by contract, to submit for prior review by CIA all materials (defined in paragraph f(1) and (2) below) intended for nonofficial publication.* This regulation also establishes standards for review.

(2) It is the Agency's policy to adopt and implement all lawful measures to protect from unauthorized disclosure information which, if disclosed, could damage the national security, and to ensure that individuals given access to such information understand and comply with their obligation not to disclose it. Prior review by the Agency of material intended for nonofficial publication is a key component of efforts to prevent unauthorized disclosures. The purpose of prepublication review is twofold: to assist individuals in meeting their obligations and to ensure that information damaging to the national security is not disclosed inadvertently. Prior restraint of publication imposed by the Agency in implementing this policy has been judicially upheld where the Agency acts without undue delay, as a general rule meaning within 30 days of receipt of the material to be reviewed.

(3) In conducting prepublication review, the Agency's policy is to:

(a) Identify information for deletion or revision only to the extent necessary to protect information the disclosure of which could harm national security;

(b) Respond in a timely manner to specific inquiries from individuals as to whether particular material must be submitted for review or about any other aspect of the review process or the Agency's substantive determination; and

(c) Provide for administrative appeal of the initial determinations.

Revised: 14 March 1995 (0036)                                                                 1

### c. AUTHOR RESPONSIBILITIES

(1) Current and former Agency employees are obligated to submit material intended for nonofficial publication for prepublication review. Agency contractors and others who sign secrecy agreements with the Agency must also submit such material for prepublication review in accordance with their secrecy agreements.

(2) Submission to the Agency must be made prior to disclosing such information to anyone who is not authorized by the Agency to have access to it. The responsibility rests with the author to learn from the Agency whether the material intended for publication fits the description set forth in this paragraph. Prepublication review obligations cannot be avoided by causing another person, such as a ghostwriter, spouse, friend, or associate, to prepare the material. Revelation of information damaging to the national security to any person not authorized to receive it is prohibited.

(3) Current employees must also submit material that could reasonably be expected to impair the performance of their duties, interfere with the authorized functions of the Agency, or have an impact on the foreign relations or security of the United States.



(5) Authors of material submitted to the Agency are expected to cooperate with and assist the review process. When an author claims that information intended for nonofficial publication is unclassified because it has already appeared in public, the author may be called upon to identify any open sources for information that, in the Agency's judgment, originates from classified sources. Failure or refusal to identify such public sources or otherwise to cooperate may result in refusal of authorization to publish the information in question. The author also may be requested to cite the source in a footnote.



2

Revised: 14 March 1995 (0036)

**d.  PROCEDURES FOR SUBMITTING MATERIAL FOR REVIEW**

(1) Current employees must submit material intended for nonofficial publication through their supervisory chain of command to their Deputy Director or Head of Independent Office.  However, current employees may elect first to make submissions directly to the Chair of the PRB only for determination of the necessity for any Agency review. (Note:  Employees are also required to notify the Office of Personnel Security and the Public Affairs Staff of the proposed publication by submitting ████████ Outside Activity Approval Request.)

(2) Upon receipt of material from a current employee as described in paragraph c(3), any supervisory official in the author's chain of command may submit the material to the Board for decision under paragraph i(1), below.  Alternatively, a Deputy Director or Head of Independent Office (or designee) may:

  (a) Determine that public release of the material is authorized based on paragraphs i(1) or (2), below, or

  (b) Approve publication of the material with deletions and/or changes, or disapprove publication, based on paragraphs i(1) or (2), below.

  The Board acts as the Agency's office of record for all component-approved material.  Thus, the author should ensure that the Board receives a copy of the approval memorandum signed by his or her Deputy Director or Head of Independent Office and a copy of the manuscript.

(3) Deputy Directors and Heads of Independent Offices shall submit material intended for nonofficial publication to the Board (see paragraph (8) for address).  The Chair will notify them of the Board's findings and act as primary spokesperson for the Agency in all communications concerning prepublication review.

(4) Former employees and others not currently affiliated with the Agency must submit material intended for nonofficial publication to the Board (see paragraph (8) for address).  The Chair will notify them of the Board's findings and act as primary spokesperson for the Agency in all communications concerning prepublication review.



(6) Authors who are directed to delete material in accordance with this regulation are required to submit their revisions to the Agency for final review.

Revised:  14 March 1995 (0036)                                                              3

(7) Persons preparing material for nonofficial publication are invited at any stage to discuss their plans with the Chair, PRB, the PRB legal adviser, or an authorized representative specifically designated for this purpose. The views of the Agency may be given only by one of these individuals. Anyone acting in reliance on views expressed by any person other than such authorized Agency representative must assume responsibility for the consequences of that action.

e. **AGENCY ORGANIZATION AND RESPONSIBILITIES**

(1) The Board consists of a Chair designated by the Director of Information Technology and senior representatives from the Directorate of Operations, the Directorate of Administration, the Directorate of Science and Technology, the Directorate of Intelligence, the Office of the Associate Deputy Director for Administration/Information Services, the Office of Personnel Security, and the cover unit. The Board members are nominated by the appropriate Deputy Director or Operating Official for the concurrence of the Director of Information Technology. The Office of General Counsel provides a legal adviser. The Board will meet as required at the call of the Chair to ensure that the provisions of this regulation are met.

(2) The Chair will ensure that appropriate reviewers are assigned to review submitted material. If the reviewers unanimously decide that it is unobjectionable under the standards and criteria listed above, the Chair will notify the author through the appropriate channels. If any reviewer objects to publication, the matter will be resolved upon consultation with the Chair or at a Board meeting.

(3) The Chair is authorized unilaterally to represent the Board when disclosure of submitted material so clearly would not harm national security that additional review is unnecessary or when time constraints or other unusual circumstances make it impractical or impossible to convene or consult the Board. The Chair may also determine that the subject of the material is so narrow or technical that only certain Board members need be consulted.

(4) The Agency will make every effort to complete the initial review of submitted material and respond to authors within 30 days of receipt by the PRB or other reviewing official.

f. **MATERIALS TO BE SUBMITTED FOR PREPUBLICATION REVIEW**

(1) Material which must be submitted for prepublication review consists of all writings and scripts or outlines of oral presentations intended for nonofficial publication, including works of fiction, which contain any mention of the CIA, intelligence data or

4

Revised: 14 March 1995 (0036)

intelligence activities, or material on any subject about which the author has had access to classified information in the course of his or her employment or other CIA affiliation.

(2) The prepublication review obligation is not limited to any particular category of materials or methods of presentation or publication. It applies to both oral and written materials. With respect to written materials, it applies not only to books but to all other forms of written materials or prepared statements intended for public dissemination, such as (but not limited to) newspaper columns, magazine articles, letters to the editor, book reviews, pamphlets, scholarly papers, and nonofficial testimony prepared in advance of presentation, whether it is before a Federal or state investigative commission, a Congressional body, a judicial forum (unless the witness is a defendant in a criminal case in the United States), or any other similar proceeding. (Current employees who must make court appearances and respond to subpoenas should contact the Office of General Counsel.) Because works of fiction are often based upon and/or can be used to convey factual information, fictional accounts of the Agency or of intelligence activities are also covered. Material created or disseminated through electronic or other media also is subject to this regulation.

g. **MATERIALS NOT SUBJECT TO REVIEW**

(1) The prepublication review requirement does not apply to material that is totally unrelated to intelligence or employment matters, such as cooking, gardening, or purely domestic political matters.

(2) Material that consists solely of personal views, opinions, or judgments on matters of public concern and does not contain or purport to contain any mention of the CIA, intelligence activities or data, or information on any topic about which the author had access to classified information, is not subject to the prepublication review requirement. For example, a person with prepublication review obligations is free without prior review to submit testimony to Congress to make public speeches or publish articles on such topics as proposed legislation as long as the material prepared for public use is not classified, does not state or imply facts about intelligence activities or substantive intelligence information, or, in the case of current employees or contractors, impair the performance of their duties or the authorized functions of the Agency or adversely affect foreign relations or national security.

(3) In some circumstances the expression of what purports to be an opinion may in fact convey information subject to prior review. For example, a former intelligence analyst's opinion that the United States can or cannot verify compliance with strategic arms limitation agreements is an implied statement of fact about Agency activities and substantive intelligence information and would be subject to prior review. This does not mean that such a statement would necessarily require deletion, but merely that the subject matter requires review by the Agency before publication. However, discussion limited to the desirability of a proposed arms limitation agreement based solely on analysis of its provisions, without any discussion of intelligence information or activities, would not require prior review.

