# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRANZ BOENING             *
                                *

       Plaintiff,          *

                                *       Civil Action No: 07-430 (EGS)

       v.                    *

                                *

CENTRAL INTELLIGENCE AGENCY   *

                                *

       Defendant.       *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## RESPONSE TO DEFENDANT'S LOCAL RULE 7(h) STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Rule 7.1 (h), the plaintiff respectfully responds to the defendant's Statement of Material Facts as to Which There is No Genuine Issue.

1.   Plaintiff does not dispute this statement.

2.   Plaintiff does not dispute this statement.

3.   Plaintiff does not dispute the factual recitation of these statements, except to the extent it sets forth legal characterizations and he disputes the conclusion that his May 10, 2001 Memorandum did not represent an "urgent concern."

4.   Plaintiff does not dispute this statement, but has no independent knowledge this is what took place.

5.   Plaintiff does not dispute these statements.

6.   Plaintiff does not dispute the factual recitations of these statements, except he has no independent knowledge this is what took place, but does dispute any legal characterizations or conclusions.

7.   Plaintiff does not dispute the factual recitations of these statements, except to the extent it contains any legal characterizations or conclusions and the letter dated February 4, 2004, speaks for itself.

8.   Plaintiff does not dispute this statement, except to the extent he did not assert, nor does he claim, his May 10, 2001 Memorandum was a "nonofficial document."

9.  Plaintiff does not dispute these statements.

10. Plaintiff disputes the allegation he "failed to make the necessary changes", but does not dispute the PRB's notifications as its' written communications speak for themselves.

11. Plaintiff does not dispute these statements.

12. Plaintiff does not dispute this statement.

13. Plaintiff does not dispute this statement as the letter speaks for itself, but he does dispute the conclusion that the material in the "Classified Annex" was properly classified.

14. Plaintiff does not dispute that the DiMaio Declarations (only one of which is available to the plaintiff) speak for themselves and reflect the fact that a CIA official believes that certain identified information within the relevant records is classified, but does dispute the contents of the Declarations to the extent they set forth legal characterizations asserting why the information at issue is considered classified.

Dated: November 12, 2007

Respectfully submitted,

/s/

_____

Mark S. Zaid, Esq.
D.C. Bar #440532
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036

Attorney For Plaintiff

2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

FRANZ BOENING                 *

                              *

      Plaintiff,            *

                              *      Civil Action No. 07-0430 (EGS)

      v.                   *

                              *

CENTRAL INTELLIGENCE AGENCY   *

                              *

      Defendant.         *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
## UNDER RULE 12 AND MOTION FOR SUMMARY JUDGMENT
## UNDER RULE 56 AND MEMORANDUM OF POINTS AND AUTHORITIES IN
## SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT[1]

Plaintiff Franz Boening ("Boening"), a former employee of the defendant Central

Intelligence Agency ("CIA") for nearly three decades,[2] internally challenged the CIA

with a legal, factual and moral dilemma by calling upon it to publicly come clean about

it's alleged relationship with a foreign national – **[one word deleted by CIA]** – who held

---

[1] This filing and its attachments were submitted to and reviewed by the CIA for classification purposes. As a result it has been approved for public filing in its present form. To the extent any information has been redacted as "classified", the filing of this document does not denote Boening's, or his counsel's, agreement with any classification decisions and he reserves the right to challenge these decisions at the appropriate time. Moreover, depending upon the extent of information redacted, this Court should review any unredacted version in order to ensure Boening receives full due process during these proceedings.

[2] Boening was employed by the CIA from 1980 – 2005. After learning Arabic in the early 1980s, he spent nearly one dozen years handling agent operations, primarily in the Middle East. He worked declassification issues from 1995 – 1999, and ultimately retired from the CIA after working at the Foreign Broadcast Information Service where he handled Internet exploitation and training. He has held a Top Secret/Sensitive Compartmented security clearance for more than 25 years. Complaint at ¶3 (dated March 5, 2007).

a senior position with another Government and was revealed to be a human rights violator and criminal.[3]

This case revolves around a single document: a 25-page memorandum dated May 10, 2001 and its attachments (hereinafter referred to as the "M Complaint"). Boening's concerns about **[one word deleted by CIA]** arose not from any classified work he had performed, or as a result of classified files he had reviewed (or even heard through hallway gossip), but were entirely derived from his reading of publicly available newspaper and magazine articles that described the relationship. Based on open source information, and not knowing whether any documentation on **[one word deleted by CIA]** actually existed, he pursued a rarely used whistleblower provision and called upon the CIA to declassify any relevant classified information it might possess on this individual.

Relying upon provisions established by President Clinton in Executive Order 12,958 which encouraged government employees to challenge overclassification determinations, Boening attempted to persuade the CIA to do the right thing. Instead of rewarding Boening the CIA turned on him and retaliated.[4] It initially classified the "M Complaint" because of its misconceived notion that Boening possessed access to legitimately classified information on the topic, and shut him down completely. As a CIA employee, his options – unfortunately – were limited.

---

[3] **[1 ½ lines deleted by CIA]** Defendant's Motion to Dismiss Under Rule 12 and Motion for Summary Judgment Under Rule 56 ("Def's Memo")(filed July 20, 2007), Declaration of Scott A. Koch ("Koch Decl."), Exs. "E" & "G".

[4] As a result of the matters addressed herein Boening became a whistleblower and suffered employment retaliation to include not being sent to Foreign Country "A" in 2003 despite his having volunteered and possessing needed language skills. Complaint at ¶3; Declaration of Franz Boening at ¶23 (dated November 12, 2007)("Boening Decl."), attached as Exhibit "1".

Now, as a former employee, Boening is free of some of the legal restraints the CIA previously held over him. The Agency's only power now is control over properly classified information, none of which is contained within Boening's writings. As a result, the CIA continues to unlawfully impose a prior restraint upon him to obstruct his ability to disseminate the document so as to avoid embarrassment

This lawsuit represents a significant challenge to the CIA's attempt to unconstitutionally broaden the scope of its authority over its former employees and stifle their First Amendment rights. That effort, based on the law and facts established herein, should be thwarted by this Court.

## FACTUAL BACKGROUND

Boening began employment with the CIA in 1980, at which time he executed a routine secrecy agreement. Koch Decl., Ex. "A". This is the only secrecy agreement ever executed by Boening. Boening Decl. at ¶3. He retired from the CIA in 2005. Id. at ¶2.

*Creation Of The "M Complaint"*

Beginning in or around Autumn 2000, Boening began reading publicly available newspaper and magazine articles that described the political scandals in **[one word deleted by CIA]** country **[six words deleted by CIA]**. [5] Boening had a personal interest in developmental affairs of this geographic region as well as human rights issues. Boening Decl. at ¶4. After reading the domestic and international news accounts Boening was angered, not just by the level of narco-corruption in **[one word deleted by CIA]** particular country and the hidden brutality of the regime in question, but also by the constant reminder that, according to the scores of credible published media accounts, his

---

[5] **[14 lines deleted by CIA]** Id. at ¶7.

employer – the CIA – had nurtured and supported **[one word deleted by CIA]** for years. Complaint at ¶4.

Boening decided to monitor, during his own personal time, the unfolding political scandal because of his strong sense of civic responsibility, which was combined with his personal irritation of the allegations.[6] If what he had read was even 50% true, he decided to take it upon himself to document what he perceived to be an apparently gargantuan intelligence failure. Boening Decl. at ¶8. Boening was livid that CIA may have been party to human rights violations and, even worse, that it seemed entirely possible that CIA had been criminally involved with **[one word deleted by CIA]**. Id. at ¶9.

Based on the articles Boening had read, he decided to document the "perceived violations of the law committed by the CIA" with regard to an alleged "special relationship with a foreign individual who committed unlawful human rights violations and criminal acts." Complaint at ¶6. This led him to create his "M Complaint", which was a whistleblower complaint drafted pursuant to the Intelligence Community Whistleblower Protection Act of 1998 ("ICWPA"). Boening's "M Complaint" specifically alleged that the:

> CIA may have violated US laws during its 10+ year relationship with [NAME REDACTED](paragraph five);
>
> CIA's professional behavior was so scandalous that it seriously damaged American prestige and credibility (paragraph six);

---

[6] During the relevant period of time in question Boening worked overtly in the Foreign Broadcast Information Service as a Mideast media analyst. He had absolutely no professional responsibility whatsoever for **[one word deleted by CIA]** geographical area nor did he have access to any type of classified, compartmented CIA operational information on either **[one word deleted by CIA]** or his region. Boening Decl. at ¶10.

> relationship continued because of an egregious counterintelligence failure (paragraph eight).

Complaint at ¶6; Exhibit "2".[7]

Not one word of the May 10, 2001 "M Complaint" is based on any classified CIA document on or concerning **[one word deleted by CIA]**, or on any information Boening received as a result of his employment with the CIA. Indeed, in his entire life Boening has never read a single classified CIA document (apart from official responses to his complaint which classified publicly available newspaper and magazine articles) wherein **[one word deleted by CIA]** was mentioned. Every comment or conclusion expressed in the "M Complaint" is based on open source information (or officially declassified information from other federal agencies that Boening obtained via the Internet).

Complaint at ¶¶7-8; Boening Decl. at ¶11.

*Attempt To Internally Challenge CIA's Actions Involving The "M Complaint"*

The "M Complaint" was officially submitted to the CIA's Office of Inspector General ("OIG") on May 10, 2001. The document was styled as an "urgent concern" and addressed to "Office of the Inspector General, Central Intelligence Agency," and identified as coming from "Franz Boening, Central Intelligence Agency". The OIG rejected Boening's request. Koch Decl. at ¶21. The CIA then conducted an initial classification review of the document and determined it contained classified information. Id. at ¶22. The CIA "classified" more than a dozen pages of publicly available newspaper, radio, and television information. Additionally, the CIA not only deleted all

---

[7] The "M Complaint" was formatted in the typical simple memo-style format one learns as a schoolchild and included "To", "From" and "Subject" headings. See Exhibit "2"

5

references to the foreign individual's name but also Boening's personal assessment of this individual. Complaint at ¶8.

On July 2, 2001, pursuant to Executive Order 12,958 and the CIA's implementing regulations, Boening, acting in his capacity as a CIA official, submitted the "M Complaint" to the CIA's Agency Release Panel ("ARP") for further classification review so that he could release it to a non-profit organization. Koch Decl. at ¶23. The ARP mistakenly believed that Boening had actually accessed classified information in order to create the "M Complaint", and referred the document to the "Agency Classification Management Review Panel" ("ACMRP") for further review. Id. at ¶¶23-24. The ACMRP also failed to realize that Boening's "M Complaint" was based simply on publicly available information. Id. at ¶25.

When a new Executive Secretary was appointed to the ARP he questioned whether the "M Complaint" was an "official" document. Id. at ¶26. Ultimately, by memorandum dated December 12, 2002, Boening was notified he "was not conducting or facilitating agency business" and that his "M Complaint" was a "personal record" and, therefore, not subject to review pursuant to the Executive Order. Id. at ¶27; Boening Decl. at ¶13; Exhibit "3". Thus, the CIA erroneously determined that neither the ARP nor ACMRP held jurisdiction over the document. Koch Decl. at ¶27.

During this time, in May 2002, Boening met with William McNair, then CIA's Information Review Officer, Directorate of Operations, who revealed to Boening why the "M Complaint" was considered classified. McNair stated:

> "*Look, Franz, do you think I care about* **[two words deleted by CIA]***?*
> *This is not about 'source protection,' this is about CIA's reputation. We*
> *don't want you to have any credibility. The problem with the M*
> *memorandum is that what you've written is all true.*"

Complaint at ¶9; Boening Decl. at ¶16. McNair also acknowledged during the same

conversation that the "M Complaint" was based solely on open source information and

that it seemed to be reasonably well-sourced.

The "M Complaint" was eventually forwarded to the Information Review Officer for

the Directorate of Science & Technology ("DS&T/IRO"). The DS&T/IRO was the

responsible official, based on the regulations that existed at that time, to review "non-

official" documents authored by current employees who worked within the DS&T as

Boening did. Koch Decl. at ¶28. It took until June 24, 2003, for an unfavorable decision

to be communicated to Boening. Id. at ¶29.

*Attempt To Externally Challenge CIA's Actions Surrounding The "M Complaint"*

 Following the CIA's decision Boening sought to appeal the denial that the

ARP/ACMRP lacked jurisdiction and that the document contained classified information

to the Inter-Agency Security Classification Appeals Panel ("ISCAP"), which operates

through the Information Security Oversight Office ("ISOO"), National Archives &

Records Administration. Complaint at ¶17. Initially, ISCAP, or at least ISOO, agreed that

Boening was permitted to appeal to the ISCAP and ordered CIA to deliver the document.

Boening Decl. at ¶15. The CIA refused. Id.

Eventually, William Leonard, Chair, ISOO, was persuaded, based on information not

fully known to Boening, that the CIA's view was correct and that he was not an

"authorized holder". Id. This decision was conveyed by letter dated February 4, 2004.

Koch Decl., Ex. "D".

*The CIA Retaliates Against Boening For His Pursuit Of The "M Complaint"*

After Boening drafted his "M Complaint" unfortunate circumstances required that he author a series of follow-up complaints alleging that the CIA had retaliated against him. These complaints included two formal whistleblower memorandums and dated March 24, 2003 and May 20, 2004, as well as two internal grievances dated January 16, 2003 and November 7, 2003. Exhibit "4". During this period Boening was forced to endure various retaliatory acts from being denied assignments, being told to keep his mouth shut, not speak to younger officers and never being promoted again. Boening Decl. at ¶23.  From 1980 to 1993, Boening had been promoted on average once every 2.5-3.0 years. After he filed his first informal human rights complaint in 1994, and the series of whistleblower complaints in later years, he never once received another promotion during the time – 12 more years – he served with the CIA. Id. at ¶24.

*Submission Of The "M Complaint" For Prepublication Review*

By memorandum dated November 22, 2004, Boening submitted to the PRB four documents, which included the "M Complaint", for classification review for the purposes of potential public dissemination.[8] Exhibits "2" & "4"; Complaint at ¶5. The "M Complaint" was accompanied by all the source documentation. Boening Decl. at ¶¶17-22. Apparently, the PRB did little to no work on reviewing the documentation for months. Id. at ¶18. Finally, when Boening was nearing his retirement in Summer 2005, he and then PRB Chairman, Paul Noel Chrétien, exchanged internal messages about the

---

[8] These were: (a) May 10, 2001, Whistleblower Complaint and addendums dealing with [Individual's name]; (b) March 24, 2003, Whistleblower Complaint alleging retaliation; (c) May 20, 2004, Whistleblower Complaint alleging retaliation; and (d) January 16, 2003, Grievance Against FBIS managers. All four documents were considered classified, but (b) – (d) have since been declassified. Complaint at ¶5;Koch Decl. at 20 fn.7.

"M Complaint". In or around January 2006, the PRB acknowledged that **[one word deleted by CIA]** name and country could be released if Boening could demonstrate the information was based on overt sources. Complaint at ¶10.

However, by letter dated June 20, 2006, the new PRB Chairman, Richard Puhl, formally notified Boening of a reversal of the CIA's decision regarding the classification of his submissions. This letter detailed thirteen pages of required changes on the basis that the information "is inappropriate for disclosure in the public domain and must be revised or deleted prior to publication". Koch. Decl., Ex. "F". Given that by now Boening was no longer a CIA employee, the only information the CIA could legally block publication of was information that was considered classified. This included **[one word deleted by CIA]** name and country of origin. The PRB also noted it required Boening to include a specific disclaimer should he disseminate the redacted document. Id.

By e-mail dated June 30, 2006, in response to Boening's inquiries, the PRB's Richard F. clarified that:

> If you rewrite your [Foreign Individual's name] story in a different format, outside the official-looking memo-type one it currently is in; and attribute those statements to open sources in the new format (as you basically have), there should be no problem with you getting your message out. The deletions noted in our letter pertain to the information as presented in the old format and not to the information itself.

Koch Decl., Ex. "G"[9]

---

[9] The basis for the format requirement, which is not addressed in the PRB's regulations, was never explained. It is especially questionable given that Boening's other whistleblower memos that have been publicly released by the CIA as unclassified were drafted in a similar or identical format that the CIA is challenging. See Exhibit "4".

Furthermore, by letter dated August 11, 2006, the PRB notified Boening that the "2001 classified annex"[10] document he created was also considered "inappropriate for disclosure in the public domain (i.e., is considered to be classified information)." Koch Decl., Ex. "H".

## ARGUMENT

*Applicable Legal Standards*

The CIA has moved pursuant to Rule 12(b)(1),(6) of the Federal Rules of Civil Procedure to dismiss Boening's two APA claims, and seeks summary judgment under Rule 56 to dispose of Boening's First Amendment claims. Boening has cross-moved for summary judgment on all counts, or alternatively for discovery.

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) presents a threshold challenge to the Court's jurisdiction. Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987). The Court may resolve a Rule 12(b)(1) motion based solely on the complaint, or if necessary, may look beyond the allegations of the complaint to affidavits and other extrinsic information to determine the existence of jurisdiction. See id. at 908; Herbert v. Nat'l Acad. of Sci., 974 F.2d 192, 197 (D.C. Cir. 1992). The Court must accept as true all the factual allegations contained in the complaint, but the plaintiff bears the burden of proving jurisdiction by a preponderance of the evidence. Bennett v. Ridge, 321 F. Supp. 2d 49, 51-52 (D.D.C. 2004).

A motion filed under Rule 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim. "[A] complaint should not be

---

[10] Boening styled this document as a "classified annex" not because he was conceding it contained classified information, but because of all his submitted pages it was a possibility. In fact, Boening continues to challenge that this document does not contain classified information. Boening Decl. at ¶11.

dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The district court must treat the complaint's factual allegations -- including mixed questions of law and fact -- as true and draw all reasonable inferences therefrom in the plaintiff's favor. Macharia v. United States, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 165 (D.C. Cir. 2003).

Summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Waterhouse v. Dist. of Columbia, 298 F.3d 989, 991 (D.C. Cir. 2002). In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); see Celotex Corp., 477 U.S. at 324.

*Legal Standards For Prepublication First Amendment Classification Challenges*

The D.C. Circuit has twice provided guidance to the district courts on how to handle prepublication classification challenges; first in McGehee v. Casey, 718 F.2d 1137, 1149 (D.C. Cir. 1983), and more recently in Stillman v. CIA et al., 319 F.3d 546 (D.C. Cir. 2003). As the Circuit originally stated in McGehee:

> Because the present case implicates first amendment rights, however, we feel compelled to go beyond the FOIA standard of review for cases reviewing CIA censorship pursuant to secrecy agreements.  While we believe courts in securing such determinations should defer to CIA judgment as to the harmful results of publication, they must nevertheless satisfy themselves from the record, *in camera* or otherwise, that the CIA in fact had good reason to classify, and therefore censor, the materials at issue.  Accordingly, the courts should require that CIA explanations justify censorship with reasonable specificity, demonstrating a logical connection between the deleted information and the reasons for classification. These should not rely on a "presumption of regularity" if such rational explanations are missing. We anticipate that *in camera* review of affidavits, followed if necessary by further judicial inquiry, will be the norm. Moreover, unlike FOIA cases, in cases such as this both parties know the nature of the information in question. Courts should therefore strive to benefit from "criticism and illumination by [the] party with the actual interest in forcing disclosure."

719 F.2d at 1148-49 (citations omitted); Accord Stillman, 319 F.3d at 548-49.

This review will not involve the need to "second-guess CIA judgments on matters in which the judiciary lacks the requisite expertise." McGehee, 719 F.2d at 1149. There will be little, if any, substantive classification decisions in this case that this Court does not possess the requisite level of expertise to rule upon.[11] Importantly, "while the CIA's tasks include the protection of the national security and the maintenance of the secrecy of sensitive information, the judiciary's tasks include the 'protection of individual rights. Considering that 'speech concerning public affairs is more than self-expression; it is the essence of self-government,' and that the line between information threatening to foreign policy and matters of legitimate public concern is often very fine, courts must assure

---

[11] See New York Times Co. v. United States, 403 U.S. 713 (1971)(per curiam) (permitting publication of Pentagon Papers despite government's claim that they were "top secret"); Haig v. Agee, 453 U.S. 280, 289 (1981)(President's plenary power over foreign relations, "like every other government power, must be exercised in subordination to the applicable provisions of the Constitution."), quoting United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320 (1936).

themselves that the reasons for classification are rational and plausible ones." Id. (citations omitted).[12]

> When the government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply "posit the existence of the disease sought to be cured." It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.

United States et al. v. National Treasury Employees Union et al., 513 U.S. 454, 475 (1995).[13]

## I.  BOENING HAS BEEN DEPRIVED OF HIS PROTECTED FIRST AMENDMENT RIGHT TO PUBLISH UNCLASSIFIED INFORMATION

The CIA argues that Boening's First Amendment claim should be dismissed due to the lack of a First Amendment right to publish information that has been properly classified by the CIA, Def's Memo at 26; that the information contained in the "M Complaint" has been properly classified pursuant to the provisions of EO 12,958, id. at 31; and that simply because some of the information contained in the "M Complaint" has been publicly discussed does not mean that the information has not been properly classified. Id. at 37.

---

[12] In the landmark "Pentagon Papers" case, Justice Brennan wrote that "[t]he entire thrust of the Government's claim throughout these cases has been that publication of the material sought to be enjoined 'could,' or 'might,' or 'may' prejudice the national interest in various ways. But the First Amendment tolerates absolutely no prior judicial restraints of the press predicated upon surmise or conjecture that untoward consequences may result." New York Times Co. 403 U.S. at 725 (1971).

[13] "As Justice Brandeis reminded us, a 'reasonable' burden on expression requires a justification far stronger than mere speculation about serious harms. 'Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women...To justify suppression of free speech there must be reasonable grounds to fear that serious evil will result if free speech is practiced.'" National Treasury Employees Union, 513 U.S. at 475, quoting Whitney v. California, 274 U.S. 357, 376 (1927)(Brandeis, J., concurring).

The Supreme Court has long recognized that expression about public issues rests "on the highest rung of the hierarchy of First Amendment values." Carey v. Brown, 447 U.S. 455, 467 (1980). The constitutional protection for freedom of expression on public matters, which was "fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," Roth v. United States, 354 U.S. 476, 484 (1957), is at the very core of our constitutional and democratic system. Stromberg v. People of State of Cal., 283 U.S. 359, 369 (1931). Therefore, in addressing challenges under the First Amendment, courts must keep in mind that "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964), citing Terminiello v. Chicago, 337 U.S. 1, 4 (1949).

That said, Boening's ability to disseminate his writing is legitimately subject to certain limitations due to his prior affiliation with the CIA.[14] To start, Boening is neither asserting that the prepublication review process is unconstitutional or that he possesses a

---

[14] To some extent, however, Boening's relationship with the CIA also creates greater First Amendment significance under the circumstances. As Judge Kessler noted recently in a prepublication review case "the FBI, by its very nature, is not an open institution, and very few people are knowledgeable about its inner operations. For that very reason, the views of knowledgeable, informed, experienced 'insiders' are of particular utility." Wright v. FBI, 2006 U.S. Dist. LEXIS 52389, *23 (D.D.C. July 31, 2006). It would seem obvious that the same rationale applies equally, and in fact more, to the CIA. As Justice Jackson recognized in American Communications Assn. v. Douds, 339 U.S. 382, 442 (1950), "[t]he priceless heritage of our society is the unrestricted constitutional right of each member to think as he will. Thought control is a copyright of totalitarianism, and we have no claim to it. It is not the function of our Government to keep the citizen from falling into error; it is the function of the citizen to keep the Government from falling into error." Id. at 443.

First Amendment right to publish *properly* classified information. See <u>Snepp v. United States</u>, 444 U.S. 507, 510 (1980).

Boening's secrecy agreement, however, ultimately applies only when he seeks to publish "classified information" that "has come or shall come to [his] attention by virtue of [his] connection with the Central Intelligence Agency." <u>McGehee</u>, 718 F.2d at 1142. As the D.C. Circuit has noted, secrecy agreements, such as the one Boening executed, do not extend to "unclassified materials or to information obtained from public sources." <u>Id</u>. The government may not censor such material, "contractually or otherwise." <u>United States v. Marchetti</u>, 466 F.2d 1309, 1313 (4th Cir.), <u>cert. denied</u>, 409 U.S. 1063 (1972).[15] "The government has no legitimate interest in censoring unclassified materials. Moreover, when the information at issue derives from public sources, the agent's special relationship of trust with the government is greatly diminished if not wholly vitiated." <u>McGehee</u>, 718 F.2d at 1141. <u>Accord</u> <u>Snepp v. United States</u>, 444 U.S. 507, 513 n.8 (1980)("if in fact information is unclassified or in the public domain, neither the CIA nor foreign agencies would be concerned"). <u>See also</u> <u>Stillman</u>, 319 F.3d at 548 (if information not classified properly, manuscript can be published).

The CIA can not properly classify the information contained in Boening's "M Complaint" for at least three reasons: (1) at no time did Boening ever obtain access to any classified information relating to the substance of his "M Complaint" during the time of

---

[15] This Court recently noted that "any secrecy agreement which purports to prevent disclosure of unclassified information would contravene First Amendment rights." <u>Stillman v. CIA et al.</u>, 2007 U.S. Dist. LEXIS 24206, *13 fn.4 (D.D.C. March 30, 2007)(EGS), <u>citing</u> <u>Marchetti</u>, 466 F.2d at 1317 ("We would decline enforcement of the secrecy oath signed when he left the employment of the CIA to the extent that it purports to prevent disclosure of unclassified information, for, to that extent, the oath would be in contravention of his First Amendment rights.").

his employment and the information in question was derived *exclusively* from open source materials; (2) the information addresses perceived violations of the law by the CIA in its relationship with a foreign individual who has committed "unlawful human rights violations and criminal acts" and the CIA can not classify its own violations of the law; and (3) the CIA can not demonstrate that the information is within its "control" and therefore can not properly classify the information.

By virtue of any or all of these arguments, by seeking to improperly classify information within the "M Complaint", the CIA has deprived Boening of his First Amendment right. Therefore, its' Motion should be denied and judgment entered in favor of Boening or, alternatively, it should be denied without prejudice until discovery has been completed.

The governing document concerning the CIA's classification decisions is Executive Order 13,292, 68 Fed. Reg. 15315 (2003), which President Bush issued in March 2003 (amending Executive Order 12,958 that dated back to 1995).[16] Pursuant to § 1.4 of the Order, information shall not be considered for classification unless it concerns (noting in relevant part those provisions that have been raised in this particular case): foreign government information, intelligence activities (including special activities), intelligence

---

[16] This case apparently presents the novel question within the realm of prepublication classification challenges of which Executive Order applies given that the document was reviewed under both EO 12,958 and EO 13,292. See Koch Decl. at 3 (noting "M Complaint" reviewed in May 2001 and May 2004, as well as on 5 other occasions). This issue, however, has been addressed by the courts before in the FOIA context, and there appears to be no reason why to make a distinction in prepublication review cases. The accepted rule is that a reviewing court will assess the propriety of FOIA Exemption 1 withholdings under the Executive Order in effect when the agency's ultimate classification decision is actually made. Campbell v. U.S. Dep't of Justice, 164 F.3d 20, 29 (D.C. Cir. 1998) ("[A]bsent a request by the agency to reevaluate an Exemption 1 determination based on a new executive order ... the court must evaluate the agency's decision under the executive order in force at the time the classification was made.").

sources or methods, or cryptology; and foreign relations or foreign activities of the

United States, including confidential sources.

EO 13,292, contains four conditions for the classification of information: (1) the

information must be classified by an "original classification authority"; (2) the

information must be "owned by, produced by or for, or is under the control of" the

government; (3) the information must fall within one of the authorized classification

categories under section 1.4 of the Order; and (4) the original classification authority

must "determine [] that the unauthorized disclosure of the information reasonably could

be expected to result in damage to the national security" and must be "able to identify or

describe the damage." Id. at § 1.1.

A. **The CIA Can Not Properly Classify The Information Contained In The "M Complaint" As It Was Exclusively Derived From Publicly Available Newspaper And Magazine Articles And Declassified Government Records Retrieved From The Internet**

Let it be clear from the outset – the CIA can not honestly dispute that every withheld

fact from within the "M Complaint" was derived from published newspaper and

magazine articles, or declassified documents of other government agencies that were

retrieved from the Internet. These openly available sources were presented to the CIA

during the review process and have been attached as exhibits for the Court and the public

to review for themselves (unless, of course, the CIA designates them as "classified").

Boening Decl. at Exhibits "A" – "OOOO". In fact, the Court is permitted to take judicial

notice of these documents. See e.g. Benak ex rel. Alliance Premier Growth Fund v.

Alliance Capital Management L.P., 435 F.3d 396, 401 n. 15 (3d Cir. 2006)(court may

take judicial notice of published newspaper articles); In re Merrill Lynch & Co. Research

Reports Sec. Litig., 289 F. Supp. 2d 416, 425 n. 15 (S.D.N.Y. 2003)(same).

There is no case – and the CIA has notably failed to cite any – holding that information in the public domain may be censored. Indeed, in McGehee, the D.C. Circuit specifically noted that "when the information at issue derives from public sources, the agent's special relationship of trust with the government is greatly diminished if not wholly vitiated." 718 F.2d at 1141. The Circuit relied heavily on Marchetti, which held that the government may not censor information obtained from public sources, "contractually or otherwise." 466 F.2d at 1313. See also Snepp, 444 U.S. at 513 n. 8 ("if in fact information is unclassified or in the public domain, neither the CIA nor foreign agencies would be concerned"); Wright v. FBI, 2006 U.S. Dist. LEXIS 52389, *28 (D.D.C. July 31, 2006)("Defendants' argument, even if accurate, does not explain how, regardless of how or when Wright learned of certain information, the Government could have any interest whatsoever in censoring it if it is already in the public domain").

> 1. *There is A Significant Legal And Factual Distinction Between Adjudicating Whether Information Has Been "Officially Acknowledged" In FOIA Cases And Whether Information Is In The Public Domain In Prepublication Classification Challenges*

The CIA's last line of defense is that the information contained in the "M Complaint" can still be properly classified despite being "publicly discussed," as there has been no official acknowledgment of the information. Def's Memo at 37, citing Fitzgibbon v. CIA, 911 F.2d 755, 765 (D.C. Cir. 1990). This argument is a red herring. The CIA relies exclusively on analysis taken from FOIA decisions that is inapplicable to the present circumstances. See e.g., id. at 765 (finding that disclosure of a CIA station's location in a Congressional report did not constitute official disclosure and that the CIA, due to national security concerns, could not be forced, pursuant to FOIA, to disclose the actual location); Public Citizen v. Dep't of State, 11 F.3d 198, 202 (D.C. Cir. 1993)(rejecting a

FOIA request for records relating to a meeting between Saddam Hussein and U.S.
Ambassador April Glaspie, despite her public testimony before Congress on the meeting,
on the grounds that the public testimony did not necessarily constitute official disclosure
because the public information did not necessarily specifically match the requested
information).