**Revised: 14 March 1995 (0036)**                                                                 5

(4) Descriptions of Agency activities will require prior review. A person subject to the prepublication review obligation who writes or speaks about areas of national policy as an observer outside the government, without relying or purporting to rely on classified information, intelligence information, or other similar information does not have to submit such materials for prior review. While some "gray areas" may exist, persons preparing material intended for nonofficial publication are expected to err on the side of prepublication review.



### i. STANDARDS OF REVIEW

(1) The Agency may deny permission for nonofficial publication of any information obtained during the course of employment or other service with the CIA that has not been placed in the public domain by the U.S. Government and if disclosure reasonably could be expected to harm the national security interests of the United States.

(2) Permission to publish will not be denied solely because the statement may be embarrassing to or critical of the Agency.

(3) Where information contained in material intended for nonofficial publication is available to the author from classified sources and also independently from open sources, the author may be permitted to republish the information if he or she can cite an adequate open source publication and if republication of the information by that author at the time of review will not cause additional damage to the national security through authoritative confirmation of previous publications. The Board will exercise due care and discretion in making these determinations on a case-by-case basis and include as factors in its decision the following: the sensitivity of the information from classified sources, the number and currency of these previous publications, the level of detail previously exposed, the source of the previous disclosures (whether authoritative and acknowledged or an anonymous "leak"), the new author's access to classified sources, and the authority and credibility his or her Agency experience brings to a confirmatory statement. The Board may give permission to publish contingent on the author's citation of open sources in a footnote.

6

Revised: 14 March 1995 (0036)

(4) For current employees and contractors, the Agency may also deny permission to publish statements or expressions of opinion that could reasonably be expected to impair the author's performance of duties, interfere with the authorized functions of the CIA, or have an adverse impact on the foreign relations or security of the United States.

(5) Approval for publication does not represent Agency endorsement or verification of, or agreement with, the subject matter. Therefore, consistent with cover status, authors are encouraged (current employees are required, unless waived by supervisors) to publish the following disclaimer: "This material has been reviewed by the CIA. That review neither constitutes CIA authentication of information nor implies CIA endorsement of the author's views." An employee's supervisors may also amend the wording of this disclaimer, when appropriate, provided the Chair, PRB, is notified of the variance.

## j. BREACH

(1) Prepublication review allows the Agency to determine whether material contemplated for nonofficial publication contains information which, if disclosed, could harm national security, and gives the Agency an opportunity to prevent the public disclosure of such information. Prior review means that written materials are submitted to the Agency before being circulated to publishers, editors, literary agents, coauthors, reviewers, or the public at each stage of their development. This prior review requirement is intended to prevent comparison of different versions of such material, which would reveal what items had been deleted by the Agency. For this reason, review of the material after it has been submitted to publishers, reviewers, or other outside parties does not satisfy an author's prepublication review obligation. The Agency reserves the right to review any such material in order to take necessary protective action to mitigate damage caused by disclosure. Such review and action does not preclude the U.S. Government and the Agency from exercising the legal rights otherwise available.



## k. APPEAL

(1) Authors who wish to appeal decisions should address such appeals in writing to the Executive Director of the Agency, accompanied by the material intended for nonofficial publication and any supporting materials the author wishes the Executive Director to consider. On behalf of the Executive Director, the Chair, PRB will forward the appeal and relevant documentation through the senior Operating Officials of the affected component to each Deputy Director or Head of Independent Office

Revised: 14 March 1995 (0036)                                          7

whose representative on the Board objected to information in the material at issue. The Deputy Director or Head of Independent Office will affirm or recommend revision of the Board's decision affecting his or her equities and will forward that recommendation to the General Counsel. The General Counsel will review the recommendations for legal sufficiency and will make a recommendation to the Executive Director for a final Agency decision. Every effort will be made to complete the appeal process within 30 days.

(2) This regulation is intended to provide direction and guidance for those persons who have prepublication review obligations and those who review material submitted for nonofficial publication. Nothing contained in this regulation or in any procedures promulgated to implement this regulation is intended to confer, and does not confer, any substantive or procedural right or privilege on any person or organization.

---

*"Publication" in this context means communicating information to one or more persons. "Nonofficial publication" is a work prepared by the author as a private individual, not as a government employee or contractor acting in an official capacity.

8

**Revised:** 14 March 1995 (0036)

Declaration of Scott A. Koch
Information and Privacy Coordinator
Central Intelligence Agency

# Exhibit C

2005 Regulation

ADMINISTRATIVE - INTERNAL USE ONLY

**Date:** 07/22/2005

**Category:** ▮ - Public Affairs **OPR:** ▮

**Title:** ▮(U) AGENCY PREPUBLICATION REVIEW OF CERTAIN MATERIAL PREPARED FOR PUBLIC DISSEMINATION



*This regulation was written by* ▮
▮

## 2. AGENCY PREPUBLICATION REVIEW OF CERTAIN MATERIAL PREPARED FOR PUBLIC DISSEMINATION

   SYNOPSIS: This regulation sets forth CIA polices and procedures for the submission and review of material proposed for publication or public dissemination by current and former employees and contractors and other individuals obligated by a CIA secrecy agreement to protect from unauthorized disclosure certain information they obtain as a result of their

contact with the CIA. This regulation applies to all forms of dissemination, whether in written, oral, electronic, or other forms, and whether intended to be an official or nonofficial (that is, personal) publication.

## a. AUTHORITY

The National Security Act of 1947, as amended, the CIA Act of 1949, as amended, and Executive Order 12333 require the protection of intelligence sources and methods from unauthorized disclosure. Executive Order 12958, as amended, requires protection of classified information from unauthorized disclosure. 18 U.S.C. section 209 prohibits a federal employee from supplementation of salary from any source other than the U.S. Government as compensation for activities related to the employee's service as a Government employee. The *Standards of Ethical Conduct for Employees of the Executive Branch* (5 C.F.R. 2635) are the Government-wide ethics regulations that govern Federal employees. Those regulations include restrictions on outside activities and compensation for teaching, speaking, and writing related to official duties. In Snepp v. U.S., 444 U.S. 507 (1980), the Supreme Court held that individuals who have been authorized access to CIA information the public disclosure of which could harm the national security hold positions of special trust and have fiduciary obligations to protect such information. These obligations are reflected in this regulation and in CIA secrecy agreements.

## b. GENERAL REQUIREMENTS AND DEFINITIONS

(1) The CIA requires all current and former Agency employees and contractors, and others who are obligated by CIA secrecy agreement, to submit for prepublication review to the CIA's Publications Review Board (**PRB**) all intelligence-related materials intended for publication or public dissemination, whether they will be communicated in writing, speeches, or any other method; and whether they are officially sanctioned or represent personal expressions, except as noted below.

(2) The purpose of prepublication review is to ensure that information damaging to the national security is not disclosed inadvertently; and, for current employees and contractors, to ensure that neither the author's performance of duties, the Agency's mission, nor the foreign relations or security of the U.S. are adversely affected by publication.

(3) The prepublication review requirement does not apply to material that is

unrelated to intelligence, foreign relations, or CIA employment or contract matters (for example, material that relates to cooking, stamp collecting, sports, fraternal organizations, and so forth).

(4) Agency approval for publication of nonofficial, personal works (including those of current and former employees and contractors and covered non-Agency personnel) does not represent Agency endorsement or verification of, or agreement with, such works. Therefore, consistent with cover status, authors are required, unless waived in writing by the **PRB**, to publish the following disclaimer:

> "All statements of fact, opinion, or analysis expressed are those of the author and do not reflect the official positions or views of the Central Intelligence Agency (CIA) or any other U.S. Government agency. Nothing in the contents should be construed as asserting or implying U.S. Government authentication of information or CIA endorsement of the author's views. This material has been reviewed by the CIA to prevent the disclosure of classified information."

(5) Those who are speaking in a nonofficial capacity must state at the beginning of their remarks or interview that their views do not necessarily reflect the official views of the CIA.

(6) A nonofficial or personal publication is a work by anyone who has signed a CIA secrecy agreement (including a current or former employee or contractor), who has prepared the work as a private individual and who is not acting in an official capacity for the Government.

(7) An official publication is a work by anyone who has signed a CIA secrecy agreement, (including a current employee or contractor), such as an article, monograph, or speech, that is intended to be unclassified and is prepared as part of their official duties as a Government employee or contractor acting in an official capacity.

(8) "Publication" or "public dissemination" in this context means:
> (a) for nonofficial (that is, personal) works -- communicating information to one or more persons; and
> (b) for official works - communicating information in an unclassified manner where that information is intended, or is likely to be, disseminated to the public or the media.

(9) Covered non-Agency personnel means individuals who are obligated by a

CIA secrecy agreement to protect from unauthorized disclosure certain information they obtain as a result of their contact with the CIA.