The CIA does cite to one of the first prepublication review cases ever decided (which
was an outgrowth of the Marchetti case, the first such legal challenge) by the Fourth
Circuit more than thirty years ago. Def's Memo at 39, citing Knopf v. Colby, 509 F.2d
1362, 1370 (4th Cir. 1975)("It is true that others may republish previously published
[press] material, but such republication by strangers to it lends no additional credence to
it. [Plaintiffs] are quite different, for their republication of the material would lend
credence to it, and, unlike strangers referring to earlier unattributed reports, they are
bound by formal agreements not to disclose such information.").

But this ignores the D.C. Circuit's clear admonition nearly a decade later rejecting the
notion of that premise: "when the information at issue derives from public sources, the
agent's special relationship of trust with the government is greatly diminished if not
wholly vitiated". McGehee, 718 F.2d at 1141. The CIA's argument also ignores its own
interpretation of what is meant by "official information" and the relationship to publicly
available materials. See 57 Fed. Reg. 876 (1992)(CIA regulation defining "official

information" to exclude items meant for public consumption, such as newspapers, magazines, books, and reference materials.[17]

The D.C. Circuit court noted that "[a]n ex-agent should demonstrate, however, at an appropriate time during the prepublication review, that such information is in the public domain." Id. at 1141 n. 9. That is the only requirement in a prepublication review challenge. Not that the information has been "officially disclosed" by the federal government.

Boening has met the requirement as set forth by the law in this Circuit, Boening Decl. at ¶¶17-22, and is entitled to summary judgment as the CIA can not prevent the disclosure of the information in his "M Complaint".

## B.  The CIA Can Not Classify Information Concerning A Violation Of Law Or To Prevent Embarrassment

Boening submitted the "M Complaint" to the CIA IG pursuant to the ICWPA on the grounds that he believed there was evidence, based on his reading of published newspaper and magazine accounts, that the CIA had engaged in "perceived violations of the law" with regard to an alleged "special relationship with a foreign individual who committed unlawful human rights violations and criminal acts." Def's Memo at 8.

---

[17] The CIA does possess wide latitude to prevent current employees from publishing even personal opinions concerning publicly available newspaper articles. See 57 Fed. Reg. 54564 (1992), citing HR 6-2 (2)(h)(4)("For current employees and contractors, the Agency may also deny permission to publish statements or expressions of opinion that could reasonably be expected to impair the author's performance of duties, interfere with the authorized functions of the CIA, or have an adverse impact on the foreign relations or security of the United States.")(although from a proposed regulation, identical or similar language exists in the current regulation governing employee writings). For former employees, which is Boening's status, however, the CIA can only prevent the publication of properly classified information. See Koch Decl., Exs. "B" & "C".

The CIA may not classify information to "conceal violations of law, inefficiency, or administrative error," "prevent embarrassment to a person, organization, or agency," or "prevent or delay the release of information that does not require protection in the interest of the national security." Exec. Order 13,292, § 1.7(a)(1)-(2).

The CIA chooses to ignore this exception, instead focusing on the classification criteria that the information contained in the "M Complaint" allegedly implicates "intelligence sources and methods" or "information concerning foreign relations or foreign activities of the United States, including confidential sources,"[18] and that disclosure of the information in the Memorandum could reasonably be expected to cause damage to national security. Def's Memo at 34, citing Exec. Order 12958, as amended, § 1.4(c)-(d). The CIA's decision to classify the information in the "M Complaint", which the CIA concedes was derived from open source materials,[19] serves only to strengthen the overwhelming suspicion that violations of the law did in fact occur and that the CIA's classification decision was purely designed to prevent the emergence of embarrassing information about the CIA (just as CIA official William McNair stated, see Complaint at ¶9; Boening Decl. at ¶16). Given that the information in the "M Complaint" was derived exclusively from open source materials, and referred to a questionable unethical or even

[18] For unexplained reasons (at least in its public filings), the CIA also identified "foreign government information" as an applicable classification category. However, the very definition of the term, see EO 13,292, § 6.1 (r), demonstrates its inapplicability. All of the information contained within the "M Complaint" was derived directly from published newspaper and magazine accounts. Complaint at ¶¶7-8; Boening Decl. at ¶11.

[19] In an email from the PRB's Richard F. dated June 30, 2006, Boening was informed that the only two problems were the "official-looking" format of the Memorandum and the need to "attribute those statements to open sources in the new format (*as you basically have*)…" Complaint at ¶ 12; Koch Decl., Ex. "G" (emphasis added).

criminal relationship, the CIA's decision to attempt to classify public information should respectfully lead this Court to seriously look behind the propriety of the CIA's decision.

While not confronting the EO exception § 1.7(a)(1)-(2) directly, the CIA attempts to weaken the Court's authority by continually reminding it of the concept of judicial deference on issues of national security classifications. Def's Memo at 27-35. A thorough examination of the specific case law cited by the CIA, however, reveals a somewhat misleading argument as those cases *solely* involved FOIA disclosure lawsuits. See e.g. Ctr. for Nat'l Sec. Studies v. United States Dep't of Justice, 331 F.3d 918, 928 (D.C. Cir. 2003)(concluding that the government's affidavits concerning the anticipated harm to national security that could arise from disclosure pursuant to FOIA of the names of terrorist suspects detained after the 9/11 attacks was reasonable); Frugone v. CIA, 169 F.3d 772, 775 (D.C. Cir. 1999)(finding that the court was in no position to dismiss the CIA's facially reasonable concerns regarding harm to national security that could arise from the confirmation or denial of the existence of an employment relationship with an allegedly covert employee). Not one of the cases cited pertained to a First Amendment classification challenge of a former CIA employee, which the CIA is well aware of involves completely different legal and factual considerations. Stillman, 319 F.3d at 548-49; McGehee, 719 F.2d at 1148-49 (citations omitted).[20]

_____

[20] This is not to say that judicial deference does not play a role in prepublication review challenges. It clearly does, as this Court has itself recognized. Stillman, 2007 U.S. Dist. LEXIS 24206, *18-19 (noting "government is entitled to substantial deference in its classification decisions."). However, "[d]espite this high level of deference, the Court will not just rubber stamp the government's classification decision. To uphold the government's classification decision, the Court must satisfy itself 'from the record, *in camera* or otherwise, that the [government agencies] in fact had good reason to classify, and therefore censor, the materials at issue.'… The Court will not rely on any

While Boening does not challenge the tradition of affording a level of deference to the expertise of the Executive Branch on matters of national security, such deference is not a blank check and can not be permitted to interfere with the legal rights of individual citizens without some form of judicial oversight. "[W]hile the CIA's tasks include the protection of the national security and the maintenance of the secrecy of sensitive information, the judiciary's tasks include the protection of individual rights". Id. at 1149. In the instant matter, the Court does not need to "second-guess" the CIA's underlying classification decisions as much as factually or legally determine that the CIA is attempting to inappropriately classify publicly available information for the purpose of concealing a violation of law or to prevent embarrassment of the CIA.

### C. The CIA Can Not Demonstrate That The Information Is Owned By, Produced By Or For, Or Under The Control Of The Government.

The governing Executive Order defines "information" as "any knowledge that can be communicated or documentary material, regardless of its physical form or characteristics, that is owned by, produced by or for, or is under the control of the United States Government." Exec. Order 13,292, § 6.1(s). It also defines "control" as "the authority of the agency that originates the information … to regulate access to information." Id.[21] The

---

'presumption of regularity' if rational explanations are missing." Id. at *19-20 (internal citations omitted), quoting McGehee, 718 F.2d at 1148-49.

[21] Interestingly, as part of a litigation settlement in 1991, the CIA published a new regulation entitled "Nondisclosure Obligations and Prepublication Review; Access to and Release of Official Information". 57 Fed. Reg. 876 (1992). It specifically defined the related term of "official information," to include "all information, whether classified or unclassified, that is originated, received, *or controlled* by the Agency in pursuance of law or in connection with the discharge of official duties. This definition encompasses information that concerns sources and methods, is unique to the Agency, or can be traced to the Agency. *Excluded from this definition are … items meant for public consumption, such as newspapers, magazines, books, and reference materials*. Id. (emphasis added).

CIA asserts that because the information in Boening's "M Complaint" describes the government's intelligence activities, sources or methods or impacts foreign relations that it falls within the purview of Boening's Secrecy Agreement and is therefore under the "control" of the CIA. Def's Memo at 32. It counters that Boening's "passing assertions that he did not have access to the classified information in his Memorandum while employed at the CIA, *see* Compl. ¶ 8, are insufficient to defeat the Agency's control over that information." Def's Memo at 33.

However, to supports its claim regarding control the CIA chooses to focus on the issue of whether former CIA employees who had access to classified information within the "control" of the CIA can claim that information they discovered through open source materials was not related to the classified information to which they had access, regardless of whether the employee ever actually exercised that access. The CIA's apparent view is that since Boening *possibly* had access to the allegedly classified information contained in his "M Complaint" while employed at CIA, regardless of whether he ever actually exercised that access to learn that information, Boening can not now claim that he based all of his research exclusively on open source materials. Id.

The CIA exclusively relies on two Fourth Circuit cases, neither of which is applicable to the current situation. Id. In Knopf, the Court held that a former government employee can not "be heard to say that he did not learn of information during the course of employment if the information was in the Agency and he had access to it." 509 F.2d at 1371. Several years later the Circuit noted in Colby v. Halperin, 656 F.2d 70, 72 (4th Cir. 1981), that former CIA employees "cannot disclose classified information to which they had access during their public service, even though they may have acquired such

information elsewhere"). The basis of its reasoning was that there is a substantial

presumption that information to which an employee had access would have been

discovered or learned during employment. Knopf, 509 F.2d at 1371.

The CIA's reliance on these cases is flawed for at least two reasons. First, the Knopf

Court held that a secrecy agreement only covers information learned during or in

consequence of employment, and not information gathered outside of employment. Id.

Second, in both cases the Fourth Circuit chose to highlight the qualifying condition that

the employee in question must have had access to the information while employed at the

CIA. Id.; Halperin, 656 F.2d at 72.

In the instant case, Boening can not only prove he gathered the information

exclusively outside of his employment at CIA and solely from open source materials

(especially since the materials were submitted to the PRB and are now included as part of

this case for judicial review), but further that at no time did he even have authorized

access to the information while employed at the CIA. Complaint at ¶8; Boening Decl. at

¶11. In fact, the CIA has repeatedly conceded – particularly in order to defeat Boening's

efforts to attain outside intervention – that Boening did not have authorized access to any

of the "classified" information he included within his "M Complaint". Def's Memo at 22-

23; Classified DiMaio Decl. ¶8; see also Koch Decl. ¶32 n.7 & Ex. D (letter from J.

William Leonard)("[T]he CIA has represented that any access to classified information

you gained and which you included in your original complaint was not granted in

accordance with your duties at the CIA. They have further represented that you did not

have a need-to-know . . . the specific classified information accessed in preparation of

your original complaint.").[22] And the CIA has characterized the "M Complaint" as a

"personal record." Koch Decl. at ¶27. The CIA can not have it both ways.[23]

    Moreover, the PRB has conceded that the only issues preventing publication were the

"official-looking" format of the "M Complaint" and the perceived inadequacy of

Boening's open source citations (an assertion challenged by Boening). Complaint at ¶12

("If you rewrite your [Foreign Individual's name] story in a different format, outside the

official-looking memo-type it is currently in; and attribute those statements to open

sources in the new format (*as you basically have*), there should be no problem with you

getting your message out. *The deletions noted in our letter pertain to the information as

presented in the old format and not to the information itself*")(emphasis added). The

PRB's statement evidences the true issue for the CIA: the formatting of the "M

Complaint" (which ties directly into the embarrassment factor elucidated by CIA official

William McNair). This bears no relation to the classification status, or the CIA's

"control" of the information contained in the "M Complaint".

    Therefore, as the CIA can not demonstrate that the information was within its

"control" the information can not be properly classified..

---

[22] See *infra* at 43 fn. 34.

[23] The CIA tries to gloss over this fact by implying Boening perhaps inappropriately accessed classified information without CIA consent. Def's Memo at 23, n.11 ("employees with access to classified systems can obtain classified information on a wide variety of subjects"). Whether the implication that follows is true, namely that the CIA is admitting its own failure to restrict access in compliance with Executive Order 13,292, it remains to be seen and serves to fortify the need for discovery to determine the extent of Boening's access while employed at CIA and whether he actually accessed classified materials relevant to the information contained in the "M Complaint". Most likely this argument is nothing less than after-the-fact lawyering, especially since the CIA at no time, and this issue obviously dates back more than six years, ever cited Boening for a security violation or sought to revoke his security clearance (which he actually still maintains to this day). Boening Decl. at ¶12.

**D.  The Information Concerning [one word deleted by CIA] And The Drafting Of The "M Complaint" Occurred Outside The Scope Of Boening's Employment And Secrecy Agreement**

Not far removed from the argument that the "M Complaint" was based entirely on publicly available information, Boening is also entitled to summary judgment due to the fact that he obtained the information and created the document outside of the scope of his employment and secrecy agreement.[24]

This Court recently issued a ruling in another prepublication classification challenge in <u>Stillman</u> wherein it noted that "the same logic that prevents current and former employees from revealing classified information *obtained by them during the course of their employment* prevents individuals who maintain a security clearance and contract with the government as either an employee or affiliate from disclosing classified information obtained while under such a contract and bound by a secrecy agreement." <u>Stillman</u>, 2007 U.S. Dist. LEXIS 24206, *16 (emphasis added). While there are notable distinctions between the factual and legal circumstances that led to the instant matter and that of <u>Stillman</u>, one conclusion in particular resonates with significant relevance.

> The Court is also persuaded by the government's *in camera* submissions that *but for* Stillman's high-level security clearances with the government and its contractors and the secrecy agreements he signed, Stillman would not have had access to or obtained the classified information that he is now attempting to disclose in his manuscript.

<u>Stillman</u>, 2007 U.S. Dist. LEXIS 24206, *17 fn.6 (emphasis added). This "but for" determination that was accorded significant weight in <u>Stillman</u> is conspicuously absent in Boening's case. Having relied *solely* upon published newspaper and magazine articles (as

---

[24] This argument does not eliminate Boening's obligation to submit any writings, even when created outside of the scope of employment, for prepublication review. Of course, that requirement extends into perpetuity.

27

well as declassified records of other federal agencies retrieved off the Internet), and never once having had access to any related classified information from the CIA's systems, Boening's relationship with the CIA had absolutely nothing to do with the contents of the "M Complaint".[25] Notwithstanding Boening's employment with the CIA, he still would have had access and obtained the information that he set forth in his "M Complaint".[26]

An analysis of the prior prepublication review cases recognizes an implicit recognition that there was a limitation as to how far the scope of employment would extend to permit an infringement upon a former employee's First Amendment rights. See e.g., Snepp, 444 U.S. at 510 n.3 (government may "protect substantial government interests by imposing reasonable restrictions on employee activities that in other contexts might be protected by the First Amendment."); Stillman, 319 F.3d at 548 (favorably citing Snepp); Marchetti, 466 F.2d at 1317 ("Marchetti retains the right to speak and write about the CIA and its operations, and to criticize it as any other citizen may, but he may not disclose classified information obtained by him during the course of his employment which is not already in the public domain); Knopf, 509 F.2d at 1371 (secrecy agreement "of course, covers only information learned by [an employee] during their employment and in consequence of it. It does not cover information gathered by them outside of their employment or after its termination."); United States v. Snepp,

---

[25] Indeed, the only significance of Boening's CIA relationship was that he could submit the memorandum internally. Of course, any John Q. Public could have written the same memorandum utilizing the same sources and mailed the document to the CIA Director's Office. Under the circumstances it likely would have received virtually the same treatment as did Boening's effort.

[26] Boening would submit the "but for" test appropriately relates to access and content of the document in which the classification is being challenged, not whether the memorandum overall would have been written in the first place had he not been a CIA employee.

456 F.Supp. 178, 182 (E.D.V.A. 1978)(upheld government's "system of prior restraint against disclosure by employees and former employees of classified information obtained during the course of employment.").

1. *The CIA's Argument That It Has The Lawful Authority To Block Publication Of Information Obtained Outside Of The Course Of Employment Or The Scope Of Any Executed Secrecy Agreement Renders Those Agreements Unconstitutionally Broad*

The government's argument is essentially that because a secrecy agreement may be active for an individual who is handling information "A", it lawfully applies to information "B", "C" and "D" as well. As noted above, that argument renders secrecy agreements too broad and, therefore, unconstitutional. See also National Federation of Federal Employees v. United States, 659 F.Supp. 1196, 1204 (D.D.C. 1988)(requirement that certain government employees not disclose any information which is "classifiable" was excessive restriction on speech which was more than necessary to protect the substantial government interest), on remand, American Foreign Service Association v. Garfinkel, 490 U.S. 153 (1989)(per curiam).

**E. If Boening Is Not Entitled To Summary Judgment Outright, Discovery Is Necessary On His First Amendment Claim Before The CIA Deserves Judgment In Its Favor**

If the CIA is claiming that Boening did not exclusively derive the information within his "M Complaint" from publicly available newspaper and magazine articles, or other federal agencies' declassified documentation retrieved from the Internet, then Boening is entitled to discovery prior to the granting of summary judgment. Additionally, there exists a factual issue as to whether the U.S. Government, in light of available declassified records, has "taken affirmative measures to conceal" the relationship with **[one word deleted by CIA]**. See Rule 56 (f) Declaration of Mark S. Zaid, Esq. at ¶¶4-5 (dated November 12, 2007), attached as Exhibit "5". See Wright, 2006 U.S. Dist. LEXIS 52389, * 27-9 (D.D.C. 2006)(finding existence of dispute concerning genuine issue of material

fact where both former and current FBI Special Agent utilized newspaper accounts and various open source materials to draft manuscript criticizing FBI counterterrorism efforts and FBI claimed the information was not derived solely from open source materials but obtained by virtue of plaintiff's position within the FBI). See also Knopf, 509 F.2d at 1365 (CIA required to produce witnesses); Marchetti, 466 F.2d at 1312 (trial on merits held); Snepp, 456 F.Supp. at 179-180 (extensive discovery conducted;  Court also heard testimony from CIA officials including former CIA Director Bill Colby and then-current CIA Director Admiral Stansfield Turner).

## II.  THE CIA'S MANDATORY DISCLAIMER IS BOTH UNCONSTITUTIONAL AND RUNS AFOUL OF THE APA

The CIA's 2005 PRB Regulations require former employees to include a disclaimer, unless waived in writing by the PRB. Koch Decl. Ex. "C". The CIA asserts that this requirement does not violate the First Amendment. Def's Memo at 23-26.

Although it is undisputed that the prepublication review process itself is not unconstitutional as long as the information sought to be censored was obtained by and through an employee's work for the government, the CIA's attempt to mandate the use of a disclaimer must fail because it has overextended its authority. The ability of the CIA to regulate or control matters surrounding the dissemination of information by its former employees is limited to protecting classified information. That authority is derived from the lawful obligation imposed by a secrecy agreement.

However, Boening's secrecy agreement contains no mention of any requirement to include a disclaimer in any published work. Compare Koch Decl., Ex. "A" (Secrecy Agreement, ¶¶4-6) to Koch Decl., Ex. "B" (1995 PRB Regulations) at ¶i.5 & Ex. "C" (2005 PRB Regulations) at ¶b.4. Moreover, the mandatory disclaimer sought to be forced upon Boening was enacted internally by the CIA four years after he submitted the "M

Complaint" to the CIA, and one year after he had submitted it to the PRB. The previous

regulation, which was issued in 1995, merely encouraged, instead of required, the

insertion of a disclaimer.[27] See Koch Decl. Ex.. B, ¶ 2.i.(5).

Even if it is determined that the disclaimer requirement is applicable to Boening's

writing, case law does not support the CIA's contention that its disclaimer passes

constitutional muster. The CIA claims that a disclaimer is less restrictive of First

Amendment rights than the prepublication review process itself, and that since the

prepublication review process has been found to be constitutional, then by necessity a

disclaimer must also be constitutional. Def's Memo at 24-25, citing Weaver v. U.S.

Information Agency, 87 F.3d 1429, 1453-54 (D.C. Cir. 1996)(Wald, J., dissenting);

Snepp, 444 U.S. at 510 n.3.

As an initial matter, it goes without saying that the CIA's primary support for the

contention that a disclaimer is less restrictive than the prepublication review process is

based upon a dissenting opinion in the Weaver case. Def's Memo at 24. In any event, the

constitutionality or restrictiveness of a disclaimer in relation to the prepublication review

process was not considered in Weaver and therefore provides no support to the CIA's

argument that its disclaimer is constitutionally valid.

Alternatively, the CIA claims that even if its disclaimer does violate the First

Amendment, it would still be constitutional in the context of the prepublication review

process. Def's Memo at 25. Its' rationale is based on the fact that it retains the authority,

---

[27] The 1995 Regulations required the disclaimer for current employees. Koch Decl. Ex.
"B", ¶ 2.i.(5).  However, while Boening was still a CIA employee when he submitted the
"M Complaint", he retired on August 13, 2005, months before the PRB even responded
to his submission with its initial concerns. Therefore, pursuant to the regulations,
Boening would be considered a former employee.

in general, to "protect substantial government interests by imposing reasonable restrictions on employee activities that in other contexts might be protected by the First Amendment." Snepp, 444 U.S. at 510. Thus, according to the CIA, a disclaimer is constitutional because ensuring that current *and former* employees who had "access to sensitive national security information do not publish personal documents appearing to be official Agency records" qualifies as a "substantial government interest." Def's Memo at 25 (emphasis added).

The CIA's argument constitutes a considerable expansion of what the Snepp Court considered to be a "substantial government interest." 444 U.S. at 511-12. Rather than even attempt to articulate an actual substantive reason for the necessity of national security to require the disclaimer, the CIA speculates that preventing publication of documents by former employees that *could* be mistaken as official CIA records is an equivalent "substantial government interest" in such a manner as preventing the unauthorized disclosure of classified information and even to the extent of ensuring that the publication of unclassified information does not compromise classified information or sources.[28] See Def's Memo at 25 ("Hence, a reader might easily mistake the Memorandum as having been created as part of official Agency business").[29]

---

[28] It should be noted that the CIA's argument also attempts to expand the quoted language from Snepp to include the activities of former employees, as opposed to just current employees. Def's Memo at 25.

[29] This argument is contrary to the CIA position expressed numerous times in FOIA litigation concerning the official "worth" of a former employee's writings. Courts have repeatedly held that merely because a former employee, even if previously a high level official, states a fact that this does not constitute an official acknowledgment of anything. See e.g. Afshar v. Department of State, 702 F.2d 1125, 1133 (D.C. Cir. 1983) (information reported in book by former CIA official did not constitute official acknowledgment); Phillippi v. CIA, 655 F.2d 1325, 1330-31 (D.C. Cir. 1981)(same, regarding information reported in book by former Director of Central Intelligence). It

This argument is baseless. Beyond the legal interpretation that "confusion", to the degree it would even exist, is not tantamount to a determination that the information is classified, thereby rendering the CIA's authority over the format of a document authored by former employees to be null and void, just one simple fact illustrates the absurdity. The CIA approved the release of Boening's other memoranda that were styled in a similar if not identical format to that of the "M Complaint". See Exhibit "4".

### III. BOENING POSSESSES STANDING TO CHALLENGE THE CIA'S FINAL DECISION THAT HE WAS NOT AN AUTHORIZED HOLDER UNDER ITS REGULATIONS

Pursuant to Section 1.9 of EO 12,958 (now Section 1.8 in EO 13,292), Boening sought to challenge the CIA's overclassification of any documents that might exist relating to **[one word deleted by CIA]** and certainly with respect to his "M Complaint".

The CIA argues that Boening lacks standing to bring his APA claim concerning his ability to raise a classification challenge because the "M Complaint" was drafted in his personal, as opposed to official, capacity, and therefore not within the purview of Section 1.9, but also because that the CIA did not arbitrarily determine that Boening was not an "authorized holder" of the allegedly classified information contained in the "M Complaint". Def's Memo at 19, 23.

#### A. Boening Can Demonstrate That He Has Incurred Substantive Harm Sufficient For Purposes Of Standing

It is undisputed that mere allegations of error, untethered from any substantive harm, are insufficient to satisfy Article III for purposes of standing. See Center for Law and Educ.v. Dep't of Educ., 396 F.3d 1152, 1160 (D.C. Cir. 2005)("Appellants have failed to

seems somewhat disingenuous then for the CIA to ascribe additional credibility to Boening simply to support its own argument when, in fact, Boening's position with the CIA added no substantive value to his "M Complaint".

show that the alleged procedural violation caused actual injury to Appellants' concrete interests such that they satisfy Article III's requirements of standing."). The CIA argues that Boening has conceded that he drafted the "M Complaint" in his personal capacity by virtue of his statement that the document consisted of Boening's "personal assessment of the individual." Def's Memo at 20. Apparently, the CIA speculates that Boening is not challenging the CIA's determination that whistleblower complaints drafted for purposes of the ICWPA are not drafted in an "official capacity" for purposes of Section 1.9 of EO 12958. Id. If that is the case, argues CIA, then even if CIA committed a procedural error by erroneously determining that Boening was not an "authorized holder," Boening has still failed to allege any substantive harm and concrete injury following from the erroneous determination and therefore lacks standing. Id.

To clarify, all Boening has conceded is that he *personally* drafted the "M Complaint". See Exhibit "6" ("I do not agree with OIM's assertion that these documents are unofficial but I am willing to submit them to your branch on the chance that they will be approved for release"). However, he submitted the "M Complaint" in his capacity as an employee of the CIA pursuant to the Executive Order and to the OIG for a determination of whether it presented an "urgent concern" that should be reported to Congress under Section 17(d)(5) of the CIA Act, 50 U.S.C. § 403q(d)(5).

     1.   *The CIA's Determination That Boening Pursued His Classification Challenge In His Personal Capacity Violated The APA*

The CIA argues that a whistleblower complaint is, by its nature, "a personal communication between a federal employee, the IG, and/or Congress," and that because it represents the federal employee's personal views, it can not be construed as "facilitating agency business." Koch Decl. ¶27. However, this view too narrowly

interprets the important role that whistleblowers play in contributing to the functions of government. The submission of an ICWPA whistleblower complaint is more than a mere "personal communication" and should be held to constitute facilitation of CIA business in that the ICWPA was specifically designed for current government employees to raise issues of "urgent concern" to Congress.

As an initial matter, the ability to submit ICWPA whistleblower complaints is limited to a select group of individuals – federal employees – and necessarily and logically involves topics regarding which the federal employee would be uniquely qualified to view as a potential matter of "urgent concern" due to the employee's training and experience while employed at the particular agency. To attempt to label ICWPA whistleblower complaints as "personal documents" merely because they raise awareness of issues that could expose the CIA to embarrassing questions does not serve as a justification for the CIA to denigrate their importance.

As an additional matter, although the arguments contained in the "M Complaint" do not represent the CIA's official position on this particular topic that has no bearing on the question of whether the document or the views expressed therein facilitate official CIA business.  The entire purpose of the ICWPA was to provide a secure and protected line of communication between federal employees and Congress concerning matters of "urgent concern." This protection was deemed to be necessary because of the concern that federal employees would otherwise not raise such concerns without some form of protection from retaliatory action. The notion that drawing the attention of the CIA's IG and Congress to such matters does not constitute facilitation of official CIA business merely

because it is the not official CIA *position* evidences a fundamental lack of understanding by the CIA of the purpose behind the ICWPA.

Section 1.9 of EO 12,958 provides additional support to the idea that ICWPA whistleblower complaints are both drafted by "authorized holders" of information in their official capacity and that the act of drafting and submitting such complaints constitutes a facilitation of official CIA business. It notes that "[a]uthorized holders of information who, in good faith, believe that its classification status is improper are encouraged *and expected* to challenge the classification status of the information …")(emphasis added). This is not a legislatively adopted statute. It is not an agency regulation. This language emanates directly from an order of the President of United States. One can not find higher authority for the designation of official policy as to how federal employees, such as Boening, are to act under these types of circumstances.

> 2. *The CIA's Determination Concerning The Capacity In Which Whistleblower Complaints Are Drafted Constitutes A Violation Of The APA's Notice-And-Comment Rulemaking Provisions*

The ICWPA does not address, explicitly or implicitly, whether whistleblower complaints were to be considered as "personal" or "official" documents for purposes of classification challenges under Section 1.9 of EO 12958. See Public Law No: 105-272. Under the Chevron doctrine, when a statute is silent or ambiguous as to the intended construction of a particular piece of statutory language and does not explicitly leave a gap for an agency to fill, the reviewing court must decide whether the agency's interpretation of the statute was reasonable and permissible. See Chevron v. Natural Resources Defense Council, 467 U.S. 837, 843 (1987); Nat'l Ass'n. of Clean Air Agencies v. EPA, 489 F.3d 1221, 1228 (D.C. Cir. 2007) . If the interpretation is reasonable and permissible, it must

be upheld unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. §706(2)(A); Nat'l Ass'n. of Clean Air Agencies, 489 F.3d at 1228; Wright, 2006 U.S. Dist. LEXIS at *32.

The CIA's interpretation is unreasonable, arbitrary and "not in accordance with the law" in that the CIA failed to abide by the APA's notice-and-comment rulemaking provisions. See 5 U.S.C. §552(a); 5 U.S.C. §553(b); Tripoli Rocketry Ass'n. v. United States ATF, 337 F. Supp. 2d 1, 12 (D.D.C. 2004)(noting that the "APA requires federal agencies to publish general notice of proposed rulemaking in the Federal Register and give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments"). When the CIA chose to interpret ICWPA whistleblower complaints as being drafted in a "personal capacity" and thereby removed the ability of authorized holders to challenge the classification status of the information in such complaints, the CIA in effect prescribed a "substantive rule" and subsequently was obligated to undertake notice-and-comment rulemaking. See Chrysler Corp. v. Brown, 441 U.S. 281, 301 (1979). To date, to Boening's knowledge, the CIA has not undertaken any notice-and-comment rulemaking on this issue.