## c. THE PUBLICATIONS REVIEW BOARD

(1) The **PRB** is the Agency body charged with reviewing, coordinating, and formally approving in writing all proposed nonofficial, personal publications that are submitted for prepublication. It is also responsible for coordinating the official release of certain unclassified Agency information to the public. The Board consists of a Chair and an Executive Secretary -- designated by and reporting directly to the Chief, Information Management Services (IMS) – with the rest of the Board membership composed of senior representatives from the Director of CIA Area, the Directorate of Operations (DO), the Directorate of Support, the Directorate of Science and Technology, the Directorate of Intelligence, the Security Center, and the DO's Global Deployment Center, who are designated by the appropriate Deputy Director, or Operating Official with C/IMS concurrence. The Office of General Counsel (OGC) provides a nonvoting legal advisor.

(2) The **PRB** shall adopt and implement all lawful measures to prevent the publication of information that could damage the national security or foreign relations of the U.S. or adversely affect the CIA's functions or the author's performance of duties, and to ensure that individuals given access to classified information understand and comply with their contractual obligations not to disclose it. When the **PRB** reviews submissions that involve the equities of any other agency, the **PRB** shall coordinate its review with the equity owning agency.

(3) The **PRB** Chair is authorized unilaterally to represent the Board when disclosure of submitted material so clearly would not harm national security that additional review is unnecessary or when time constraints or other unusual circumstances make it impractical or impossible to convene or consult with the Board. The Chair may also determine that the subject of the material is so narrow or technical that only certain Board members need to be consulted.



## d. CONTACTING THE PRB

(1) <u>Former employees and contractors and other covered non-Agency personnel</u> must submit covered nonofficial (personal) materials intended for publication or public dissemination to the **PRB** by mail, fax, or electronically as follows:



(2) <u>Current employees and contractors</u> must submit covered nonofficial and official materials intended for publication or public dissemination to the **PRB** by mail, fax, or electronically as follows:

<u>Internal Mail:</u>
<u>Classified Facsimile:</u>
<u>Email:</u>
<u>Secure Phone:</u>

(3) <u>Current employees and contractors intending to publish or speak on a nonofficial, personal basis</u> must also complete and submit to the **PRB** an electronic cover memorandum identifying their immediate supervisor or

contracting officer. The **PRB** will notify the appropriate Agency manager or contracting officer, whose concurrence is necessary for publication.

(4) Review Timelines. As a general rule, the **PRB** will complete prepublication review for nonofficial publications within 30 days of receipt of the material. Relatively short, time-sensitive submissions (for example, op-ed pieces, letters to the editor, and so forth) will be handled as expeditiously as practicable. Lengthy or complex submissions may require a longer period of time for review, especially if they involve intelligence sources and methods issues. Authors are strongly encouraged to submit drafts of completed works, rather than chapters or portions of such works.

## e. WHAT IS COVERED

(1) Types of Materials. The prepublication review obligation applies to any written, oral, electronic, or other presentation intended for publication or public dissemination, whether personal or official, that mentions CIA or intelligence data or activities or material on any subject about which the author has had access to classified information in the course of his employment or other contact with the Agency. The obligation includes, but is not limited to, works of fiction; books; newspaper columns; academic journal articles; magazine articles; resumes or biographical information on Agency employees (submission to the **PRB** is the exclusive procedure for obtaining approval of proposed resume text); draft *Studies in Intelligence* submissions (whenever the author is informed by the *Studies* editor that the draft article is suitable for *Studies* Editorial Board review); letters to the editor; book reviews; pamphlets; scholarly papers; scripts; screenplays; Internet blogs, e-mails, or other writings; outlines of oral presentations; speeches; or testimony prepared for a Federal or state or local executive, legislative, judicial, or administrative entity; and Officers in Residence speeches and publications (although oral and written materials prepared by OIRs exclusively for their classroom instructional purposes are not covered, OIRs must take particular care to ensure that any anecdotes or other classroom discussions of their Agency experiences do not inadvertently reveal classified information). Materials created for submission to the Inspector General and/or the Congress under the Whistleblower Protection Act and CIA implementing regulations are nonofficial, personal documents when they are initially created and the author is entitled to seek a review by the **PRB** to determine if the materials contain classified information and, if so, the appropriate level of classification of the information. If, at any point during or after the whistleblower process, the author wishes to disseminate his whistleblower complaint to the public, the author must submit his complaint to

http://agdes01/OpenAccess/REPOS.NSF/e09050384e00c52185256...

the **PRB** for full prepublication review under this regulation. If the author is a current employee or contractor who intends to disseminate his whistleblower complaint to the public, the author must also obtain **PRB** review of his materials under paragraph g below.

(2) <u>Review of Draft Documents</u>. Written materials of a nonofficial, personal nature covered by the regulation must be submitted to the **PRB** at each stage of their development before being circulated to publishers, editors, literary agents, coauthors, ghost writers, reviewers, or the public (that is, anyone who does not have the requisite clearance and need-to-know to see information that has not yet been reviewed, but may be classified). This prepublication review requirement is intended to prevent comparison of different versions of such material, which would reveal the items that the Agency has deleted. For this reason, **PRB** review of the material only after it has been submitted to publishers, reviewers, or other outside parties violates the author's prepublication review obligation. The Agency reserves the right to conduct a post-publication review of any such material in order to take necessary protective action to mitigate damage caused by such a disclosure. Such post-publication review and action does not preclude the U.S. Government or the CIA from exercising any other legal rights otherwise available as a result of this prepublication violation. Additionally, the Agency reserves the right to require the destruction or return to CIA of classified information found to have been included in earlier versions of a work regardless of the form of the media involved (for example, paper, floppy disk, hard disk, or other electronic storage methods).

(3) <u>Public Presentations</u>:

    (a) With respect to <u>current and former employees and contractors and covered non-Agency personnel</u> making intelligence-related speeches, media interviews, or testimony, they must submit all notes, outlines, or any tangible preparatory material to the **PRB** for review. Where no written material has been prepared specifically in contemplation of the speech, interview, or oral testimony, the individual must contact the **PRB** Chair or his representative to provide a summary of any and all topics that it is reasonable to assume may be discussed, and points that will or may be made. Unprepared or unrehearsed oral statements do not exempt an individual from possible criminal liability in the event they involve an unauthorized disclosure of classified information.

    (b) In addition, with respect to <u>current employees and contractors</u> making

official or nonofficial oral intelligence-related statements to the media or to groups where the media will likely be in attendance, prior to granting interviews or making public appearances, the speaker shall contact the **PRB** for guidance. The **PRB** will coordinate the review of proposed speeches or media interviews with the component involved, the Office of Public Affairs for guidance regarding media or press relations, and other offices as necessary.

(c) <u>Current employees</u> who must make court appearances or respond to subpoenas must contact OGC for guidance.

(4) <u>Official Publications</u>. The publication or public dissemination of official Agency information by any means, including electronic transmissions, such as Internet and unclassified facsimile, is subject to prepublication review. In addition to the types of materials listed in paragraph e(1) above, official publications subject to this review include unclassified monographs; organizational charts; brochures; booklets; flyers; posters; advertisements; films; slides; videotapes; or other issuances, irrespective of physical media such as paper, film, magnetic, optical, or electronic, that mention CIA or intelligence data or activities or material on any subject about which the author has had access to classified information in the course of his employment or other association with the Agency.



(6) <u>Additional **PRB** Guidance</u>. It is not possible to anticipate all questions that may arise about which materials require prepublication review. Therefore, it is the author's obligation to seek guidance from the **PRB** on all prepublication review issues not explicitly covered by this regulation.

## f. PREPUBLICATION REVIEW GUIDELINES FOR FORMER EMPLOYEES AND CONTRACTORS, AND COVERED NON-AGENCY PERSONNEL

8/4/2006 8:13 AM

(1) All material proposed for publication or public dissemination must be submitted to the **PRB** Chair, as described in paragraph d(1) above. The **PRB** Chair will have the responsibility for the review, coordination, and formal approval in writing of submissions in coordination with appropriate Board members.

(2) The **PRB** will review material proposed for publication or public dissemination solely to determine whether it contains any classified information. Permission to publish will not be denied solely because the material may be embarrassing to or critical of the Agency. Former employees, contractors, or non-Agency personnel must obtain the written approval of the **PRB** prior to publication.

(3) When it is contemplated that a co-author who has not signed a CIA secrecy agreement will contribute to a publication subject to prepublication review, the final version of the publication must clearly identify those portions of the publication that were authored by the individual subject to the secrecy agreement. Where there is any ambiguity concerning which individual wrote a section, and the section was not submitted for review, the Agency reserves the right to consider the section to be entirely written by the individual subject to the secrecy agreement and therefore in violation of the individual's prepublication review obligations.