Although there are three exceptions to the notice-and-comment rulemaking requirement, namely if the agency action constitutes "interpretative rules, general statements of policy, or rules of agency organization, procedure or practice," 5 U.S.C. § 553(b)(A), the only potentially applicable exception is the "interpretative rule"

exception.[30] "Interpretative rules" are limited to "administrative construction of a statutory provision on a question of law reviewable in the courts." Air Transport Association of America, Inc. v. FAA, 291 F.3d 49, 55 (D.D.C. 2002)(holding that distinction between substantive and interpretative rules is "whether the interpretation itself carries the force and effect of law" or "rather whether it spells out a duty fairly encompassed within the regulation that the interpretation purports to construe"); Paralyzed Veterans of Am. v. D.C. Arena L.P., 117 F.3d 579, 588 (D.C. Cir. 1997)("If the statute or rule to be interpreted is itself very general, using terms like "equitable" or "fair," and the "interpretation" really provides all the guidance, then the latter will more likely be a substantive regulation"); Pickus v. United States Bd. of Parole, 507 F.2d 1107, 1113 (D.C. Cir. 1974)(finding that agency's action was not mere interpretation of statute's meaning but rather consisted of "self-imposed controls over the manner and circumstances in which the agency will exercise its plenary power," and had effect of law and not reviewable except for arbitrariness).

---

[30] The CIA's determination can not constitute a "general statement of policy," as "[a]gency action can not be a general statement of policy if it substantially affects the rights of persons subject to agency regulations." Pickus, 507 F.2d at 1112; Syncor Int'l Corp. v. Shalala, 127 F.3d 90, 94 (D.C. Cir. 1997)(finding that a policy statement "merely represents an agency position with respect to how it will treat – typically enforce – the governing legal norm"). The CIA's unilateral construction of the status of ICWPA-related whistleblower complaints for purposes of classification challenges under Section 1.9 of EO 12958 substantially affects Boening's rights, as well as those of every current and former CIA employee, to raise an important classification challenge. The CIA's determination also can not constitute a "rule of agency organization, practice, or procedure," as matters relating to "practice or procedure" have not been found to include any action which goes beyond formality. Pickus, 507 F.2d at 1113 (finding that matters relating to practice or procedure do "not include formalized criteria adopted by an agency to determine whether claims for relief are meritorious"). The CIA's construction clearly went beyond mere matters of formality dealing with the operation of the agency.

Unlike an "interpretative rule," a "substantive rule" modifies or adds to a legal norm based on the agency's own authority, and since that authority flows from a Congressional delegation to engage in supplementary lawmaking, the APA requires compliance with notice and comment. See Syncor, 127 F.3d at 95 (agency rulemaking does not purport to construe language of statute or regulation but rather consistent with invocation of agency's general rulemaking authority to extend regulatory reach does not constitute "interpretative rule"). The CIA's construction of the status of ICWPA whistleblower complaints constitutes a substantive regulation, as it "interprets" the CIA's obligations in a manner that carries the "force and effect of law" and does not merely provide guidance concerning a duty "fairly encompassed" within EO 12958, as amended, or the ICWPA, as neither addresses the notion of affording authority to agencies to determine what documents are "official" for purposes of classification challenges.

Even if the CIA's construction could be considered as an "interpretative rule," it would still be subject to notice-and-comment rulemaking as it would constitute a modification of an existing rule. Air Transport Association of American, Inc., 291 F.3d at 56 (highlighting Supreme Court noted APA rulemaking required if interpretation adopts new position inconsistent with existing regulations); Tripoli Rocketry Assn, 337 F. Supp. 2d at 13 (finding ATF's changing interpretation of applicability of exemption for sport model rockets in form of two letters sent to private company in 1994 and 2000 constituted modification of existing interpretation and imposed upon ATF obligation to undertake notice and comment rulemaking before adopting new interpretation). As the CIA's Motion and supporting declarations make quite clear, prior to the appointment of a new Executive Secretary of the ARP ("ES/ARP") in 2002, the CIA had considered

whistleblower complaints as "official" documents within the jurisdiction of the ARP to consider for purposes of classification challenges. See Def's Memo at 9-10; Koch. Decl. at ¶¶23-25. Even if Boening is apparently the first, and so far only, CIA employee to have raised this issue and received the contradicting interpretations, the CIA's initial decision to view the "M Complaint" as being drafted in Boening's "official capacity" and then reversing that decision constitutes a modification of an existing interpretation and necessitates that the CIA undertake notice and comment rulemaking.

Therefore, the CIA's failure to abide by the APA's notice-and-comment rulemaking requirements constituted conduct that was arbitrary and "not in accordance with the law," and thereby demonstrates that Boening has incurred substantive harm.

    3.   *Boening Can Demonstrate That There Is Still Meaningful Relief He Can Obtain From The Court*

Assuming that Boening can demonstrate a concrete injury, the CIA argues that his injury is not redressable because there is no meaningful relief Boening could obtain from this Court. Def's Memo at 21. The proper remedy, asserts the CIA, would be to remand the matter to the CIA so that the ARP could adjudicate the merits of the classification challenge. Id.; Lynom v. Widnall, 222 F. Supp. 2d 1, 5 (D.D.C. 2002). Given that both the ARP and the Executive Director of the ISCAP, the entity to which ARP determinations may be appealed, has already concluded that the "M Complaint" was properly classified, any remand, according to the CIA, would be a "hollow, meaningless exercise." Def's Memo at 21-22; NLRB v. Wynam-Gordon Co., 394 U.S. 759, 766 (1969).

As an initial factual matter, the CIA never completed the process it was required to follow. As the CIA itself explains in considerable detail, on July 2, 2001, Boening

submitted the "M Complaint" to the ARP for a classification challenge. Def's Memo at 9. The ARP referred the Memorandum to the ACRMP, which, on July 25, 2001, agreed that the paragraphs marked classified (save one) were properly labeled as such. Id. The ACRMP met again on September 4, 2001, to consider specific issues identified by Boening in his July 2, 2001 letter and reaffirmed its initial determination that the "M Complaint" was properly classified. Id. at 9-10. On September 12, 2001, the ACRMP wrote to the Chair of the ARP, setting forth its decision, and Boening promptly appealed the ACRMP's decision to the ARP. Id. Although the ARP scheduled a formal appeal, it was at this point that the ES/ARP and the CIA made the decision that whistleblower complaints drafted pursuant to the ICWPA were not official CIA documents and therefore not within the jurisdiction of the ARP. Id. Because of the CIA's arbitrary decision, Boening was deprived of the administrative appeal to the ARP.

In addition, while the statements by the Executive Secretary of the ISCAP, ISOO Director William Leonard ("Leonard"), are informative[31] they are in no way authoritative or conclusive, as they do not represent a formal decision by the ISCAP.  The ISCAP does not consist merely of the Executive Secretary, but rather consists of senior-level representatives from the Departments of State, Defense, and Justice, as well as the CIA, the National Archives, and the Assistant to the President for National Security Affairs. Exec. Order 12,958, as amended, § 5.3(a)(1); 32 C.F.R. § 2001.83(A)(defining the

---

[31] It should be noted that Mr. Leonard's letter focused solely on the issue of whether Boening was an "authorized holder" and did not address the CIA's interpretation of whistleblower complaints drafted pursuant to the ICWPA as they pertain to classification challenges. Def's Memo at 21. Furthermore, Mr. Leonard's interpretation of "authorized holder" incorrectly relied upon the ISOO definition and not the applicable CIA definition, which differed significantly in scope. Compare 32 C.F.R. § 1907.2 (CIA reg) to 32 C.F.R. § 2001.14 (ISOO reg).

membership of the ISCAP as the appointments made under Section 5.3(a) of Executive Order 12958). The regulations and the Executive Order do not, at any point, accord authority to the Executive Secretary to make a conclusive and authoritative determination outside of the established framework. Id. at § 5.3(b); 32 C.F.R. § 2001.83(E)-(F) (stipulating that the Executive Secretary must notify the senior-level representatives of the relevant agencies of the existence of the appeal, present those representatives with an appeal file, and that the ISCAP as a whole must vote to either affirm, reverse or remand the matter).

As a supplemental matter, there has been no evidence provided to demonstrate what information was provided to Mr. Leonard by the CIA prior to his determination. 32 C.F.R. § 2001.83(E)(stating that the appeal file will include "*all records pertaining to the appeal*")(emphasis added).

4.  *Boening Can Demonstrate That The CIA Arbitrarily And Erroneously Determined That He Was Not An "Authorized Holder" Of The Information In The Memorandum*

The CIA counters that even if it is determined that Boening can demonstrate a concrete injury and that the injury is redressable, thereby satisfying the requirements for standing, the Court should still dismiss his claim under Rule 12(b)(6), or in the alternative award summary judgment to the CIA, because the CIA did not err in determining that Boening is not an "authorized holder" of the classified information in the "M Complaint". Def's Memo at 22.

The CIA cites to three different sources for definitions of what constitutes an "authorized holder" and what is required to permit "access to specific classified information." Id. The CIA's regulations define an "authorized holder" as one who "holds

a security clearance from or has been authorized by the Central Intelligence Agency to possess and use on official business classified information." Id. citing 32 C.F.R. § 1907.02(b).[32] ISOO's regulations contradictorily define an "authorized holder" as "any individual, including an individual external to the agency, who has been granted access to specific classified information." Id., citing 32 C.F.R. § 2001.14. Finally, the CIA points to EO 12,958, as amended, wherein it sets forth three prerequisites that must be met before a person may *access* specific classified information. Def's Memo at 22.[33]

The CIA argues that because there was never any need-to-know determination awarding Boening access to the specific "classified" information contained in the "M Complaint" then Boening does not meet the definition of an "authorized holder". Id. at 23.[34] However, this argument is flawed for the simple reason that it relies on the ISOO regulation's narrow definition of "authorized holder" rather than the CIA's own more expansive and applicable definition.

While per the ISOO regulation an individual is apparently required to have had access to the specific information that is being challenged, the CIA's regulation is simply not as narrow. A plain reason of the provision reflects that an "authorized holder" need only

---

[32] A "challenge" under this provision is defined as "a request in the individual's official, not personal, capacity and in furtherance of the interests of the United States; 32 C.F.R. § 1907.02(d). The CIA fails to distinguish that a document can be written in an individual's "personal" capacity, i.e., away from the office and on his own time, but still submitted in his "official" capacity.

[33] "A person may have access to classified information provided that: (1) a favorable determination of eligibility for access has been made by an agency head or the agency's head designee; (2) the person has signed an approved nondisclosure agreement; and (3) the person has a need-to-know the information." EO 12,958 § 4.1(a).

[34] Ironically, the CIA's decision to classify information within the "M Complaint" but then later grant Boening access to the unredacted document during internal proceedings constitutes the issuance of a "need-to-know" determination.

possess a valid security clearance or otherwise be authorized by the CIA to "possess and use" classified information in general. 32 C.F.R. § 1907.01(b). Nowhere in the CIA's regulation does it indicate that the individual must have had access to the specific classified information that is being challenged. Given that Boening, as a CIA employee, indisputably possessed a valid security clearance and was authorized by the CIA to "possess and use" classified information, he met the parameters of the CIA's definition.[35]

Therefore, the CIA's determination that Boening lacked "authorized holder" status was indeed arbitrary and erroneous and is without merit.

## IV. BOENING'S APA CLAIM CONCERNING THE CIA'S FAILURE TO ADJUDICATE THE PREPUBLICATION REQUEST WITHIN 30 DAYS IS NOT MOOT AND THE EXCESSIVE UNDUE DELAY IS UNCONSTITUTIONAL

The CIA argues that this Court lacks jurisdiction over Boening's APA claim concerning the CIA's failure to adjudicate Boening's prepublication request within 30 days because it is moot. Def's Memo at 16. Under Article III of the Constitution, federal courts are courts of limited jurisdiction that can only decide "'actual, ongoing controversies.'" Clarke v. United States, 915 F.2d 699, 700-01 (D.C. Cir. 1990)(en banc), quoting Honig v. Doe, 484 U.S. 305, 317 (1988). Even if an action poses a live controversy when filed, the mootness doctrine requires "a federal court to refrain from deciding it if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" Clarke, 915 F.2d at 701, quoting Transwestern Pipeline Co. v. FERC, 897 F.2d 570, 575 (D.C. Cir. 1990). The test for mootness comprises two requirements: (1) there is "no reasonable expectation … that the alleged violation will recur," and (2) "interim relief or

---

[35] See supra 43 fn. 34.

44

events have completely and irrevocably eradicated the effects of the alleged violation."

County of Los Angeles v. Davis, 440 U.S. 625, 632 (1979).

This Court recently ruled on a similar argument set forth in Stillman and noted that

the plaintiff's "APA claim is moot because there is no further relief that this Court can

provide as to that claim. Stillman has already received the final classification decision

that he sought from the defendant agencies. Accordingly, this Court lacks subject matter

jurisdiction over Stillman's APA claim and dismisses it as moot under Rule 12(b)(1) of

the Federal Rules of Civil Procedure." Stillman, 2007 U.S. Dist. LEXIS 24206, *9-10.

## A.  Boening's Case Demonstrates The Circumstances Surrounding The CIA's Prepublication Review Process Is Capable Of Repetition Yet Evading Review

However, Boening's case presents a slightly different set of circumstances not

previously addressed in cases such as Stillman. For one thing, as discussed above,

Boening's submission has not been properly reviewed through the ARP process.

Additionally, Boening continues to submit writings to the CIA PRB for classification

review. Boening Decl. at ¶27. Thus, this is the type of case where the injury is "capable

of repetition yet evading review" and the CIA has imposed unreasonable delays in its

adjudication of the prepublication request.

This exception waives the mootness doctrine when "the challenged action was in its

duration too short to be fully litigated prior to its cessation or expiration" and "there was

a reasonable expectation that the same complaining party would be subjected to the same

action again." Alliance for Democracy v. FEC, 335 F. Supp. 2d 39, 44 (D.D.C. 2004).

See also Friends of the Earth, Inc. v. Laidlaw Envtl. Services, Inc., 528 U.S. 167, 174

(2000)("[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does

not suffice to moot a case."); Boag v. MacDougall, 454 U.S. 364, 364 (1982)(transfer to

another prison did not moot prisoner's damages claim arising from his allegedly being placed in solitary confinement without notice or hearing); <u>Jersey Cent. Power & Light Co. v. New Jersey</u>, 772 F.2d 35, 41 (3d Cir. 1985)("The availability of damages or other monetary relief almost always avoids mootness….").

The CIA's contentions to the contrary, this case is more than appropriate to invoke the "capable of repetition yet evading review" exception. As the CIA chose not to address the first prong of the test, it must be considered waived. In any event, it would seem reasonable to presume that a 30 day period constitutes too short a period to gain meaningful judicial relief. <u>See</u> e.g., <u>Burlington Northern Railroad Co. v. Surface Transportation Bd.</u>, 75 F.3d 685, 690 (D.C. Cir. 1996)(noting that agency conduct of less than two years duration will ordinarily evade review). And as stated, Boening continues to submit documents for review. Boening Decl. at ¶27.

In this case, the CIA has offered no evidence to establish a "reasonable expectation" that it will not employ the same tactics in the future. Indeed, all past evidence indicates that the PRB's excessive delays and reversals constitute a routine pattern and practice. <u>See</u> Zaid Decl. at ¶6. Certainly, the CIA's continuing refusal to grant permission to publish the other portions of the "M Complaint" – which it even admits are in the public domain – strongly indicates that the same violation may recur as it is ongoing now.

**B. The Repeated And Continuing Excessive Undue Delays Experienced By The CIA's PRB Constitutes Unconstitutional Suppression Of Protected Speech**

Alternatively, the CIA further argues that if the claim is not found to be moot the Court should nonetheless dismiss it pursuant to Rule 12(b)(6), or award summary judgment, because "there is no regulation requiring the CIA to adjudicate all prepublication requests within 30 days, and because the CIA did not unreasonably delay

action on [Boening's] submission." Def's Memo at 18. Boening's secrecy agreement states that the CIA will respond to submissions within a "reasonable time". Koch Decl., Ex. "A". What constitutes a "reasonable time" is undefined, but whatever it might be the CIA violated that period in the instant matter by taking 16 months to render a decision. Furthermore, while it is true that the CIA's regulations do not explicitly require that it abide by a thirty day deadline, this is not the policy that has been previously adopted by other courts adjudicating prepublication review challenges or, more importantly, what the PRB itself broadcasts.

Moreover, the CIA's argument that it did not unreasonably delay the processing of Boening's submission is factually flawed. The CIA seeks to muddy the waters by pointing to the "complex" process that ensued prior to Boening's submission of the Memorandum to the PRB; namely, his submission to the ARP for a classification challenge and the debate over whether Boening was an "authorized holder". Def's Memo at 19. The CIA also notes that following Boening's submission of the "M Complaint" negotiations ensued with the PRB, and that only after those negotiations failed did the PRB issue its final decision. Id.

As the 30 day deadline applies only from the date upon which Boening submitted the Memorandum to the PRB, the CIA's reference to Boening's classification challenge and submission to the ARP is completely irrelevant. Furthermore, the CIA's depiction of the delay in beginning the commencement of negotiations distorts the facts. By memorandum dated November 22, 2004, Boening submitted his "M Complaint" to the PRB for official release and approval. See Koch Decl. ¶ 33. By email dated November 25, 2005, a full year after his initial submission, Boening sought a status update from the PRB. Id. ¶ 34.

By letter dated January 5, 2006, *nearly 16 months* after Boening submitted the "M Complaint" to the PRB, the PRB Chairman responded and notified Boening that the PRB "*requires* that you rewrite you 'M Documents' outside of a government memo format stating in your own words what you desire to communicate" and that Boening include "specific, open source citations." Id.(emphasis added).

Whether or not this constitutes "negotiations" is questionable, but what remains relevant is that nearly 16 months passed without a word from the PRB concerning Boening's submission before "negotiations" commenced. Even conceding that the 30 day deadline is an "aspirational" goal, for the CIA to argue that 16 months does not constitute an unreasonable delay defies logic.

The Fourth Circuit in <u>Marchetti</u> held that the prepublication review process was constitutional *provided* the agency acted on, and responded to, the request quickly.

> Because we are dealing with a prior restrain upon speech, we think the CIA must act promptly to approve or disapprove any material which may be submitted to it by Marchetti. Undue delay would impair the reasonableness of the restraint, and that reasonableness is to be maintained if the restraint is to be enforced. *We should think that, in all events, the maximum period for responding after the submission of material for approval should not exceed thirty days.*

<u>Marchetti</u>, 466 F.2d at 1317 (emphasis added).

In fact, the PRB routinely leads submitters to believe that the 30-day deadline is, in fact, a legally binding deadline. In 2003, then PRB Chairman Paul Noel-Chrétien distributed copies of unclassified briefing slides that he used to explain the PRB process to CIA employees. <u>See</u> Exhibit "7". These slides very clearly acknowledge the existence of a firm 30-day deadline (including referring to court authorization). <u>Id</u>. Although one slide references that the PRB is increasingly finding it "difficult to meet" the 30-day deadline, nowhere is it mentioned that the CIA can take longer than the 30-days, request

an extension of time or that this "deadline" is nothing more than "administrative guidance".

Moreover, the CIA's own unclassified journal, which is publicly available on its website, unequivocally asserts that the CIA faces a 30-day deadline for compliance in reviewing a submitted publication. In an article written by then PRB Chairman John Hollister Hedley, it states:

> The courts have held that this signed agreement is a lifetime enforceable contract. The courts also have noted that the secrecy agreement is a prior restraint of First Amendment freedom. But they ruled it a legitimate restraint, provided it is limited to the deletion of classified information and so long as a review of a proposed publication is conducted and a response given to its author within 30 days.[36]

In fact, although the D.C. Circuit does note that a "time lag" does not amount to a violation of law *per se*, that conclusion pertained to whether an agency may be constitutionally required to adopt and follow a specific "pre-set time limit" for prepublication review. Weaver, 87 F.3d at 1443. Boening, however, challenges the excessive delay perpetrated by the CIA and the fact that this conduct repeats itself time and time again. See Zaid Decl. at ¶6. The Supreme Court has actually recognized that a constitutional violation may occur when the review period is unreasonable. FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 228 (1990)(agency must issue "license for a First Amendment-protected business … within a reasonable period of time, *because undue delay results in the unconstitutional suppression of protected speech*.")(emphasis added); see also Weaver, 87 F.3d at 1441 ("The primary burden on employees from the

---

[36] The article can be retrieved online at *https://www.cia.gov/library/center-for-the-study-of-intelligence/csi-publications/csi-studies/studies/spring98/Secret.html*. The footnote to this sentence reads "[t]The 30-day time constraint was set forth by the circuit court decision in US v. Marchetti, 466 F2d 1309, 1317 (4th Cir. 1972). It was reiterated in US v. Snepp, 595 F2d. 934 (4th Cir. 1979), and it has been adopted as the standard by the Department of Justice."

regulation is simply the delay associated with submitting to the review process prior to publication. If the prior review were extensive, of course, it might delay constitutionally protected speech to a time when its only relevance was to historians.").

For these reasons, the CIA's argument that Boening's APA claim is moot, or that it should be dismissed pursuant to Rule 12(b)(6), or alternatively be awarded summary judgment, is without merit and should be denied.

## V. BOENING AND HIS CLEARED COUNSEL ARE ENTITLED TO SEE THE CLASSIFIED MATERIALS AT ISSUE IN THIS CASE

On October 15, 2007, Boening and his cleared counsel requested access to the "M Complaint" in order to substantively respond to the CIA's Motion. Exhibit "8". This request was denied, despite the fact that Boening authored the document and counsel is privy to all the "classified" information therein. Exhibit "9". This denial hampered Boening's ability to fully respond to the CIA's Motion.

Additionally, in order to allow "criticism and illumination by [the] party with the actual interest in forcing disclosure," McGehee, 719 F.2d at 1148-49, Boening and his counsel should be permitted to view the CIA's "classified" declaration and comment upon it.

Boening has contemporaneously filed a Motion to Compel Access to Classified Information for Plaintiff and His Cleared Counsel and incorporates herein the facts and arguments expressed therein.

## __CONCLUSION__

Based on the foregoing, the defendants' Motion should be denied and summary judgment should be granted to the plaintiff instead. Alternatively, both motions should be denied without prejudice and the plaintiff should be permitted to conduct discovery.

Date:   November 19, 2007

Respectfully submitted,

/s/
_____

Mark S. Zaid, Esq.
DC Bar #440532
Bradley P. Moss, Esq.
D.C. Bar #975905
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036

Attorneys For Plaintiff

# EXHIBIT "1"

# Declaration of Franz Boening

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRANZ BOENING                 *

                              *

        Plaintiff,            *

                              *      Civil Action No: 07-430 (EGS)

        v.                   *

                              *

CENTRAL INTELLIGENCE AGENCY    *

                              *

        Defendant.        *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## DECLARATION OF FRANZ BOENING

The undersigned hereby declares as follows:

1.  I am a person over eighteen (18) years of age and competent to testify. I am the plaintiff in this action and make this Declaration on personal knowledge. This Declaration is submitted in support of my Opposition to Defendants' Motion to Dismiss.[1]

2.  I was formerly employed by the Central Intelligence Agency (CIA) from 1980 – 2005. After learning Arabic in the early 1980s, I spent nearly one dozen years in agent operations, primarily in the Middle East. I worked declassification issues from 1995 – 1999, and ultimately retired from the Agency after working at the Foreign Broadcast Information Service where I handled Internet exploitation and training. I have held a Top Secret/Sensitive Compartmented security clearance for nearly 25 years (in fact, I continue to still hold my clearance as a contractor working at CIA). As a result of the matters addressed herein I became a whistleblower and suffered employment retaliation, some of which are described below.

---

[1] Per the requirements of my secrecy agreement, this document has been submitted for classification review and the contents, unless noted otherwise, have been deemed unclassified and approved for public filing.

3.  In 1980, when I entered onto duty with the CIA I signed a secrecy agreement in which I agreed to pre-publication review of any intelligence related documents that I might author after leaving government service. This was the only secrecy agreement I executed while a CIA employee. I agreed not to reveal any CIA classified information and I have observed the agreement. However:

- I did not agree to any specific type of CIA formatting for my documents;

- I did not agree to append tortuously worded disclaimers;

- I did not agree to never criticize the CIA;

- I did not agree to withhold reporting of apparently felonious activity by CIA that is publicly discussed in declassified documents that originated with other federal agencies;

- I did not agree to never write a whistleblower complaint;

- and I did not agree to refrain from citing and quoting published newspaper and magazine articles in my criticism.

My secrecy agreement deals strictly with properly classified CIA information. I made no other legal promises to CIA.

4.  This lawsuit primarily pertains to my whistleblower complaint of May 10, 2001, which I will refer to as the "M Complaint" (a designation that the CIA and I have utilized with approval in unclassified correspondence). I drafted the "M Complaint" in the spring of 2001 after reading a number of publicly available newspaper and magazine articles since autumn 2000 about political scandals in **[one word deleted by CIA]** country **[six words deleted by CIA]**. I have long taken a personal interest in Latin American

2

developments and in human rights issues.  I have visited several countries in the area and speak serviceable Spanish.

5.   As I read the domestic and international news accounts I became angered not just by the level of narco-corruption in this particular country and the hidden brutality of the regime in question, but also by the constant reminder that, according to the scores of credible published media accounts, my employer, the CIA, had nurtured and supported **[one word deleted by CIA]** for years.

6.   **[eight lines deleted by CIA]**

7.   According to the same media accounts I read, many of which are attached to my declaration as Exhibits "A" through "OOO" (these documents were ultimately submitted to the CIA's Publication Review Board (PRB) as part of the review process), **[seven lines deleted by CIA]**.

8.   I decided to monitor, during my own personal time, the unfolding political scandal because of my strong sense of civic responsibility combined with my personal irritation. I did this because I knew that if what I had read was even 50% true, I would take it upon myself to document an apparently gargantuan intelligence failure.

9.   Why would a CIA officer do this when it had little or nothing to do with his present assignment? Because by 2001, I had devoted over 20 years of my life to the CIA and I owed it to the American taxpayers to call my employer to account. It made me livid that CIA was so inept, that it may have been party to human rights violations and, even worse, that it seemed entirely possible that CIA had been criminally involved with **[one word deleted by CIA]**. After all, for whom did I work? The American taxpayer or for an organization that might engage in criminal activity and hide behind the flag? Was it not

3

my civic duty to draft a professional complaint in which I outlined my credible evidence of intelligence failure and wrongdoing?

10. It is important to note that during this period I worked in the Foreign Broadcast Information Service (FBIS) as a Mideast media analyst (I did the original mapping of the Arabic-language network of jihadist bulletin boards). I had absolutely <u>no</u> professional responsibility whatsoever for Latin American affairs nor did I have computer or other access to any type of classified, compartmented CIA operational information on Latin America.

11. I can swear that <u>not one word</u> of my May 10, 2001 memorandum is based on any classified CIA document on **[one word deleted by CIA]**, or on any information I received as a result of my employment with the CIA. Indeed, in my entire life I have never read a single classified CIA document (apart from official responses to my complaint which classified publicly available newspaper and magazine articles) wherein **[one word deleted by CIA]** was mentioned. Everything in my May 10, 2001 memo is based on open source information from newspaper or magazine accounts, or officially declassified information from other federal agencies that I obtained via the Internet. Additionally, the "classified annex" that accompanied the "M Complaint" was styled that way as a precaution, and not because I actually believed it did contain classified information. In fact, I explicitly challenge that it does not.

12. The CIA operates an extremely rigid, compartmented data system that prevents anyone without a need to know to access sensitive information. Thus, the insinuation that I may have surreptitiously entered into CIA's Latin America databases is completely baseless and utterly irresponsible. The CIA knows full well that accessing databases, at

least undetected, in such a manner is virtually impossible and was beyond my technical

reach. Such an allegation, even if just an insinuation, further demonstrates the level at

which the CIA will sink in order to cover-up its embarrassing conduct. Moreover, if the

CIA even believed this to be true it never once raised the allegation during the four years

(2001-2005) I spent inside the CIA discussing the "M Complaint". It never sought to

discipline me for a security violation, or revoke my clearance. Nor did it interfere with the

transfer of my security clearance, which the CIA continues to hold, for contracting work

after I retired.

13. About a year after writing the "M Complaint", I was allowed to formally

challenge its classification under rules established by EO 12,958 (or so I thought at the

time). CIA informed me that it had formally accepted my challenge in Summer 2002, and

implicitly acknowledged that the "M Complaint" was an official document. By Fall 2002,

however, after the process had run its course inside the Agency and the latter had refused

to declassify any material, I requested, in keeping with rules established by the EO as I

understood them, to have the document forwarded to the Inter-Agency Security

Classification Appeals Panel (ISCAP) in Washington, D.C., then chaired by William

Leonard, which supposedly had jurisdiction over the challenge.

14. Significantly, within weeks of making this request, on December 13, 2002, CIA

annulled my official classification challenge in its entirety. Beginning in December 2002,

CIA suddenly asserted that my "M Complaint" was not really an official document;

rather, it was a personal document. And, according to the CIA, personal documents could

not be submitted to ISCAP, nor could they be published while the author remained an

employee.

15. I protested the cancellation of the challenge to the ISCAP. Ultimately, as I understand it, the ISCAP Panel agreed with me and ordered CIA to deliver the document to it. CIA refused to do so. Sometime later, ISCAP chairman William Leonard visited the CIA where officials apparently persuaded him that I did not really have the right to write a whistleblower complaint on Latin America since I did not work in that field and was not an "authorized holder" of the specific classified information. Moreover, it was my understanding they falsely insinuated to him that I may have broken into databases in order to obtain material contained in the document. The result was that ISCAP seemingly relented and changed its position.

16. No doubt anyone reading this declaration is likely saying to themselves "why in the world would the CIA be so determined to withhold a series of overt newspaper and magazine articles and claim they were classified?" Why did my writing a memorandum alleging government misconduct based <u>solely</u> on public sources cause the CIA such consternation? I was provided the answer in May 2002 during a conversation with the then Information Release officer of the CIA's Directorate of Operations, William McNair. He told me privately in his office the real reason he would continue to classify the "M Complaint". With his voice tinged by exasperation he said something very close to the following:

> "*Look, Franz, do you think I care about [***two words deleted by CIA***]? This is not about 'source protection,' this is about CIA's reputation. We don't want you to have any credibility. The problem with the "M" memorandum is that what you've written is all true.*"

6

McNair also privately acknowledged during the same conversation that my May 10, 2001 memo was based solely on open source information and that it seemed to be reasonably well-sourced.

17. Contrary to CIA's assertions that I did not source my May 10, 2001, memo, the document is actually sourced in quite amount of detail, as described below, although perhaps not according to the academic standards of Harvard University. At no time was I ever informed by the PRB that I needed to source my document in a specific manner or utilizing a particular method. Anyone who reads the document carefully will find a specific source and a date attached to most entries in the chronology and a full list of sources in the bibliography. The body of the "M Complaint" is based on the chronology. Moreover, as can be plainly seen in the e-mail June 30, 2006, the CIA conceded that I did demonstrate that my sources were all overt.