(4) When otherwise classified information is also available independently in open sources and can be cited by the author, the **PRB** will consider that fact in making its determination on whether that information may be published with the appropriate citations. Nevertheless, the Agency retains the right to disallow certain open-source information or citations where, because of the author's Agency affiliation or position, the reference might confirm the classified content.

## g. PREPUBLICATION REVIEW GUIDELINES FOR CURRENT EMPLOYEES AND CONTRACTORS

(1) All proposed unclassified material must be submitted to the **PRB** Chair, as described in paragraph d(2) above. The **PRB** Chair will have the responsibility for the review, coordination, and formal approval in writing of submissions in

coordination with the author's supervisor and other offices as necessary. The **PRB** Chair will provide copies of submitted material to all components with equities in such material, and will also provide copies to all Board members and, upon request, to any Directorate-level Information Review Officer.

(2) <u>Additional Review Criteria</u>. For current employees and contractors, in addition to the prohibition on revealing classified information, the Agency is also legally authorized to deny permission to publish any official or nonofficial materials on intelligence-related matters set forth in paragraph e(1) and e(4) above that could:

> (a) reasonably be expected to impair the author's performance of his or her job duties,

> (b) interfere with the authorized functions of the CIA, or

> (c) have an adverse effect on the foreign relations or security of the U.S.

(3) <u>Outside Activities Approval Request</u>. Current employees and contractors must also complete a ▮▮▮▮▮▮ (Outside Activity Approval Request) before undertaking any unclassified publication not officially sanctioned by the CIA ▮.
(4) <u>Management Review Process</u>:

> (a) <u>Nonofficial publications</u>. For all nonofficial publications, current employees must complete and submit to the **PRB** a cover memorandum identifying their immediate supervisor or contracting officer. The **PRB** will notify these individuals, whose concurrence is necessary for publication.

> (b) <u>Unclassified official publications</u>. For all unclassified official publications (official documents whose dissemination is likely to be broader than the initial, intended Federal Government entity recipient – for example, unclassified Congressional "constituent replies") that are covered by this regulation, current employees or contractors must first coordinate the document or speech with their management chain. Once initial management acceptance has been made, the employee must then submit the publication to the **PRB** for final review and approval. (*Classified* official publications are not covered by this regulation and, therefore, are not required to be submitted to the **PRB** for review.)



## h. APPEALS

(1) If the **PRB** denies all or part of a proposed nonofficial publication, the author may submit additional material in support of publication and request reconsideration by the **PRB**. In the event the **PRB** denies the request for reconsideration, the author may appeal. **PRB** decisions involving nonofficial publications may be appealed to the Executive Director (EXDIR) within 30 days of the decision. Such an appeal must be in writing and must be sent to the **PRB** Chair. Appeal documentation must include the material intended for publication and any supporting materials the appealing party wishes the EXDIR to consider. The **PRB** Chair will forward the appeal and relevant documentation through the components that objected to publication of the writing or other product at issue. The Deputy Director or Head of Independent Office will affirm or recommend revision of the decision affecting his or her component's equities and will forward that recommendation to OGC. OGC will review the recommendations for legal sufficiency and will make a recommendation to the EXDIR for a final Agency decision. The **PRB** Chair is responsible for staff support to the EXDIR. The EXDIR will render a written final decision on the appeal. Best efforts will be made to complete the appeal process within 30 days from the date the appeal is submitted.

http://agdes01/OpenAccess/REPOS.NSF/e09050384e00c52185256...

(2) This regulation is intended to provide direction and guidance for those persons who have prepublication review obligations and those who review material submitted for nonofficial or official publication. Nothing contained in this regulation or in any practice or procedure that implements this regulation is intended to confer, or does confer, any substantive or procedural right or privilege on any person or organization beyond that expressly stated herein.

## i. BREACH OF SECRECY AGREEMENT

Failure to comply with prepublication review obligations can result in the imposition of civil penalties or damages. When the **PRB** becomes aware of a potential violation of a CIA secrecy agreement, it will notify OGC and the Security Center. After Security Center review and investigation of the case is completed, if further action is deemed warranted, the Security Center will refer the matter to OGC, which will report all potentially criminal conduct to the Department of Justice (DoJ) and consult with DoJ regarding any civil remedies that may be pursued.

/s/

Porter J. Goss
Director of the Central Intelligence Agency

Declaration of Scott A. Koch
Information and Privacy Coordinator
Central Intelligence Agency

# Exhibit D

## J. William Leonard Letter
## (Feb. 4, 2004)



# *Information Security Oversight Office*

### *National Archives and Records Administration*

*700 Pennsylvania Avenue, NW . Washington, DC 20408*



February 4, 2004

Mr. Franz Boening
⬛ Deer Mountain Estates
Harpers Ferry, WV 25425

Dear Mr. Boening:

In your initial correspondence of December 13, 2002, you outlined a number of oppositions with respect to how the Central Intelligence Agency (CIA) has handled several documents associated with a complaint you have made pursuant to the Intelligence Community Whistleblowers Protection Act of 1998. In addition, you registered additional concerns on May 20, 2003, with respect to two other documents associated with this matter. We only recently received the last piece of needed information from the CIA, thus the lateness of this reply.

Based upon your correspondence, we approached this issue from two perspectives. First, that you believe that you were denied your right to file a classification challenge with the Interagency Security Classification Appeals Panel (ISCAP) with respect to several documents associated with your original "whistleblower" complaint. Second, that you believe CIA improperly classified information contrary to the provisions of Executive Order 12958 as amended (Order).

With respect to the first complaint, in order for individuals to have standing to file a classification challenge with the ISCAP, they must be "authorized holders of information" (Order, § 1.8). An "authorized holder" is defined in the Information Security Oversight Office's (ISOO) Classified National Security Information Directive No. 1 (Part 2001, 32 C.F.R.) as "any individual ... who has been granted access to specific classified information in accordance with the provisions of the Order ...". In response to inquiries from this office, the CIA has represented that any access to classified information you gained and which you included in your original complaint was not granted in accordance with your duties at the CIA. They have further represented that you did not have a need-to-know in the performance of your official duties for the specific classified information accessed in preparation of your original complaint. As such, notwithstanding my initial determination of April 15, 2003, based upon additional information provided by the CIA, I have determined that you are not an authorized holder of the information which you accessed in preparation of your complaint. Thus, in this instance, you do not have standing to make a classification challenge to the ISCAP in accordance with the Order.

-2

Notwithstanding my determination above, I did pursue your complaint pursuant to
§5.2 (b) (6) of the Order which charges me with the responsibility to "consider and take
action on complaints and suggestions from persons within or outside the Government
with respect to the administration of the program established under (the) Order."
Specifically, I pursued your complaint that the CIA improperly classified information
contrary to provisions of the Order.

Based upon my review of this second complaint, to include a review of the specific
information in question, I have determined that the information satisfies the classification
standards set forth in § 1.1 of the Order. I further determined that the information
concerned intelligence activities, sources and methods and thus satisfied the criteria set
forth in § 1.4 of the Order. Finally, based upon information made available to me, I have
concluded that the CIA's classification decision in this instance was not in order to
circumvent any of the prohibitions and limitations of § 1.7 of the Order. In view of the
above, I have determined that the CIA's classification of the information in question is
appropriate and find no merit in support of your complaint.

I understand that the CIA is working with you in order to develop an unclassified version
of your original complaint. I encourage you to continue working with them to that end.

Sincerely,

/Signed/ J. William Leonard

J. William Leonard
Director

Declaration of Scott A. Koch
Information and Privacy Coordinator
Central Intelligence Agency

# Exhibit E

PRB Letter (Jan 5, 2006)



Central Intelligence Agency

Washington, D.C. 20505

**Publications Review Board**                        Telephone:  703.613.3070
**1H11 IP Building**                                           703.613.1219
**E-mail:  prb@ucia.gov**                      Facsimile:  703.613.3004

5 January 2006

Mr. Franz Boening
████Deer Mountain Est.
Harpers Ferry, WV 25425

Dear Mr. Boening:

In response to your e-mail message of 28 November 2005, the Publications Review Board requires that you rewrite your "M Documents" outside of a government memo format stating in your own words what you desire to communicate. As mentioned in our previous messages, what you resubmit must include specific, open source citations (author, title, source, date, page) for the statements you wish to make. These citations must be placed in the body of the text linked to specific sentences and paragraphs.

Please contact me if you have any questions or if we can be of assistance.