18. I personally delivered source documents to the PRB in the autumn of 2004 and then in Summer 2005. I was under the clear impression that I needed only to prove that my sources were overt and I wanted the documents released after I retired in August 2005. I discovered only a few days before retiring in August 2005 that absolutely no one in PRB had taken the time to review the materials I had submitted nearly one year earlier! As far as I know, they did absolutely nothing with the documents at all during that time. At my last meeting with the PRB on August 10, 2005, they now asserted that not only must I demonstrate that the sources were unclassified (which they privately acknowledged was the case) but that everything should be rewritten in a non-official format, that I must add their formal disclaimer, and that every entry in the chronology

must be formatted to their specifications (which are explained nowhere in their

regulations). These concerns had never been raised before.

19. The CIA's primary concern, at least as how I interpreted their e-mail to me of

June 30, 2006 and now their arguments before this Court, pertains to formatting design.

For reasons they best understand the CIA does not want me to "publish" the

memorandum in an official looking format, whatever that might be. Of course, the format

I used for the May 10, 2001, is <u>exactly</u> the format I used for my March 24, 2003 and

May 20, 2004 memorandums which have since been declassified and released in full

(other than names of certain CIA officials).

20. Let me provide some explanatory information surrounding my source

documentation for the "M Complaint".  In understanding the sourcing of the "M

Complaint" it is important to comprehend the specific sections of the document.

Pages 1-8 contain a narrative description of the various crimes that I believed, based on

my public source documentation, **[one word deleted by CIA]**, and possibly CIA,

committed. It is in a narrative format. Pages 9-21 comprise a historical chronology of the

**[one word deleted by CIA]** situation listing 87 entries. Not one page of this section has

been publicly released but I understand the Court has been provided with an unredacted

copy it can review. Pages 22-23 are final comments by me and  a call for investigation.

Page 24-25 is a bibliography with 55 different listings plus an "about the author"

statement. There is then a two page "Unclassified Annex: Myths Surrounding CIA's

Relationship with **[one word deleted by CIA]**", and a two page "Unclassified Annex:

Was **[one word deleted by CIA]** an Agent?". Finally, there is also a "Classified Annex"

which remains classified in its entirety.

21. The chronology set forth within pages 9-21 is a key section for this Court to review. Nearly all entries in the chronology follow the same general format: First, the date of the incident or development in the **[one word deleted by CIA]** story is identified. Second a summary of incident, development, or pertinent fact in the **[one word deleted by CIA]** story is noted. Finally, a parenthetic remark containing usually two elements: a) the specific media source of the fact, development or incident and b) the author's comment and/or analysis of the fact or development. It was my belief that the chronological unfolding of the **[one word deleted by CIA]** debacle was easier to comprehend and digest in his chronological format. The format was very simple: date, development, source, author's comment. Most parenthetic entries contain a source and a comment. Some contain simply the source with no comment; a very small number contain a comment only. The full names of all of the media sources are listed in the bibliography. I should specifically note that all source documents were reviewed by CIA and all documents were linked to specific entries in the chronology. All of the source documents were eventually returned to me by the PRB.

22. All of the supporting documents that are attached as Exhibits "A" through "OOO" to this declaration are annotated according to the entry date in the chronology of the "M Complaint" or the paragraph number in the body of the document. For instance, some documents might say "para one". This means that it is a general fact that supports paragraph one of the "M Complaint", which asserts that the press claimed **[one word deleted by CIA]** had a relationship with CIA. Other supporting documents might say "44", "37", or "79". This means that the cited document corresponded to the 44th, or 37th or 79th entry in the "M Complaint" chronology. Additionally, for example, the first entry

9

in the chronology is from a long article written by **[four words deleted by CIA]**. I

provided the PRB with a copy of the **[one word deleted by CIA]** article and in the "M

Complaint", I provided a brief explanation of who **[one word deleted by CIA]**

is. Throughout the document I wrote "source: **[one word deleted by CIA]**" to refer to the

article as the source for information within a particular paragraph. Many entries within

the "M Complaint" state "source: **[one word deleted by CIA]**, various." **[one word**

**deleted by CIA]** refers to the organization "**[three words deleted by CIA]**" and I

submitted only one document from **[one word deleted by CIA]** as a source. Thus, by

referencing this specific document I was identifying information from within the "M

Complaint" as having primarily originated from that article, although there may also have

been support from other sources that I submitted for the same factual assertion.

    23. Finally, this Court should also be aware that after I drafted the "M Complaint", I

was forced to author a series of follow-up complaints alleging that the CIA had retaliated

against me. These complaints are also formal whistleblower memorandums and dated

March 24, 2003 and May 20, 2004, as well as internal grievances dated January 16, 2003

and November 7, 2003. During the period after I drafted and submitted the "M

Complaint", as just an example of some of the conduct, I was variously told by a number

of different CIA managers that:

- ◆ I lacked the qualifications to serve abroad. Yet prior to submitting these

  whistleblower memorandums I had served successfully in a half-dozen different

  CIA foreign postings;

- ◆ I volunteered to serve in a particularly sensitive country in 2003. I happened to

  speak the language, which was in very short supply, particularly among CIA

officers. I was informed I was not fit to serve in that country because the CIA did

not wish to read memorandums regarding any of its activities that I would find

fault with. As it turned out, several very public scandals emerged from the CIA's

activities in this country;

- I was grilled on the polygraph about my contacts with Congress, a practice that

  could be considered retaliation given that such contacts are a protected activity;

- I was very worthy of promotion to GS-14 – that is, if only I would keep my mouth

  shut. My supervisor at the time said I could do one thing to improve my chances

  for promotion - keep my mouth shut as "this would help a lot";

- I should consider keeping my mouth shut in order to avoid further problems or

  conflicts within the CIA. In fact, one of the OIG investigators actually said this to

  me during an interview about my March 24, 2003 complaint;

- I should not talk to younger CIA officers and that I should be given a separate

  office in order to limit my contact with them. The supervisor who made this

  comment said she feared that I might criticize CIA's historical conduct to

  impressionable young officers;

- I was accused of allegedly threatening an office colleague by leaving a yellow

  Post-it note asking that she be consistent in her editing. CIA's Office of Security

  investigated and found no merit in the charge. This baseless accusation was

  nothing more than an intentionally designed form of harassment; and

- I was publicly humiliated by the head of a CIA office when he attributed work to

  another employee that he knew I had undertaken.

11

24. Was I retaliated against? From 1980 to 1993, I was promoted on average once every 2.5-3.0 years. After filing my first informal human rights complaint in 1994, and the series of whistleblower complaints in later years, I never once received another promotion during the time I served with the CIA. Not once in 12 years, from 1993-2005.

25. I strongly believe, based on my over 25 years of CIA experience, that CIA wants to keep my May 10, 2001, memorandum classified because its contents reveal an undeniable intelligence failure involving illegal actions (and despicable human rights violations) by an individual with whom the CIA had close relations and disclosure of this information would prove excruciatingly embarrassing to the organization.

26. The **[one word deleted by CIA]** case in 2007, minor as it may seem to some observers, is an outrageous example of the lengths to which CIA will go to extinguish criticism and to negate my First Amendment rights. In the process the CIA will classify scores of media articles, all of which were produced by non-CIA (and even non-governmental and non-American) authors.

27. Finally, I should also note that I fully intend to continue submitting writings to the PRB for classification review. In fact, I submitted a document for review on November 12, 2007.

28. In closing, when I retired from the CIA in August 2005, I received a warm personal letter from then Director of Central Intelligence Porter Goss that said, in part:

> . . . *It takes the conscientious efforts of many people to do the important work of this Agency. You leave with the knowledge that you have personally contributed to our success in carrying out our mission. Your dedication and loyal support has measured up to the high ideals and traditions of the Federal service. May I express to you my appreciation and extend my best wishes for the years ahead.*"

I do solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge.

Date:   November 12, 2007

/s/

_____

Franz Boening

DECLARATION OF
FRANZ BOENING

# EXHIBITS
# "A" – "OOOO"

# Withheld At The Request
# Of The CIA

# EXHIBIT "2"

# May 10, 2001 Memorandum

Unclassified

May 10, 2001

To:   Office of the Inspector General, Central Intelligence Agency

Info:  Director of Central Intelligence
       Executive Director, Central Intelligence Agency
       Office of Congressional Relations
       Deputy Director for Operations
       Chief, Latin America Division, Directorate of Operations
       Counter-Narcotics Center

From:  **Franz Boening**, Central Intelligence Agency

Subject: The[        ]Affair: **Possible Violations of US law, Scandal, and
Counterintelligence Failure** during CIA's relationship with[
             ](action filed under Title Seven, *"The Whistleblower
Provision"* of the 1999 Intelligence Authorization Act)


1. **Introduction:** This unclassified memorandum, (accompanied by one brief classified
and two unclassified annexes), constitutes an *urgent concern* under Title Seven *("the
Whistleblower Provisions," sections 701 and 702)* of the 1999 Intelligence Authorization
Act.  I wish to call to your attention several very serious issues, including possible
violations of US laws, related to CIA's alleged operational relationship with[
             ](1)    You will recall that

I allege that:

- **CIA may have violated US laws** during its 10+ year relationship with
  [        ](paragraph five);
- **CIA's professional behavior** was so scandalous that it **seriously
  damaged American prestige and credibility** (paragraph six);
- the relationship continued because of an **egregious counterintelligence
  failure** (paragraph eight)

(1) On November 13, 2000,[ ]urged CIA management to investigate our
relationship with[        ]I received no acknowledgement.

CL BY: _____
CL REASON: _____(c)
DECL ON: _____
DRV FROM: UAI-05

Unclassified

Unclassified

*1*

2. I will demonstrate that my *urgent concerns* are validated by the language of the *whistleblower* provisions (sections 701 and 702 of the FY 1999 IA Act, passed October 1998) and by section 502 of the 1947 National Security Act. The relevant portions of these acts read, respectively, as follows:

> • *the term "urgent concern" means any of the following: A serious or flagrant problem, abuse, violation of law or Executive order, or deficiency related to the funding , administration, or operations of an intelligence activity involving classified information*…(bolded italics the author's)

*10*

> • *…the Director of Central Intelligence and the heads of all departments, agencies, and other entities of the United States Government involved in intelligence activities shall—(1) keep the intelligence committees fully and currently informed of all intelligence activities…including any significant intelligence failure*…. (bolded italics the author's)

*16*
*19*

3. I contend that from 1990-2000, the period (according to news reports) of CIA's most recent relationship with [       ] that the latter not only violated [       ] laws—allegations whose truth is becoming axiomatic according to overt reporting—*but that CIA itself may have violated US laws.* CIA's possible violations were the unfortunate by-product of CIA's conscious policy not to act on clear indicators of [       ] criminal activity. CIA pursued this passive policy in order to prolong the relationship with [       ] which it considered useful.

*20*
*21*

*23*

4. CIA's seeming disregard for the criminal reporting and other requirements of US law and its relentless lack of true curiosity about [       ] activities calls into question the professionalism—and indeed ethics—of CIA officers and their management.  So prevalent was CIA's policy of dismissing criminal and counterintelligence indicators that even a casual observer can legitimately wonder if CIA's officers ever attempted to seriously vet [       ] information and activities; to question his motivation; to corroborate serious criminal charges made against him by others or; to take seriously its US crimes reporting responsibilities.  CIA's conduct also calls into question how seriously it took its responsibilities vis-à-vis other elements of the USG.

*27*

*37*

5. **The Possible Violations of US Laws:**   It is likely that CIA has violated one or all of the laws in the sub-paragraphs below. (Note: CIA's unfortunate and mendacious habit of seeking *"deniability"* before the requirements of *US law* seems to have contributed to the possible violations.  While seeking deniability in the face of the law— *foreign laws*—is wholly appropriate when a CIA officer operates in a foreign capital, it would seem completely inappropriate for CIA to seek *deniability before US laws.* Indeed, in the [       ] relationship, CIA's extraordinarily poor appreciation for political risk and its tendency to "hike near the edge of the cliff" may have caused it to err legally.)

Unclassified

**1**
**2**
a. **The 1952 Immigration and Naturalization Act.** It is now clear, based on numerous overt accounts and considerable physical evidence, that [        ] was ineligible for the US visa. (A glance at the tough questions on the NIV application, OF-156, demonstrates this.) Moreover, CIA had good reason to believe that

**5**
**6**
[        ] was ineligible. So...how did he obtain the visas? If contemporaneous allegations of [        ] involvement in narcotics trafficking had been taken seriously, they would almost certainly have made him ineligible to receive a visa. (2)

**10**
**11**
b. **US Customs Service financial declaration requirements, the Bank Secrecy Act, and CIA's duty to report possible crimes to the Financial Crimes Enforcement Network of the US Treasury Department.** Was [        ] guilty of money-laundering in the United States? Did CIA assist [        ] to launder money here or abroad, whether intentionally or unintentionally? (See classified annex and April 13, 2001 entry in chronology.)

**15**
**16**
**17**
**18**
**19**
**20**
**21**
**22**
**23**
**24**
**25**
**26**
c. **The Foreign Assistance Act of 1961.** According to news accounts, CIA provided years of support to [        ]

[        ] CIA did this at a time when [        ] was a regular violator of human rights. (See classified annex.) [        ]

[        ] Given the overall requirements of the Foreign Assistance Act, it would seem that CIA's support to [        ] organization may have violated the law. (3)

**27**

(2) I do not believe that a visa to [        ] was even possible without a waiver from the State Department. The second bullet of question 29 of the OF-156 reads, "Have you ever been arrested or convicted of any offence or crime, even though subject of a pardon, amnesty, or other similar legal action? Have you ever distributed or sold a controlled substance?" *CIA knew,* for example, that [        ] Did he obtain a visa without a waiver? [        ] US visa was revoked [        ]
[        ] See classified annex.

**31**
**32**
**33**
**34**
(3) Few knowledgeable observers would consider [        ] during the [        ] years to have been an oasis of liberal human rights practices. It is well worth noting that the State Department itself was critical of [        ] human rights record during the [        ] Moreover, the [        ] Congress, completely controlled by [        ] after its initial dissolution in [        ]

**36**
**37**
**38**
**39**
**40**
**41**
[        ] Can CIA, or anyone else, possibly assert that [        ] did not have a human rights problem during the [        ] Did CIA take the Foreign Assistance Act seriously?

Unclassified

d. **Executive Order 13107** (December 10, 1998) on the **Implementation of Human Rights Treaties**; specifically, USG obligations under the **Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment.** According to overt accounts,

it would appear that Article nine of the **Convention Against Torture** obligates the USG (and CIA) to *"afford one another the greatest measure of assistance in connection with criminal proceedings brought in respect of any of the offences referred to in article 4, including the supply of all evidence at their disposal necessary for the proceedings."*

e. *The Torture Victim Protection Act of 1991.*   Based on overt information, it would appear that ⎡        ⎤ was detainable under this act during any possible travel to the US after 1991.  (Note: See classified annex.  The author acknowledges that ⎡        ⎤ was not taken to task under this law during the ⎡        ⎤ Nevertheless, the simple fact that he was probably prosecutable under it is both significant and embarrassing.)

f. The *CIA's own 1995 human rights guidelines* for agent and liaison relationships.  (Note: The guidelines, which appear to be ignored as often as observed, do not have the force of law.  The guidelines are a response to the *Harbury, Bamaca, Alpirez, Constant* et.al. scandals of 1993-94.)

6.  **The (quiet) Foreign Policy Scandal and its Cost:**    Notwithstanding the seriousness of the above allegations, I must also emphasize that CIA's relationship with ⎡        ⎤ was extraordinarily scandalous, at the political level.  **In effect, during the 1990s, CIA pursued a type of separate foreign policy vis-à-vis** ⎡

⎤ **Yet, during the same period, the stated policy of the USG was to promote human rights, democracy, and to fight narco-trafficking.**   As a result of CIA's irresponsible behavior, USG credibility was seriously compromised.  It is doubtful that ⎡         ⎤ policymakers will take seriously the USG's stated policies when ⎡        ⎤ conduct—obvious to astute ⎡        ⎤ but not to CIA—had so effectively undermined them.  *Had CIA been the equivalent of the "lawyer for Tony Soprano" during* ⎡          ⎤ What was the political cost?

---

(4) Although primary authorship of the scandal belongs to the CIA, other elements of the USG—that tolerated the relationship for too long—must share blame.

*36*

Unclassified

Unclassified

7. As is now known [       ] secretly undermined important USG policy objectives—on an industrial scale—over a 10-year period. *Indeed, CIA's dubious support for [              ] suggests a political scandal of the first order—comparable in magnitude, and exceeding in duration and titillating variety, the Iran-Contra Scandal.* Did CIA share with other elements of the USG all aspects of its confidential relationship? Was CIA even aware of the overall foreign policy of the USG? (5)    This question can be largely addressed by examining what I hold to be the main cause of the scandal. (6)

8. **The Decade-long Counterintelligence Failure:**   Numerous domestic and foreign news accounts (in Asia, Europe, North and South America), including those sourced to the USG, allege that CIA both supported and apologized for [



]  In virtually all cases, CIA's special friend [        ] played the central role in personally suborning individuals. Although corruption schemes were undoubtedly complicated, endorsed by [      ] and involved more than one seducer, it remains nevertheless true that [        ] held center stage. This fact is clearly and conclusively demonstrated in the hundreds of videotapes [              ] currently in the possession of the [      ] judicial authorities.

9.   According to various newspaper accounts [

]

(5) Generally speaking, US foreign policy, summarized in annual reports to Congress, stresses national security issues and the promotion of free trade, free markets, *democracy and human rights* (italics the author's).

(6) According to domestic news reporting, all other elements of the USG gradually grew to oppose CIA's relationship with [        ] n fact, DEA appears to have viewed [     ] as an outright narcotics trafficker for years.

(7) For those who may be irritated by the rhetorical question, please consider the reverse: **Is accidentally working with and supporting the narco-corrupter of an entire society some sort of CIA success?**

Unclassified

are
either strongly suspected, under investigation, have been arrested, have fled the county,
or have admitted to corruption charges, since[        ] In literally all cases,
[        ]'s viewed as the ringleader of civil corruption—by the[

                         ](8)

10. So...large swaths of the political and military classes of an entire nation were
suborned and corrupted.... Is an objective observer to believe that CIA, (after all, *an
intelligence agency*) was completely unaware of[      ]efforts to suborn, bribe or
blackmail? How can this be?

11. Those whom[        ]could not suborn, he harassed or intimidated. Journalists,
newspapers, individuals, and opposition politicians were subjected to all forms of
pressure[        ] Among other things,[

              ]

12. On the human rights front[      ]

_____

(8) These names have been reported in the[

     ...

            ]

38
Unclassified

Unclassified

*1*
*2*
*3*

⌐

]Indeed, the only way that CIA could have not known about these serious human rights violations, especially torture, was if its officers never read the newspaper, listened to the radio, or watched television. Since I consider this unlikely, it is safe to say that CIA simply ignored the problem, perhaps *in keeping with CIA's unfortunate history of ignoring rights problems.* (9)  In sharp contrast⌐

*7*
*8*
*10*
*11*

]For this reason, I contend that CIA actually pursued (*the functional equivalent of*) its own foreign policy during the⌐          ⌐years.  **For only CIA could have warned the USG about the true nature of⌐          ⌐was reportedly CIA's special friend—not State's, not DEA's, not FBI's, not DIA's, not USIS', not Commerce's, not the US Ambassador's, not anyone else's.  CIA singularly failed to take its counterintelligence duties seriously.**  (See classified annex.)

13.  **But…why?:**  The failure outlined above occurred because CIA chose to ignore or downplay obvious criminal indicators.  Quite simply, if CIA incorrectly assesses the core
*18*     motivations of its liaison partner or its secret agent, as the case may be⌐          ⌐
         arguable *agent of influence* status represents elements of both), CIA will operate at its
         peril…and its conduct may jeopardize US foreign policy and erode USG credibility.
*21*     This is roughly what happened in the⌐          ⌐case.  In its effort to combat drug
         traffickers, CIA deluded itself into believing—despite a mountain of freely available,
*23*     contrary evidence—that⌐          ⌐was sincerely helping to further USG
*24*     policy goals.  What it didn't take into account is that men like⌐          ⌐if
         fundamentally misunderstood, can subvert whole aspects of US foreign policy.  The
         counterintelligence failure was exacerbated and prolonged by CIA's hubris and apparent
         tendency towards secrecy, even with USG colleagues.  *CIA's hubris, secretiveness, disinclination to accept contrary assessments and evidence, its lax management, and its desire to avoid embarrassment, all proved to be a smoldering recipe for disaster.*

14. The counterintelligence process demands vigilance and a constant
reexamination of one's operational assumptions.  Perhaps the best known (albeit least
common), type of counterintelligence failure occurs when a USG official is secretly
recruited by a foreign power and operates undetected for years.  Professional CIA
officers know, however, that there are other types and levels of counterintelligence
failure—some of which can inflict the same magnitude of damage to America.  (In truth,
aspects of the *Iran-Contra Scandal* were exacerbated by counterintelligence failures.*)  In
*the foreign field, an important type of CI failure occurs when it is discovered that a
foreign agent or liaison service has an entirely different—and malicious—agenda from
*29*     that which he/she/it describes to CIA.* ⌐          ⌐engthy (and not so) concealed anti-
         human rights, anti-democracy, and narco-trafficking activities fall into this category.

(9) CIA's tendency to ignore or downplay rights concerns has been criticized even in
reports from CIA's own Office of the Inspector General.

Unclassified

**15** As is now becoming apparent⌐          ⌐almost certainly acted as only one in a small galaxy of Latin American narco-traffickers—but one who enjoyed the unique political protection inside the USG of CIA. *I contend this was an important aspect of the* ⌐                                            ⌐almost certainly used CIA tools and **bureaucratic support to facilitate his crimes.** (See classified annex.)

**16** In addition to almost single-handedly undermining⌐

⌐

**17.** As we now know from the newspapers, CIA's relationship with⌐
⌐ At that time, even CIA became convinced that
⌐          ⌐had participated in a scheme⌐

⌐                ⌐ Even CIA was finally persuaded that⌐          ⌐could no longer be trusted. ⌐

⌐                ⌐How substandard had been CIA's counterintelligence performance? How much would need to be spent in order to counter the strengthened ⌐      ⌐reinforced with arms supplied by⌐                    ⌐

**18.** In order to understand the foreign policy scandal, the counterintelligence fiasco, and CIA's performance, it is helpful to review a chronology of the contemporaneously available information and developments (i.e. the criminal and counterintelligence indicators) that should have alerted CIA to⌐          ⌐character and agenda.  Did CIA overlook or ignore compelling evidence of a problem?  Or, is the author unfair to suggest that CIA presided over a counterintelligence disaster and precipitated a scandal?  I invite readers to judge for themselves.  (My comments are enclosed in brackets.  Most entries can be traced to multiple media sources.)  (10)

(10)  Of course, according to the newspapers, other USG departments—probably employing nothing more sophisticated than common sense—did not ignore the criminal and counterintelligence indicators.  At various times, they warned CIA that the relationship with⌐          ⌐was counter-productive.  Their warnings went unheeded.

Delete all of pages
41- 53

Unclassified

**1 2**

1⁰. **Analysis:** Since newspaper accounts report that CIA remained in professional contact with [    ] until the late summer of [    ] it is not unfair to say that until that time none of the developments described above were considered serious enough to justify severing the relationship. (See classified annex.) Readers are asked to use their common sense to decide whether CIA exercised appropriate political judgment or counterintelligence sensitivity. (Personally, I do not believe that a degree in criminology is necessary to assess this case.) Was CIA simply not paying attention or had it chosen to willfully disregard indications of criminality? Or…was something more sinister at play? What could explain such relentlessly unprofessional behavior?

**10 11 12**

20. It is worth noting that the relationship with [    ] ostensibly endured through [    ] Fair

questions might be:

- Is CIA on autopilot?
- Do case officers occasionally read newspapers and apply independent judgment or do they rely exclusively on information from *special friends*?
- Does a re-examination of aggregate counterintelligence evidence ever occur?
- Will CIA do absolutely anything to maintain a prestigious covert relationship? including working at cross purposes to America's stated foreign policy?
- At the US public policy level, is it wise to allow CIA to handle contacts at the policy level of a foreign country?

**25 26**

- And, the two most frightening questions: *Did CIA maintain a relationship with* [    ]
- *Did CIA help to establish a unit* [    ] *which engaged in human rights violations?*

**28 30**

21. Whatever the stated reasons were for CIA's failure, [    ] *seems to be an extraordinary example of how not to conduct operations.* Frankly, I must agree with late Senator Cranston; it is all embarrassingly reminiscent of [    ] (See classified annex.)

**33**

22. **Conclusion:** As a 20-year employee of CIA with considerable agent-handling experience, I find [    ] personally distasteful, professionally inexplicable, and quite possibly legally indefensible. Consequently, I have initiated this whistleblower action. The need for accountability, especially before the elected officials of the House Permanent Select Committee on Intelligence, the Senate Select Committee on Intelligence, other congressional committees, and the incoming US Drug Coordinator strongly suggests that a detailed explanation be given for the counterintelligence failure, the foreign policy scandal, *and that possible violations of law be thoroughly investigated.* Let us hope that CIA chooses not to invoke the overworked excuse of *sources and methods* to avoid embarrassment and accountability. (Or, to protect whom—the most

Unclassified

wanted man in[        ] 11) Secrecy—in this instance—is the enemy of accountability.

Fortunately, since DCI Tenet spoke of the need for accountability during his 1997 confirmation hearing, it is hard to believe that he will allow CIA to hide behind the mantra of *sources and methods*. Therefore, I have no doubt that he will support a thorough investigation of this matter.

23. Should you have any questions concerning this memorandum, please do not hesitate to contact me. In the meantime, I remain,

Yours Sincerely,


Franz. Boening


**Postscript:** Given my previous whistle-blowing experience with CIA in 1998-99, I plan to track CIA's response to the best of my limited ability. Naturally, I shall be most disappointed if I incur any bureaucratic retaliation as a result of this memorandum. Should any such retaliation occur, it shall be swiftly reported to the appropriate congressional committees.

My hope is that an investigation of this matter will help the USG to restore some of its badly damaged credibility in the[        ]*Drug Wars*. This is an important issue to me and other Americans. *A fresh wind blowing over the landscape can help us to achieve this*...

On a separate issue—and in order to be helpful—I will make my personal, unclassified file on[        ]available to CIA and/or law enforcement investigators.


(11[        ]

the Website of the[        ]                              [        ]Details are available at

Unclassified

## Bibliography :

1. Amnesty International
2. Associated Press
3. BBC News
4. Bogota Cambio
5. Bogota El Tiempo
6. Bogota Semana
7. CBS News
8. CNN
9. Committee to Free Lori Berenson
10. Covert Action Quarterly
11. Cornell University
12. University of Colorado
13. University of Minnesota
14. UCLA (Daily Bruin)
15. Caracas Venezuela Online News WWW
16. Desaparacidos (latin American human rights org.)
17. Derechos (latin American human rights org.)
18. DEA Website
19. DEA report (available from National Security Archive)
20. declassified DIA reports (National Security Archive)
21. EGroups
22. Global Spy Magazine
23. Gustavo Gorriti  (various WWW sources; outstanding reportage)
24. Human Rights Watch
25. Interview with Coletta Younger on the WWW
26. Lima Radio Programas del Peru
27. Lima Gestion
28. Lima La Republica
29. LATimes
30. Madrid EFE
31. Madrid RNE Radio
32. Madrid El Pais
33. Medillin El Columbiano
34. Mexico City NOTIMEX
35. Mexico City Reforma
36. Miami Herald
37. Moscow Segodnya
38. Narco News
39. New York Times
40. New Yorker Magazine (outstanding reportage by Isabel Hilton)
41. Panama City El Panama America
42. Peru Ministry of Interior Website
43. Paris AFP
44. Radio Netherlands



Unclassified

45. Revolutionary Worker
46. Swiss Info WWW
47. San Jose Mercury News
48. Observatoire Geopolitique Des Drogues, Paris
49. US Department of State Website
50. Sao Paulo Folha De Sao Paulo WWW
51. Tel Aviv Yedioth Aharonot, Shiv'a Yamim supplement (13 April 2001)
52. Washington Post
53. Workers World
54. Washington Office on Latin America
55. World Socialist Website

## About the author:

Franz Boening is a 45 year-old CIA employee who entered on duty in 1980. After learning Arabic in the early 1980s, he spent 10-12 years in agent operations, primarily in the Middle East. However, shortly after protesting privately to the DDO in 1994 of CIA's paid relationship with _____ Boening was asked to return permanently from abroad. Upon return from abroad in 1995, Boening was asked to work in declassification, where he worked from summer 1995-spring 1999. (Note:

In fall 1998, Boening filed CIA's first Title Seven action over testimony and comments made by the CIA's information release officer, Lee Strickland, to Congressman Dennis Kucinich, (D, Ohio). Boening protested what he interpreted to be highly misleading remarks made by Strickland with regard to whether or not the CIA protects human rights violators. Strickland's comments were made to "clarify" CIA's position on the Human Rights Information Act, which CIA opposed. The Human Rights Information Act did not become law.

As a result of Boening's action, DCI Tenet "regretted" Strickland's comments to the US Congressman. Boening, in turn, was allowed to consult directly with the congressman regarding the legislation.

Since spring 1999, Boening has worked at the Foreign Broadcast Information Service, where he does Internet exploitation and training.

Unclassified

unclassified

*1*

Unclassified Annex:

*2*

## Myths Surrounding CIA's Relationship with [     ]

*3*
*4*

It is useful to address, at least cursorily, what the USG/CIA got from [
        ] in return for CIA's relationship with him. Was the seeming

*7*
*8*

counterintelligence failure and the political scandal worth it?  Let's take a very brief look
at a few myths surrounding this unusual character.  Newspaper accounts usually assert
that CIA worked with [        ] in some fashion or other, against terrorism and the
drug trade. So….how much did actually [        ] help us?