Sincerely yours,

R. Puhl

R. Puhl
Chairman, Publications Review Board

Declaration of Scott A. Koch
Information and Privacy Coordinator
Central Intelligence Agency

# Exhibit F

PRB Letter (June 20, 2006)



Central Intelligence Agency



Washington, D.C. 20505

Publications Review Board
1H11 IP Building
Washington, D.C. 20505

Telephone: 703.613.3070
Facsimile:  703.613.3004
E-mail:  prb@ucia.gov

20 June 2006

Mr. Franz Boening
███ Deer Mountain Est.
Harpers Ferry, WV  25425

Dear Mr. Boening:

The Publications Review Board has completed its review of your manuscript consisting of five memorandums dated 10 May 2001, 16 January 2003, 24 March 2003, 20 May 2004, and 22 November 2004.  The Board determined that, in accordance with the terms of your secrecy agreement, the following information in your manuscript is inappropriate for disclosure in the public domain and must be revised or deleted prior to publication:

**10 May 2001 Memorandum**
**Page 33**
Line 10
    Delete the third word in the line.
Lines 11 – 12
    Delete the seventh word in line 11 through the first word in line 12.
Lines 18 – 19
    Delete the last word in line 18 through the fifth word in line 19.
Lines 20 – 26
    Delete all of lines 20 through 26.
Line 29
    Delete the first word in the line.
Line 35
    Delete the third word in the line.

**Page 34**
Line 16
    Delete the fourth word in the line.
Lines 16 – 17
    Delete the eleventh word in line 16 through the fifth word in line 17.

Line 20

    Delete the seventh word in the line.

Line 21

    Delete the ninth word in the line.

Line 23

    Delete the ninth word in the line.

Line 27

    Delete the third word in the line.

Line 37

    Delete the fourth word in the line.


**Page 35**

Line 2

    Delete the penultimate word in the line.

Line 5

    Delete the first word in the line.

Line 6

    Delete the third word in the line.

Line 10

    Delete the eighth word in the line.

Line 11

    Delete the ninth word in the line.

Lines 15 – 16

    Delete the sixth word in line 15 through the sixth word in line 16.

Line 16

    Delete the last word in the line.

Lines 17 – 25

    Delete the eleventh word in line 17 through the first word in line 25.

Line 26

    Delete the sixth word in the line.

Line 27

    Delete the tenth word in the line.

Line 31

    Delete the eighth through eleventh words in the line.

Line 32

    Delete the eighth word in the line.

Lines 32 –33

    Delete the thirteenth word in line 32 through the first word in line 33.

Line 34

    Delete the seventh and tenth words in the line.

Line 36

    Delete the seventh and thirteenth words in the line.

Line 37

    Delete the third and eighth words in the line.

Lines 38 – 40
> Delete the third word in line 38 through the second word in line 40.

Line 40
> Delete the eleventh word in the line.

Line 41
> Delete the sixth word in the line.

**Page 36**

Lines 4 – 7
> Delete the sixth word in line 4 through the eleventh word in line 7.

Line 13
> Delete the fourth word in the line.

Line 15
> Delete the first and twelfth words in the line.

Line 24
> Delete the first word in the line.

Lines 25 – 30
> Delete the eleventh word in line 25 through the first word in line 30.

Line 33
> Delete the first and last words in the line.

Line 34
> Delete the fifth word in the line.

Line 36
> Delete the first word in the line.

**Page 37**

Line 1
> Delete the sixth word in the line.

Line 3
> Delete the third through sixth word in the line.

Lines 11 – 22
> Delete the eleventh word in line 11 through the tenth word in line 22.

Line 23
> Delete the fourth word in the line.

Line 25
> Delete the first word in the line.

Line 26
> Delete the first word in the line.

Line 27
> Delete the fourth, fifth, and last words in the line.

Lines 29 – 32
> Delete the seventh word in line 29 through line 32.

Line 37
> Delete the seventh word in the line.

Line 38
>   Delete the first word in the line.

**Page 38**
Lines 1 – 10
>   Delete the first word in line 1 through the penultimate word in line 10.
Line 12
>   Delete the eighth and ninth words in the line.
Line 13
>   Delete the first word in the line.
Lines 13 – 16
>   Delete the twelfth word in line 13 through the penultimate word in line 16.
Line 19
>   Delete the seventh word in the line.
Line 21
>   Delete the fourth word in the line.
Line 23
>   Delete the second through fourth words in the line.
Lines 23 – 28
>   Delete the eighth word in line 23 through line 28.
Lines 29 – 35
>   Delete the seventh word in line 29 through the last word in line 35.
Lines 36 – 41
>   Delete the ninth word in line 36 through line 41.

**Page 39**
Lines 1 – 3
>   Delete the first word in line 1 through the fourth word in line 3.
Lines 7 – 9
>   Delete the last word in line 7 through the third word in line 9.
Line 10
>   Delete the ninth word in the line.
Line 11
>   Delete the tenth and eleventh word in the line.
Line 18
>   Delete the last word in the line.
Line 21
>   Delete the eighth word in the line.
Line 23
>   Delete the fourth through seventh words in the line.
Line 24
>   Delete the penultimate word in the line.
Line 39
>   Delete the seventh word in the line.

**Page 40**
Line 1
  Delete the seventh word in the line.
Line 4
  Delete the first through sixth words in the line.
Lines 6 – 15
  Delete the eighth word in line 6 through the last word in line 15.
Lines 16 – 17
  Delete the last word in line 16 through the seventh word in line 17.
Line 18
  Delete the first word in the line.
Lines 18 – 21
  Delete the seventh word in line 18 through the second word in line 21.
Line 21
  Delete the penultimate word in the line.
Lines 22 – 25
  Delete the fifth word in line 22 through the second word in line 25.
Line 27
  Delete the first and last words in the line.
Line 31
  Delete the eighth word in the line.
Line 39
  Delete the third word in the line.


**Pages 41 – 53**
  Delete all of page 41 through page 53.


**Page 54**
Line 2
  Delete the third and ninth words in the line.
Line 10
  Delete the tenth word in the line.
Lines 11 – 12
  Delete the first word in line 12 through the eleventh word in line 12.
Line 25
  Delete the third through last words in the line.
Line 26
  Delete the eighth through tenth words in the line.
Line 28
  Delete the tenth word in the line.
Line 30
  Delete the ninth and tenth words in the line.
Line 33
  Delete the fourth word in the line.

**Page 55**

Line 1

Delete the fourth and fifth words in the line.

Line 17

Delete the eighth and ninth words in the line.

Line 21

Delete the fourth word in the line.

Lines 22 – 23

Delete the second word in line 22 through the tenth word in line 23.

Line 24

Delete the fifth through last words in the line.

**Page 57**

Line 16

Delete the fifth through eighth words in the line.

Lines 19 – 24

Delete all of lines 19 through 24.

**Page 58**

Line 2

Delete the last word in the line.

Lines 3 – 4

Delete the last word in line 3 and the first word in line 4.

Line 7

Delete the fifth word in the line.

Line 8

Delete the eighth word in the line.

Lines 9 – 10

Delete the third word in line 9 through the eighth word in line 10.

Line 11

Delete the sixth through tenth words in the line.

Lines 12 – 14

Delete the third word in line 12 through line 14.

Lines 15 – 16

Delete the third word in line 15 through the second word in line 16.

Line 16

Delete the seventh through eleventh words in the line.

Lines 17 – 20

Delete the penultimate word in line 17 through line 20.

Line 21

Delete the ninth through twelfth words in the line.

Line 25

Delete the penultimate word in the line.

Line 26

Delete the last word in the line.

Lines 33 – 36
>Delete the first word in line 33 through the ninth word in line 36.

**Page 59**
Line 1
>Delete the seventh word in the line.
Line 2
>Delete the first word in the line.
Line 3
>Delete the sixth and seventh words in the line.
Line 7
>Delete the third, eighth, and ninth words in the line.
Line 8
>Delete the first, second, and seventh words in the line.
Line 16
>Delete the third through ninth words in the line.
Lines 16 – 17
>Delete the penultimate word in line 16 through line 17.
Lines 19 – 20
>Delete the first word in line 19 through the sixth word in line 20.
Line 21
>Delete the fifth word in the line.
Lines 21 – 22
>Delete the tenth word in line 21 through the fourth word in line 22.
Line 22
>Delete the tenth word in the line.
Line 24
>Delete the first, third, fourth, and fifth words in the line.
Line 25
>Delete the fourth word in the line.
Line 26
>Delete the fifth through twelfth words in the line.
Lines 27 – 28
>Delete the third word in line 27 through the third word in line 28.
Line 29
>Delete the second through last words in the line.
Line 30
>Delete the seventh through last words in the line.

**Page 60**
Line 1
>Delete the fourth word in the line.
Line 6
>Delete the fourth word in the line.

Line 8

    Delete the second and third words in the line.