*9*
*10*
*11*
*12*
*13*
*14*

1. **Myth:** [

[        ] **Fact:** Not according to Washington
Post reporting or that of [                                           ] Rather, it
was the [

*15*
*16*
*17*
*18*
*20*

2. **Myth:** [
        ] **Fact:** Not entirely true. [                                 ] played an
equal, if not greater role, in the planning of the operation.  He was fired, [

*21*

3. **Myth:** There was no good evidence that [                        ] were involved in
criminal activities.  **Fact: The author considers this claim to be complete and utter
nonsense (see chrono).**  Those who make this claim probably mean to say that they
personally are unaware of a smoking gun.  In fact, if one takes the long view and
examines the anti-democracy activities and the anti-human rights activities of [    ] the
evidence of criminality becomes overwhelming.  Why the focus only on [
seeming drug activities *(where the criminal indicators were still extremely strong)*?
Why did CIA not also focus its intelligence efforts on anti-human rights activities or the
intimidation of journalists, for example?    These sorts of activities are themselves
criminal and counterintelligence indicators.  Does CIA not realize this obvious fact?
*For any system that is willing to engage in the gross violations of democratic practices
and the massacre of innocents is also quite willing to engage in narco-trafficking.*

*25*
*26*

*33*
*34*
*35*
*36*

[                                                              ] *Did CIA ignore literally
everything?*

Finally, why would any thoughtful person assume that the standard for severing
an intelligence relationship must be legal evidence of wrongdoing?  Why did CIA

58

unclassified

apparently bend over backwards to defend[        ] *Did CIA consider itself*
[        ] *lawyer?* Practically speaking, *did CIA work on behalf of the citizens of*
*Idaho and Iowa or for[        ]?* In foreign policy, the intelligence standard for
severing a relationship should simply be whether a heavy preponderance of the evidence
indicates that a partner is unsuitable or undermines the broad mix of US foreign policy
objectives.

4. Myth: [        ]helped America in the [        ]Drug Wars. After all,
[        ]acreage declined markedly after[        ]and many drug seizures took place.
**Fact: True and true. Unfortunately, the real measure of success is not coca plantings
but whether cocaine production or shipments to North America actually declined.
This is far more difficult to determine.** After all, human beings don't consume coca
plants, they consume cocaine. What is known, moreover, is that yields in the remaining
acres under cultivation appear to have increased somewhat even as total acreage under
cultivation declined (according to the *Observatoire Geopolitique des Drogues* in Paris
and *DEA* analysis). Likewise, some overt reporting indicates that while acreage was
declining in[        ] Let's face it-[

**Secondly, it seems possible that at least some of the cocaine seized by the**
[

[        ]if current DEA theories are valid. A recent news
service report suggests that[        ]alleged front man in[        ]
[        ]was the man to whom[        ]allegedly shipped
seized drugs for resale. (This would seem to explain the occasional stories in the
[        ]press[        ]of missing drugs from government warehouses.) While it may
be true that[        ]is innocent of the charge, it is undeniably true that he could not be
found as of early[

Thirdly, if[
[        ]this sure didn't help America. The author would note in this regard that
the[        ]
apparently became military contractors for the[        ]

Finally, this author understands that the street price of cocaine in the US market
has been on a downward glide path from the mid-1990's to 2000. Unfortunately, since
price is a generally a function of supply and demand (even for cocaine)—and demand
remains reasonably strong in this country—this would seem to indicate that cocaine
remains quite plentiful.

Unclassified

## Unclassified Annex: Was[ ]an Agent?

This question deserves closer examination. I suggest that as you read my personal analysis below, you ask yourself the following questions:

**Does anyone seriously expect CIA to do anything other than minimize the extent of this embarrassing relationship?**

The corrupter of [ ] a human rights violator, a narcotics and weapons trafficker, a blackmailer, a briber, a money-launderer, and arguably the most wanted man in [ ] who, in his right mind, would admit that they had been [ ] friend?

As we are now aware, the man in question [ ]

Of course, the contention by the USG that [ ] was not *"an agent"* is somewhat strained and, unfortunately, typical of CIA's hair-splitting mendacity. What CIA actually means to assert—now that its judgment has been so discredited—is that [

]

Viewed from another optic, every professional case officer knows that it is not necessary for a person to take a formal salary in order for CIA to view him/her as "special." And, rest assured, CIA viewed [ ] as unique, useful, and often responsive. CIA may indeed have fretted about its limited ability to influence this prickly

60

Unclassified

Unclassified

personality but the strange sense of bonhomie, emotional obligation, shared history, and support still provided considerable forward momentum on various issues[    ]
[    ] Besides,[    ] did not brag openly about his relationship with CIA. This is one of the behavioral characteristics that every case officer seeks to establish in any "special" person.

CIA will argue, probably out of embarrassment, that[    ] was not paid a cash salary and not always responsive so, ipso facto, he could not have been an agent. I would respond that no one, paid or unpaid, is ever fully responsive. **Yet the fact remains that neither CIA nor[    ] broke off the relationship—no matter what the provocation—until[    ]**. In other words, it was generally friendly, supportive, and exceedingly durable.    CIA was able to overlook virtually any "malicious rumor" about[    ] and the latter, in turn, tried not to get too annoyed when CIA asked him the occasional tough question. The relationship endured. (Note: The apparent, albeit largely ephemeral, decrease in[    ] production after[    ] also helped to reinforce CIA's belief in[    ] utility.)

Both sides got what they wanted: CIA, the psychic rewards of a warm welcome by the[    ] the very useful political insurance policy that only CIA could provide.

*CIA, the lawyer for Tony Soprano?*    Judge for yourself.

# EXHIBIT "3"

# December 12, 2002 APR Memorandum

UNCLASSIFIED//AIUO

CIO/IMS 0108-02
12 December 2002

MEMORANDUM FOR:  Franz W. Boening
                 Foreign Broadcast Information Service, DS&T

FROM:            Herbert O. Briick
                 Executive Secretary, Agency Release Panel

SUBJECT:         Consideration of Appeal of ACMRP Decision.


     1.  This is in response to your request that the Agency
Release Panel (ARP) consider your appeal of the decision of the
Agency Classification Management Review Panel (ACMRP), the
successor to the Classification Management Review Group
Augmented Panel, regarding the classification of your complaint
made under the Intelligence Community Whistleblowers Protection
Act of 1998 (the Act).

     2.  Background:  On 10 May 2001, you initiated a
whistleblower complaint regarding a classified matter which you
deemed to be an "urgent concern" that you had a right under the
Act to complain about to Congress.  Since the Act applies to
"urgent concerns" involving classified information, Central
Intelligence Agency (CIA) procedures implementing the Act, as
set forth in the Attachment to AN 7-2-1, require that the
appropriate CIA officials be consulted to determine whether any
information contained in an employee complaint is classified.
After such consultation was undertaken, it was determined that
your complaint did contain classified information, and your
complaint was marked so that you, and any CIA and Congressional
officials involved in the review of your complaint, would be
alerted to the specific portions of your complaint containing
classified information.

     3.  After your complaint was submitted to the CIA Office
of Inspector General and appropriate Congressional officials in
accordance with the Act, you indicated that you wanted to
publish your complaint by providing it to the National Security
Archives, a nongovernmental public interest advocacy group.

All Portions are Marked
UNCLASSIFIED//AIUO

UNCLASSIFIED//AIUO

UNCLASSIFIED//AIUO

SUBJECT:  Consideration of Appeal of ACMRP Decision

Since you further indicated that you believed your complaint
was, in fact, unclassified, on 2 July 2001 you requested that
your complaint be reviewed under the classification challenge
provisions of Executive Order 12958 and CIA implementing
regulations.

4.  Upon receipt of your complaint by the predecessor
Executive Secretary of the Agency Release Panel (ES/ARP) for
review under the classification challenge provisions of the
Executive Order and CIA implementing regulations, it was
assumed, without further analysis, that your complaint met the
threshold legal criteria necessary for a classification
challenge to take place. Based upon this assumption, an initial
review of your complaint was commenced under 32 CFR, Part 1907
and AR 70-3 by the ACMRP. After completing its review, the
ACMRP determined that, with the exception of one item, the
information in your complaint which had been previously
identified as classified was, in fact, properly classified.

5.  Upon being informed by the Executive Secretary (ES)/ARP
of the decision of the ACMRP regarding your complaint, you
appealed the Panel's decision to the ARP. During the pendency
of your appeal, informal efforts were undertaken to assist you
in revising your complaint so that it would express your
personal opinions without revealing classified information.
When these efforts proved unavailing, your appeal to the ARP was
formally scheduled for consideration. Meanwhile, the individual
serving as ES/ARP was selected for another assignment, and I was
appointed as the new ES/ARP.

6.  In the process of preparing for consideration of your
appeal, I focused on your strongly expressed views that your
complaint was not an official expression of the CIA.  This, in
turn, caused me to question whether a whistleblower complaint
made under the Act is actually reviewable under the
classification challenge provisions of the Executive Order and
CIA implementing procedures. As a result of my concerns, I
requested the Office of General Counsel's (OGC) legal opinion
regarding whether the requisite jurisdiction exists for CIA
employee complaints under the Act to be reviewed pursuant to the
classification challenge provisions of Executive Order 12958 and
CIA implementing regulations.

2

UNCLASSIFIED//AIUO

SUBJECT:  Consideration of Appeal of ACMRP Decision

7.  In response to my request, OGC has advised the ARP that a CIA employee whistleblower complaint is a "personal record" created by the employee acting in his personal capacity, and therefore, in accordance with the classification challenge provisions of Executive Order 12958 and other relevant legal guidance, the requisite jurisdiction does not exist for CIA employee complaints under the Act to be reviewed pursuant to the classification challenge provisions of Executive Order 12958 and CIA implementing regulations (32 CFR, Part 1907, as procedurally supplemented by AR 70-3).  OGC has also advised that while there is no jurisdiction to review your complaint in the context of a classification challenge, your complaint is reviewable under the AR 6-2/Employee Bulletin 0003-02 procedures that apply to any writing by a current employee about the Agency that is intended for nonofficial publication.  Please note that AR 6-2i(2) prohibits CIA from denying permission to publish "solely because the statement may be embarrassing or critical of the Agency."

8.  Conclusion:  Based on the foregoing, since your complaint is not reviewable under the classification challenge provisions of Executive Order 12958 and CIA implementing regulations, neither the ACMRP nor the ARP has the jurisdiction to review the classification of your complaint.  As a "personal record" created by you in your personal capacity, the classification of your complaint must be reviewed under the AR 6-2/Employee Bulletin 0003-02 procedures that apply to any writing by a current employee about the Agency that is intended for nonofficial publication.

9.  Please accept my profound apologies for the incorrect processing of your complaint, and the time that that incorrect processing has entailed.  I stand ready to help facilitate the expedited processing of the review of your complaint through your supervisory chain of command, if you desire my assistance in that regard.  No further action will be taken by the ARP on this matter.

Herbert O. Briick

Herbert O. Briick

3

SUBJECT: Consideration of Appeal of ACMRP Decision


Distribution:
  Orig - Addressee
    1 - D/IMS
    1 - DD/IMS
    1 - C/IRRG
    1 - Bruce Burke
    1 - Lisa Studtmann
    1 - Richard Puhl
    1 - Laura Shea
    1 - Kristi Kenniston
    1 - AC/PPRD/IRRG
    1 - D/History Staff
    1 - ARP Members
    1 - Fred Manget (DGC)
    1 - Nancy Fortenberry (GC/EA)
    1 - CIO/IMS/FO File Subject
    1 - ARP File

4

# EXHIBIT "4"

# PRB Submissions

## UNCLASSIFIED//AIUO

16 January 2003

Memorandum For: Melda⎡     ⎤C/HRS/FBIS

Information: Douglas⎡     ⎤Director, FBIS

### Subject: **Record of Grievance Against FBIS Managers**

1. Introduction: I wish to record a grievance against senior managers at FBIS. I allege that certain supervisors continue to judge me not by objective performance but by my "attitude" toward the CIA and by critical opinions that I have allegedly shared with younger officers and/or new EOD's. I shall describe my allegations in the following paragraphs and explain why they are improper. *I request any and all reasonable redress—to include counseling and possible reprimand of the offending officers.*

2. Two FBIS officers, in particular Joyce Forrest, C/ENEAG, but to a lesser extent Michael⎡     ⎤C/TNEP, have told me that they "are concerned" by "negative comments" about CIA that I have allegedly made to unnamed "young officers and new EOD's." Despite their "concern" neither Forrest nor⎡     ⎤have described to me, nor documented in any way, a specific instance where these alleged comments were made. Yet, it is clear from one "PAR feedback session" with Forrest and several other conversations with⎡     ⎤including "PAR signing discussions" that both officers assess my well-known critical views of CIA (and in Forrest's case other criteria) as barriers to career advancement. Moreover, my alleged views continue to factor prominently into their assessment of my performance and were negatively commented on in my most recent, December 2002 PAR—despite a complete absence of documentation.

3. I contend that taking anyone's privately-held opinion of CIA's general effectiveness into account in a performance appraisal report seems contrary to the Agency's policy on diversity, is not permitted by any CIA regulation, can be plausibly interpreted (in my case) as a form of retaliation against a *whistleblower*, and is a probable violation of one's First Amendment rights. I am greatly disappointed that these senior managers seem obsessed with controlling personal opinions and an employee's possible sharing of them with "young officers." This unprofessional conduct is equally disappointing because it subordinates all other contributions that a person may have made to the intelligence mission (in my case, very substantial, pioneering contributions), to these managers' obsession with an employee's private views and "how to control" them.

4. I discovered the phenomenon described above during a revealing PAR feedback session with Joyce Forrest on the afternoon of 25 October, at 1500 hours. After a give and take criticism, in which Forrest criticized my "poor writing" and my "bad judgment," I detected a previously unknown, yet profound subtext to the conversation. Forrest proceeded to make multiple undocumented criticisms, which clearly had played a role in her assessment of me—and had been recorded nowhere, hitherto. Among other things, Forrest noted that she and⎡     ⎤(but especially⎡     ⎤she claimed) were "concerned" about my comments to "young officers." Dumbfounded, I joked that perhaps FBIS

62
## UNCLASSIFIED//AIUO

UNCLASSIFIED//AIUO

( should give me a comfortable, private office to keep me from contact with them."
Forrest calmly responded, to my great surprise, "actually, we are considering just that."
She noted that it was for this reason that I was not allowed "to mentor any young officer."
When I pointed out to her that I was already mentoring, for all practical purposes, one
5 young EOD, Wesley[          ] and that the results seemed quite positive, she offered no
comment.  She proceeded to make other undocumented observations about my alleged
behavior, *which revealed a level of psychological bias that I have never witnessed before
in the CIA.*  She asserted that the reason "FBIS has no video program" was because Ken
Hughes, the former head of FBIS/CTU, had not been able to call on me to manage the
*Blue View* Web research initiative because Hughes felt that my "attitude towards *Blue
View* was negative."  Consequently, "FBIS managers had to make our video lead, Joe
12 [          ] the *Blue View* manager."  Thus, Forrest continued, "Franz, you the reason FBIS
does not have a video program."  To this unusual, undocumented (and inane) argument, I
responded that Ken had never offered the *Blue View* project to me, that he had not spoken
with me orally (or telepathically), and that, in the event, FBIS managers had inadvertently
made the correct decision to allow me to continue work on militant Islamic issues, as my
contributions had been indeed pioneering.  Nonetheless, I acknowledged to Forrest
private doubts about *Blue View*'s efficacy, given my background as one of only two
regular FBIS speakers on Internet exploitation issues, and my taxpayer's awareness of the
20 project's considerable cost (eight million dollars).  I reminded Forrest that it is any
employee's right to harbor private reservations about any untested research program—but
that I had expressed these reservations to no more than 1-2 people, in any case.  In one
final, undocumented assertion, Forrest asserted that I had "driven away" young FBISer's
24 like Kevin[          ]  I vigorously denied this allegation and told Forrest that she clearly
did not know what she was talking about.  I noted that perhaps "bad management" had
26 played a role in[          ] departure.  The discussion ended inconclusively shortly
thereafter, having lasted for more than one hour.

28 6. On 12 November, during a 45-minute private conversation with[          ] I shared with
him Forrest's comments, in particular, my alleged "unsuitability" to mentor or speak with
young officers.  Although a bit surprised, he sympathized with my irritation and
emphasized that he had no problem whatsoever with informal critiques of CIA.  He
requested only that I be positive about the FBIS work at hand—which he acknowledged
33 had been my practice with young officers such as Wesley[          ]  He promised to discuss
the issue with Forrest and reluctantly divulged that it was Forrest who did not believe me
suitable to mentor young officers.

36 7. However, during two conversations with[          ] in mid-December 2002 to discuss my
37 PAR,[          ] contended that he also had become "concerned" about my interaction with
young employees, a fact that he recorded in his comments on my PAR.  While he
39 acknowledged my great assistance to officers like[          ] he said that "he preferred not to
provide details" to me about my alleged offending remarks.

41 8. As some officers in FBIS are aware, (including[          ] Hughes, Kelly[          ] Rich
42 [          ] and Gina[          ] I am a former *whistleblower* at the CIA and perhaps enjoy a

63
2

UNCLASSIFIED//AIUO

UNCLASSIFIED//AIUO



deserved reputation for outspokenness. Peers seem to have no problem with this fact—very many routinely ask me for advice—and I get along with everyone in the organization quite well (except for 1-2 managers). Moreover, a handful of other CIA supervisors find my views refreshing. Yet, whatever may be managers' privately held opinion of my critiques of the CIA—the following facts are undeniably true:

a.[        ]and Forrest expressed no criticism whatsoever of my outspokenness during the previous PAR period.

b. Neither[        ]nor Forrest documented their "concern" in any way; nor do they describe the alleged incident(s) that seem to trouble them. In other words, there is no written record of their reported "concern." *(Comment: But their "concern" most certainly played a role at the 2002 panel and will play another important role at the 2003 panel.)*

c. Forrest and[        ]did not feel strongly enough about their "concern" to contact the Office of Security. If they were so "concerned,' they made their views known to no one. Moreover, it seems likely that[        ]did not even discover his "concern" until he was reminded of the need to comment on his "concern" in my December 2002 PAR. *(Comment: Am I required to guess managers' thoughts?)*

d. Neither[        ]nor Forrest allege that I am fundamentally wrong in any criticism of CIA. Neither claims that my alleged comments—whatever they were—lack factual basis.[        ]also acknowledges no problem with criticizing CIA's performance to "mature" employees. *(Comment: Should I ask an employee's age before venturing comments that an overly sensitive manager might construe as "negative?" Are all young employees immature?)*

e.[        ]freely acknowledges that I have been of great service to young EOD's like Wesley[        ]Both[        ]and Forrest acknowledge that I am above average in initiative and productivity and exceptional in expertise.

f.[        ](and perhaps Forrest) are "concerned" only with my comments to young officers and new EOD's, not to all CIA employees. In other words, I am "unfit" to discuss the Agency at large with only one group—the young.

g. Agency regulation AR 20-16, which governs PAR writing, does not list "political correctness" or "willingness to sing CIA's praises to young officers" as factors that can be considered in a performance appraisal report. Nor were these two factors listed in my 2001 "goals and expectations" statement. *(Comment: Agency practice also does not permit taking into account whether a person smokes. Why? Because smoking is a personal choice. Yet, smoking in front of "young people" could easily be construed as "negative." Therefore, would it be proper to put in a PAR "he smokes and is a bad role model for young people?" Of course not!)*

64

UNCLASSIFIED//AIUO

UNCLASSIFIED//AIUO

h. Agency regulation AR 20-16 states clearly that *evaluation factors for managers* (like Forrest and _____ are, among other things: "Valuing and Managing Diversity" – i.e. . . .the degree to wish a manager views *differences* as assets, and utilizes these *differences* to accomplish organizational goals. . . (my italics).

i. A rarely applied Agency regulation, AR 51-3, actually encourages critical assessments of the Agency's intelligence performance. Conversely, no regulation prohibits a CIA employee from sharing with colleagues his/her private assessment of Agency performance. *(Comment: In view of AR 51-3, why would a manager object when an experienced employee informally critiques CIA's performance in the presence of a less experienced employee?)*

j. The CIA's policy on diversity, first promulgated in Feburary 1999, specifically states that every employee should be treated with "integrity and respect" and that "everyone's voice should be heard." *(Comment: Except mine?)*

k. No employee signs away all aspects of his First Amendment rights when he accepts employment at CIA. I certainly didn't. *Do certain FBIS managers consider it their duty to police their subordinates' informal comments to colleagues? Comments that are unrelated to FBIS' work?*

l. Based on her lengthy comments on 25 October, it is clear to me that Forrest most certainly did factor in my personal criticisms of the Agency to young officers (and other inane, undocumented criteria) during her "defense" of me at the GS-13 panel in early October 2002. Similarly, _____ was critical of my comments to young employees in my recent PAR from mid-December 2002. *(Comment: With overwhelmingly biased "advocates" like Forrest at the panel, who needs enemies? See paragraph 5 above.)*

9. **The Context:** As many people are aware, I am a former whistleblower and I have been quite critical of CIA's intelligence performance, particularly in the run-up to the 9/11 attacks. I do not deny or apologize for this nor do not hesitate to share my opinion with co-workers. (But I do not give seminars!) I have also described to several young employees instances of undeniable corruption at CIA. *What of it?* These days, as everyone is aware, it seems every second congressman is critical of CIA's intelligence performance and two investigatory committees have been established to examine it. So, why is it illegitimate for an experienced CIA officer to privately share opinions voiced by elected officials such as Senator Shelby or Congressman Porter Goss, both of whom have been critical of CIA? *(Whether managers consider my outspokenness "negative behavior" is up to them—but they cannot make it a criterion for advancement. I prefer to describe myself as "critical" of CIA and believe government bureaucracies need such people to offer contrary and constructive criticism. If others refuse or disdain this role, that is their choice.*

65

UNCLASSIFIED//AIUO

UNCLASSIFIED//AIUO

*Incidentally, according to a recent article in Time magazine, the majority of Americans believe that whistleblowers perform a useful role.)*

10. It is worth noting that shortly after 9/11, I was sought out by the Denial and Deception Staff of the National Intelligence Council to speculate over possible reasons why CIA had been unable to warn of the attacks. Similarly, I was summoned for a lengthy interview with the US Congress' 9/11 Investigatory Committee headed by Eleanor Hill in late spring 2002. During the interview with Hill's staff, I made a large number of criticisms of the performance of CIA's Directorate of Operations, as I am a former Arabic-speaking case officer with considerable agent-handling experience. During the two-hour meeting, the investigators specifically requested a report that I had written several years ago documenting CIA's inability to predict attacks from one terrorist group. They thanked me for the report and for my observations about how the DO operates. *Why do I relate this?* Because I have made identical comments and observations to young officers like Wesley⎡    ⎤(with no discernable "negative" effect). Therefore, is it proper, wise, or legal for CIA to make this a matter of negative comment in a PAR? Is it proper for a senior manager like Forrest to take such criticisms of CIA into account? Did not George Tenet say that no one would suffer retaliation for speaking his mind to congressional investigators? *If so, how can CIA publicly encourage employee feedback to the 9/11 Investigatory Committee in one venue and how can Congress pass the Whistleblower provision of the 1999 Intelligence Authorization Act—and simultaneously punish the same employee for making identical remarks to young employees in an internal setting? What is going on here?* (Comment: *Wesley⎡    ⎤knows of the existence of my whistleblower action re "M" but has not read the complaint. Does Title Seven prohibit sharing of a whistleblower experience with cleared employees? No, it does not. Are my comments to⎡    ⎤about M the mysterious "negative comments" of which Forrest speaks?)*

11. In the event of an unsatisfactory resolution to the matter, I will pursue it with the Office of the Inspector General. It seems to me that there had better be an excellent reason why the only person in FBIS told not to share critical opinions of CIA with young officers—indeed, who is privately considered unsuitable to have contact with them—just happens to be FBIS' only former whistleblower. All a coincidence?

12. The situation described above is unbecoming of a great public institution and demands an explanation. Thank you for your kind attention to this matter.

UNCLASSIFIED//AIUO

Unclassified

\  subverts not just the provisions of E.O. 12958 *such as the absolute prohibition against
covering up possible crimes through classification* but also my First Amendment rights.
(By what sort of un-American, Orwellian logic can CIA make an employee's discussion
of overt news items secret?)

**7. Action Requested: I kindly request that you contact the CIA, including the
Office of the Inspector General John Helgerson, to investigate—and if warranted—
rectify the situation described above.** I delivered an electronic version of this letter to
CIA/OIG on 13 December. My right to appeal to the ISCAP is being ignored and CIA is
in seeming violation of E.O. 12958. Good faith on the part of CIA—OIG being the
likely exception—seems to have evaporated.

8. Please feel free to email me _____ and/or call me at my office (703-
613-5980) or home _____ should you desire further information. For your
background, I currently work for the Foreign Broadcast Information Service in Reston,
Virginia. At FBIS, I work on militant Islamic issues and related _____ topics. I entered
on duty with the federal government on October 20, 1980 and my SSN is _____

Thank you for your kind attention to this matter, and . . .

Season's Greetings

Franz Boening

*47*

SECRET
UNCLASSIFIED//AIUO

March 24, 2003

To:     John L. Helgerson, Inspector General, Central Intelligence Agency

Info:    Buzzy Krongard, Executive Director, Central Intelligence Agency
        Office of General Counsel
        Office of Congressional Affairs

From:   Franz Boening, Foreign Broadcast Information Service

Subject:  *Urgent Concern* filed under Title Seven (the *Whistleblower Provision*) of the
          1999 Intelligence Authorization Act - CIA's Record of Retaliation Against a
          Whistleblower

**1. This memorandum is an *Urgent Concern*. It describes the history of CIA retaliation against an internal whistleblower.** Actions requested (in approximate order of importance):

- Kindly investigate the history of retaliation described below and provide suitable redress.

- Take appropriate action to make CIA an exemplary bureaucracy.

- Enforce the Agency's stated policy on diversity and brief managers about the *Whistleblower Provision* and its implications.

- Consider suggesting to the Senate Select Committee on Intelligence and to the House Permanent Select Committee on Intelligence that performance appraisal reports for whistleblowers be drafted by CIA's OIG.

- Consider reprimanding guilty parties.

- Improve my personal situation by compensating me for past retaliation.

**2. This memorandum alleges that some CIA managers have retaliated against me in a series of incidents over the years because of separate *Urgent Concerns* submitted in both October 1998 and again in May 2001. I have suffered discrimination in assignments, promotions, and training as a result.** As your office is aware, Title Seven (the *Whistleblower Provision*) of the 1999 Intelligence Authorization Act, expressly prohibits retaliation against a whistleblower for submitting an *urgent concern.* Yet, a whistleblower's fair treatment ultimately depends not so much on the law or an organization's stated policies, but on the quality, integrity, awareness, and goodwill of the senior officials who administer the bureaucracy.[1] Given that the law allows the

---

[1] If the *Whistleblower Provision* of the 1999 Intelligence Authorization Act, the Lloyd-LaFollette Act of 1912, the USG's code of ethics, other regulations, and CIA's stated *policy on diversity* actually ensured fair treatment and non-retaliation, then a whistleblower would have absolutely nothing to worry about.

CL BY: 0711
CL REASON: 1.4(c)
DECL ON: 20300304
DRV FROM: UA 1-03
            Coc 2-03

CL REASON: 1.5(c)
DECL ON: X1
DRV FROM: M(S)-87

SECRET
UNCLASSIFIED//AIUO

whistleblower, and not the bureaucracy, to decide when he believes that retaliation has occurred and report it to appropriate authorities, I have drafted this memorandum.

3. Background: As some senior CIA managers are aware, in October 1998, I alleged in an *urgent concern* that Lee Strickland, at the time CIA's publicly identified information release officer, had consciously misled Congressman Dennis Kucinich (D-Ohio) in his testimony regarding the failed Human Rights Information Act. Although no OIG investigation ensued, DCI George Tenet privately apologized—apparently very profusely—to Congressman Kucinich for Strickland's conduct.[2] Tenet denied, however, that "criminal intent" had existed on the part of Strickland. In a separate complaint in May 2001, I alleged that CIA had likely violated US law in its overtly reported "relationship" with _____

_____ You will recall that _____

_____

_____In a word, there was strong prima facie evidence that both whistleblower actions were justified. The two *urgent concerns* were not frivolous.

4. (Historical Note: CIA did not investigate either complaint formally. Although this aspect of CIA's conduct is an interesting counterpoint to the subsequent retaliation that I allege, the organization's seeming apathy about the *urgent concerns*, albeit perhaps inexplicable from the public policy standpoint, is not the purpose of this memorandum. It does call into question, though, CIA's general willingness to abide by the spirit of Title Seven, the *Whistleblower Provision*. In fact, CIA's demonstrated disinclination to actually investigate an *urgent concern* formally has been criticized by some in Congress.[4])

5. The following paragraphs shall describe in detail a series of incidents, decisions, actions, and conversations that, while perhaps individually excusable or understandable, constitute, in the aggregate, a history and pattern of CIA retaliation against a whistle-

_____

Unfortunately, private attitudes are more important than laws, regulations, and stated policies. Managers are too often guided by the former and ignore the later.

[2] Congressman Kucinich had been angered by Strickland's misleading information and by other CIA officials. He told me personally about the DCI's apology.

[3] I read about the alleged "relationship" in the newspapers. Consequently, this *urgent concern* does not constitute official CIA acknowledgment that _____ had a "relationship" with CIA. I speak for myself on this issue and only CIA knows the truth of the matter. I remind readers that I enjoyed no official access whatsoever to any USG document, which dealt with _____ (except those available at the *National Security Archive* after their official release).

[4] Other USG departments, including the FBI, the Defense Department, and the Department of Transportation, actually investigate whistleblower complaints. However, CIA's proven reflex in response to any hint of official wrongdoing in an *urgent concern* is to exonerate itself without any formal investigation. CIA does this by simply asserting, "an investigation of this matter is not needed." Yet, the non-investigation of a credible *urgent concern* accompanied by retaliation against the whistleblower is simply not too impressive from the public policy perspective. (For added insight, see Iden cc's comment in "classified" appendix.)



SECRET

blower. It is the story of an organization whose managers will retaliate even years after a
whistleblower has submitted his *urgent concern.* Although I consider myself a tolerant
and reasonably easy-going person, and not one to jump to conclusions, egregious
incidents at the Foreign Broadcast Information Service in particular have confirmed my
belief that de facto CIA retaliation exists, and has existed for several years. (It has taken
years of careful observation to make sense of the individual events.[5]) The retaliation has
been sometimes quiet or oblique and other times not so quiet; sometimes coordinated and
other times seemingly uncoordinated. Although I do not allege that all CIA managers
have retaliated, it is most certainly true that some managers have retaliated—and I have
paid a tangible cost for their inappropriate actions. Therefore, I remind the most senior
levels of CIA that they are responsible for the conduct of all, repeat all, CIA managers.

*6. It has become time to catalog the irritating history of retaliation for posterity and, I
freely admit, possible legal action. For if the incidents are not listed, explained, and
dealt with, the law guaranteeing whistleblowers freedom from retaliation (Title Seven of
the 1999 Intelligence Authorization Act) will continue its transmutation into an object of
quiet contempt—and mockery—by CIA managers. The law will lose all practical
meaning and, I fear, some CIA managers will remain tempted to retaliate against the
next whistleblower.[6] And, if this happens, what good is the law?* Nevertheless, basic
fairness demands that CIA be allowed to respond to the allegations. My employer is
entitled to attempt to rebut every single allegation of retaliation—which I do not consider
even remotely possible—or to take constructive corrective action. It is my hope that
OIG will investigate this issue fairly and expeditiously and will realize that my
allegations have merit.