Line 9

    Delete the first word in the line.

Lines 10 – 25

    Delete the tenth word in line 10 through line 25.

Line 26

    Delete the ninth word in the line.

Lines 29 – 38

    Delete all of lines 29 through 38.

Line 41

    Delete the seventh word in the line.

**Page 61**

Lines 2 – 3

    Delete the tenth word in line 2 through the first word in line 3.

Line 3

    Delete the third word in the line.

Line 6

    Delete the ninth word in the line.

Line 9

    Delete the sixth word in the line.

Line 10

    Delete the fifth and sixth word in the line.

Line 12

    Delete the third word in the line.

Line 14

    Delete the seventh, eighth, and penultimate words in the line.

Line 15

    Delete the seventh word in the line.

Lines 17 – 18

    Delete the third word in line 17 through the first word in line 18.

**16 January 2003 Memorandum**

**Page 62**

Line 2

    Delete the fourth word in the line.  Please note that we have deleted the last names of current Agency employees.  You may wish to substitute an initial for the last names.

Line 3

    Delete the third word in the line.

Line 12

    Delete the second word in the line.

Line 14

    Delete the eighth word in the line.

Line 17
    Delete the third word in the line.
Line 38
    Delete the sixth and ninth words in the line.


**Page 63**
Line 5
    Delete the fourth word in the line.
Line 12
    Delete the first word in the line.
Line 24
    Delete the third word in the line.
Line 26
    Delete the fifth word in the line.
Line 28
    Delete the eleventh word in the line.
Line 33
    Delete the eleventh word in the line.
Line 36
    Delete the seventh word in the line.
Line 37
    Delete the second word in the line.
Line 39
    Delete the eighth word in the line.
Line 41
    Delete the tenth and thirteenth words in the line.
Line 42
    Delete the first and fourth words in the line.


**Page 64**
Line 6
    Delete the second word in the line.
Line 8
    Delete the third word in the line.
Line 13
    Delete the fourth word in the line.
Line 15
    Delete the tenth word in the line.
Line 18
    Delete the third word in the line.
Line 20
    Delete the fifth word in the line.
Line 24
    Delete the second word in the line.

Line 25
> Delete the third and fifth words in the line.

Line 27
> Delete the second word in the line.

**Page 65**

Line 2
> Delete the fifth word in the line.

Line 22
> Delete the ninth word in the line.

**Page 66**

Line 15
> Delete the fourth word in the line.

Line 24
> Delete the second word in the line.

Line 26
> Delete the twelfth word in the line.

**Page 67**

Line 13
> Delete the last word in the line.

Line 14
> Delete the twelfth word in the line.

**24 March 2003 Memorandum**

**Page 2**

Lines 11 – 12
> Delete the third word in line 11 through the third word in line 12.  The Agency does not acknowledge a relationship with this individual.

Lines 12 – 16
> Delete the eighth word in line 12 through the first word in line 16.

Line 34
> Delete the sixth word in the line.

Line 36
> Delete the tenth word in the line.

**Page 7**

Line 31
> Delete the thirteenth and fourteenth words in the line.

Lines 33 – 40
> Delete the twelfth word in line 33 through line 40.

Line 41
> Delete the twelfth word in the line.

**Page 9**
Line 21
>   Delete the third word in the line.  You may wish to substitute an initial for the last name.

Line 23
>   Delete the third word in the line.

Line 36
>   Delete the second word in the line.

Line 37
>   Delete the last word in the line.

**Page 10**
Line 6
>   Delete the eleventh word in the line.

**Page 13**
Line 42
>   Delete the twelfth through sixteenth words in the line.

**Page 17**
Line 2
>   Delete the sixth word in the line.  You may wish to substitute an initial for the last name.

Line 3
>   Delete the fifth word in the line.

Line 4
>   Delete the fifth word in the line.

Line 6
>   Delete the fifth word in the line.

Line 8
>   Delete the fifth word in the line.

Line 9
>   Delete the fifth word in the line.

Line 10
>   Delete the fifth word in the line.

Line 11
>   Delete the fifth word in the line.

Line 13
>   Delete the fifth word in the line.

Line 16
>   Delete the fifth word in the line.

Line 17
>   Delete the fifth word in the line.

Line 19
>   Delete the fifth word in the line.

Line 20
    Delete the fifth word in the line.
Line 21
    Delete the fifth word in the line.
Line 22
    Delete the fifth word in the line.
Line 25
    Delete the fifth word in the line.
Line 26
    Delete the fifth word in the line.
Line 27
    Delete the fifth word in the line.
Line 28
    Delete the fifth word in the line.
Line 29
    Delete the fifth word in the line.

**Page 18**
Line 5
    Delete the fourth and fifth words in the line.
Line 7
    Delete the fourth through seventh words in the line.
Line 9
    Delete the tenth word in the line.
Line 13
    Delete all of line 13.
Lines 18 – 19
    Delete the thirteenth word in line 18 through line 19.
Line 23
    Delete the fourth and fifth words in the line.
Line 25
    Delete the seventh through tenth words in the line.
Line 31
    Delete the fourth through eighth words in the line.
Line 32
    Delete the fifth through last words in the line.

**Page 19**
Lines 1 – 2
    Delete all of lines 1 and 2.

**20 May 2004 Memorandum**
**Page 23**
Line 7
>   Delete the last two words in the line.

Line 8
>   Delete the first word in the line.

Line 9
>   Delete the fourth through sixth words in the line.

Line 12
>   Delete the second word in the line.

Line 16
>   Delete the first three words in the line.

Line 22
>   Delete the fourth through seventh words in the line.

Line 23
>   Delete the ninth word in the line.

Line 26
>   Delete the last two words in the line.

**Page 24**
Line 44
>   Delete the fifth and sixth words in the line.

**Page 28**
Line 2
>   Delete the sixth word in the line.

**Page 29**
Line 1
>   Delete the eighth word in the line.

**Page 30**
Line 35
>   Delete the fifteenth word in the line.

Line 39
>   Delete the eleventh word in the line.

**22 November 2004 Memorandum**
**Page 1**
Line 33
>   Delete the third word in the line.

**Page 2**
Line 2
>   Delete the last word in the line.

A copy of the edited pages is enclosed for your records.

If you add material to or change the manuscript the Board has reviewed, you must submit these additions or changes to us before giving them to your publisher or anyone else. Please mark or otherwise indicate the new material clearly so we can expedite our review. Additional items that require submission include, but are not limited to, photographs, photograph captions, illustrations, diagrams, tables, charts, or maps.

The Board requires that you include the following disclaimer:

All statements of fact, opinion, or analysis expressed are those of the author and do not reflect the official positions or views of the CIA or any other U.S. Government agency. Nothing in the contents should be construed as asserting or implying U.S. Government authentication of information or Agency endorsement of the author's views. This material has been reviewed by the CIA to prevent the disclosure of classified information.

The Board is also in possession of a set of reference documents that you provided. Please inform the Board within ten days of receipt of this letter if you want them returned to you and we will do so.

Do not hesitate to contact me if you have any questions or if we can be of further assistance.

Sincerely yours,

R. Puhl

R. Puhl
Chairman, Publications Review Board

Page 14

Declaration of Scott A. Koch
Information and Privacy Coordinator
Central Intelligence Agency

# Exhibit G

PRB E-mail (June 30, 2006)

**Subject:** Re: PRB review of M documents
**From:** rich███████████████
**Date:** Fri, 30 Jun 2006 14:57:40 -0400
**To:** Franz Boening ████████████████

Franz,

As we have told you a number of times in the past, if you rewrite your M story in a different format, outside the official-looking memo-type one it currently is in; and attribute those statements to open sources in the new format (as you basically have), there should be no problem with you getting your message out. The deletions noted in our letter pertain to the information as presented in the old format and not to the information itself.

As you should be well aware, anyone with access to classified systems can easily access classified information on a wide variety of subjects, including those they don't work on.

We are looking into the "**1-2 document**" issue.

We will return your source material.

Let me know if you have any more questions.

Franz Boening wrote:

> Dear PRB,
>
> Thank you for finally processing the majority of the M collection of "personal documents."  Although it took your office 10+ months to almost complete the job (i.e., about 1000% longer than the time it is supposed to take), you actually processed the documents!   This is an accomplishment for me and for you.  (Please see para five below.)
>
> Obviously, I have a big problem with your assertion that M's name cannot be mentioned by name.  This is the heart of the first complaint.  But why can M's name and country of employment not be released?  Why not?  He is mentioned by name in all of the source documents that I provided to your office.  Moreover, **I did not agree in my CIA secrecy agreement to keep newspaper articles, public analysis, public statements, and my personal opinions secret.**   Finally, your office's letter of January 2006 and Paul Chretien's multiple Lotus Note statements of summer 2005 said that the M documents could be released if I demonstrated that they were based on overt sources.  I did this to everyone's satisfaction.  Do you now assert that I have not satisfied this

requirement? Why the change?