**The Chronology of Retaliation:[7]**

---

[5] But, nearly 23 years as an intelligence officer prepares a person for such observation and analysis.
[6] The American public, according to a to a poll appearing in *Time* magazine over the New Year, generally
believes that whistleblowers play a positive role, (notwithstanding the bureaucracy's opinion of them).
Several whistleblowers, including Coleen Rowley of the FBI, made the cover of the magazine only a few
months ago. In a word, only bureaucracies dislike whistleblowers. That's why blowing the whistle is not
just legally defensible but it is also morally and politically defensible.
[7] Or, more accurately, of *visible* retaliation. The high likelihood of passive retaliation--such as never being
offered a management opportunity in 22+ years of service—is an extremely difficult phenomenon to detect
and to "prove." Therefore, I will not engage in non-credible speculation on this issue in the absence
specific evidence.
A few instances of visible retaliation have been omitted. Why? For various reasons: a) I sensed the person
who could corroborate my allegation fears to talk to OIG, b) OIG may not protect his/her identity c) CIA
may retaliate against them for assisting me d) I do not wish to be so paranoid as to assume that every tiny
slight is an instance of retaliation. (In fact, my thick skin is the reason why it has taken be so long to write
this memorandum. Besides, I do not like to take USG time to draft *urgent concerns* without good reason.
Yet, it is striking that some employees are so afraid of managerial retaliation that they do not want even to
be seen to corroborate a whistleblower's allegation of retaliation. This, in itself, is an interesting comment
on CIA's corporate culture.)



UNCLASSIFIED//AIUO
SECRET

7. (Background note: Paragraphs 9-17 were drafted largely in February 1999, only a
few months after my first *urgent concern*. They were passed to Identity a (Iden a) of the
Office of the Inspector General, as an informal "draft 3rd Whistleblower Urgent
Concern." I observed to Iden a at the time that I was prepared to take legal action
against CIA if the issues described were not addressed. As a result of the draft, Idens a
and b generously helped to overcome Foreign Broadcast Information Service's
resistance to my employment described in paragraphs 9-10. Both officers were helpful,
professional, and very fair-minded. Paragraphs 18-37 were drafted in January-March
2003, after I learned new information that made it clear to me, beyond a shadow of a
doubt, that some CIA managers continued to view negatively my whistle-blowing
activities in their promotion, assignment, training, and travel decisions. The realization
that the issue of continuing retaliation would not just "go away" without confronting the
bureaucracy is what prompted me to write this memorandum.[*] It is worth noting that the
fact of the first whistleblower action was not tightly held within CIA in fall 1998 and was
openly discussed in DO staff meetings. Therefore, it is safe to assume that the second
*urgent concern* was also freely discussed, particularly within LA Division of the DO and
on the Seventh Floor.)

8. (Second background comment: Where I use quotes below, I do so for emphasis and
not because I recall the exact words used, unless otherwise noted. As all readers are
aware, personal recording devices are not permitted on CIA property and the
conversations below could not be recorded. Therefore, unless described otherwise, my
words attempt to capture the essence of what was said. The conversations had no other
participants besides myself and one other person. In some cases, I described to others
the content of conversations so that they could vouch for their veracity—but in all cases I
quickly made informal, contemporaneous notes of what was said. Finally, separate
attachments for identities and related documentation are provided. True names have been
listed separately for privacy reasons and other identities and facts because I believe they
are classified or classifiable.)

9. The first incident occurred about three and a half months after my first whistleblower
*urgent concern*. During a 15-20 minute telephonic conversation late on the afternoon of
18 February 1999, Iden c, then employed by the Foreign Broadcast Information Service,
informed me that I was unsuitable for a position as an analyst (Iden d), a job for which I
had formally applied during the first week of January 1999. I had applied for the
position about two months after my first whistleblower action. With perceptible
nervousness in his voice, Iden c contended that my writing skills were "not good enough"
for FBIS, that my analytical skills were poor, that despite my acknowledged fluency in
Arabic, extensive agent-handling experience, strong area knowledge, and the fact that I
was the *only applicant*, I would simply not be a "good fit" at FBIS.

---

[*] It is better to deal with the problem of retaliation definitively, to include possible legal action, rather than
for the rest of my career. This is not just good for me but for the next well-intentioned guy who wishes to
invoke Title Seven.



SECRET

SECRET
UNCLASSIFIED//AIUO

10. But, it was Iden c's additional remarks that really caught my attention and which I found particularly irritating—as they almost certainly constituted a form of retaliation. In a memorable exchange, Iden c characterized me as *"enthusiastic, aggressive, perhaps abrasive, and the classic lone wolf"* (I recorded for posterity Iden c's exact words immediately after the conversation). He maintained that it was simply "too risky" for FBIS to employ me and that he feared that I would prove to be like an earlier employee who, although brilliant, had just left Iden c's component because of his apparent lack of interpersonal skills. Yet, he could cite little evidence in support of my alleged lack of "interpersonal skills." At the same time, Iden c contended that if he could write a description of the *"ideal employee"* for Iden d, that employee would have all of my objective qualifications. He quickly asserted, however, that he didn't want me and that *"it would be better to have no one in Iden d rather than you."* Shortly thereafter, superficial "pleasantries" were exchanged and the conversation ended. (At the time of the conversation, I enjoyed good personal relations with members of my old component and numerous friendly contacts in the building. My PARs reflected my competence and most people thought that I had an excellent sense of humor.)

11. Interpretation: As I have mentioned, the incident described above occurred about three and a half months after my first *urgent concern*. Is it not possible that Iden c considered whistle-blowing of any sort the action of a *"lone wolf?"* Could a reasonable person not interpret Iden c's seeming fixation with my personality as a form of retaliation?[9] (Ironically, I did not object to the adjectives Iden c used to describe me. But it is improper to deny a qualified person a job opportunity, especially when he is the only applicant, based on selective and anti-diversity criteria.) Would Iden c have preferred that I possess the opposite qualities—that I be unaggressive, unenthusiastic, docile, and possess all the personality of a domesticated sheep? What had triggered Iden c's reaction, as he did not know me personally?

12. For the record, I was not interviewed by Iden c in January or February 1999. I had met Iden c, however, in the summer of 1997 when I applied for a different position at FBIS. At that time, there was no perceptible tension of any sort between Iden c, his staff, and myself. In fact, during our only meeting, Iden c had given me the strong impression that he was eager to have me.

13. I believe that Iden c's cursory judgments concerning my "poor writing ability" apparently stemmed from a subordinate's assessment of a lengthy non-commissioned

---

[9] The astute reader will detect in this memorandum a recurring CIA concern with my "personality " or my "opinions." This is a perfidious (and deniable) way for a bureaucracy to engage in retaliation without publicly acknowledging that it has a "philosophical problem" with the whistleblower. Yet, I ask, do non-whistleblowers get this type of scrutiny? What certain managers do not understand is that this strange concern is not permitted by any CIA regulation, the policy on diversity, the USG's code of conduct, the DCI's stated views, or any US law (including the First Amendment and the Lloyd-LaFollette Act) as long as these same employee's opinions do not impinge on good security or on professional performance. *Of course a whistleblower is critical of CIA conduct! What of it?* Yet, in my case, CIA cannot possibly claim that I have been professionally unproductive.



SECRET
UNCLASSIFIED//AIUO

1997 report I wrote on a sensitive issue in Middle Eastern terrorism, although it is equally likely that he was aware of the Lee Strickland *urgent concern*. This terrorism report had received very considerable in-house praise, at very senior levels, for its objectivity, boldness, and honesty. Indeed, Tom Newcombe, then in charge of HUMINT for the House Permanent Select Committee on Intelligence, told me that the terrorism report—and CIA's considerable reluctance to allow Congress to see it in fall 1997 and January 1998—had figured prominently into Congress' desire to establish the Whistleblower Provision in the 1999 Intelligence Authorization Act. Newcombe thanked me for the report and congratulated me, on behalf of HPSCI, for bringing it to their attention.[10]

14. The second incident occurred in mid-February 1999 when my immediate supervisor, Iden e, informed "certain members" of my component, Iden f of IMS, that IMS had instituted a policy to henceforth "severely limit overtime and/or compensatory time to IMS employees." Iden e proceeded to inform me that I would no longer be eligible for compensatory time but that my two colleagues, Idens g and h, *with whom I shared an office and job descriptions*, would continue to be eligible for overtime. When I formally complained about this apparent imbalance on 8 March 1999, Iden e could not explain the decision to my satisfaction and contacted Iden i. Iden i reiterated that only I would be ineligible for compensatory time.

15. Interpretation: Although there may be a reasonable explanation for this incident, it certainly isn't obvious to me. *I stress that I was the only member of my branch to be affected by the "new T/A policy," which had been introduced ostensibly to limit fraud.* In addition, I had regularly worked a small number of compensatory hours in my position and no one had accused me of any form of malfeasance or fraud. After checking with other IMS employees I learned that many were not even aware of the new policy and that, if it existed, it was enforced apparently only selectively. Therefore—and I am not one to jump to hasty conclusions—a neutral observer could easily conclude from the IMS action that I had been placed in a special category of "suspect employees," probably because of my whistle-blowing. The practical effect of the "new" TA policy was to deny *only me* a privilege enjoyed even by branch independent contractors.[11]

---

[10] After 9/11, I was contacted by CIA's National Intelligence Council and by Eleanor Hill's 9/11 Investigative Committee to discuss the report. In 1997, Newcombe told me that he had had to spent "all afternoon on the phone to the Seventh Floor" in order to warn CIA management against the temptation to retaliate. The prospect of retaliation was very real in Newcombe's view and could occur despite HPSCI's praise for the report. In hindsight, though, it is not so clear that Newcombe's effort succeeded. Because in 1998, I had applied for a routine GS-12 position in the CIA ops center, primarily in order to go to a flexible schedule. I was a GS-13 at the time. Another candidate was selected. Although I have not retained the details of this application, clearly, a junior officer "with broader experience" must have been chosen.
[11] Obviously, I did not begrudge compensatory time to my supervisor, Iden e, as his wife suffered from a serious medical condition that had forced him to exhaust his sick leave. Nevertheless, there was no excuse for management not to treat me like other IMS employees in my branch who retained their eligibility to earn CT/OT. Was this a form of retaliation? As I edit this footnote in early 2003, I remain convinced that it was.





UNCLASSIFIED//AIUO

16. The third incident occurred on 1 March 1999 when I was informed by Iden j of the
Office of Military Affairs that I would *"under no circumstances"* be allowed to be CIA's
TDY representative in Iden k. This was during the period immediately before NATO's
military deployment to Albania the same spring. I had volunteered to go to Iden k in
early February 1999 at a time when CIA's volunteers could be counted on one hand.
According to Iden j, a person calling on behalf of Iden l, then a senior official in CE
Division, had informed the former that CE Division *"would 'go to the mat' to prevent
Boening's deployment to Iden k."* The CE Division caller did not detail to Iden j why I
was "unsuitable" but noted that *"Boening has done things abroad that we are concerned
about. . ."* (Comment: What had I done?[12]) Iden j told me later that he was quite
confused by his conversation with CE Division and remarked that, as far as he was
concerned, I was not only well-qualified to deploy to Iden k, but that he considered me
his *"number one candidate,"* an opinion he reiterated even after I apprised him of my
whistleblower urgent concern. He told me, with some irritation, that CE Division had
supplied absolutely no volunteers for this possibly risky deployment and that he did not
have any other suitable candidates.

17. Interpretation: What was it that set off managers in CE Division when they heard my
name? Was their refusal to allow me to go to Iden k a form of CIA retaliation? You
will recall that the first *urgent concern* took place approximately four months earlier.
Moreover, I had not been overseas with CIA in years, having returned from Iden m in
summer 1995.

18. Spring 1999: Upon eventual assignment to FBIS, I was asked to work on a separate,
non-traditional project, unassisted by any other member of iden n. The project consisted
of single-handedly mapping a given constellation of websites. Upon completion of the
project in summer 2000, FBIS took no action on the data compiled, despite the
intelligence potential it represented. (In late October 2002, a personal friend at FBIS,
iden o, having been appraised of the incident described in paragraph 29, confided to me
privately that branch employees in Iden n *"had been cautioned about excessive contact*

---

[12] Although retaliation for whistle-blowing is the leading candidate given the timing, there is a second
possible theory: I was recalled short of tour in 1995 almost certainly for having protested privately in fall
1994, in a one-page cable to the DDO, CIA's alleged relationship with _____ which I had
read about in the *International Herald Tribune*. (This was before CIA's enlightened *"policy on diversity,"*
which was first promulgated in February 1999.) According to the press,

---

*Important Note: This short footnote does not constitute CIA acknowledgment that _____ worked for
CIA. I had no access to any classified information on this issue and I don't speak officially for the
organization. I am simply relating what I read in the newspapers.* It is perhaps significant, though, that
after I returned to CIA Headquarters in 1995, I was asked to begin a new and interesting career in the
basement of Headquarters as a declassification worker.



UNCLASSIFIED//AIUO

SECRET
UNCLASSIFIED//AIUO

*with me*" in spring 1999. He observed, however, that since that time, nearly everyone had grown to like me! In fairness to FBIS, by summer 2000 the manager of Iden n, Iden c, who had initially rejected me, seemed to appreciate my work very much, probably grew to like me, and was unhappy that FBIS had taken no action with the Internet data.[13])

19. Interpretation: While it may be justifiable to have a new employee work separately, for a limited period, is it ever appropriate for CIA managers to actually warn other employees about new ones? Is this the CIA's *"policy on diversity"* in action?[14] Or do only whistleblowers get this special treatment? Is not the net effect to prejudice everyone in advance against the whistleblower?

20. Late summer 2000: FBIS management denied me the opportunity for half-time (online) study in computer technology/management with the Rochester Institute of Technology. My supervisor at the time, Iden p, who had encouraged me to apply and with whom I had an excellent relationship, told me that she considered approval of the request to be "pro-forma." (Note: I regret that I do not have a copy of the denied application. Presumably, it is available from FBIS/HRS. Iden p will vouch for the fact of the application.)

21. Interpretation: A form of retaliation? In hindsight, it certainly seems likely. It is worth remembering that other FBIS officers, some of them with less experience or at a lower grades, had been granted sometimes expensive study opportunities, including the officer who denied the request, Iden q, and the officer who is investigating my grievance (see paragraph 31), iden u. Moreover, FBIS has sponsored employees even when the proposed field of study (i.e., journalism, business, or international relations) bore only a superficial relationship to FBIS' intelligence needs.

22. Summer 2000: During an out-of-cycle polygraph, I was subjected to an inordinate number of probing questions about my contact with Congressmen regarding my *urgent concerns*. The repeated questions—and suggestions that I was not being forthcoming—finally resulted in my warning the examiner that I, *"was beginning to view his incessant questions about strictly whistleblower activities as a possible form of CIA retaliation."* I

---

[13] Iden c's personal experience with me is an excellent reason why the policy on diversity should be enforced. Iden c initially rejected me and then discovered that I was very productive.

[14] The words of CIA's *Statement on Diversity* are indeed something everyone can be proud of. But, CIA's general non-enforcement of the policy is not so admirable. An excerpt from the policy reads, "We *must ensure that those with different perspectives have a seat at the table and a meaningful voice in the discussion . . . each and every one of us . . . can find a ways to help make our offices vibrant places where diversity is welcome, where a variety of views is sought and heard, where equal opportunities for training and advancement are afforded, where people are valued for the content of their characters and rewarded for the value of their work . . . the higher your rank, the more accountable you will be for ensuring that this Agency and Community are inclusive institutions . . . that differences are regarded as organizational assets rather than liabilities, and that every employee is treated with fairness and dignity."* (Comment: Noble sentiments, indeed. Unfortunately, CIA does not like to hold managers responsible for their intolerance or occasional vindictiveness. This is one reason why blowing the whistle is so unwelcome.)



SECRET

**SECRET**

UNCLASSIFIED//AIUO

reminded him of Title Seven, asked if he had read it (he had not), and informed him
firmly that we should "change the subject." I told him I would answer no further
questions dealing with my congressional contacts or related *urgent concerns*.

23. Interpretation: I believe that it is an arguable form of retaliation when a
whistleblower gets raked over the coals about his *urgent concerns* during a polygraph.
Do all CIA officers get this treatment? Why was CIA so obsessed with whistleblower
activities over a year and a half after the *urgent concern*? Was this proper? What was
the security issue when everyone I had spoken with at Congress had had the requisite
security clearances?

24. In early February 2002, shortly before I was to leave on a 10-12 day tdy for Thailand
and Pakistan,[15] iden t obliquely signaled to me that FBIS management would be watching
my behavior particularly closely. She said, *"this is a big tdy for you, Franz. If you
perform well it will 'help a lot.'"* As I considered her comment somewhat odd, I asked
what exactly she meant? I observed to her that my personal relations were good; my
intelligence production in the element had been exemplary and pioneering; my briefings
on militant Islam and Internet exploitation had been well-received around the Intelligence
Community and beyond; that no one had ever complained about their content; that I had
been on numerous, often successful foreign tdys for CIA and; that briefing FBIS foreign
bureaus seemed to me a rather simple task. "What's to be worried about?" I asked. She
remarked, *"some people will be watching your performance closely, Franz. Do well."*
(Note: Gina        the former Director of FBIS, stopped me in the hall later in the
spring of 2002 to tell me personally how well she thought I had done on the tdy. She
told me,        Bureau could not say enough good things about you!" I thanked her
for her kind remarks but observed that my briefing duties had been simple enough.)

25. Interpretation: Iden t's remarks do not represent any personal retaliation against me
although, upon reflection, they certainly clarified an irritating phenomenon, namely a
more insidious form of managerial retaliation. *I assert that iden t had signaled to me
CIA management's extreme reluctance to ever send me abroad again for any extended
period of time.* CIA seems to prefer it when I don't travel. . . in order to keep an eye on me,
perhaps? In this regard, kindly note that Iden t's remarks were completely consistent
with the incident described in paragraph 15 when CE Division had said, *"We will go to
the mat to prevent Boening's deployment to iden k."* They are also consistent with the
DO's denigration of my qualifications in response to a routine job application described
in paragraph 32 (*which would require an extended period abroad*); they are consistent
with the fact that *I have not been allowed an orientation/training tdy to FBIS'
Mideast        bureaus* (like all new officers receive) and; they are consistent with iden
o's background comments on how FBIS viewed me when I was first assigned to
Yet, what had I done to irritate CIA—that is, apart from blowing the whistle? Had I ever
been disciplined for insubordination? No. Did I lack professional competence,
experience, speaking, writing, analytical, or linguistic ability? No. Had I had weak

---

[15] My first trip abroad on official business in about seven years.



**SECRET**

UNCLASSIFIED//AIUO

performance appraisal reports? No. Did I have no sense of humor? Again, no. But, I had been a whistleblower.[16]

26. During an outrageous incident on 1 March 2002, my immediate supervisor at FBIS, Iden r, informed me that she had no complaints at all about my professional performance and that she considered me "*very worthy of promotion to GS-14.*" The 45-minute conversation began at 1300 hours in her office in 3S-11 _____ during a routine PAR counseling/feedback session. Nevertheless, she remarked that I could do "*one thing*" that would "*greatly help my chances.*" With noticeable hesitation, she asked me to "*keep my mouth shut.*" She explained, "*this would help a lot.*" (Note: Iden r used rather inelegant language here; she did not say, "remain silent" or "be quiet." I recall that her words were less refined than this although she may have said merely, "*keep your mouth closed.*") As I was completely taken aback by her request, I asked her to repeat her remark. She did so, and I reiterated that I did not understand what she meant by "*keeping my mouth shut.*" I reminded her that I got along with everyone in the element and that no one at the numerous audiences that I had spoken to about militant Islam or Internet exploitation had ever complained about any inappropriate remarks.[17] She acknowledged that this was indeed the case. Consequently, I probed more deeply and asked again exactly what she meant by "*keeping my mouth shut?*" After a long pause and discomfort evident from her body language, she said, "*you know what I mean—memos to the Director etc.*" Then I exclaimed, "Oh, now I understand! You mean whistle-blowing activity, don't you!? Because those are the only 'memorandums' that I have ever sent to the Director's office."[18] Iden r did not dispute my interpretation of her remarks. I firmly reminded Iden r that my whistle-blowing was protected by statute and that she was not allowed to even take it into consideration in professional settings. She responded, "*it may be true that you are protected by law—but I am trying to help you by telling you how the bureaucracy actually works.*" She continued, "*It doesn't matter what the law says—the CIA bureaucracy will never promote someone who seeks to embarrass it. If you desist, you will probably be promoted. However, if we promote you and you engage in further whistle-blowing, you will remain at your grade forever. It is your choice.*" Iden r added, "*you are free to your opinions but you must realize that such activities are tacitly taken into account.*" I reminded her that the purpose of my whistle-

---

[16] A careful study of my career reveals promotions at a statistically average or somewhat above average rate from 1980-93 (once every 2.6 years). From 1993 to the present, however, everything ground to a complete halt (zero in nearly 10 years.) Now, why is this? My professional performance certainly hadn't fallen off; that is, it continued to compare quite favorably with others in my job description. *But it is interesting to note that after the first urgent concern in 1998, the egregious, recurring instances of retaliation really began to multiply.* I assert this is not a coincidence. It is retaliation. (Since the whistleblower actions, I haven't been able to obtain even an interview for a position outside of FBIS! This is "passive retaliation" at work.)

[17] I have given numerous presentations on militant Islam, (and to a lesser extent, on Internet exploitation and globalization issues), within the IC and elsewhere in the USG. Since December 2000, audiences have included the Rand Corporation, the State Department, the Naval Criminal Investigative Service, the National Air Intelligence Center, several Pentagon elements, SACLANT, the FBI, US Customs, NSA, foreign liaison services, and numerous offices within CIA.

[18] The Director of Central Intelligence.



SECRET

SECRET
UNCLASSIFIED//AIUO

blowing was not to embarrass the CIA per se, but rather to have management investigate apparent wrongdoing. I told her she seemed to me to be making an explicit link between promotions and whistle-blowing and that it was very difficult to interpret her remarks otherwise. Iden r responded, *"Look, I am trying to help you. It is already an 'uphill battle'* (Iden r's exact phrase) *convincing others of your worth. I just want to explain to you how the bureaucracy works. It is reality. Besides, the bureaucracy will never explicitly link getting promoted to not engaging in whistle-blowing. The bureaucracy is more clever than this. Instead, it will say, 'Boening can't communicate effectively.' Listen, I hope that you are not so irritated that 'you want to sue me'."* The conversation ended inconclusively shortly thereafter.[19]

27. The general details of the above conversation—and the fact that Iden r had explicitly linked being promoted to not engaging in whistle-blowing—were shared with Iden s of FBIS on or about 11 March 2002 (first thing in the morning after Iden s's return from tdy), with Iden a of OIG on 12 March (shortly after lunch), with Iden t in April 2002 and again in February 2003, with Iden q (at his request) in July 2002, with iden y in November 2002, and with Iden u on 24 January 2003.

28. Interpretation and summary: A senior manager at CIA, the person who writes my PAR, explicitly linked getting promoted to not engaging in whistle-blowing. She asserted that the bureaucracy takes whistle-blowing into account in promotion decisions and that if I engage in further whistle-blowing, *"you will never be promoted."* She warned me to *"keep my mouth shut"* and not to *"write memos to the DCI"* if I sought advancement. This would *"help a lot."* The same manager expressed the view that the *"law doesn't matter"* and that *"the bureaucracy will not promote anyone who embarrasses it."* Question: **Can any reasonable person not interpret Iden r's remarks as a threat of retaliation? If her remarks are not retaliation, I don't know what is.** Did the congressional drafters of Title Seven intend for whistleblowers to be threatened by their managers? What is this?!?! (Note: I respect the law and do not share Iden r's disdain for the Whistleblower Provision. In mid-July 2002, Iden q, an FBIS manager, immediately disassociated himself from Iden r's remarks after asking to see me. He did not deny Iden r's remarks or defend her in any way. Nonetheless, no other FBIS manager has disavowed her remarks, including Iden r, to this day. Idens s and u, however, found iden r's comments inexcusable. Iden t could not believe that Iden r had actually uttered such words.[20] Iden a speculated that Iden r might deny her remarks if asked.)

29. Early July 2002: Iden r included in the first draft of my PAR, *"Boening has been cautioned not to express his personal views in front of audiences."* I protested her wording and reminded her that no one had ever complained to FBIS management about

---

[19] Actually, I found Iden r's remarks so annoying that I did want to sue her about a half hour later. Yet, if her remarks represent management's general view of the *Whistleblower Provision*, then perhaps CIA needs to start holding orientation seminars on the law. I alluded to this in paragraph one.

[20] "could not believe" in the sense that Iden t couldn't believe that Iden r had said something so inappropriate.

SECRET
11



UNCLASSIFIED//AIUO

any inappropriate remarks made by me so why was I being warned against
*"inappropriate expressions of opinion?"*[21]   Iden r conceded the point, deleted the
phrase—and strengthened language alleging that I could not get along with others.
(Please find attached partial Lotus note documentation of this conversation as well as
Iden r's response. You will observe that Iden r was seemingly very eager to de-link
whistle-blowing from promotion. Kindly observe, however, that she denied no portion
of my account of our 1 March 2002 conversation. Nor did any of the other recipients of
my Lotus note, Iden q, my former supervisor, was particularly eager to distance himself
from Iden r's comments.[22])

30. September 2002: During an informal hallway exchange, Iden r suggested to me that
"being nice" to Iden v might be of benefit to me. Iden r reminded me that Iden v "will
be your advocate" on the GS-13 panel. I politely rejected Iden r's suggestion to
ingratiate myself and told her that although I had nothing against Iden v, I did not see the
need for sycophancy. I reminded her that CIA was supposed to be a meritocracy and that
my objective performance (outstanding by any measure), spoke for itself.[23]

31. During a serious incident on 25 October 2003, the senior officer in question, Iden v
(my "advocate" on promotion panels) made it clear to me that she *"was concerned"* about
my effect on young people and privately believed I should have *a separate office in order
to limit my contact with them (!).*[24] This issue, described at length in the attached
grievance action, took place during a feedback session I had requested after being denied
promotion. At the very least, Iden v's attitude illustrated her disdain for CIA's policy on
diversity. At the worst, it can be reasonably interpreted, certainly in my case, as
retaliation against a whistleblower. *Can CIA cite any other employee who has been told
he is not fit to talk to young people? (Who might even deserve to be "quarantined?!?!")
What is this?! Is it just a "coincidence" that the only person who is told he shouldn't
share critical opinions about CIA's intelligence performance with young people is also
the only person in FBIS who has shared his opinions—quite vigorously—to members of
Congress on issues of seeming wrongdoing by CIA? How is it possible to be allowed by
CIA and/or Congress to make critical statements in an urgent concern or to the 9/11
Investigative Committee and be punished when one makes identical statements to "young
people?"* Therefore, kindly consider all portions of the grievance to be part of this

---

[21]Given Iden r's remarks on 1 March 2002, I assert that she considers whistle-blowing the *"inappropriate
expression of opinion."* Otherwise, why had she threatened me? Unfortunately, her opinion is almost
certainly shared secretly by most members of the bureaucracy. This is the real problem.

[22] I was being polite to Iden r in my Lotus note when I wrote, *"probably out of genuine concern for me."* I
wrote this before the events of October 2002.

[23] Iden bb, a second manager named in the grievance described in paragraph 31, objected to this
characterization of CIA. In mid-December 2002, he threw up his hands during a private PAR meeting with
me and exclaimed in exasperation, "Who ever said that CIA was a meritocracy?" (Answer: George Tenet
in his 1997 confirmation hearing.) Please see classified appendix for further comment on my professional
performance.

[24] Iden v has been accused of mistreating employees in multiple grievance actions.



UNCLASSIFIED//AIUO

**SECRET**

UNCLASSIFIED//AIUO

urgent concern. This is retaliation.[25]  (Note: Idens a, o, p, s, t, u, y, z, aa, and bb are aware of the gist of Iden v's comments.  Iden bb, in particular, confided to me that Iden v told him I was unfit to mentor any young person.)

32.  In late October 2002, I was told by the Near East Division of the DO that my qualifications for DO work are *"below our threshold for necessary skills and being current in terms of training/experience"* after I had applied for a mid-level, non-managerial position in an Arab country—that did not even require language ability at the time of application.  The position was a routine job as Iden w.  The DO refused to explain its negative decision despite two requests for clarification.  It is worth noting that I remain a strong speaker and reader of Arabic (a skill in extremely short supply in the Intelligence Community), that I speak passable French and German, that I have 10+ years of agent-handling and liaison experience, that I have been asked to lecture to DO audiences on intelligence issues, that I have been a regular trainer in the avant-garde field of Internet exploitation, and that the DO had employed my skills as an interpreter in 2001 and 2002.  My PARs have been generally strong—often outstanding—and I have never been accused of insubordination.[26]

33.  Interpretation:  This was clearly an instance of retaliation against a whistleblower, in my view.  The type of job that I had applied for is routinely filled by 2nd or 3rd tour officers—and I have considerably more experience than this.  In fact, if the press is to be believed, even non-DO officers have headed DO stations.[27]  Therefore, I theorize that certain officers in the DO did not appreciate my allegation of possible criminal wrongdoing in my second *urgent concern* (May 2001) and that its extreme irritation manifested itself in the DO's response to my job query—the same way it exhibited itself in 1999 (paragraph 16).  It is one thing to say, "we are sorry but this position has been assigned to a more qualified person."  It is an entirely different thing to clarify nothing and to tell someone with my professional background that I no longer meet "DO standards."  I contend that as there is an extreme shortage of officers who combine strong Arabic-language skills, strong operational backgrounds, and a strong knowledge of terrorism issues, perhaps the handful of officers who possess all three attributes should be considered qualified, in principle, for DO positions.  Moreover, those officers, like myself, who lecture routinely on the intelligence issue of the hour, who have assisted the DO in recent years, and who pioneer whole new intelligence sources for CIA, might even be considered very qualified.  (Note: Copies of the Lotus note exchange with NE Division are attached.)

---

[25] It is nothing short of infuriating to be told by one's supervisor—after having risked one's neck in Beirut and Iraq in the past, as I have, and after having developed an entirely new set of intelligence sources for the IC—*"You know what?  Personally, I don't even think you're fit to talk to young people."*  This is CIA's reaction to a whistleblower and the organization's "diversity policy" in action.  Moreover, FBIS has not resolved the grievance, to date.  Regrettably, this too, is predictable.

[26] Then again, the bureaucracy probably considers any form of whistle-blowing a type of insubordination. In any event, their actions certainly suggest this.