**Please respond to the following questions:**

1. **Where in my secrecy agreement did I agree to keep overt information secret?** I recall having promised to keep CIA information secret, which, frankly, I have done. **Which of my 80+ source documents did CIA author? Any?** Cite even one document, please.

2. **When and how during my CIA career did I have access to classified documents on M that I used to write my collection?** I vigorously deny ever having read even one classified M document in my entire life. **Did I ever work on Latin America topics in my entire career? Please explain.**
(Note: Of course, as I acknowledged years ago, I have read previously classified documents on M available at the National Security Archive--documents that were produced by other USG agencies. But, the documents were no longer classified when I read them.)

3. **Are the deletions your office took in my collection secret under law or only "inappropriate for disclosure" as your memo of 20 June asserted. Does "inappropriate for disclosure" mean secret under EO 12958? I noted that none of your deletions cited the section of the EO that might allow the deletion. Why not?**

**How can CIA withhold media and civil society documents produced by others? By what right can your organization do this? What section of the EO allows this? Do the perogatives of CIA trump the First Amendment of the Constitution? If the deletions are not secret or otherwise classified, I do not accept them. I am a retired American, who refuses to forfeit his First Amendment rights!**
(As you know, under CIA regulations, the only standard you can apply to retirees is whether material is classified. Not format, not taste, not "we hate this guy," not "this is embarassing" etc. The material used in any document submitted to your office cannot be based on classified material; otherwise you can withhold it. I have always accepted this. However, by your own standards, nothing in my collection can be considered classified because none of it is based on CIA material.)

4. **Why is the nervous CIA disclaimer necessary?** Although I have always

expressed a willingness to CIA to include such a disclaimer--since 2001, in fact, as a courtesy--why is a disclaimer necessary when no identity is mentioned? My willingness to include a disclaimer was always premised on the assumption that CIA would release the topic of discussion--M. I find the inclusion of a disclaimer when no topic is mentioned to be, frankly, insulting. (Kafkaesque, perhaps?) Please note that even if M's name were included, it seems to me that CIA will still have adequate deniability. Why not simply deny or not comment on my M collection? Remember, CIA has asserted that my collection is personal in nature. Personal, right? Private opinions, no? Based on newspaper articles? Why do you see fit to delete the subject of conversation if your disclaimer is included?

**5. Where is the 1-2 document that I authored and originally acknowledged might rpt might be secret in 2001? This annex, you will recall, detailed the truly excrutiating details of M's alleged relationship with CIA, along with the likely violations of law. Why have you not processed it? When will this document be finished? Do I not have right to have all of my personal documents processed?**

6. When is the last time that CIA sought to delete overt newspaper accounts, public statements, and public analysis from the personal writings of a retired employee? In the 1970's? Ever? Is this a wise decision from a public policy standpoint? Will this decision withstand legal challenge?

**Kindly return to me my source materials. In the meantime, I reserve the right to pursue release of further M information--contained in my "personal writings"--in another forum.**

Most sincerely,
Franz Boening

Declaration of Scott A. Koch
Information and Privacy Coordinator
Central Intelligence Agency

# Exhibit H

PRB Letter (Aug. 11, 2006)



Central Intelligence Agency

Washington, D.C. 20505

Publications Review Board
1H11 IP Building
E-mail: prb@ucia.gov

Telephone: 703.613.3070
703.613.1219
Facsimile: 703.613.3004

11 August 2006

Mr. Franz Boening
█ Deer Mountain Est.
Harpers Ferry, WV 25425

Dear Mr. Boening:

The Publications Review Board located the "2001 classified annex" document that you created when employed by the Agency. A classification review was completed of the document. The Board determined that, in accordance with the terms of your secrecy agreement, all of the information contained within the document is inappropriate for disclosure in the public domain (i.e., is considered to be classified information).

This concludes our action on your original request for the prepublication review of your six-part manuscript consisting of five memorandums dated 10 May 2001, 16 January 2003, 24 March 2003, 20 May 2004, 22 November 2004, and the 2001 classified annex.

We have now reviewed and deleted classified material from these documents. You may use them as you see fit. If you undertake to rewrite these documents or otherwise state in your own words what you desire to communicate, you are required to submit this new material for prepublication review. What you resubmit must include specific, open source citations (author, title, source, date, page) for the statements you wish to make. These citations must be placed in the body of the text and be linked to specific sentences and paragraphs.

Per your request, we are returning your reference packet along with this letter.