[27] The press has reported that an analyst used to head the



**SECRET**

SECRET
UNCLASSIFIED//AIUO

34. On 18 November and 12 December 2002, the CIA changed the ground rules regarding my declassification challenge to documents I authored in the second *urgent concern*. From summer 2001 until spring 2002, CIA had requested a series of edits to the documents but also had acknowledged my ultimate right of appeal to the Inter-Agency Security Classification Appeals Panel (ISCAP). Believing that flexibility on my part would lead to document release, I tried to make the requested changes. "Negotiations" over editing changes were ended in May 2002, however, when it became clear to me that CIA really wanted me to rewrite the entire document collection, in order to limit public embarrassment.[28] I considered this demand unacceptable and initiated a formal classification challenge, an action permitted and encouraged by Executive Order 12958. CIA officially informed me, however, on 12 December 2002 that the challenge would not be allowed to move forward to the ISCAP, an action I contended is a likely violation of the E.O. The above disagreement with CIA, and the seeming illegality of CIA's course of action, was sufficiently serious that the Office of the Inspector General accepted it as a target of investigation on 13 December 2002. Moreover, the ISCAP has informed me preliminarily that it will seek the documents in question.

35. Interpretation: Was the abrupt "rule change" a form of general harassment of a whistleblower (i.e., a form of retaliation?)—or was the rules flip-flop simply innocent bureaucratic ineptitude? Although both interpretations are possible, it seems to me that there was never an intention to deal fairly with me on the classification challenge. CIA's intention was always to stonewall. Also, did Iden x, who remains an influential official in declassification and who was accused of wrongdoing in the first *urgent concern*, play any role in CIA's decision to derail the classification challenge (i.e., the documents in the *second urgent concern*)? Did Iden x recuse himself? While I don't have all the answers to these questions, a reasonable observer would have to admit that CIA's seeming harassment with regard to the classification challenge could be interpreted as a form of retaliation.

36. Summary: The documented history of retaliation, my superior performance at FBIS and elsewhere over the last decade, and the fact that I have remained at the same grade for over 40% of my career (itself an unusual statistic), has persuaded me conclusively that I will continue to be judged by a different set of standards than other employees. My objective performance will never be sufficient to please CIA—as it is not the main criterion in my case.[29] I assert this state of affairs is the direct result of whistle-blowing

---

[28] I did not simply deduce this. In May 2002, a senior CIA officer, Iden cc, told me point-blank that the real issue surrounding release was not the protection of "*sources and methods*." Rather, it was to protect the CIA's reputation. I guess this is why CIA was so determined to "classify" the news stories, which had formed the backbone of my second *urgent concern*. Of course, when any USG office sees fit to classify a series of press stories mainly to avoid embarrassment and accountability, in seeming contravention of Executive Order 12958, it is a serious public policy issue.

[29] For instance, in just a one-month period, October 2002, I was told by one senior manager—without a shred of explanation or documentation—that she was "concerned" about my contact with "young people." Later in the same month, the DO called my professional qualifications sub-standard—and explained nothing. These assertions were juxtaposed against a very strong professional performance on my part.

SECRET

UNCLASSIFIED//AIUO



and the "negative character traits" some CIA managers perceive to be associated with whistle-blowing.[30] I believe that I have demonstrated this persuasively in the paragraphs above. For this reason, the whistleblower must remain ever vigilant. And, it is the reason for this memorandum. **I have been denied promotions, training opportunities, and assignments over the years as an almost certain result of whistle-blowing. This is a violation of the letter and the spirit of the *Whistleblower Provision* and other USG policies. No USG organization, department, office—or concerned taxpayer—should tolerate it when an individual manager, no matter what his rank or motivation, retaliates against a whistleblower.[31]**

37. I look forward to a fair resolution of this *urgent concern*. However, if the very serious public policy issue of direct and indirect retaliation against a whistleblower cannot be resolved satisfactorily inside the bureaucracy, then perhaps it would be best to change the venue. (Fortunately, the playing field is reasonably level inside a courtroom.) I regret that I must be warn you of this possibility as it is not meant to be a threat, but it seems only fair that you be made aware of how seriously I view this problem.

I thank you for your kind attention to this matter and await your reply.[32]

Respectfully,
Franz Boening

---

[30] It is particularly striking that when a USG office, such as many within CTC, the DI, at the State Department, the Rand Corporation, the Pentagon, the National Air Intelligence Center, the NSA, or at SACLANT, hasn't an inkling of my previous whistle-blowing, I am invited to speak, to correspond, to travel, and always receive thanks for my intelligence contribution. (I have had more invitations to travel from non-CIA offices than from CIA itself.)

[31] It is quite easy to demonstrate that USG bureaucracies do retaliate. CIA is not uniquely guilty and the fate of whistleblowers is always problematic. Indeed, the expectation of retaliation, even among courageous officers like Coleen Rowley at FBI, explains the paucity of whistleblowers. When it comes to whistle-blowing, the fear of retaliation permeates the workforce. For instance, few officers privately believe that the lack of internal whistle-blowing is due to the lack of incompetence, under-performance, and malfeasance at CIA. These all exist in reasonable quantities at CIA the same way they do in any government bureaucracy. If you don't believe this assessment of the perils of whistle-blowing, just ask the CIA employee sitting next to you. (Then again, why do Inspectors General exist if not to ensure that bureaucracies obey established rules, procedures, policies, and the law?)

[32] Do not be irritated at receipt of this memo as bureaucratic retaliation is a virtual fact of nature. Besides, irritation tempts some to engage in even further retaliation. Obviously, this is something I will attempt to monitor. And, if new instances of credible retaliation occur, evidence will be presented inside a courtroom.

Please assume that I am a level-headed, normally easy-going guy who believes in your goodwill and who is always willing to discuss, explain, and clarify anything you request. Moreover, I hope that you sense I have tried to present this issue coolly, carefully, and, most importantly, accurately. At the same time, of course, I am very critical of CIA retaliation. This is because the intent of the law is clear: no retaliation against whistleblowers is to occur, period. Besides, what good is the law if retaliation is tolerated?





UNCLASSIFIED//AIUO

**Attachments:**

1. FOUO Identities list
2. "Classified" Identities list
3. Lotus Note exchange with Iden r
4. Lotus Note exchange with NE Division
5. Copy of grievance against Iden v



16



UNCLASSIFIED//FOUO

**Identities**

(e) 1. Iden a: George W.            OIG
    2. Iden b: Pat            HRS
    3. Iden c: Dave           FBIS
    4.
    5. Iden e: Gerald         IMS
    6.
    7. Iden g: Nancy          IMS
    8. Iden h: Barbara        IMS
    9. Iden i: Tom            IMS
    10. Iden j: Peter
    11.
(a) 12. Iden l: John        covert
    13.
    14.
    15. Iden o: Youssef       FBIS
    16. Iden p: Bonnie        FBIS
    17. Iden q: Ken Hughes, FBIS
    18. Iden r: Kelly         FBIS
    19. Iden s: Joe           FBIS
    20. Iden t: Hollis        FBIS
    21. Iden u: Melda         FBIS
    22. Iden v: Joyce Forrest, FBIS
    23.
    24. Iden x: Ed
    25. Iden y: Jim           FBIS
    26. Iden z: Sylvia
    27. Iden aa: Tom          FBIS
    28. Iden bb: Michael        FBIS

SECRET//X1

## Identities

4. Iden d:  HU-110, a position in FBIS/Gulf-Med as an open source analyst/linguist

6. Iden f:  Initial Review Branch, DO/IMS

11. Iden k:  Kosovo/Albania

13. Iden m: ▮▮▮▮▮▮▮▮▮DO

14. Iden n:  Gulf-Med Team, FBIS

23. Iden w: ▮▮▮▮▮▮▮▮▮▮DO

27. Iden cc:  Bill McNair, DO/IRO  (McNair's comment: The DO/IRO told me in
May 2002 that, in addition to fact that the ▮▮▮▮▮ *urgent concern* would hurt
CIA's reputation, the other problem with the *urgent concern* was that *"it's all
true."* Now...as I alleged possible criminal wrongdoing in my complaint, am I
to conclude, based on McNair's comments, that CIA did indeed facilitate
▮▮▮▮▮▮▮▮▮▮▮

## Performance:

While I have alluded to the regular talks I deliver on militant Islam, this is not my most
substantial contribution to the intelligence mission.  At FBIS I performed pioneering
work in an entirely new set of intelligence sources for the Intelligence Community.  I
was the first officer in CIA—or anywhere in the IC—to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

beginning in November 2001.  These websites have provided nearly 100 unique and
well-received intelligence reports to date and will be coverage for the foreseeable future.
As a result of my work, FBIS now has 5-6 fulltime employees and subcontractors
monitoring nothing but ▮▮▮▮▮▮▮  (Although I established the field, I did not author
all of the reports. FBIS has other line linguists and analysts.)

The regular, systematic exploitation of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮is an
entirely new OSINT field for CIA and FBIS.  Yet, it did not exist before I demonstrated
its intelligence value through my reporting.

(In other words, for 60 years, from 1941-2001, FBIS exploited TV, radio, newspapers,
periodicals, and some Internet sites, primarily those representing the professional media.
However, since November 2001 and increasingly throughout 2002, the organization has
begun the regular ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮These are one of the few places
where collectors can watch ▮▮▮▮▮▮▮▮▮▮▮▮▮

**SECRET**

CL BY: 0718647
CL REASON: 1.5 (c)
DECL ON: X1
DRV FROM: COV 2-87

SECRET/X1

1
2

SECRET
19



**SECRET**

May 20, 2004

To:             Inspector General, Central Intelligence Agency

Information:   Executive Director, Central Intelligence Agency

From:          Franz Boening, Foreign Broadcast Information Service, CIA

Subject:       *Urgent Concern* – Prohibited Personnel Practices at CIA:
               Continuing Bureaucratic Retaliation Against a Whistleblower (U)

Refs:          a. 24 March 2003 *Urgent Concern* (Chronology of
                  retaliation/prohibited personnel practices through spring 2003).
               b. 10 May 2001 *Urgent Concern* (details probable CIA misconduct vis-a-
                  vis 'M').
               c. 5 February 2004 Classification Challenge filed by Franz Boening
                  (Challenged CIA classification of interviews and clarification resulting
                  from ref a.)
               d. Grievance against Iden h, 7 November 2003
               e. Grievance against Iden o, 16 January 2003. (U//AIUO)

1. **Introduction:** This memorandum constitutes an *Urgent Concern*, filed under Title
Seven of the 1999 Intelligence Authorization Act (the *Whistleblower Provision*). It is the
second *Urgent Concern* that alleges that some CIA managers have engaged in *prohibited
personnel practices* as a result of previous *urgent concerns* I have filed. Such practices,
when directed at a protected federal whistleblower, are violations of federal law. This
memorandum will recount the history of illegal treatment detected since ref a. (U)

2. I contend that some CIA managers have not treated me in accordance with the federal
laws established to protect whistleblowers. Some have done this by improperly basing
their personnel decisions on my "hall file" rather than my objective professional
performance, and no offending manager has been called to account. I ask that you
investigate the incidents described below, bring yourself to take appropriate disciplinary
or corrective action, and ensure that no further retaliation or threats take place.[1]  I remind
you that any form of bureaucratic retaliation, reprisal, or threat against a protected federal
whistleblower constitutes—if proven—a violation of the United States Code.[2]  This

---

[1] You may also wish to compensate me in some way for the virtually indisputable fact that some managers
have taken into account my previous whistleblowing in their professional treatment of me. This has caused
me to be denied training, promotions, travel, and internal job opportunities over the years. (U//AIUO)
[2] See USC Title 5, Part III, Subpart A, Chapter 23, section 2302 (a)(2)(A) subsection (e)(3)(B) and 5 USC
section 2302 (8) and (9). Section 2302 is entitled "Prohibited Personnel Practices." See also Title 50,
chapter 15, 403q. As OIG is aware, I retained the law firm of Krieger & Zaid in early fall 2003 because I
remain unconvinced that CIA wishes to address my concerns equitably or even takes the law seriously. As
addressees are aware, as of the date of this memorandum, no normative, corrective, disciplinary, or
compensatory action has been taken. Other than to undertake an opaque investigation that has moved at a
glacial pace, there is little evidence that CIA wishes to address my concerns equitably. Therefore, I remain
determined to seek legal redress if necessary. (U//AIUO)

**SECRET**

*20*

CL BY: 0711132
CL REASON: 1.4(c)
DECL ON: 20300304
DRV FROM: COL 5-03



includes viewing negatively or taking into account any whistleblower complaint I have written in any internal CIA personnel decision that affects me. They are *prohibited personnel practices*—violations of federal law that seem to have occurred so frequently in my case that they verge on being accepted management behavior at CIA. (U)

## The History of Illegal Retaliation and *Prohibited Personnel Practices* Since 24 March 2003.[3] (U)

3. December 2002 (rpt 2002) - At approximately this time, I was the target of a special security inquiry to determine if I had passed classified information to unauthorized parties.[4] Such actions are not just contrary to internal CIA regulations and the *Statement on Diversity* but are almost certainly a violation of Federal law, specifically 5 USC 2302 (8) and (9), which describe *prohibited personnel practices* vis-à-vis federal whistleblowers.[5] The extraordinary inquiry was a direct result of a vigorous classification challenge that I had pursued with regard to ref b, itself a separate *Urgent Concern* that had alleged probable violations of law by CIA. The late 2002 security inquiry determined that there was no evidence that I had passed classified information to unauthorized parties.[6] (U//AIUO)

---

[3] I.e. Generally speaking, a *prohibited personnel practice* under federal law is when a whistleblower is denied opportunities by the bureaucracy simply because he is/was a whistleblower. In essence, it is when management takes into account the fact that an employee has been a whistleblower and views it negatively in its personnel and management decisions. In ref a, dated 24 March 2003, I attempted to document this illegal phenomenon from the late 90s until early 2003. In the current *Urgent Concern*, I attempt to capture what was discussed during a series of conversations and will describe why I believe CIA has engaged in *prohibited personnel practices* more than once. (U//AIUO)

As the conversations were not taped, I can only describe or paraphrase what my interlocutor and I said, to the best of my memory and my contemporaneous notes. Where I use quotes, I do so for emphasis, unless otherwise noted. Please also be aware that at least one suspect incident has not been described in this memorandum. This is because documentation was weak and/or I refuse to interpret every strange interaction with a manager as a personal slight or a legal issue. (U//AIUO)

[4] Although the special security inquiry pre-dates ref a, I only learned of it in December 2003. For this reason it was not included in ref a. The improper security inquiry was briefly described in footnote 5 of Ref c. (U//AIUO)

[5] Internally, the applicable CIA regulation governing classification challenges is AR 70-3i, paragraph 17. CIA formally accepted my original challenge of ref b under AR 70-3i. Within the framework of the USG, all federal whistleblowers enjoy specific legal protections that are not to be violated. 5 USC 2302 (8) (9), the basic Federal statute concerning national security whistleblowers, makes it illegal to, *"take or fail to take, or threaten to fail to take any personnel action against employee or applicant for employment because of a) the exercise of any appeal, complaint, or grievance right granted by any law, rule, or regulation . . ."* In other words, in this specific instance I took advantage of a regulation allowing me to challenge classification (section 1.9 of EO 12958) and CIA mounted a special security inquiry. This seems patently illegal to me. (U//AIUO)

[6] I wish to emphasize that I have not passed classified information to unauthorized parties. It is unclear where the documentary evidence of the special inquiry lurks. It was not in my security file, which I reviewed in spring 2004. Also, during this same time period, i.e. December 2002, my wife was told that she would no longer be allowed to process FOIA requests that dealt with 'M.' This was "for her own good," according to OIM where she worked from spring 1996 until May 2003. Yet, why was CIA's apparent suspicion of me extended to my wife? Was this warranted? What was this about? (U//AIUO)



4. I learned of the inquiry directly from Iden a, who told me personally of the special personnel action during private conversations I had with her on 23 and 24 December 2003 repeat 2003 and again in January 2004. Iden a herself conducted the inquiry. She had approached me privately because she did not feel that it had been justified and wanted me to know what had happened the previous year—unbeknownst to me. She told me that she had uncovered no evidence whatsoever of wrongdoing on my part and that idle speculation and suspicion on the part of some manager(s) seemed to be what had triggered the request for the inquiry in the first place. I told her that I appreciated her candor, that she was only doing her job given her lack of context, and that she seemed to have been placed in a difficult position by CIA managers. In January 2004, she went further, *"I can tell you this, Franz. I doubt if the Office of Security would pursue such an inquiry again. You had done nothing wrong."*[7] (U//AIUO)

5. Comment: Who in CIA thought it proper to mount a special security inquiry? Iden a did not know exactly but speculated that it was either the Office of Information Management, the *Interagency Security Classification Appeals Panel*, or the FBIS front office. But the real question is whether a CIA manager was seeking "dirt" on a whistleblower simply because he challenged the classification of a document in accordance with section 1.9 of Executive Order 12958? Do some CIA managers quietly suggest a security inquiry based on nothing more than idle speculation and/or their dislike of someone who challenges the bureaucracy? Could a normal person not credibly interpret a special security inquiry—based on zero evidence of misconduct—as an attempt to harass a whistleblower? Is it not a *"prohibited personnel practice"* when directed at a federal whistleblower?[8] (U//AIUO)

6. April 28, 2003-late spring 2004: CIA's Office of Information Management, the office that manages declassification, has continued to deny me the opportunity to challenge the classification of three documents. They are: (U//AIUO)

- ref a, the first *urgent concern* alleging illegal retaliation.
- a Lotus Note dated 28 April 2003 in which OIM explained how a classification challenge in accordance with section 1.9 of EO 12958 would not be allowed.
- ref c, an OIG account of an interview of Franz Boening. (U//AIUO)

---

[7] Iden a added, "I have seen CIA go after a person for time and attendance fraud when they wish to discredit someone."

[8] CIA really ought to lighten up. How fragile is the organization if it can't tolerate a few classification challenges? Unfortunately, it is a common practice within most bureaucracies to attempt to defame the whistleblower and/or deny him rights. This phenomenon is not peculiar to CIA. Actually, I don't mind routine security investigations—good security is very important—*but a security inquiry triggered by a classification challenge?* I mean, *a classification challenge?!* This sort of bureaucratic behavior is unwarranted, smacks of reprisal, and is almost certainly a *prohibited personnel practice*. This is because it is patently illegal for a federal bureaucracy to engage in unwarranted personnel actions—such as a special security inquiry—in response to an employee having merely invoked a federal law, rule or regulation. See 5 USC Sec 2302 (8) and (9). I challenged classification under section 1.9 of Executive Order 12958 and I got a special security inquiry as a result.

SECRET

CIA's continuing practice of denying most formal classification challenges forces me to ask why I am being denied a right granted to all "authorized holders."[9]  Can I not reasonably construe the denial of the right to challenge classification as a "personnel action"—which would make it a *prohibited personnel practice*?  Under Executive Order 12958, all documents that have been classified by CIA—even when the document was not solicited by CIA—are challengeable.  (U//AIUO)

7. In late spring-early summer 2003 I was denied the opportunity to ⌐
⌐                ¬On or about 1 May 2003, a senior CTC officer, Iden aa, asked me if I would
be available to⌐                            ⌐from a very prominent Middle Eastern group.
Iden aa, who has known me for about 15 years, chanced into me in an OHB hallway and
quickly asked if I could "still speak good Arabic" and whether I would be interested in
doing⌐                ¬After I immediately expressed my willingness to assist, he explained
that there was a critical need for experienced officers who could speak fluent Arabic and
said that his subordinate, Iden aaa, would be in contact with me.  Some weeks later,
during the ensuing exchange with Iden aaa, it was decided that I would not be allowed to
⌐                            ¬although I remained eager to assist.  No persuasive explanation for
CTC's change of attitude was ever offered. (U//AIUO)  (S)  COL S-C3

8. Comment: The exchange with CTC was particularly odd given that Iden aaa had
given me the distinct impression that he did not want my participation, even though it had
been his superior Iden aa who had suggested the idea.  But why the about-face?  Had
someone in CTC decided that a person with my background would not be suitable for the
sensitive task of⌐                            ¬ Even if the officer was
particularly well qualified [on paper] to engage in⌐          ¬Had any CTC manager
taken into account my previous whistleblowing in determining my suitability?  If so, it
would probably constitute a violation of law.  Although I admit that I don't have
conclusive answers, I found it quite striking that an opportunity to⌐                ¬
which had come from a senior CTC officer had been so quickly withdrawn.  I ask that
you investigate this issue and ensure that my previous whistleblowing was not taken into
account in this personnel decision.[10] (U//AIUO)    (S)  COL S-03

9. Iden b incident: On August 28, 2003, I had a job interview with Iden b, a branch chief
in CTC.[11]  Iden b and his deputy, Iden c, said to me that the real issue with taking me
into their branch was my "hall file." [exact words][12]  Admittedly, Iden b did not use the
word "whistleblower" but indicated to me his concern with my previous actions in

---

[9] I am an "authorized holder" with regard to these documents.  I have enjoyed S/TS clearances, granted and renewed by CIA itself, for 23+ years.

[10] In spring 2004, numerous news accounts have appeared that deal with the treatment of detainees, including those from al-Qa'ida, in US custody.  Many of the apparent abuses appear to have occurred in 2003. (U//AIUO)

[11] This paragraph should be read in conjunction with a summary of the interview that was reported to OIG in a Lotus Note on 9 September 2003. (U//AIUO)

[12] Iden b seems like a decent guy although I don't know him well.  Iden c is an old friend of mine and an honest, competent officer—very solid.  He spoke candidly in August 2003 and later told me during a private phone conversation on the afternoon of 17 October 2003, "The whole system is based on hall files. Still, it is not the way the bureaucracy should run." (U//AIUO)

SECRET



another way. After remarking that he expected bureaucratic resistance at the PMC to getting me into his branch, I asked out loud why this would be the case? Iden b said very slowly: *"Let's just say that everyone knows your name and what 'Franz Boening' has done. But, we are willing to take a 'chance' with you."*[13]  He continued, *"The PMC is too careful to say anything directly about your 'activities,' but it can always simply claim that you are 'not qualified' and you will not be able to prove anything."*[14]  Iden c immediately chimed in, *"Let's say that it is more a matter of your 'hall file.'"*[15]  Asked whether I could tdy, in principle, for his branch, Iden b responded, *"If you do OK, after about three months, we'll try to 'sneak you out' on a tdy and see if anyone complains."*[16]  (U//AIUO)

10. It was clear to me that Iden b was making decisions based on the "hall file." The hall file, as some are aware, refers to the informal reputation that an officer acquires at CIA and is usually separate from his/her objective qualifications, achievements, and overall performance. **Given the fact that I have a pretty consistent record of strong professional performance** (some of it outstanding), **does CIA expect me to believe that no manager takes into account my whistleblowing when it comes to me? Especially after remaining in grade for nearly 11 years?**[17]  **Only a fool would believe this. Because the main component of my "hall file" is the fact that I have been a whistleblower several times. This has caused the "hall file" to assume—for some managers—an importance far greater than my objective professional performance. It has had a determining effect on their attitude toward me. (U//AIUO)**

11. On 11 September 2003, I inquired from Iden d about the possibility of assisting in a tdy capacity in Iraq and included a brief summary of my career and my qualifications.[18]  A personal friend, Iden e, had spoken with Iden d by telephone in advance of my contact with her. He told me that Iden d had been enthusiastic about finding someone with my

---

[13] Or "risk." One of these two words was uttered. (U//AIUO)

[14] This sentence was inadvertently not recorded in my 9/9/2003 Lotus Note to OIG. I recalled it later and wish to include it in this memorandum. It was definitely uttered by Iden b and I encourage you to ask him about it.

[15] Iden b decided he wanted me in his branch anyway, "baggage" and all. He offered me a job with no particular responsibilities, one that could easily be filled by any new career trainee. I thought about it very briefly and declined. (U//AIUO)

[16] Compare with paragraphs 16, 24, and 25 of ref a and with Iden g's remarks in this complaint. CIA managers have signaled to me more than once over the years that they are very careful about allowing me to travel. Now, what had I possibly done wrong that has caused some managers to be skittish? When I was a case officer, (that is, before I had ever written a whistleblower complaint), I never encountered any such hesitancy to allow me to travel. (U//AIUO)

[17] Nearly eleven years and counting. This time-in-grade figure is almost four times longer than my average promotion rate from EOD to 1993. Significantly, it is also approximately 200% longer than my average Agency time-in-grade for a GS-13. Juxtapose this figure against a professional reputation that includes regular speaking engagements around the intelligence, foreign policy, and law enforcement community and fluency in a hard language/agent experience that few DO officers can match. (U//AIUO)

[18] I remain a fluent Arabic speaker (3+, 3+, 3+), experienced agent handler, and pioneered for CIA the intelligence exploitation of certain⌐            ⌐ I also tdy'd to Iraq a couple of times after the first Gulf War. (U//AIUO)

44

24




qualifications.[19]  Yet, during my ensuing Lotus Note correspondence with Iden d—after she had had time to review my file—she claimed that NE Division preferred to send only officers "who could spend one year in Iraq" and that there was no need for any tdy services.[20]  As I was serious about assisting, I told her that I knew for a fact that NE Division and the CIA continued to send officers to Iraq on three-month tdys and asked her for a fuller explanation.  Obviously embarrassed, she referred me to Iden g to discuss the issue directly.[21]  (U//AIUO)

12.  I assert that Iden d had almost certainly reflexively discriminated against me after she had learned of my professional history.  Yet, such discrimination is a *prohibited personnel practice*.[22]  Under federal law, it is illegal to *"discriminate for or against any employee or applicant for employment on the basis of conduct which does not adversely affect the performance of the employee or applicant."*  Therefore, from my perspective, how did my previous whistleblowing diminish my ability to serve in a tdy capacity in Iraq?  How was this relevant?  How did whistleblowing disqualify me from debriefing an Arabic-speaking agent or handling any other debriefing?  Would a US Army officer not pay attention to me because I had been a whistleblower?  Why was a fluent Arabic speaker with years of operational experience—in an organization where such individuals are in precious short supply—seemingly intentionally misled?  Why? (U//AIUO)

13.  The answer came later.  At 1330 on 23 September I met alone with Iden g for about 40 minutes in the latter's Hqs office.  After exchanging pleasantries and inquiring about one another's families, I asked whether I could tdy to Iraq to assist NE Division and reminded him of my skills.  I told him that I knew for a fact that what Iden d had told me about "no more three-month tdy's" was untrue and that it irritated me that I had been lied to.  After pausing and shifting in his seat, Iden g said: *"Franz, you're right. It is not true that we no longer send officers on 90-day tdys to Iraq and Iden d should not have claimed this. You have to understand, though, you have an absolutely 'horrible reputation'* [exact words used by Iden g] *in NE Division. But I want you know that I have always held you in 'good stead'* [exact words] *and have always had a high professional opinion of you."*  With irritation in my voice, I responded to Iden g's assertion about my supposed 'horrible reputation': *"Based on what?!* [my exact words].  *My performance appraisal reports have always been good to excellent and I developed a*

---

[19] Iden e was initially skeptical about my evaluation of CIA's willingness to engage in *prohibited personnel practices*.  He came to be a believer, however.  During this period, I also spoke with Iden f directly about the possibility of travel to Iraq and the latter confirmed to me that NE Division continued to send officers on 60-90 day tdys.  Separately, I have spoken with other officers who have returned from Iraq and who told me that "the office is filled with tdyers--" the vast majority of whom know no Arabic!  Thus, it is exceedingly easy to confirm that Iraq is filled with tdy-ers. (U//AIUO)

[20] Again, tdy officers are the norm in Baghdad. (U//AIUO)

[21] The issue was discussed via Lotus Notes with Iden d.  As for Iden g, we served in the Middle East together 20 years ago and became fast and solid friends.  Although we fell out of contact over the years, our time there obviously made Iden g much more inclined to level with me.  He is a pretty honest guy.
(U//AIUO)

[22] Reread Section 2302 (8) and (9) which describes in detail prohibited personnel practices vis-à-vis federal whistleblowers.  For the record, Iden e considered Iden d's claim "breathtaking in the literal sense" as he had learned officially from NE Division that it remained in dire need of qualified officers on the ground in Iraq. (U//AIUO)

*whole new field of intelligence exploitation for CIA. Few people have done this. Instead of relying on hearsay, why don't you allow me to tell you directly why I have this 'reputation.'"* I then proceeded to tell Iden g, in very broad outline, of CIA's apparent lies to a congressman in 1998, for which the DCI later apologized.[23] I reminded Iden g that I had broken no laws in filing my complaints and that the bureaucracy should not take them into account. Iden g listened intently, in seemingly non-judgmental fashion, then said: *"Look, there are ways to express your displeasure inside the bureaucracy and then there is 'your way.'* [24] *I think I have been able to resist bad conduct. That said, in your case, I think that you have suffered from bad managers."* Iden g continued, *"The real problem with sending you to Iraq, though, is we can't have someone who might write a memorandum because of something he sees or doesn't like while in country. The war on terrorism has changed the ground rules. We need people who obey immediately—not after 10 minutes of reflection."*[25] I responded: *"I know that* [i.e. that there is a new determination to fight terrorism]—*but remember, the law permitted me to write urgent concerns. Besides, I am volunteering. Did you know that in fall 2002 NE Division actually told me that I was 'beneath the current standard for NE officers in terms of training and experience?'"* Iden g responded, *"That is not true* [i.e., that you are beneath NE's skill level]. *The truth is there are a lot of places where you could be of great assistance given your skills. Perhaps we could use you in a place like Mosul. There are mostly young officers serving in Iraq and experience is needed."* (U//AIUO)

14.  Iden g tried to reduce the significance of what I had been told by Iden d, perhaps in an attempt to reduce my irritation.  Speaking slowly and carefully while shifting in his chair, he said, *"Look, Franz, when someone around here hears your name, even if they don't know the exact details of your past—maybe they only know a little bit about you* [Iden g raised his hand and gestured with his thumb and index finger]—*they just reflexively shun you."* Although Iden g tried to empathize, his demeanor suggested that he found Iden d's reaction to be as understandable and "no big deal." He continued, *"I have to be honest . . . no one here wants you. I do not agree with them, though. I would like nothing better than to bring you back to the division, to prove to your many critics that you are a good officer, and possibly to give you a double promotion if you do well. Give me a few days to think about it—I plan to pray for guidance—and I will get back to you by Friday* [26 September] *with my decision. If you go to Iraq, you will be granted no supervisory role and I will brief your superior about you accordingly. If you do well,*

---

[23] This *Urgent Concern* was written drafted immediately after the passage of the Whistleblower Provision.
[24]Compare with paragraph 26, ref a.  In the above conversation, Iden g was signaling to me that he did not believe writing an *urgent concern* was an acceptable way to voice disagreement.  Yet, if CIA does not think whistleblowing is an 'acceptable way,' I suggest CIA raise the issue with Congress and the President. After all, they make the law. Read further. (U//AIUO)