Sincerely yours,

R. Puhl

R. Puhl
Chairman, Publications Review Board

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
FRANZ BOENING,                      )
                                    )
            Plaintiff,              )
                                    )
    v.                              )        Civil Action No.
                                    )        1:07CV00430 (EGS)
CENTRAL INTELLIGENCE AGENCY,        )
                                    )
            Defendant.              )
_____)
```

## DECLARATION OF RALPH S. DIMAIO
### INFORMATION REVIEW OFFICER, NATIONAL CLANDESTINE SERVICE
### CENTRAL INTELLIGENCE AGENCY

### INTRODUCTION

I, RALPH S. DIMAIO, hereby declare:

1. I am the Information Review Officer (IRO) for the National Clandestine Service (NCS) of the Central Intelligence Agency (CIA). I was appointed to this position on 11 June 2007. I have held several senior level, operational, and administrative positions in the CIA since 1983. I am responsible for the review of documents originated by the NCS, or otherwise implicating NCS interests, that may become the subject of litigation.

2. The NCS is the organization within the CIA responsible for the conduct of foreign intelligence collection activities through the clandestine use of human sources. The NCS is responsible for conducting the CIA's foreign intelligence and counterintelligence activities,

and covert action; coordinating liaison activities with foreign intelligence and security services; serving as the repository for foreign counterintelligence information; supporting clandestine technical collection; and coordinating CIA support to the Department of Defense. Specifically, the NCS is responsible for the conduct of foreign intelligence collection activities through the clandestine use of human sources.

3.    As the NCS/IRO, I am responsible for the protection of information originated by the NCS, or otherwise implicating NCS interests, which may be the subject of court proceedings. As part of my official duties, I ensure that any determinations as to the release or withholding of such information are proper and do not jeopardize NCS interests or endanger NCS personnel or facilities. As a senior CIA official under a written delegation of authority pursuant to Section 1.3(c) of Executive Order 12958, as amended, I hold original classification authority at the TOP SECRET level.[1] Therefore, I am authorized to make original classification and declassification decisions.

---

[1]   Executive Order 12958 was amended by Executive Order 13292. See Exec. Order No. 13292, 68 Fed. Reg. 15,315 (Mar. 28, 2003). All citations to Executive Order No. 12958 are to the Order as amended by Executive Order No. 13292. See Exec. Order No. 12958, 3 C.F.R. 333 (1995), reprinted as amended in 50 U.S.C.A. § 435 note at 180 (West Supp. 2007).

4.   I am familiar with the above-captioned litigation and plaintiff's request to the PRB for approval to publish the memorandum that is the subject of this case.  I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

5.   As set forth more fully in my classified *in camera, ex parte* declaration, I have determined that public disclosure of certain information in plaintiff's memorandum reasonably could be expected to cause serious damage to national security.  Accordingly, the information that the Agency has required plaintiff to delete from his memorandum is classified at the SECRET level and plaintiff may not, consistent with the terms of his Secrecy Agreement, publish this memorandum unless he removes this information.

6.   This declaration provides the Court with relevant statutory and Executive Order authorities.  My classified *in camera, ex parte* declaration sets forth a brief summary of the background of plaintiff's submission, and a detailed discussion of the categories of classified information that have been revealed in the memorandum, and outlines the damage to national security that reasonably could be expected if this information is publicly disclosed.

3

I.    **Statutory and Executive Order Authorities**

A.    **The National Security Act of 1947**

7.    Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 403-1(i)(1) (West Supp. 2006), requires the Director of National Intelligence (DNI) to protect intelligence sources and methods from unauthorized disclosure.  As IRO, I assist the DNI in implementing these statutory responsibilities.

B.    **The Central Intelligence Agency Act of 1949**

8.    Section 6 of the Central Intelligence Agency Act of 1949, as amended, codified at 50 U.S.C. § 403g, exempts the CIA from the provision of any other law that requires the publication or disclosure of the organization, functions, names, official titles, salaries or numbers of personnel the CIA employs.

C.    **Executive Order 12958**

9.    Executive Order 12958, as amended in March 2003 by Executive Order 13292, prescribes a uniform system for classifying and protecting national security information. Executive Order 12958 defines "national security" as "national defense or foreign relations of the United States" and defines "information" as "any knowledge that can be communicated or documentary material, regardless of its physical form or characteristics, that is owned by,

4

produced by or for, or is under the control of the United
States Government."  Information may be originally
classified under the Executive Order only if it (a) is
owned by, produced by or for, or is under the control of
the U.S. Government; (b) falls within one or more of the
categories of information set forth in section 1.4 of the
Executive Order; and (c) is classified by an original
classification authority who determines that its
unauthorized disclosure reasonably could be expected to
result in damage to the national security that the original
classification authority can identify or describe.  E.O.
12958, § 1.1.  The anticipated severity of the damage
determines which of three classification levels is applied
to the information.  Thus, if an unauthorized disclosure of
information reasonably could be expected to cause *damage* to
the national security, that information is classified as
CONFIDENTIAL; *serious damage* is classified as SECRET; and
*exceptionally grave damage* is classified as TOP SECRET.
E.O. 12958, § 1.2.

        10.  In this case, I have determined that certain
information contained in plaintiff's memorandum is properly
classified under the above guidelines.  Under § 6.1(s) of
Executive Order 12958, "control" refers to the "authority
of the agency that originates information, or its successor

in function, to regulate access to the information."  In
this case, plaintiff signed a Secrecy Agreement in which he
agreed to submit for prepublication review any written
material he prepared that contained any mention of
intelligence data or activities or information or contained
data that may be based upon information classified pursuant
to the Executive Order.  Plaintiff also agreed that any
classified information he learned in the course of his CIA
employment is and will remain the property of the United
States Government and the CIA.

    11.  Under Section 1.4 of Executive Order 12958,
information can be considered for classification if it
concerns one of eight categories.  The information at issue
here falls within at least three of the eight categories:
foreign government information (§ 1.4(b)); intelligence
activities (including special activities), intelligence
sources or methods, or cryptology (§ 1.4(c)); and/or
foreign relations or foreign activities of the United
States, including confidential sources (§ 1.4(d)).

    12.  Finally, as IRO, I have assessed the information
at issue in this case, and I have determined that the
unauthorized disclosure of certain information in
plaintiff's memorandum reasonably could be expected to
cause *serious* damage to national security as described in

Part II below.  Therefore, I have determined that the

information is properly classified at the SECRET level.

## II.  INFORMATION CLASSIFIED

13.  The history of the submission of Mr. Boening's

May 10, 2001 memorandum is detailed in the Declaration of

Scott Koch, and will not be repeated here.  <u>See</u> Declaration

of Scott Koch, ¶¶ 19-38.  The May 10, 2001 memorandum was

submitted twice to the CIA for classification review, once

in May 2001 and once in November 2004, and was

substantively reviewed at least five separate times inside

the Agency, and at least once outside; all of those who

reviewed it agreed that information within was properly

classified at the SECRET level.  An unredacted copy of the

memorandum is attached as an exhibit to my classified *in*

*camera, ex parte* declaration.

### A.  Classified Information

14.  I have determined that the information in

plaintiff's memorandum contains CIA information concerning

intelligence activities, intelligence sources, intelligence

methods, foreign relations, and foreign government

information, and is properly classified pursuant to

Sections 1.4(b), 1.4(c) and 1.4(d) of Executive Order

12958, as amended.  As discussed in greater detail in my

classified *in camera, ex parte* Declaration, disclosure of

the classified information in plaintiff's memorandum reasonably could be expected to cause serious damage to national security.

**B.    Harm From Disclosure.**

15.    The primary mission of the CIA is to collect and analyze, for the President and other U.S. Government policymakers, otherwise unavailable information about foreign governments, foreign individuals, and entities such as terrorist organizations whose actions and interests may impact the foreign policy and national security interests of the United States.   It is critical that the CIA succeed in this mission if the President and his senior advisors are to make well-informed decisions on matters of vital importance to the nation's security.   As IRO, I am responsible for ensuring that the release of NCS information does not jeopardize this flow of intelligence information to policy-makers, or endanger other CIA intelligence sources and methods, personnel, or facilities.

16.    Often, it is not obvious from the face of a document why the disclosure of certain information could cause damage to the national security.   The potential damage from disclosure can only be assessed in a broader context, with an understanding of the origin of the information, information that has previously been released,

and current circumstances.   Each piece of data that the CIA

obtains makes up a piece of a mosaic of intelligence

information that informs the conduct of U.S. national

security policy.   Sometimes, the release of even small bits

of information, when combined with other leaked, stolen, or

publicly available information, can provide our adversaries

with valuable insights into CIA intelligence activities.

Even disclosure of pieces of the intelligence puzzle that

seem innocuous on their own may together provide a damaging

framework within which to assemble other pieces and gain a

picture of the whole.   Putting together the pieces of

intelligence is one of the primary methods employed by all

intelligence services to discern the activities in which a

hostile government or group is engaged, what interests it

has, and its possible future objectives.   Indeed, the CIA

has an entire component -- the Directorate of Intelligence

-- dedicated to the mission of collecting seemingly

disparate pieces of information and assembling them into a

coherent picture of a foreign intelligence target's

activities and intentions.

        17.   Assessing the harm that could result from

disclosure of information is also not an intuitive process.

The harm from unauthorized disclosures may be swift and

obvious:   foreign partners terminate their relationship

9

with the CIA, sources are captured or killed, foreign

countries remove CIA officers from the country, or covert

operations are discovered and consequently abandoned.  The

harm may also be more subtle:  foreign partners may not

provide their most sensitive and useful information to the

United States, possible sources may choose not to cooperate

with the CIA, or hostile intelligence services or terrorist

groups may thwart CIA's collection efforts or provide

misinformation.  Often, the CIA does not know, and will

never know, the intelligence and opportunities that were

lost due to unauthorized disclosures.  Thus, the CIA must

do its best to prevent unauthorized disclosures to avoid

this harm to the national security.

18.  As part of the prepublication review of

plaintiff's memorandum and in preparing this declaration, I

carefully reviewed plaintiff's entire memorandum.  This

review process required careful scrutiny not only of each

word or phrase but also of the context in which statements

are made; the review is more art than science.  As the

individual responsible for protecting information

originating within the NCS, I must endeavor to safeguard

classified information that can be inferred or deduced from

other, seemingly innocuous information in the memorandum.

Further details of the classified information at issue

cannot be discussed on the public record, but are contained in my classified *in camera, ex parte* declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19 day of July, 2007.


Ralph S. DiMaio
Information Review Officer
National Clandestine Service
Central Intelligence Agency

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| FRANZ BOENING, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07-0430 (EGS) |
| ) | |
| CENTRAL INTELLIGENCE AGENCY, ) | |
| ) | |
| Defendant. ) | |

**NOTICE OF LODGING OF CLASSIFIED EXHIBIT IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS UNDER RULE 12
AND MOTION FOR SUMMARY JUDGMENT UNDER RULE 56**

Defendant Central Intelligence Agency, through its undersigned counsel, hereby provides notice that it is lodging for submission in support of Defendant's Motion to Dismiss Under Rule 12 and Motion for Summary Judgment under Rule 56 the Classified *in camera, ex parte* Declaration of Ralph S. DiMaio, Information Review Officer, National Clandestine Service, Central Intelligence Agency.

This *in camera*, *ex parte* declaration is classified pursuant to Executive Order 12958, 60 Fed. Reg. 19825 (Apr. 17, 1995), as amended by Executive Order 13292, 68 Fed. Reg. 15315 (Mar. 25, 2003), and cannot be disclosed without proper authorization. It has been lodged for secure storage and transmission to the Court with the United States Department of Justice, Litigation Security Group, 20 Massachusetts Avenue, N.W., 5th Floor, Washington, D.C., (202) 514-9016. An unclassified declaration from Mr. DiMaio is attached as an exhibit to Defendant's Motion, filed this date on the public record.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFERY A. TAYLOR
United States Attorney

VINCENT M. GARVEY
Deputy Branch Director

Of Counsel:                              **/s/ Michael P. Abate**
Vesper Mei                               MICHAEL P. ABATE
Office of the General Counsel            (IL Bar No. 6285597)
Central Intelligence Agency              Trial Attorney, Civil Division
Washington, DC  20505                    U.S. Department of Justice
                                         P.O. Box 883
                                         20 Massachusetts Ave., N.W., Room 7302
                                         Washington, D.C. 20530
                                         Telephone: (202) 616-8209
                                         Facsimile: (202) 616-8470

                                         *Attorneys for Defendants*

Dated: July 20, 2007