[25] Perhaps it is well and good that some people are willing to write about "things they don't like."  In May 2004, numerous stories have appeared in the world press, including the *Washington Post*, the *New York Times* and *USA Today*, about abuse of Iraqi prisoners by US personnel at Abu Ghrayb Prison outside Baghdad.  The *Washington Post* stated that CIA's Inspector General's Office was investigating CIA's possible connection to these incidents.  Yet, one thing is certain—if I had witnessed clear violations of accepted international conduct vis-à-vis prisoners of war and civilians, I would have reported it immediately to CIA authorities. (U//AIUO)



*we'll bring you back to the NE Division.*[26]   The conversation ended in friendly fashion
shortly thereafter. Iden g got back to me several weeks later via a friendly Lotus Note.
He said that I could serve in Iraq but only if I agreed to stay 6-12 months.[27]  (U//AIUO)

15. Comment: Did Iden g engage in a *prohibited personnel practice*? Judge for
yourself.[28]  A basic federal whistleblower protection says that it is illegal to, *"take or fail
to take or threaten to fail to take any personnel action against any employee or applicant
for employment because of a) the exercise of any appeal, complaint, or grievance right
granted by any law, rule, or regulation. . . "*  Now, whistleblowing is legal under the law
. . . I am a whistleblower. . . and an assignment to Iraq is a personnel action. Plus, scores
of CIA officers are or have been considered for 90-day assignments (or even less; this is
exceedingly easy to prove). Yet clearly, my previous whistleblowing did enter into Iden
g's calculations in a big way. He said so unambiguously. Iden g did indeed "fail to take
an action"—such as allowing a tdy without conditions—simply because I had been a
whistleblower.  Iden g's remarks are one of the clearest indications yet that I am not
imagining this problem and that violations of federal whistleblower protections are
endemic inside the bureaucracy. In addition, I claim that Iden d's intentionally
misleading statement to me about "no more 90-day tdy's" was in keeping with NE
Division's longer policy of denying me opportunity based on my "hall file." She too
engaged in a *prohibited personnel practice*. The law says that it is illegal to
*"discriminate for or against any employee or applicant for employment on the basis of
conduct which does not adversely affect the performance of the employee . . ."* Yet, how
could my previous whistleblowing make me ineligible for 90-day tdy's (that is, without
violating the law)? Why did Iden d seek to mislead me?  Remember, Iden g directly
contradicted Iden d about the possibility and length of tdy's to Iraq and he directly
contradicted NE Division's claim in October 2002 that I was *"below our threshold for
necessary skills and being current in terms of training/experience."*  His candid remarks
put into context paragraphs 32-33 of ref a—and I appreciated his honesty.[29]  (U//AIUO)

---

[26] This revealing conversation with an old friend—even an honest, capable guy like Iden g—speaks
volumes about how CIA really works.  "Hall files," not objective performance, decide employee futures.
Iden g's comments mirrored Iden c's.  And, years of operational experience, fluent Arabic, developing an
entirely new set of intelligence sources for CIA, mentoring young officers, and being a recognized expert
around the IC in an esoteric field, all counted for nothing.  Moreover, Iden g, a former human resources
manager (!), signaled to me that he needed to "rehabilitate" me despite being reminded of the law, the
occasional appropriateness of whistleblowing, and of my productivity at FBIS! His further comment that
he would "pray for guidance" was particularly annoying.  (What's next, tea leaves?)  In view of above,
how can CIA possibly think that my whistleblowing has never been taken into account by some managers?
As far as I am concerned, it is axiomatic that it has been taken into account. And, lest we forget, Iden d
consciously sought to mislead me. (U//AIUO)

[27] I was initially happy that Iden g did not rule me out completely, as some other officers had done. He
opened a door—albeit only part way.  Yet, upon reflection, even this solid officer proved to me that he was
willing to take extraneous and illegal factors into account in his personnel decision. (U//AIUO)

[28] Here it is necessary for me to detach myself from my earlier warm friendship with Iden g.  Our time
abroad inclines me to treat him gently, yet the conduct in question is almost certainly illegal. Despite this,
Iden g is much more honest than most officers and he occupies his current position mostly due to
competence.  Although he is a good person, he appears either ignorant of the law or unwilling to take it
seriously. (U//AIUO)

[29] It is worth noting here that the OIG investigators who investigated the October 2002 assertion by NE
Division that I was 'below their current standards in terms of training and experience" clearly were either



16. On 26 September 2003, Iden h publicly humiliated me during a visit by the Executive Director of CIA to [      ] This incident is described in detail in ref d. In a nutshell, Iden h publicly told a number of officers, while I stood 10 feet away, that a junior officer with one year of experience had done "the groundbreaking work" in a promising new intelligence field and had developed a "whole new product line." Neither claim was true—I had pioneered the entire new field for CIA, had mapped and assessed the constellation of sources, and had suggested the new product.[30] Thus, this act of public humiliation of federal whistleblower almost certainly constituted a *prohibited personnel practice* under Section 2302. The law says that it is illegal to *"discriminate for or against any employee or applicant for employment on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others . . ."* (U//AIUO) (e) TOCT 03

17. Iden h's treatment of me was one of several extremely irritating incidents that I have endured since 1998 and demonstrates to me, beyond a shadow of a doubt, that some managers will discriminate against employees whose personal views and criticisms of CIA they do not like.[31] Iden h knew that I was a whistleblower—I had told him so—and had responded to me both orally and in written comments in June 2003, that he takes into account my criticisms of CIA in his management decisions. Moreover, he partially bases his promotion decisions on the "hall file" of FBIS employees, in clear contradiction of

---

too credulous or didn't dig deep enough. On August 13, 2003, they told me informally that NE Division's written comment about my "lack of qualifications" was actually a "routine reply." This contention is nonsense. I did not believe this then and I do not believe it now—it was not at all a "routine reply." I think it is clear from my conversation with Iden g that the OIG investigators were misled by NE Division, perhaps as a way for the latter to escape or deflect culpability for illegal behavior. Iden g's comments directly demonstrate that the OIG investigators must be more vigilant and less gullible. Because when all is said and done, a written reply from an area division should make sense. (U//AIUO)

In fact, on 13 August 2003, the OIG investigators gave me the distinct impression of seeking to minimize the significance of conduct (including threats) that they had preliminarily determined had taken place— even if such threats against federal whistleblowers are, in themselves, *prohibited personnel practices* and thus violations of law. For instance, OIG acknowledged to me that Iden k had made most of the threatening remarks that I had alleged in ref a but "may have wanted to help you." Shortly thereafter, a well-meaning OIG investigator even told me that that she could personally understand why Iden k had told me to "shut up," which the OIG officer considered sound advice! My description of the 13 August OIG meeting is recorded in a Lotus Note dated 15 August 2003.

Finally, I find it striking that in general, the tendency of NE Division (and FBIS) to take into account my background is greater than among other elements of CIA. This is because CIA is a big place and my name is better known in certain offices than in others. In other words, where people know me, they do seem to take my previous whistleblowing into account in their personnel decisions. (U//AIUO)

[30] See ref d grievance. My irritation assumes we ignore the unseemliness of choosing a junior employee with one-year of experience over the veteran officer who developed the program to give the briefing. Iden h did this intentionally, as he knew the truth of the matter. (U//AIUO)

[31] Other extremely irritating incidents at FBIS have included Iden k explicit threat on 1 March 2002 to never promote me if I engaged in further whistleblowing. This was a clear *prohibited personnel practice* under federal law. Likewise, Iden o's suggestion on 25 October 2002 that I was not fit to talk to young officers was extremely annoying. She repeated the same general suggestion on 10 March 2004, without supplying details of my alleged remarks. (U//AIUO)

28



CIA human resources policies and Agency regulation.[32] (If CIA wants to understand why I retained lawyers only ca 1 October 2003, I invite you to reread this and paragraph 16.) (U//AIUO) (e) (CM(s /-03)

18. On 10 March 2004, I was accused by Iden o, against whom I had filed a grievance in January 2003, of creating a "negative atmosphere" for unnamed young officers and—in the most outrageous piece of chicanery experienced since 1998—of "threatening a colleague with a little yellow 'Post-it' note."[33] The history of this strange story, which includes the insinuation that I had physically threatened a colleague, is contained in several Lotus Notes dated 12 March 2004, in a 6 January 2004 memorandum, and in a memorandum for the record/with rebuttal. It suffices to say that a senior FBIS manager insinuated to me, in essence, that I was "disrupting" the minds and morale of unnamed young officers based on unspecified comments I had made. Moreover, maybe Franz Boening was a closet felon! The "disruption of young officers'morale" allegedly occurred as a result of "negative" assessments I have made about various aspects of CIA's performance.[34] Likewise, the Post-it note form of Franz Boening's "negative behavior" rested on the thinnest of "evidence" combined with a healthy dose of sophistry. Consequently, could a person in my position not reasonably ask whether FBIS management sought to intentionally harass me? (U//AIUO)

19. The Case of the Yellow Post-it Note: The note in question was addressed by me to Iden p on 10 December 2003, a senior editor/analyst at FBIS, who reported to Iden o her "perception" that I had physically "threatened" her with the note below. I invite the reader to judge for himself/herself. The exact text of the note follows in italics. My elucidating comments are in brackets: (U//AIUO)

[Begin text]
- *Iden p, 10:15 am, 12/10/2001* [The note was addressed to Iden p; the date of 2001 was due to my bad writing. I meant to write 2003.]
- *This is what I described to you yesterday.*
- *I think it is formatted the way want it* [sic].
- *Notes: Let's do one set of edits (not 2-3).*
- *Be consistent; (I'll try to be).*

---

[32] I will try to produce a Powerpoint from Iden h, which suggests that he considers "hall files" carefully. Yet, if this is the case, it necessarily means that a powerful psychological bias will always exist against a whistleblower.

How does CIA explain such improper managerial conduct? Also, since the paragraph 16 incident, Iden h has denied me the opportunity to travel to brief three foreign liaison services that had requested me by name. This occurred in early 2004. While this latter decision may be his management prerogative, it seems equally possible that it was a direct response to the grievance I filed against him in ref d. (U//AIUO)

[33] You know, those little yellow notes made by 3M with the sticky backs? Please do not laugh; the accusation was quite serious. Iden o endorsed the remarks of Iden r who called the note an example of my "negative behavior." (U//AIUO)

[34] I admit that I have perhaps influenced how young officers understand the intelligence business. But, what of it? Personally, my morale has been "disrupted" by CIA's recurring intelligence failures abroad, the ineptitude of some managers, and the fact the so few senior officers speak Arabic in a world where this skill is critical. In fact, it seems that the US Congress cannot stop talking about US intelligence failures. In fact, what can be possibly be wrong with examining the reasons for intelligence failure? (U//AIUO)



- *Let's get it out by Friday.*
- *Franz.*

[End text]  (U//AIUO)

After receiving this note, Iden p complained to Iden o that she had felt "threatened" by me. Iden o and Iden r in turn tacitly endorsed Iden p by calling it an example of my "negative behavior" towards others in the office. Iden o said that she felt compelled to "address the issue" with me because it was her duty "as a manager." I vigorously denied to all parties aware of this issue that I had threatened anyone. During a follow-up meeting on 15 March, both Idens o and r declined to disassociate themselves from Iden p's ominous interpretation of the Post-it even though I gave both officers two opportunities to do so. Both said, "we don't know the context," (ergo, maybe Iden o's interpretation is accurate). I immediately challenged both officers to take the Post-it note to CIA's Office of Security—or better yet to the Loudoun County Police Department—if they felt strongly about the "threat" it contained. They declined, without comment.[35] (U//AIUO)

20. Comment: What is next? To be accused by management of planning an assault because I keep a plastic butter knife in the drawer? Of robbing the coffee fund? Because if certain FBIS managers tacitly subscribed to Iden o's silly and paranoid interpretation of the Post-it note—and they did—it is no longer management. Leveling baseless accusations of what amounts to criminal conduct is very serious matter. It can rightly be called intentional harassment, from my optic. It suffices to say that I do not like CIA managers to insinuate that I am a violent person or that I would commit a criminal act. This is malicious character assassination when done without a shred of evidence. (U//AIUO)

21. The Negative Effect on the Intelligence Mission: After the weird incident described in paragraphs 19 and 20, Iden p compounded the phenomenon of seeming harassment by refusing to allow four draft reports I had submitted for edit to be released as formal FBIS intelligence reports. All of her de facto refusals occurred after I had vigorously challenged her paranoia in late March 2004 and showed the Post-it note to the Office of Security.[36] The draft reports dealt with high-priority designated USG terrorist groups, to include al-Qa'ida and HAMAS. In all cases, other offices of CIA or substantive experts within FBIS had endorsed the value of the drafts. In the most egregious case, Iden p, almost certainly out of personal pique, nixed the production of an important report that was to be used by Federal Bureau of Investigation. Moreover, she did this even after I

---

[35] Of course, nothing prevented me from sharing the note with the security officer at[___    ] Iden t. I gave her some background to my case on 12 March and a copy of the text of the Post-it note, as well as an accompanying memo, on 17 March 2004. A few days later, on or about 25 March, she indicated to me that she could discern no "threat" in note and was surprised that anyone else could. (U) LOC 1-03
[36] I have written literally scores of reports, foreign media analyses, _____ monitor reports, and operational alerts (OA's) since I came to FBIS in 1999. (I proposed the concept of the OA in late spring 2002, which FBIS then adopted some months later and which has become a useful product for the IC.) Most of them were required to pass through Iden p's editing. Yet, prior to spring 2004 it had been extremely rare for iden p to fundamentally question the intelligence value of a draft that I had submitted. (U//AIUO)

had specifically told her that the information demanded a formal report because the FBI planned to use it to launch an investigation.[37]  (U//AIUO)

22.  Action Requested: Kindly investigate and solve the problems described above—and finish CIA's investigation of ref b.  It is painfully clear to me that the CIA bureaucracy does not function the way it is supposed to, insofar as it has allowed some managers to engage in seeming *prohibited personnel practices* vis-à-vis a federal whistleblower.  My previous whistleblowing has been quietly, yet illegally taken into account in numerous personnel decisions over the years.[38]  I contend that some managers think it is OK to discriminate against a whistleblower because they have "deniability" and because such cases can be difficult to prove.[39]  (U//AIUO)

23.  CIA will not be let off the hook until it resolves this problem equitably.  I have been threatened, told that I am unfit to talk to young officers, publicly humiliated, "prayed for," and denied other opportunities too many times for all these incidents to be coincidences.  Moreover, two CIA staff officers have done this with explicit reference to my previous whistleblower complaints and several others have made negative allusions to my supposed "hall file."  This has all taken place while I have made important intelligence contributions that have been largely ignored and within a framework of formal laws that are designed to protect federal whistleblowers.[40]

24.  I ask you that resolve this complaint fairly and with a certain measure of urgency.[41]  In the meantime, please know that I appreciate your attention to this matter.

Respectfully,
Franz Boening

---

[37] On the very day that she did this John Brennan of Terrorism Threat Integration Center sought to reassure the 9/11 Congressional Commission that CIA was doing everything possible to work with other elements of the government.  Therefore, if CIA management worries about nothing else in the memorandum, I hope that it appreciates the lunacy of allowing a vindictive manager to harass an employee—out of pure personal pique—to the point that the intelligence mission is tangibly damaged.  Such managerial conduct is absolutely unconscionable.  It is even worse when other FBIS managers who witnessed the incident did not intervene to facilitate the production of actionable intelligence.  Significantly, after I recorded my intention to report to outside CIA authorities the unconscionable hindering of intelligence reports—seemingly based on nothing more than Iden p's irritation—the ill-conceived practice stopped.  By 30 April, I was again able to produce formal intelligence.  (U//AIUO)

[38] Moreover, nearly all CIA employees know intuitively that whistleblowing entails professional risks and friends have acknowledged to me privately that they believe my allegations have merit.  (U//AIUO)

[39] If certain managers believe this, then I will do my level best to prove them wrong.  After all, if we do not attempt to enforce federal law, what good is it?  Do we wish to ignore the law of the land?  For my part, I will not hesitate to document other *prohibited personnel practices* should they occur.

[40] In late April 2004, I obtained a position in TTIC.  The military officer who recommended me for the position as a senior analyst hired me without any hesitation, almost certainly because he was unaware of my previous whistleblowing and thus focused, appropriately, on objective qualifications.  I ask you to contrast this officer's behavior with that of some of the CIA officers described in this memorandum.

[41] I apologize for the dense prose of this complaint.  There was much to say and I did not want to ignore important details or context.

# EXHIBIT "5"

# Rule 56 (f) Declaration of Mark S. Zaid, Esq.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FRANZ BOENING                              *
                                           *
        Plaintiff,                         *
                                           *        Civil Action No: 07-430 (EGS)
        v.                                 *
                                           *
CENTRAL INTELLIGENCE AGENCY                *
                                           *
        Defendant.                         *
*       *       *       *       *       *       *       *       *       *       *       *

**RULE 56(F) DECLARATION OF MARK S. ZAID, ESQ.**

I, MARK S. ZAID, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.  I am a person over eighteen (18) years of age and competent to testify. I make this Declaration on personal knowledge and in support of the plaintiff's Opposition to Defendant's Motion for Summary Judgment.

2.  I am the attorney of record for plaintiff Franz Boening ("Boening"). I am admitted to practice law in the States of New York, Connecticut and the District of Columbia, as well as the D.C. Circuit, Second Circuit and Fourth Circuit Court of Appeals, and the United States District Courts for the District of Columbia, Maryland, Eastern District of New York, Northern District of New York and the Southern District of New York. I have been litigating cases pertaining to national security since 1993. As part of my representation of Boening, I have executed a secrecy agreement providing me access to up to and including SECRET level information (and the same applies to my associate Bradley P. Moss, Esq.). I have, in fact, participated in classified meetings with Boening and the CIA to discuss or review the specific documents at issue in this case.

3.  This action was filed on March 5, 2007 to challenge the conduct of the defendant Central Intelligence Agency ("CIA") with respect to the processing by the Publication Review Board of a memorandum drafted by Boening dated May 10, 2001. The memorandum detailed perceived violations of law and policy mistakes surrounding the

alleged relationship between the CIA and a foreign government official **[1 ¼ lines
deleted by CIA]**.

4.   If the CIA is claiming that Boening did not exclusively derive the information
within his "M Complaint" from publicly available newspaper and magazine articles, or
other federal agencies' declassified documentation retrieved from the Internet, then
discovery is essential prior to the granting of summary judgment for the CIA. This goes to
the heart of the question surrounding Boening's sources.

5.   Additionally, there exists a factual issue as to whether the U.S. Government, in
light of available declassified records, has "taken affirmative measures to conceal" the
CIA's relationship with **[one word deleted by CIA]**, thereby precluding summary
judgment for the CIA at this time.

6.   For more than a decade I have handled numerous prepublication review cases,
particularly with the CIA, both at the administrative and litigation stages. See e.g. Sterling
v. CIA, Civil Action No: 03-0603 (D.D.C.)(TPJ); Wendy Lee v. CIA, Civil Action No.
03-0206 (D.D.C.)(TPJ); Waters v. CIA, Civil Action No: 06-383 (D.D.C.)(RBW);
Stillman v. CIA 209 F. Supp. 2d 185 (D.D.C. 2002), rev'd on other grounds, 319 F.3d
546 (D.C. Cir. 2003). Personally, I will openly concede that – notwithstanding the fact
that the PRB sends conflicting messages to its current and former employees regarding
whether a specific deadline exists for a response – a 30 day requirement is often
unrealistic given the manner in which the current process has been structured for reviews.
However, my experiences have revealed that delays that extend one to two years before a
final response occurs have become a common routine pattern and practice with the CIA.
The excessive delays have a significant impact on the submitter, especially since there is
often a publication deadline involved or an important public interest underlying the
contents. Moreover, at times the final response is negotiated to such an extent, i.e., that

"classified" information all of a sudden becomes unclassified, it makes a mockery of the classification system in general.

I do solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true to the best of my knowledge.

Date:   November 12, 2007

/s/

_____

Mark S. Zaid

# EXHIBIT "6"

# November 22, 2004 PRB Submission Memorandum

# EXHIBIT "7"

# PRB Briefing Slides



## The Requirement

"... all current and former Agency employees, and others obligated by contract [are required] to submit for prior review by CIA all materials ... intended for nonofficial publication."

(AR 6-2)



## Nonofficial Publication? What's That?

- "Publication" means communicating information to one or more persons.
- "Nonofficial publication" is a work the author prepares as a private individual, not as a government employee or a contractor acting in an official capacity.



## Why a Publications Review Board?

In fewer than 20 words:
- "The PRB reviews nonofficial publications to ensure that they do not disclose information damaging to US national security."



## Who Reviews My Resume?

- According to AR 20-28, HRM's Transition Center reviews resumes; PRO officers are now handling resumes.
- Seek guidance from the Transition Center and PRO office on what a resume can and cannot contain.
- Employees under cover have special considerations covered in the regulation.



## Fundamental Questions

- Who reviews my resume?
- What is prepublication review?
- What does the Publications Review Board do?
- How does this affect me?



Prepublication Review:
Your Rights and Responsibilities

2

## What Does the Board Do?

- Assists the DCI in his statutory responsibility to protect intelligence sources and methods.
- Helps individuals meet their prepublication review obligations.
- Ensures that information damaging to national security is not disclosed inadvertently.

## Prepublication Review Applies to:

- Former employees
- Others with access to classified information (former DCIs, Presidents, Cabinet officers, Congressional staffers)
- Current employees, at component's request — normally done through chain of command to assess effect on performance of duties, Agency functions, foreign relations

## The Obligation Is Contractual

- The obligation arises from the secrecy agreement.
- The US Supreme Court has said in *United States v. Snepp* that the obligation is contractual and arises regardless of classification issues.

## Is There a Loophole?

- Oral statements--like interviews--are not subject to prepublication review if an individual does not prepare notes, outlines, or memoranda beforehand.
- But, the individual is still liable if he or she discloses classified information!
- Notify Public Affairs (703) 482-7677 of press contacts; it can give guidance.

## What Is Covered?

- Books, book reviews, articles, scripts, outlines of oral presentations, letters to the editor, any form of electronic dissemination (Internet)
- Even term papers, video games, and cookbooks [that] contain any mention of the CIA, intelligence data or intelligence activities, or material on any subject which the author has had access to classified information in the course of his or her employment.

## When Does the Obligation Arise?

When a writing, script, or oral presentation (even a work of fiction):
- Contains any mention of CIA
- Intelligence data or intelligence activities
- or deals with topics to which the author had access to classified information during his or her employment with CIA.

PRB

## What Does the Board Not Do?

- **Does not declassify** Agency information
- **Does not release** Agency information
- **Does not endorse** or verify authors' information

PRB

## Who Serves on the Board (or whom do I blame if my article is not approved)?

- PRB is an independent board comprising senior representatives from the DI, DO, DS&T, MSOs, EOCD, and a legal advisor.
- October 1991 IG report recommended that all PRB members—including alternates—be SIS officers.

PRB

## The First Amendment Balancing Act

- DCI's authority by statute, Executive Order, Agency regulations
- Individual's First Amendment rights
- Court authorization of "prior restraint" with 30 days for review and response to author

PRB

## What Is the Standard for Review?

- PRB can redact material only if disclosure would damage national security.
- PRB cannot redact embarrassing or critical statements, nor does it correct factual errors.
- The Agency can prevent former employees from writing about topics others can write about freely.
- Fictional accounts and non-experts have more leeway.
- "Sourcing" allows authors more freedom.

PRB

## What Is the Process?

- The process is not adversarial, although sometimes it seems so to some authors.
- Chairman's job is to reconcile differences where they can be reconciled.

PRB

## Process Summary

- Author submits a manuscript.
  - PRB has 30 days to complete its review.
- Board reviews for classified information.
- Author notified in writing of Board's decision.
- Author can contest and negotiate.
- Board reconsiders, but decision on reconsideration is final Board action.

3

## What If an Author Disagrees With the Board?

- Author can appeal to the Executive Director.
- Author can litigate Executive Director's decision.

## What Happens If I Don't Comply?

The Agency can, through the Department of Justice, either:

- Seize any royalties your publication generates (like Snepp case) or
- Seek an injunction to restrain you from publishing unless you comply with the terms of you secrecy agreement.

## Trends in Reviewing

- Steady volume of submissions:
  - 331 manuscripts in FY 2003
  - 22,467 pages in FY 2003
- More writing on operations.
- More complex, time-consuming reviews make 30-day deadlines more difficult to meet.

## What Are My Chances for Approval?

- In FY 2002, the Board had "no objection" to 82% of manuscripts.
- In the past five fiscal years, the appeal rate has been less than 1%—which means that the Board and authors were able to reach a satisfactory resolution 99% of the time!

## Contact Information:

Central Intelligence Agency
Publications Review Board
1 H 11 IP Building
Washington, D.C. 20505
(703) 613-3070; (703) 613-3004 (fax)
If sending via UPS or FED EX, use:
CIA Gate 5
Publications Review Board
1 H 11 IP Building
1000 Colonial Farm Road
McLean, VA 22101

# EXHIBIT "8"

## Zaid Letter To DOJ
## Dated October 15, 2007

# MARK S. ZAID, P.C.
### Attorney-At-Law

1250 CONNECTICUT AVENUE, N.W.
SUITE 200
WASHINGTON, DC 20036
———

TELEPHONE (202) 454-2809
FACSIMILE (202) 330-5610

October 15, 2007

<u>VIA E-MAIL</u>

Michael P. Abate
Trial Attorney, Civil Division
U.S. Department of Justice
P.O. Box 883
20 Massachusetts Avenue, N.W.
Room 7302
Washington, D.C. 20530

Re: <u>Boening v. CIA</u>, Civil Action No. 07-430 (D.D.C.)(EGS)

Dear Mr. Abate:

    I am writing to take you up on your offer of July 26, 2007, to cooperate and ensure that any "classified" submission by my client will be filed <u>in camera</u> for the Court's review. To be perfectly candid, we have no intention of filing, much less creating, a classified submission but, of course, I cannot claim to know whether the CIA will consider certain information we intend to include in a declaration, especially in light of the current posture of this case, to be classified.

    Therefore, in order to properly ascertain whether any declaration (and any accompany materials) to be submitted by my client contains alleged classified information – and therefore necessitates an <u>in camera</u> filing – I am respectfully requesting that the CIA arrange for a date/time for my client and I to use a secure computer at an Agency facility (wherever that might reasonably be) in order to draft a factual declaration for his signature. We can then submit the document(s) for classification review and act accordingly following a determination. As we have no interest in even inadvertently disclosing what may or may not be legitimately classified information, this method will ensure no potential problems arise.

    The alternative is to proceed how I normally handle these types of cases and – in complete good faith with no intention to include classified information – draft any intended filings on our own computers and then submit the document(s) for classification review. We would then delete any material – despite our good faith efforts to exclude – designated as classified by the Agency and request that the unredacted version be submitted to the Court for its <u>in camera</u> review.

We are comfortable with either option but offer both to the Government in order to ensure no concerns arise.

Furthermore, in order to ensure we can present an appropriate response consistent with my client's First Amendment rights, I would also like to make immediate arrangements for my client and I to re-review the "classified" documents he created that are the subject of this litigation. As you know, I participated in the IG process wherein these documents were created, reviewed and discussed.

Please note I am <u>not</u> asking the Government for permission to review any of the Agency's classified submissions for which I have never had prior access. That dispute will be directed towards the Court. I am only addressing those documents for which I had unfettered prior authorized access (and for which the substantive information contained therein I continue to have authorized access).

I appreciate your cooperation in this matter, and await your timely response. Should you wish to discuss any of the above with me, please contact me at (202) 498-0011.

Sincerely,

/s/

Mark S. Zaid

# EXHIBIT "9"

## DOJ Letter To Zaid
## Dated October 26, 2007



**U.S. Department of Justice**

Civil Division
Federal Programs Branch
20 Massachusetts Ave., NW
Room 7302
Washington, DC 20530

---

Michael P. Abate                                Tel: (202) 616-8209 — Fax: (202) 616-8470
Trial Attorney                                  Email: michael.abate@usdoj.gov

October 26, 2007

VIA FIRST-CLASS MAIL AND E-MAIL
Mr. Mark S. Zaid
Mark S. Zaid, P.C.
1250 Connecticut Ave., N.W., Suite 200
Washington, DC 20036

Re: *Boening v. Central Intelligence Agency*, Civil Action No. 07-0430 (D.D.C.)

Dear Mark:

I write in response to your October 15, 2007 letter.

The Central Intelligence Agency ("CIA") has advised me that it has no objection to you or your client preparing draft legal pleadings on your personal computers, as long as the draft pleadings do not contain any classified information and you submit them to the CIA for classification review before filing.

Additionally, the CIA further advised me that it has denied your client's request for access to classified documents he created in connection with the proceedings before the Office of Inspector General ("OIG") referred to in your letter. Access to classified information is governed by Executive Order 12958, as amended, which includes a requirement that the prospective recipient has a "need to know" the information. Section 6.1(z) defines "need to know" as "a determination made by an authorized holder of classified information that a prospective recipient requires access to specific classified information in order to perform or assist in a lawful and authorized governmental function." As noted in the Declaration of Scott A. Koch, filed along with the Motion for Summary Judgment, the CIA has determined that your client does not have a need to know the classified information contained in those materials. *See* Koch Decl. ¶ 32 n.6.

Moreover, the CIA has advised me that it also denied your request for access to these classified materials created by your client. The CIA has determined that you do not have a need to know this information because your representation of a private client in civil litigation against the United States does not constitute performing or assisting in a lawful and authorized governmental function. This determination that pursuing civil litigation against the United States does not constitute performing or assisting a lawful governmental function is distinct from and supercedes any limited access to certain classified information that you may have been given in connection with the proceedings involving the CIA's OIG.

Sincerely,

Michael P. Abate
Trial Attorney
United States Department of Justice

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FRANZ BOENING | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No: 07-430 (EGS) |
| v. | * | |
| | * | |
| CENTRAL INTELLIGENCE AGENCY | * | |
| | * | |
| Defendant. | * | |
| *  *  *  *  *  *  * | * | *  *  *  *  * |

### <u>ORDER</u>

Upon consideration of Defendant's Motion to Dismiss and Plaintiff's Cross-Motion

for Summary Judgment, and the entire record herein, it is this _____ day of

_____ 200\_\_, hereby

ORDERED, that defendant's Motion is denied; and further

ORDERED, that plaintiff is permitted to publish his May 10, 2001, Memorandum in

its entirety.


_____

UNITED STATED DISTRICT JUDGE