**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FRANZ BOENING           *
                                   *
        Plaintiff,          *
                                   *       Civil Action No: 07-430 (EGS)
        v.                 *
                                   *
CENTRAL INTELLIGENCE AGENCY   *
                                   *
        Defendant.       *
*   *   *   *   *   *   *   *   *   *   *   *

**RESPONSE TO DEFENDANT'S LOCAL RULE 7(h) STATEMENT OF**
**MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Rule 7.1 (h), the plaintiff respectfully responds to the defendant's Statement of Material Facts as to Which There is No Genuine Issue.

1. Plaintiff does not dispute this statement.

2. Plaintiff does not dispute this statement.

3. Plaintiff does not dispute the factual recitation of these statements, except to the extent it sets forth legal characterizations and he disputes the conclusion that his May 10, 2001 Memorandum did not represent an "urgent concern."

4. Plaintiff does not dispute this statement, but has no independent knowledge this is what took place.

5. Plaintiff does not dispute these statements.

6. Plaintiff does not dispute the factual recitations of these statements, except he has no independent knowledge this is what took place, but does dispute any legal characterizations or conclusions.

7. Plaintiff does not dispute the factual recitations of these statements, except to the extent it contains any legal characterizations or conclusions and the letter dated February 4, 2004, speaks for itself.

8. Plaintiff does not dispute this statement, except to the extent he did not assert, nor does he claim, his May 10, 2001 Memorandum was a "nonofficial document."

9.  Plaintiff does not dispute these statements.

10. Plaintiff disputes the allegation he "failed to make the necessary changes", but does not dispute the PRB's notifications as its' written communications speak for themselves.

11. Plaintiff does not dispute these statements.

12. Plaintiff does not dispute this statement.

13. Plaintiff does not dispute this statement as the letter speaks for itself, but he does dispute the conclusion that the material in the "Classified Annex" was properly classified.

14. Plaintiff does not dispute that the DiMaio Declarations (only one of which is available to the plaintiff) speak for themselves and reflect the fact that a CIA official believes that certain identified information within the relevant records is classified, but does dispute the contents of the Declarations to the extent they set forth legal characterizations asserting why the information at issue is considered classified.

Dated: February 10, 2008

                          Respectfully submitted,

                              /s/
                          _____
                          Mark S. Zaid, Esq.
                          D.C. Bar #440532
                          Mark S. Zaid, P.C.
                          1250 Connecticut Avenue, N.W.
                          Suite 200
                          Washington, D.C. 20036

                          Attorney For Plaintiff

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FRANZ BOENING | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No. 07-0430 (EGS) |
| v. | * | |
| | * | |
| CENTRAL INTELLIGENCE AGENCY | * | |
| | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**OPPOSITION TO DEFENDANT'S RENEWED MOTION TO
DISMISS UNDER RULE 12 AND MOTION FOR SUMMARY
JUDGMENT UNDER RULE 56 AND MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RENEWED
CROSS-MOTION FOR SUMMARY JUDGMENT**[1]

Plaintiff Franz Boening ("Boening"), a former employee of the defendant Central

Intelligence Agency ("CIA") for nearly three decades, internally challenged the CIA with

a legal, factual and moral dilemma by calling upon it to publicly come clean about

its' alleged relationship with a foreign national – referred to as "M" – who held a senior

position with another Government and was revealed to be a human rights violator and

criminal.[2]

---

[1] Before public filing this document and its attachments underwent a CIA classification review. To the extent any information has been redacted as "classified", the filing of this document does not denote Boening's agreement with that decision and he reserves the right to challenge the classification at the appropriate time. Moreover, depending upon the extent of information redacted, this Court should review any unredacted version in order to ensure Boening receives full due process during these proceedings.

[2] The designation "M" has been openly used by the CIA's Publication Review Board ("PRB") and Boening in unclassified e-mails, including one that was filed by the CIA on the public record. See e.g., Defendant's Motion to Dismiss Under Rule 12 and Motion for Summary Judgment Under Rule 56 ("Def's Initial Memo")(filed July 20, 2007), Declaration of Scott A. Koch ("Koch Decl."), Ex. "G" (including clear overt references to "M" as an individual).

This case revolves around a 25-page memorandum dated May 10, 2001 and its attachments (hereinafter referred to as the "M Complaint", the unclassified term used by Boening and the CIA). Boening's concerns about "M" arose not from any classified work he had performed, or as a result of classified files he had reviewed (or even heard through hallway gossip), but were entirely derived from his reading of publicly available newspaper and magazine articles that described or speculated about the relationship. Based on open source information, and not knowing whether any documentation on "M" actually existed, Boening pursued a rarely used whistleblower provision to call upon the CIA to declassify any relevant classified information it might possess on this individual.

Relying upon provisions established by President Clinton in Executive Order 12,958 which encouraged government employees to challenge overclassification determinations, Boening attempted to persuade the CIA to do the right thing. Instead of rewarding Boening the CIA retaliated.[3] The CIA initially classified portions of the "M Complaint" because of its misconceived notion that Boening possessed access to legitimately classified information on the topic. As a CIA employee, his options were limited. As a former employee Boening is free of some of the legal restraints the CIA previously held over him. The CIA's only power now is control over *properly* classified information.

This lawsuit represents a significant challenge to the CIA's attempt to unconstitutionally broaden the scope of its authority over its former employees and stifle

---

[3] As a result of the matters addressed herein Boening became a whistleblower and suffered employment retaliation to include not being sent to Foreign Country "A" in 2003 despite his having volunteered and possessing needed language skills. Complaint at ¶3 (dated March 5, 2007); Second Declaration of Franz Boening at ¶25)(dated February 11, 2008)("Second Boening Decl."), attached as Exhibit "1".

their First Amendment rights. That effort, based on the law and facts established herein, should be thwarted by this Court.[4]

## FACTUAL BACKGROUND

Boening began employment with the CIA in 1980. At that time he executed a routine secrecy agreement.[5] Koch Decl., Ex. "A". This is the only secrecy agreement he ever executed. Second Boening Decl. at ¶3. He retired from the CIA in 2005. Id. at ¶2.

*Creation Of The "M Complaint"*

In or around Autumn 2000, Boening began reading publicly available newspaper and magazine articles that described the political scandals in M's country [**six words**

---

[4] This is the CIA's second bite at the proverbial legal apple. The CIA initially filed a Motion to Dismiss Under Rule 12 and Motion for Summary Judgment Under Rule 56 on July 20, 2007. Boening filed an Opposition and Cross-Motion for Summary Judgment on November 19, 2007. These Motions were denied without prejudice on November 28, 2007 (Dkt. No. 16), to allow the Court to resolve Boening's Motion to Compel Access to Classified Information for Plaintiff and His Cleared Counsel (filed November 19, 2007). As part of its Opposition to the Motion to Compel, the CIA has simultaneously renewed its original Motions and heavily relied upon its prior submissions by incorporating its earlier arguments and attachments (such as supporting declarations and its Statement of Material Facts). As it is Boening's belief that doing so violates the spirit, if not the letter, of LCvR 7(h) and 56.1 (and is simply confusing to the reader), he will not duplicate this strategy and instead has included all of his arguments herein. However, given the posture of the CIA's filings, he will necessarily cite to its earlier submissions. Interestingly, a comparison of the CIA's First Amendment arguments from its initial motion to its current reveals significant differences, particularly to the extent the CIA seeks to shift the burden from itself to Boening. Many of the arguments the CIA initially asserted about the "M Complaint" being properly classified are gone. Instead they are replaced with attacks on Boening's alleged failure to supply pinpoint overt sources to the PRB. Of course, the CIA continues to rely on its' hidden *in camera, ex parte* classified declaration.

[5] Boening was employed by the CIA from 1980 – 2005. After learning Arabic in the early 1980s, he spent nearly one dozen years handling agent operations, primarily in the Middle East. He worked declassification issues from 1995 – 1999, and ultimately retired from the CIA after working at the Foreign Broadcast Information Service where he handled Internet exploitation and training. He has held a Top Secret/Sensitive Compartmented security clearance for more than 25 years. Complaint at ¶3.

**redacted by the CIA**].[6] Boening had a personal interest in developmental affairs of this geographic region as well as human rights issues. Second Boening Decl. at ¶4. After reading domestic and international news accounts Boening was angered, not just by the level of narco-corruption in M's country and the hidden brutality of his regime, but also by the constant reminder that, according to the scores of credible published media accounts, his employer had nurtured and supported "M" for years. Complaint at ¶4.

Boening decided to monitor, during his own personal time, the unfolding political scandal because of his strong sense of civic responsibility, which was combined with his personal irritation of the allegations.[7] If what he had read was even 50% true, he decided to take it upon himself to document what he perceived to be an apparently gargantuan intelligence failure. Second Boening Decl. at ¶8. Boening was livid that CIA may have been party to human rights violations and, even worse, that it seemed entirely possible that CIA had been criminally involved with "M". Id. at ¶9.

Based on the articles Boening read he decided to document the "perceived violations of the law committed by the CIA" with regard to an alleged "special relationship with a foreign individual who committed unlawful human rights violations and criminal acts." Complaint at ¶6. This led him to create his "M Complaint", which was a whistleblower complaint drafted pursuant to the Intelligence Community Whistleblower Protection Act of 1998 ("ICWPA"). Boening's "M Complaint" specifically alleged that the:

---

[6] **[14 lines deleted by CIA. The deleted text can be found in Boening's original memorandum filed November 19, 2007]**. Second Boening Decl. at ¶7.

[7] During the relevant period of time in question Boening worked overtly in the Foreign Broadcast Information Service as a Mideast media analyst. He had absolutely <u>no</u> professional responsibility whatsoever for "M's" geographical area nor did he have access to any type of classified, compartmented CIA operational information on either "M" or his region. Second Boening Decl. at ¶10.

> CIA may have violated US laws during its 10+ year relationship with [NAME REDACTED](paragraph five);
>
> CIA's professional behavior was so scandalous that it seriously damaged American prestige and credibility (paragraph six);
>
> relationship continued because of an egregious counterintelligence failure (paragraph eight).

Complaint at ¶6; Exhibit "2".[8]

Not one word of the May 10, 2001 "M Complaint" is based on any classified CIA document on or concerning "M", or on any information Boening received as a result of his employment with the CIA. Indeed, in his entire life Boening has never read a single classified CIA document (apart from official responses to his complaint which classified publicly available newspaper and magazine articles) wherein "M" was mentioned. Every comment or conclusion expressed in the "M Complaint" is based on open source information. Complaint at ¶¶7-8; Second Boening Decl. at ¶11.

*Attempt To Internally Challenge CIA's Actions Involving The "M Complaint"*

The "M Complaint" was officially submitted to the CIA's Office of Inspector General ("OIG") on May 10, 2001. The document was styled as an "urgent concern" and addressed to "Office of the Inspector General, Central Intelligence Agency," and identified as coming from "Franz Boening, Central Intelligence Agency". The OIG rejected Boening's request. Koch Decl. at ¶21. The CIA then conducted an initial classification review and determined it contained classified information. Id. at ¶22. This included publicly available newspaper, radio, and television information. Additionally,

---

[8] The "M Complaint" was formatted in the typical simple memo-style format one learns as a schoolchild and included "To", "From" and "Subject" headings. See Exhibit "2".

the CIA deleted all references to "M" and Boening's personal assessment of him. Complaint at ¶8.

On July 2, 2001, pursuant to Executive Order 12,958 and the CIA's implementing regulations, Boening, acting in his capacity as a CIA official, submitted the "M Complaint" to the CIA's Agency Release Panel ("ARP") for further classification review so that he could release it to a non-profit organization. Koch Decl. at ¶23. The ARP *mistakenly* believed that Boening had actually accessed classified information in order to create the "M Complaint", and referred the document to the "Agency Classification Management Review Panel" ("ACMRP") for further review. Id. at ¶¶23-24. The ACMRP also failed to realize that Boening's "M Complaint" was based simply on publicly available information. Id. at ¶25.

When a new Executive Secretary was appointed to the ARP he questioned whether the "M Complaint" was an "official" document. Id. at ¶26. Ultimately, by memorandum dated December 12, 2002, Boening was notified he "was not conducting or facilitating agency business" and that his "M Complaint" was a "personal record" and, therefore, not subject to review pursuant to the Executive Order. Id. at ¶27; Second Boening Decl. at ¶14; Exhibit "3". Thus, the CIA erroneously determined that neither the ARP nor ACMRP held jurisdiction over the document. Koch Decl. at ¶27.

During this time, in May 2002, Boening met with William McNair, then CIA's Information Review Officer, Directorate of Operations, who revealed to Boening why the "M Complaint" was considered classified. McNair stated:

> "*Look, Franz, do you think I care about "M's name"? This is not about 'source protection,' this is about CIA's reputation. We don't want you to have any credibility. The problem with the M memorandum is that what you've written is all true.*"

Complaint at ¶9; Second Boening Decl. at ¶16. McNair also acknowledged during the same conversation that the "M Complaint" was based solely on open source information and that it seemed to be reasonably well-sourced.

The "M Complaint" was eventually forwarded to the Information Review Officer for the Directorate of Science & Technology ("DS&T/IRO"). The DS&T/IRO was the responsible official, based on the regulations that existed at that time, to review "non-official" documents authored by current employees who worked within the DS&T as Boening did. Koch Decl. at ¶28. It took until June 24, 2003, for an unfavorable decision to be communicated to Boening. Id. at ¶29.

*Attempt To Externally Challenge CIA's Actions Surrounding The "M Complaint"*

 Following the CIA's decision Boening sought to appeal the denial that the ARP/ACMRP lacked jurisdiction and that the document contained classified information to the Inter-Agency Security Classification Appeals Panel ("ISCAP"), which operates through the Information Security Oversight Office ("ISOO"), National Archives & Records Administration. Complaint at ¶17. Initially, ISCAP, or at least ISOO, agreed that Boening was permitted to appeal to the ISCAP and ordered CIA to deliver the document. Second Boening Decl. at ¶15. The CIA refused. Id.  Eventually, William Leonard, Chair, ISOO, was persuaded, based on information not fully known to Boening, that the CIA's view was correct and that he was not an "authorized holder". Id. This decision was conveyed by letter dated February 4, 2004. Koch Decl., Ex. "D".

*The CIA Retaliates Against Boening For His Pursuit Of The "M Complaint"*

After Boening drafted his "M Complaint" unfortunate circumstances required that he author a series of follow-up complaints alleging that the CIA had retaliated against him.

7

These complaints included two formal whistleblower memorandums and dated March 24, 2003 and May 20, 2004, as well as two internal grievances dated January 16, 2003 and November 7, 2003. Exhibit "4". During this period Boening was forced to endure various retaliatory acts from being denied assignments, being told to keep his mouth shut, not speak to younger officers and never being promoted again. Second Boening Decl. at ¶25.

From 1980 to 1993, Boening had been promoted on average once every 2.5-3.0 years. After he filed his first informal human rights complaint in 1994, and the series of whistleblower complaints in later years, he never once received another promotion during the time – 12 more years – he served with the CIA. Id. at ¶26.

*Submission Of The "M Complaint" For Prepublication Review*

By memorandum dated November 22, 2004, Boening submitted to the PRB four documents, including the "M Complaint", for classification review.[9] Exhibits "2" & "4"; Complaint at ¶5. The "M Complaint" was accompanied by all the source documentation. Second Boening Decl. at ¶¶17-24. The PRB did nothing for months. Id. at ¶18. Finally, when Boening was nearing his retirement in Summer 2005, he and then PRB Chairman, Paul Noel Chrétien, exchanged internal messages about the "M Complaint". In or around January 2006, the PRB stated "M's" name and country could be released if Boening could demonstrate the information was based on overt sources. Complaint at ¶10.

However, by letter dated June 20, 2006, the new PRB Chairman, Richard Puhl, formally notified Boening of a reversal of the CIA's decision regarding the classification

---

[9] These were: (a) May 10, 2001, Whistleblower Complaint and addendums dealing with [Individual's name]; (b) March 24, 2003, Whistleblower Complaint alleging retaliation; (c) May 20, 2004, Whistleblower Complaint alleging retaliation; and (d) January 16, 2003, Grievance Against FBIS managers. All four documents were considered classified, but (b) – (d) have since been declassified. Complaint at ¶5;Koch Decl. at 20 fn.7.

of his submissions. This letter detailed thirteen pages of required changes on the basis

that the information "is inappropriate for disclosure in the public domain and must be

revised or deleted prior to publication". Koch. Decl., Ex. "F". Given that by now Boening

was no longer a CIA employee, the only information the CIA could legally block

publication of was information that was considered classified. This included "M's" name

and country of origin. The PRB also noted it required Boening to include a specific

disclaimer should he disseminate the redacted document. Id.

By e-mail dated June 30, 2006, the PRB further clarified that:

> If you rewrite your M story in a different format, outside the official-
> looking memo-type one it currently is in; and attribute those statements
> to open sources in the new format (as you basically have), there should
> be no problem with you getting your message out. The deletions noted in
> our letter pertain to the information as presented in the old format and
> not to the information itself.

Koch Decl., Ex. "G" Furthermore, by letter dated August 11, 2006, the PRB notified

Boening that the "2001 classified annex"[10] document he created was also considered

"inappropriate for disclosure in the public domain (i.e., is considered to be classified

information)." Koch Decl., Ex. "H".

## ARGUMENT

*Applicable Legal Standards*

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) presents a

threshold challenge to the Court's jurisdiction. Haase v. Sessions, 835 F.2d 902, 906

(D.C. Cir. 1987). The Court may resolve a Rule 12(b)(1) motion based solely on the

complaint, or if necessary, may look beyond the allegations of the complaint to affidavits

---

[10] Boening styled this document as a "classified annex" not because he was conceding it
contained classified information, but because it was a possibility. He expressly challenges
whether the annex contains classified information. Second Boening Decl. at ¶11.

and other extrinsic information to determine the existence of jurisdiction. Id. at 908. The Court must accept as true all the factual allegations contained in the complaint, but the plaintiff bears the burden of proving jurisdiction by a preponderance of the evidence. Bennett v. Ridge, 321 F. Supp. 2d 49, 51-52 (D.D.C. 2004).

A motion filed under Rule 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The district court must treat the complaint's factual allegations – including mixed questions of law and fact – as true and draw all reasonable inferences therefrom in the plaintiff's favor. Macharia v. United States, 334 F.3d 61, 64, 67 (D.C. Cir. 2003).

Summary judgment is to be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Waterhouse v. Dist. of Columbia, 298 F.3d 989, 991 (D.C. Cir. 2002). In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Celotex Corp., 477 U.S. at 324.

*Legal Standards For Prepublication First Amendment Classification Challenges*

The D.C. Circuit has twice provided guidance on how to handle prepublication

classification challenges; first in McGehee v. Casey, 718 F.2d 1137, 1149 (D.C. Cir.

1983), and more recently in Stillman v. CIA et al., 319 F.3d 546 (D.C. Cir. 2003). As the

Circuit originally stated in McGehee:

> Because the present case implicates first amendment rights, however, we
> feel compelled to go beyond the FOIA standard of review for cases
> reviewing CIA censorship pursuant to secrecy agreements. While we
> believe courts in securing such determinations should defer to CIA
> judgment as to the harmful results of publication, they must nevertheless
> satisfy themselves from the record, *in camera* or otherwise, that the CIA
> in fact had good reason to classify, and therefore censor, the materials at
> issue.  Accordingly, the courts should require that CIA explanations
> justify censorship with reasonable specificity, demonstrating a logical
> connection between the deleted information and the reasons for
> classification. These should not rely on a "presumption of regularity" if
> such rational explanations are missing. We anticipate that *in camera*
> review of affidavits, followed if necessary by further judicial inquiry,
> will be the norm. Moreover, unlike FOIA cases, in cases such as this
> both parties know the nature of the information in question. Courts
> should therefore strive to benefit from "criticism and illumination by
> [the] party with the actual interest in forcing disclosure."

719 F.2d at 1148-49 (citations omitted); Accord Stillman, 319 F.3d at 548-49.

The instant review will not involve the need to "second-guess CIA judgments on

matters in which the judiciary lacks the requisite expertise." McGehee, 719 F.2d at 1149.

There will be little, if any, substantive classification decisions in this case that this Court

does not possess the requisite level of expertise to rule upon.[11] Importantly, "while the

CIA's tasks include the protection of the national security and the maintenance of the

---

[11] See New York Times Co. v. United States, 403 U.S. 713 (1971)(per curiam)
(permitting publication of Pentagon Papers despite government's claim that they were
"top secret"); Haig v. Agee, 453 U.S. 280, 289 (1981)(President's plenary power over
foreign relations, "like every other government power, must be exercised in
subordination to the applicable provisions of the Constitution."), quoting United States v.
Curtiss-Wright Export Corp., 299 U.S. 304, 320 (1936).

secrecy of sensitive information, the judiciary's tasks include the 'protection of individual rights.  Considering that 'speech concerning public affairs is more than self-expression; it is the essence of self-government,' and that the line between information threatening to foreign policy and matters of legitimate public concern is often very fine, courts must assure themselves that the reasons for classification are rational and plausible ones." Id. (citations omitted).[12]

> When the government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply "posit the existence of the disease sought to be cured." It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.

United States et al. v. National Treasury Employees Union et al.("NTEU"), 513 U.S. 454, 475 (1995).[13]

## I.  BOENING IS ENTITLTED TO SUMMARY JUDGMENT AS HE HAS BEEN DEPRIVED OF HIS PROTECTED FIRST AMENDMENT RIGHT TO PUBLISH UNCLASSIFIED INFORMATION

The Supreme Court has long recognized that expression about public issues rests "on the highest rung of the hierarchy of First Amendment values." Carey v. Brown, 447 U.S. 455, 467 (1980). The constitutional protection for freedom of expression on public

---

[12] In the landmark "Pentagon Papers" case, Justice Brennan wrote that "[t]he entire thrust of the Government's claim throughout these cases has been that publication of the material sought to be enjoined 'could,' or 'might,' or 'may' prejudice the national interest in various ways. But the First Amendment tolerates absolutely no prior judicial restraints of the press predicated upon surmise or conjecture that untoward consequences may result." New York Times Co. 403 U.S. at 725 (1971).

[13] "As Justice Brandeis reminded us, a 'reasonable' burden on expression requires a justification far stronger than mere speculation about serious harms. 'Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women...To justify suppression of free speech there must be reasonable grounds to fear that serious evil will result if free speech is practiced.'" National Treasury Employees Union, 513 U.S. at 475, quoting Whitney v. California, 274 U.S. 357, 376 (1927)(Brandeis, J., concurring).

matters, which was "fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," Roth v. United States, 354 U.S. 476, 484 (1957), is at the very core of our constitutional and democratic system. Stromberg v. People of State of Cal., 283 U.S. 359, 369 (1931). In addressing First Amendment challenges courts must keep in mind that "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)(citation omitted). That said, Boening's ability to disseminate his writing is legitimately subject to certain limitations due to his prior affiliation with the CIA.[14]

But Boening is neither asserting that the prepublication review process is unconstitutional nor that he possesses a First Amendment right to publish *properly* classified information. See Snepp v. United States, 444 U.S. 507, 510 (1980). However, his secrecy agreement applies only with respect to "classified information" that "has come or shall come to [his] attention by virtue of [his] connection with the Central Intelligence Agency." McGehee, 718 F.2d at 1142. As the D.C. Circuit has noted, secrecy

---

[14] To some extent, however, Boening's relationship with the CIA also creates greater First Amendment significance under the circumstances. As Judge Kessler noted recently in a prepublication review case "the FBI, by its very nature, is not an open institution, and very few people are knowledgeable about its inner operations. For that very reason, the views of knowledgeable, informed, experienced 'insiders' are of particular utility." Wright v. FBI, 2006 U.S. Dist. LEXIS 52389, *23 (D.D.C. July 31, 2006). It would seem obvious that the same rationale applies equally, and in fact more, to the CIA. As Justice Jackson recognized in American Communications Assn. v. Douds, 339 U.S. 382, 442 (1950), "[t]he priceless heritage of our society is the unrestricted constitutional right of each member to think as he will. Thought control is a copyright of totalitarianism, and we have no claim to it. It is not the function of our Government to keep the citizen from falling into error; it is the function of the citizen to keep the Government from falling into error." Id. at 443.

agreements do not extend to "unclassified materials or to information obtained from public sources." Id. The government may not censor such material, "contractually or otherwise." United States v. Marchetti, 466 F.2d 1309, 1313 (4th Cir.), cert. denied, 409 U.S. 1063 (1972).[15] "The government has no legitimate interest in censoring unclassified materials. Moreover, when the information at issue derives from public sources, the agent's special relationship of trust with the government is greatly diminished if not wholly vitiated." McGehee, 718 F.2d at 1141. Accord Snepp v. United States, 444 U.S. 507, 513 n.8 (1980)("if in fact information is unclassified or in the public domain, neither the CIA nor foreign agencies would be concerned"). See also Stillman, 319 F.3d at 548 (if information not classified properly manuscript can be published).

The CIA can not properly classify the information contained in Boening's "M Complaint" for at least three reasons: (1) at no time did Boening ever obtain access to any classified information relating to the substance of his "M Complaint" during the time of his employment and the information in question was derived *exclusively* from open source materials; (2) the information addresses perceived violations of the law by the CIA in its relationship with a foreign individual who has committed "unlawful human rights violations and criminal acts" and the CIA can not classify its own violations of the law; and (3) the CIA can not demonstrate that the information is within its "control" and therefore can not properly classify the information.

---

[15] This Court recently noted that "any secrecy agreement which purports to prevent disclosure of unclassified information would contravene First Amendment rights." Stillman v. CIA et al., 2007 U.S. Dist. LEXIS 24206, *13 fn.4 (D.D.C. March 30, 2007)(EGS), citing Marchetti, 466 F.2d at 1317 ("We would decline enforcement of the secrecy oath signed when he left the employment of the CIA to the extent that it purports to prevent disclosure of unclassified information, for, to that extent, the oath would be in contravention of his First Amendment rights.").

By virtue of any or all of these arguments, by seeking to improperly classify information within the "M Complaint", the CIA has deprived Boening of his First Amendment right. Therefore, its' Motion should be denied and judgment entered in favor of Boening or, alternatively, both motions should be denied without prejudice until discovery should be permitted.

A. **The CIA Can Not Properly Classify The Information Contained In The "M Complaint" As It Was Exclusively Derived From Publicly Available Newspaper And Magazine Articles And Declassified Government Records Retrieved From The Internet**

The governing document concerning the CIA's classification decisions is Executive Order 13,292, 68 Fed. Reg. 15315 (2003), which amended Executive Order 12,958 (1995).[16] Pursuant to § 1.4 of EO 13,292, information shall not be considered for classification unless it concerns: foreign government information, intelligence activities (including special activities), intelligence sources or methods, or cryptology; and foreign relations or foreign activities of the United States, including confidential sources. It also contains four conditions for the classification of information: (1) the information must be classified by an "original classification authority"; (2) the information must be "owned by, produced by or for, or is under the control of" the government; (3) the information must fall within one of the authorized classification categories under section 1.4 of the Order; and (4) the original classification authority must "determine [] that the unauthorized disclosure of the information reasonably could be expected to result in

_____

[16] This case presents the novel question in a prepublication classification challenge of which Executive Order applies given that the document was reviewed under both EO 12,958 and EO 13,292. See Koch Decl. at 3 (noting "M Complaint" reviewed in May 2001 and May 2004, as well as on 5 other occasions).

damage to the national security" and must be "able to identify or describe the damage." Id. at § 1.1.

The CIA concedes that if the "M Complaint" "contains information derived only from overt sources, he may publish it." Defendant's Renewed Motion to Dismiss and Motion for Summary Judgment ("Def's Renewed Memo")(filed January 11, 2008).[17] This concession alone seemingly results in a judgment in Boening's favor.

Let it be clear from the outset – the CIA cannot honestly dispute that every withheld fact from within the "M Complaint" was derived from published newspaper and magazine articles, or declassified documents of other government agencies that were retrieved from the Internet. These openly available sources were initially attached as exhibits to his November 2007 filing, and are incorporated once again in support of this filing. However, the CIA has disturbingly "classified" these documents which include articles from the *Washington Post* and *Miami Herald*, among other nongovernmental sources retrieved from the Internet. Second Boening Decl. at Exhibits "A" – "OOOO". Although the CIA has prohibited the public from reading these documents, of course it

---

[17] The CIA misstates Boening's argument by postulating the very interesting legal question of whether an individual could publish properly classified information but which was obtained outside of government employment and secrecy agreement. It is easy to envision such a scenario, particularly if that individual remains in the Washington, D.C. region or becomes involved with the news media. For example, Frank Snepp, the former CIA official whose prepublication review case is the only one to have ever reached the Supreme Court, is now employed by the news media and often receives information from sources that the CIA would consider classified even though his employment with the CIA ended nearly three decades ago. As intriguing as this question remains, it is not the issue presented before this Court and need not be decided at this time. The entire "M Complaint" is based solely on unclassified sources. That Boening's prepublication review requirement exists in perpetuity does nothing to enhance the "classified" nature of information contained in a document he creates.

can not equally so restrict the Court.[18] In fact, the Court is permitted to take judicial notice of these documents. See e.g. Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Management L.P., 435 F.3d 396, 401 n. 15 (3d Cir. 2006)(court may take judicial notice of published newspaper articles); In re Merrill Lynch & Co. Research Reports Sec. Litig., 289 F. Supp. 2d 416, 425 n. 15 (S.D.N.Y. 2003)(same).

1. *The CIA Is Attempting To Create A More Stringent Open Source Citation Standard For Prepublication Review Challenges That Has No Basis In Fact Or Law*

Because the CIA cannot contest the open source nature of Boening's information, it has instead sought to attack the "M Complaint" by posing the following question: "has plaintiff demonstrated that he obtained the information deemed classified by the CIA from an overt source rather than from classified information that plaintiff may have had access to – either authorized or not – by virtue of his employment at the CIA?" Def's Renewed Memo at 8.

---

[18] The CIA complains that Boening disregarded its offer to make an *in camera* filing of these specific materials thereby insinuating that he (and his counsel) sought to intentionally violate their secrecy agreements by disclosing classified information. Def's Renewed Memo at 13 fn.8. This claim is quite disingenuous. While it is true the CIA offered in advance to provide assistance for any desired *in camera* filings, it had no idea what that would entail. Thus, it had no idea that Boening would rely on published newspaper and magazine articles, as well as officially declassified federal records, all of which were openly retrieved from the Internet, as support for his Motion. More to the point, Boening had no legitimate or reasonable understanding that the CIA would go to such lengths to classify published newspaper and magazine articles, as well as officially declassified federal records, all of which were openly retrieved from the Internet. The public deserves to see the absurd level to which the CIA will stoop to prevent its current or former employees from openly challenging its conduct. It was the CIA's decision to classify these documents, not Boening. Either way, the Court has access so an *in camera* filing was completely unnecessary. Finally, neither Boening nor his counsel has been contacted by CIA's Office of Security to discuss this attempted "violation" of security regulations. Once again the CIA's post-hoc legal arguments contradict its internal practices.

As a general matter, there is no case – and the CIA has notably failed to cite any – holding that information in the public domain may be censored. Indeed, in McGehee, the D.C. Circuit specifically noted that "when the information at issue derives from public sources, the agent's special relationship of trust with the government is greatly diminished if not wholly vitiated." 718 F.2d at 1141. The Circuit relied heavily on Marchetti, which held that the government may not censor information obtained from public sources, "contractually or otherwise." 466 F.2d at 1313.[19]

The CIA heavily relies on our Circuit's statement that "[a]n ex-agent should demonstrate, however, at an appropriate time during the prepublication review, that such information is in the public domain." McGehee, 718 F.2d at 1141 n. 9; Def's Renewed Memo at 12. From this simple statement the CIA extrapolates the argument that "without *specific* guidance from plaintiff as to *exactly* which information he relies upon, the PRB has no meaningful way of making the careful comparison that is required in order to determine whether a *particular* assertion touching on classified intelligence matters is in fact in the public domain." Id. at 9 (emphasis added). This enhanced burden does not exist as a matter of fact or law. Other than the single generic statement in McGehee, there is no judicial decision, statute, Executive Order or CIA regulation that imposes the stringent burden articulated by the CIA for prepublication review challenges.

The CIA's complaint that it is not the "PRB's job to wade through the large stack of documents provided by plaintiff to try to match up each unsourced, classified assertion in

---

[19] See also Snepp, 444 U.S. at 513 n. 8 ("if in fact information is unclassified or in the public domain, neither the CIA nor foreign agencies would be concerned"); Wright v. FBI, 2006 U.S. Dist. LEXIS 52389, *28 (D.D.C. July 31, 2006)("Defendants' argument, even if accurate, does not explain how, regardless of how or when Wright learned of certain information, the Government could have any interest whatsoever in censoring it if it is already in the public domain").

plaintiff's memorandum to a book or article that could have been specifically referenced by the author, but was not" disregards the actual facts of this case and is not supported by the evidence.[20]

> i. *Boening Was Not Required To Provide Specific Source Citations In The "M Complaint" By Either The Governing CIA PRB Regulations Or By PRB Officials With Whom He Negotiated The Classification Review Of The Document*

The relevant CIA provision that existed at the time Boening authored the "M Complaint" and when the document was initially submitted to the PRB for review stated:

> When an author claims that information intended for nonofficial publication is unclassified because it has already appeared in public, the author may be called upon to identify any open sources for information that, in the Agency's judgment, originates from classified sources. Failure or refusal to identify such public sources or otherwise cooperate may result in refusal of authorization to publish the information in question. The author may also be requested to cite the source in a footnote.

Koch Decl., Ex. "B", § 2(c)(5).

In July 2005, the pertinent CIA PRB regulation was modified to state:

> When otherwise classified information is also available independently in open sources and can be cited by the author, the PRB will consider that fact in making its determination on whether that information may be published with the appropriate citations. Nevertheless, the Agency reserves the right to disallow certain open-source information or citations where, because of the author's Agency affiliation or position, the reference might confirm the classified content.

---

[20] Nor does the CIA's reliance on <u>McGehee</u> and <u>Lamont v. Dep't of Justice</u>, 475 F.Supp. 761, 772 n.43 (S.D.N.Y. 1989), <u>see</u> Def's Renewed Memo at 12, provide an accurate representation of either Court's discussion of whether the burden of searching public records fell to the Government. Besides the fact that <u>Lamont</u> is a FOIA case, and thus imposes a completely different legal burden, both references pertain to a situation where the plaintiff simply claims a fact is unclassified because it is in the public record, without providing proof, and whether the Government or Court must then conduct an exhaustive search in order to disprove this assertion. On the other hand, in this case Boening provided the specific sources of published information to the PRB to demonstrate where the information originated. Whether he adequately referenced the identified source in his actual document is not the test that exists for prepublication review challenges.

Koch Decl., Ex. "C", § 2(f)(4). This language was maintained when the regulation was amended in May 2007. Exhibit "5", § 2(f)(4).

These regulations make it poignantly clear that the "pinpoint citation" standard now asserted by the CIA during litigation differs from that which exists during administrative processing. Moreover, despite the cry of foul by the CIA as to the alleged lack of citations, the evidence before this Court demonstrates that the CIA never before requested the level of specificity it now seeks to impose.

By e-mail dated June 30, 2006, the PRB acknowledged, in fact, that Boening had basically provided sufficient sourcing and that the issue with the rewrite was strictly pertaining to the "old format", i.e., the "official-looking memo type". Koch Decl., Ex. "G". And, at no time, had the PRB ever requested that Boening specifically identify any text with a "pinpoint citation". To the contrary, Boening had reached an agreement with the then PRB Chairman that it was not necessary and all he needed to do was submit his public source material. Second Boening Decl. at ¶20.[21]

> ii. *There is A Significant Legal And Factual Distinction Between Adjudicating Whether Information Has Been "Officially Acknowledged" In FOIA Cases And Whether Information Is In The Public Domain In Prepublication Classification Challenges*

The CIA's reliance on Boening's alleged failure to provide "specific guidance" is an attempted expansion of the argument that the information contained in the "M Complaint" can still be properly classified despite being "publicly discussed," if there has been no official acknowledgment of the information. Def's Initial Memo at 37, citing

---

[21] The CIA goes to great pains to attack the perceived lack of detail with his sourcing. Although he explained in his declaration what formatting he used to source information, as well as discussed the extent of his conversations and agreements with the PRB, this type of attack demonstrates why both Boening and his counsel required access to the "classified" "M Complaint" in order to more fully articulate their factual response.

Fitzgibbon v. CIA, 911 F.2d 755, 765 (D.C. Cir. 1990); Def's Renewed Memo at 9

(citing cases).[22] This argument is a red herring. The CIA continues to rely exclusively on

analysis taken from FOIA decisions that is inapplicable to the present circumstances.[23]

The CIA does cite as support one of the first prepublication review cases ever decided

(which was an outgrowth of the Marchetti case, the first such legal challenge) by the

Fourth Circuit more than thirty years ago. Def's Initial Memo at 39, citing Knopf v.

Colby, 509 F.2d 1362, 1370 (4th Cir. 1975)("It is true that others may republish

previously published [press] material, but such republication by strangers to it lends no

additional credence to it. [Plaintiffs] are quite different, for their republication of the

material would lend credence to it, and, unlike strangers referring to earlier unattributed

reports, they are bound by formal agreements not to disclose such information.").

But this argument ignores the D.C. Circuit's clear admonition, which is binding on

this case, nearly a decade later rejecting the notion of that premise: "when the

information at issue derives from public sources, the agent's special relationship of trust

with the government is greatly diminished if not wholly vitiated". McGehee, 718 F.2d at

---

[22] Unlike the CIA, see Def's Renewed Memo at 10, Boening has every bit of confidence that this Court can meaningfully assess whether the "M Complaint" is completely sourced from the public documents submitted with his declaration at Exhibits "A" – "OOOO", especially when compared to the unredacted copy of the "M Complaint".

[23] See e.g., Fitzgibbon, 911 F.2d at 765 (finding disclosure of CIA station's location in Congressional report did not constitute official disclosure and CIA, due to national security concerns, could not be forced under FOIA to disclose actual location); Public Citizen v. Dep't of State, 11 F.3d 198, 202 (D.C. Cir. 1993)(rejecting FOIA request for records relating to meeting between Saddam Hussein and U.S. Ambassador April Glaspie despite public congressional testimony on meeting as testimony did not necessarily constitute official disclosure or necessarily specifically match requested information)The rationale behind the need for "specific citations" in an "official confirmation" FOIA case is obvious. When an agency withholds documents pursuant to a FOIA request and the requestor is asserting that the information has been previously "officially disclosed", the burden is on the requestor to identify "specific information in the public domain that duplicates that being withheld." Id. at 201-02.

1141. The CIA's argument also ignores its own interpretation of what is meant by "official information" and the relationship to publicly available materials. See 57 Fed. Reg. 876 (1992)(CIA regulation defining "official information" excludes items meant for public consumption, such as newspapers, magazines, books, and reference materials.[24]

Though perhaps falling short of the manufactured stringent burden the CIA wishes to impose on the prepublication review process, Boening more importantly has met the requirement as set forth by the law in this Circuit, as well as an interpretation of the CIA's governing regulations by the PRB as to what was required during the administrative process. Second Boening Decl. at ¶¶17-24.[25] Therefore, he is entitled to summary judgment as the CIA can not prevent the disclosure of the publicly available, unclassified information in his "M Complaint".

---

[24] The CIA does possess wide latitude to prevent current employees from publishing even personal opinions concerning publicly available newspaper articles. See 57 Fed. Reg. 54564 (1992), citing HR 6-2 (2)(h)(4)("For current employees and contractors, the Agency may also deny permission to publish statements or expressions of opinion that could reasonably be expected to impair the author's performance of duties, interfere with the authorized functions of the CIA, or have an adverse impact on the foreign relations or security of the United States.")(although from a proposed regulation, identical or similar language exists in the current regulation governing employee writings). For former employees, which is Boening's status, however, the CIA can only prevent the publication of properly classified information. See Koch Decl., Exs. "B" & "C".

[25] It would seem to be clearly established in law that a person whose behavior is being regulated is entitled to rely on the representations made by the agency as to what the regulation means. See Cox v. Louisiana, 379 U.S. 559, 568-69 (1965)(individuals would "justifiably tend to rely on ... [an] administrative interpretation of how 'near' the courthouse a particular demonstration might take place"); Omnipoint Corp. v. FCC, 78 F.3d 620, 636 (D.C. Cir. 1996)(elimination of provision "would have harmed many of the minority-owned businesses that had been relying upon the rule"); International Union, United Automobile, Aerospace & Agric. Implement Workers of Am. v. Brock, 783 F.2d 237, 248 (D.C. Cir. 1986)("employers will justifiably rely on the Department's interpretation").

**B.  The CIA Can Not Classify Information Concerning A Violation Of Law Or To Prevent Embarrassment**

Boening submitted the "M Complaint" to the CIA IG pursuant to the ICWPA on the grounds that he believed there was evidence, based on his reading of published newspaper and magazine accounts, that the CIA had engaged in "perceived violations of the law" with regard to an alleged "special relationship with a foreign individual who committed unlawful human rights violations and criminal acts." Def's Initial Memo at 8. The CIA may not classify information to "conceal violations of law, inefficiency, or administrative error," "prevent embarrassment to a person, organization, or agency," or "prevent or delay the release of information that does not require protection in the interest of the national security." EO 13,292, § 1.7(a)(1)-(2).

In renewing its request for summary judgment the CIA has backed away from its initial argument that the information contained in the "M Complaint" allegedly implicates "intelligence sources and methods" or "information concerning foreign relations or foreign activities of the United States, including confidential sources,"[26] and that disclosure of the information in the Memorandum could reasonably be expected to cause damage to national security.  Def's Initial Memo at 34, citing Exec. Order 12958, as amended, § 1.4(c)-(d). It also seemingly withdrew from its heavy reliance on FOIA case

---

[26] For unexplained reasons (at least in its public filings), the CIA also identified "foreign government information" as an applicable classification category. However, the very definition of the term, see EO 13,292, § 6.1 (r), demonstrates its inapplicability. All of the information contained within the "M Complaint" was derived directly from published newspaper and magazine accounts. Complaint at ¶¶7-8; Second Boening Decl. at ¶11. The only retort from the CIA to this point was to again criticize Boening for allegedly failing to include pinpoint citations to his sources. Def's Renewed Memo at 18 fn.11.

law, particularly with respect to the notion of judicial deference. Def's Initial Memo at 27-35. [27]

Instead, the CIA now relies upon the argument that Boening cannot prevail on this claim by "merely alleging illegal behavior is somehow sufficient to overcome the deference that is due to the government's affidavits averring that the information is classified for proper purposes." Def's Renewed Memo at 17.[28] But that is not the evidence before this Court. The CIA boldly pronounces, while conveniently relying upon its classified *in camera*, *ex parte* declaration, that were this Court to look behind the propriety of its classification decision "it would uncover nothing to suggest that the

---

[27] Even Boening agrees judicial deference has a role in prepublication review challenges. As this Court has itself recognized. Stillman, 2007 U.S. Dist. LEXIS 24206, *18-19 (noting "government is entitled to substantial deference in its classification decisions."). However, "[d]espite this high level of deference, the Court will not just rubber stamp the government's classification decision. To uphold the government's classification decision, the Court must satisfy itself 'from the record, *in camera* or otherwise, that the [government agencies] in fact had good reason to classify, and therefore censor, the materials at issue.'… The Court will not rely on any 'presumption of regularity' if rational explanations are missing." Id. at *19-20 (internal citations omitted), quoting McGehee, 718 F.2d at 1148-49.

[28] The CIA once again relies solely upon several FOIA decisions, most notably People for the American Way Foundation v. National Security Agency/Central Security Service, 462 F. Supp. 2d 21 (D.D.C. 2006), where the Court reviewed a challenge under EO 13,292, § 1.7. See Def's Renewed Memo at 17-18. However, the Court there noted that "[b]ecause of the deference due to the NSA in matters of national security, *and in the absence of any evidence to the contrary*, the Court must accept defendant's reasonable explanation that the materials were classified in order to prevent damage to the national security." 462 F.Supp.2d at 33 (emphasis added). In the instant matter Boening submitted undisputed (to date the CIA has never addressed the issue) evidence in the form of an official CIA statement to the contrary.

CIA's classification decision turned on a desire to prevent embarrassment or shield supposedly illegal behavior." Id. at 19.[29]

Conveniently the CIA continues to ignore Boening's sworn declaration that recounts a conversation he had in May 2002 with William McNair, who was then serving as the Information Release officer of the CIA's Directorate of Operations.[30] McNair informed Boening the real reason for the classification of the "M Complaint" when he stated:

> "*Look, Franz, do you think I care about* ["*M*"'*s name*]? *This is not about 'source protection,' this is about CIA's reputation. We don't want you to have any credibility. The problem with the "M" memorandum is that what you've written is all true.*"

Second Boening Decl. at ¶16. McNair also acknowledged that the "M Complaint" was based solely on open sources and that it seemed to be reasonably well-sourced. Id.

While perhaps this evidence is insufficient to permit summary judgment in favor of Boening, this is far more than "unsubstantiated speculation" as the CIA asserts and is sufficient to defeat the CIA's summary judgment motion. This is the exact circumstance where discovery is in order as a material fact conceivably remains in dispute.

**C.  The CIA Cannot Demonstrate That The Information In The "M Complaint" Is Owned By, Was Produced By Or For, Or Is Under The Control Of The Government Thereby Precluding It From Restricting Its Publication As "Classified"**

Although in its latest Motion the CIA has minimized its reliance on arguments that the "M Complaint" is properly classified it still cannot escape the fact it has no legal

---

[29] In light of the important First Amendment considerations, some of which are novel, at issue in this litigation this Court should respectfully accept the CIA's challenge. "[W]hile the CIA's tasks include the protection of the national security and the maintenance of the secrecy of sensitive information, the judiciary's tasks include the protection of individual rights". McGehee, 718 F.2d at 1149.

[30] At the time, McNair served in the same position now held by Ralph S. DiMaio, who has submitted declarations in support of the CIA's Motions.

standing to block publication of the contents of the memorandum given their public source origin. The governing Executive Order defines "information" as "any knowledge that can be communicated or documentary material, regardless of its physical form or characteristics, that is owned by, produced by or for, or is under the control of the United States Government." EO 13,292, § 6.1(s). It also defines "control" as "the authority of the agency that originates the information … to regulate access to information." Id.[31]

The CIA had initially asserted that because the information in Boening's "M Complaint" describes the government's intelligence activities, sources or methods or impacts foreign relations that it falls within the purview of Boening's Secrecy Agreement and is therefore under the "control" of the CIA. Def's Initial Memo at 32. It claimed that Boening's "passing assertions that he did not have access to the classified information in his Memorandum while employed at the CIA, see Complaint at ¶8, are insufficient to defeat the Agency's control over that information." Def's Initial Memo at 33.

The CIA also initially focused on the issue of whether former CIA employees who had access to classified information within the "control" of the CIA can claim that information they discovered through open source materials was not related to the classified information to which they had access, regardless of whether the employee ever actually exercised that access. Presumably the CIA's view was that since Boening

---

[31] Interestingly, as part of a litigation settlement in 1991, the CIA published a new regulation entitled "Nondisclosure Obligations and Prepublication Review; Access to and Release of Official Information". 57 Fed. Reg. 876 (1992). It specifically defined the related term of "official information," to include "all information, whether classified or unclassified, that is originated, received, *or controlled* by the Agency in pursuance of law or in connection with the discharge of official duties. This definition encompasses information that concerns sources and methods, is unique to the Agency, or can be traced to the Agency. *Excluded from this definition are … items meant for public consumption, such as newspapers, magazines, books, and reference materials*. Id. (emphasis added).

*possibly* had access to the allegedly classified information contained in his "M Complaint" while employed at CIA, regardless of whether he ever actually exercised that access to learn that information, Boening can not now claim that he based all of his research exclusively on open source materials. Id.

Instead of hitting that argument again head-on, the CIA instead dances around the premise and affirmatively seeks to undercut any prospective claim for discovery. Although Boening challenged the Agency to prove he had ever accessed – whether in an unauthorized or authorized manner – classified information pertaining to "M", while at the same time offering evidence that he did not, the CIA does little more than seek to ridicule that premise without articulating a substantive response. Def's Renewed Memo at 19. It further decries this argument as nothing more than a "red herring" claiming that it has not asserted "control" over the public source documents in Exhibits "A" – "OOOO", which it has amusingly "classified" but "merely asserts control over its own information" as if there is some distinction at this stage of the dispute. Id. at 9.

In the instant case, Boening cannot only prove he gathered the information exclusively outside of his employment at CIA and solely from open source materials, but further that at no time did he even have authorized access to the information while employed at the CIA. Complaint at ¶8; Second Boening Decl. at ¶11. In fact, the CIA has repeatedly conceded – particularly in order to defeat Boening's efforts to solicit outside intervention – that Boening did not have authorized access to any of the "classified" information he included within his "M Complaint". Def's Initial Memo at 22-23; Classified DiMaio Decl. ¶8; see also Koch Decl. ¶32 n.7 & Ex. D (letter from J. William Leonard)("[T]he CIA has represented that any access to classified information you

27

gained and which you included in your original complaint was not granted in accordance

with your duties at the CIA. They have further represented that you did not have a need-

to-know . . . the specific classified information accessed in preparation of your original

complaint."). And the CIA has characterized the "M Complaint" as a "personal record."

Koch Decl. at ¶27. The CIA cannot have it both ways.[32]

Moreover, the PRB has conceded that the only issues preventing publication were the

"official-looking" format of the "M Complaint" and, to a much lesser extent, what can be

described perhaps as a desire or preference, rather than requirement, to supplement

Boening's open source citations. Complaint at ¶12; Koch Decl., Ex. "G" ("If you rewrite

your M story in a different format, outside the official-looking memo-type it is currently

in; and attribute those statements to open sources in the new format (*as you basically

have*), there should be no problem with you getting your message out. *The deletions*

---

[32] The CIA initially tried to gloss over this fact by implying Boening perhaps
inappropriately accessed classified information without CIA consent. Def's Initial Memo
at 23, n.11 ("employees with access to classified systems can obtain classified
information on a wide variety of subjects"). Whether the implication that follows is true,
namely that the CIA is admitting its own failure to restrict access in compliance with
Executive Order 13,292, it remains to be seen and serves to fortify the need for discovery
to determine the extent of Boening's access while employed at CIA and whether he
actually accessed classified materials relevant to the information contained in the "M
Complaint". Most likely, and this seems to be the case in light of the CIA's revised
posture, this argument is nothing less than after-the-fact lawyering, especially since the
CIA at no time, and this issue obviously dates back more than six years, ever cited
Boening for a security violation or sought to revoke his security clearance (which he
actually still maintains to this day). Second Boening Decl. at ¶12. The focus now appears
to be "[i]f, as plaintiff contends, he never accessed classified information in drafting the
memorandum, he should be able to identify specific, public source materials for those
assertions in his memorandum that the CIA deemed to be classified." Def's Renewed
Memo at 8. The fact is, he has. The entire memorandum was based on the public
documents supplied to the PRB during the administrative process, and now to this Court
as part of the litigation. Second Boening Decl. at Exhibits "A" – "OOOO". There exists
no requirement that the CIA has identified that obligates a current/former employee to
specifically pinpoint cite every single sentence or even paragraph of a submitted writing.

*noted in our letter pertain to the information as presented in the old format and not to the information itself*")(emphasis added).

The PRB's statement evidences the true issue for the CIA: the formatting of the "M Complaint" (which ties directly into the embarrassment factor elucidated by CIA official William McNair). This bears no relation to the classification status, or the CIA's "control" of the information contained in the "M Complaint".

### D. The Information Concerning "M" And The Drafting Of The "M Complaint" Occurred Outside The Scope Of Boening's Employment And Secrecy Agreement

Not far removed from the argument that the "M Complaint" was based entirely on publicly available information, Boening is also entitled to summary judgment due to the fact that he obtained the information and created the document outside of the scope of his employment and secrecy agreement.[33] This Court recently issued a ruling in another prepublication classification challenge in <u>Stillman</u> wherein it noted that "the same logic that prevents current and former employees from revealing classified information *obtained by them during the course of their employment* prevents individuals who maintain a security clearance and contract with the government as either an employee or affiliate from disclosing classified information obtained while under such a contract and bound by a secrecy agreement." <u>Stillman</u>, 2007 U.S. Dist. LEXIS 24206, *16 (emphasis added). While there are notable distinctions between the factual and legal circumstances

---

[33] This argument does not eliminate Boening's obligation to submit any writings, even when created outside of the scope of employment, for prepublication review. Of course, that requirement extends into perpetuity. Although acknowledging this contractual obligation, Boening rejects the CIA's distortion of his so-called "concession" that this expands the CIA's limitation on only being able to "classify" information submitted by former employees that fell within the individual's scope of employment. Def's Renewed Memo at 7 fn.5.

that led to the instant matter and that of <u>Stillman</u>, one conclusion in particular resonates

with significant relevance.

> The Court is also persuaded by the government's *in camera* submissions
> that *but for* Stillman's high-level security clearances with the government
> and its contractors and the secrecy agreements he signed, Stillman would
> not have had access to or obtained the classified information that he is
> now attempting to disclose in his manuscript.

<u>Stillman</u>, 2007 U.S. Dist. LEXIS 24206, *17 fn.6 (emphasis added). This "but for"

determination that was accorded significant weight in <u>Stillman</u> is conspicuously absent in

Boening's case. Having relied *solely* upon published newspaper and magazine articles (as

well as declassified records of other federal agencies retrieved off the Internet), and never

once having had access to any related classified information from the CIA's systems,

Boening's relationship with the CIA had absolutely nothing to do with the contents of the

"M Complaint".[34] Notwithstanding Boening's employment with the CIA, he still would

have had access and obtained the information that he set forth in his "M Complaint".[35]

An analysis of the prior prepublication review cases recognizes an implicit recognition

that there was a limitation as to how far the scope of employment would extend to permit

an infringement upon a former employee's First Amendment rights.[36]

---

[34] Indeed, the only significance of Boening's CIA relationship was that he could submit
the memorandum internally. Of course, any John Q. Public could have written the same
memorandum utilizing the same sources and mailed the document to the CIA Director's
Office.

[35] Boening would submit the "but for" test appropriately relates to access and content of
the document in which the classification is being challenged, not whether the
memorandum overall would have been written in the first place had he not been a CIA
employee.

[36] <u>See e.g.</u>, <u>Snepp</u>, 444 U.S. at 510 n.3 (government may "protect substantial government
interests by imposing reasonable restrictions on employee activities that in other contexts
might be protected by the First Amendment."); <u>Stillman</u>, 319 F.3d at 548 (favorably
citing <u>Snepp</u>); <u>Marchetti</u>, 466 F.2d at 1317 ("Marchetti retains the right to speak and

1.  *The CIA's Argument That It Has The Lawful Authority To Block Publication Of Information Obtained Outside Of The Course Of Employment Or The Scope Of Any Executed Secrecy Agreement Renders Those Agreements Unconstitutionally Broad*

The government's argument is essentially that because a secrecy agreement may be active for an individual who is handling information "A", it lawfully applies to information "B", "C" and "D" as well. As noted above, that argument renders secrecy agreements too broad and, therefore, unconstitutional. See also National Federation of Federal Employees v. United States, 659 F.Supp. 1196, 1204 (D.D.C. 1988)(requirement that certain government employees not disclose any information which is "classifiable" was excessive restriction on speech which was more than necessary to protect the substantial government interest), on remand, American Foreign Service Association v. Garfinkel, 490 U.S. 153 (1989)(per curiam).

**E.  If Boening Is Not Entitled To Summary Judgment Outright, Discovery Is Necessary On His First Amendment Claim Before The CIA Deserves Judgment In Its Favor**

If the CIA is claiming that Boening did not exclusively derive the information within his "M Complaint" from publicly available newspaper and magazine articles, or other federal agencies' declassified documentation retrieved from the Internet, then Boening is entitled to discovery prior to the granting of summary judgment to further demonstrate that no evidence exists that he ever accessed – either in an authorized or unauthorized manner – information contained within the "M Complaint", or that the CIA had any control over the information in the document.

---

write about the CIA and its operations, and to criticize it as any other citizen may, but he may not disclose classified information obtained by him during the course of his employment which is not already in the public domain); Knopf, 509 F.2d at 1371 (secrecy agreement "of course, covers only information learned by [an employee] during their employment and in consequence of it. It does not cover information gathered by them outside of their employment or after its termination."); United States v. Snepp, 456 F.Supp. 178, 182 (E.D.V.A. 1978)(upheld government's "system of prior restraint against disclosure by employees and former employees of classified information obtained during the course of employment.").

Additionally, discovery would be appropriate to demonstrate that the CIA has improperly claimed the information in the "M Complaint" is classified solely in order to cover up embarrassment or a violation of law. The comment by William McNair, the former Information Release officer of the CIA's Directorate of Operations, justifies further exploration on this point. Mr. McNair would specifically be deposed to discuss his concession of:

> "*Look, Franz, do you think I care about ["M"'s name]?  This is not about 'source protection,' this is about CIA's reputation. We don't want you to have any credibility. The problem with the "M" memorandum is that what you've written is all true.*"

Finally, discovery would be conducted to expose agreements and understandings between Boening and the PRB as to whether specific pinpoint citations were required to support the unclassified nature of the "M Complaint" or whether supplying copies of the actual source documentation was sufficient. See Second Rule 56(f) Declaration of Mark S. Zaid, Esq. at ¶¶3-6 (dated February 10, 2008)("Second Zaid Rule 56(f) Decl."), attached as Exhibit "6".[37]

## II.  THE CIA'S MANDATORY DISCLAIMER AND DEMAND THAT HE MODIFY THE FORMAT OF HIS DOCUMENT IS BOTH UNCONSTITUTIONAL AND RUNS AFOUL OF THE APA

The CIA's 2005 PRB Regulations require former employees to include a disclaimer, unless waived in writing by the PRB. Koch Decl. Ex. "C". The CIA asserts that this

---

[37] See Wright, 2006 U.S. Dist. LEXIS 52389, * 27-9 (D.D.C. 2006)(finding existence of dispute concerning genuine issue of material fact where both former and current FBI Special Agent utilized newspaper accounts and various open source materials to draft manuscript criticizing FBI counterterrorism efforts and FBI claimed the information was not derived solely from open source materials but obtained by virtue of plaintiff's position within the FBI). See also Knopf, 509 F.2d at 1365 (CIA required to produce witnesses); Marchetti, 466 F.2d at 1312 (trial on merits held); Snepp, 456 F.Supp. at 179-180 (extensive discovery conducted including testimony from former and then current CIA Directors).

requirement does not violate the First Amendment. Def's Initial Memo at 23-26; Def's Renewed Memo at 14-17.

### A.  The CIA Cannot Impose Additional Restrictions Upon Former Employees Beyond That Of A Classification Review

The obligation upon former CIA employees to submit to the prepublication review process is contractual in nature. It arises from the language in a secrecy agreement that all CIA employees execute. Koch Decl., Ex. "A". Although it is undisputed that the prepublication review process itself is not unconstitutional as long as the information sought to be censored was obtained by and through an employee's work for the government, the CIA's attempt to mandate the use of a disclaimer must fail because it has overextended its authority. The ability of the CIA to regulate or control matters surrounding the dissemination of information by its former employees is limited to protecting classified information *only*. That authority is derived from the lawful obligation imposed by a secrecy agreement.[38]

However, Boening's secrecy agreement contains no mention of any requirement to include a disclaimer in any published work. Compare Koch Decl., Ex. "A" (Secrecy Agreement, ¶¶4-6) to Koch Decl., Ex. "B" (1995 PRB Regulations) at ¶i.5 & Ex. "C" (2005 PRB Regulations) at ¶b.4. Moreover, the mandatory disclaimer sought to be forced upon Boening was enacted internally by the CIA four years after he submitted the "M

---

[38] The CIA's fallback argument appears to be that "[n]othing in the First Amendment or plaintiff's secrecy agreement prohibits the CIA from requiring employees to specify that personal writings touching on classified information do not constitute official statements of agency policy." Def's Renewed Memo at 15. Just as applicable, of course, is the argument that there is nothing within either the First Amendment or Boening's secrecy agreement that requires him to include the disclaimer. Unfortunately for the CIA the burden falls upon it, as the Government entity that is seeking to infringe upon Boening's First Amendment rights, to demonstrate why its' disclaimer is constitutionally valid rather than the other way around.

Complaint" to the CIA, and one year after he had submitted it to the PRB. The previous

regulation, which was issued in 1995, merely encouraged, instead of required, the

insertion of a disclaimer.[39] <u>See</u> Koch Decl. Ex.. B, ¶2.i.(5).

### B. Even If The CIA Can Generally Impose Additional Requirements Upon Former Employees The Specific Mandating Of An Explicit Disclaimer Runs Afoul Of The First Amendment

Even if it is determined that the disclaimer requirement is applicable to Boening's

writing, case law does not support the CIA's contention that its disclaimer passes

constitutional muster. The CIA claims that a disclaimer is less restrictive of First

Amendment rights than the prepublication review process itself, and that since the

prepublication review process has been found to be constitutional, then by necessity a

disclaimer must also be constitutional. Def's Initial Memo at 24-25, <u>citing</u> <u>Weaver v.

U.S. Information Agency</u>, 87 F.3d 1429, 1453-54 (D.C. Cir. 1996)(Wald, J., dissenting);

<u>Snepp</u>, 444 U.S. at 510 n.3.  <u>See also</u> Def's Renewed Memo at 15-16 (same).

As an initial matter, it goes without saying that the CIA's primary support for the

contention that a disclaimer is less restrictive than the prepublication review process is

based upon a dissenting opinion in the <u>Weaver</u> case. Def's Initial Memo at 24; Def's

Renewed Memo at 16. Additionally, the CIA further misunderstands the rationale

underlying Judge Wald's reasoning. She was suggesting that the prepublication review

---

[39] The 1995 Regulations required the disclaimer for current employees, which is perfectly understandable. Koch Decl. Ex. "B", ¶2.i.(5). The rationale is not because the contents of a current employee's writings automatically harm national security, but because they could interfere with the effective operation of the CIA to have a current employee perhaps contradicting its official policies. However, while Boening was still a CIA employee when he submitted the "M Complaint", he retired on August 13, 2005, months before the PRB even responded to his submission with its initial concerns. Therefore, for purposes of the CIA's ability to censor Boening's First Amendment rights, the CIA's reach only extends to the limitations it has over former employee – classified information.

process be *replaced* or that the Government's interests were satisfied solely by a disclaimer requirement that is less restrictive than the prepublication review requirement that was in place. <u>Weaver</u>, 87 F.3d at 1453-54.[40] If that is the CIA's preference, that all former employees can simply include its stated disclaimer rather than submit their writing to prepublication review, Boening would strongly support such a policy and willingly include the disclaimer in the "M Complaint" and all future writings. But neither <u>Weaver</u>, whether in the dissent or not, nor any other case, supports the CIA's proposition that <u>both</u> the burden of a prepublication review requirement <u>and</u> the inclusion of a disclaimer is constitutional under the First Amendment.

Alternatively, the CIA claims that even if its disclaimer does violate the First Amendment, it would still be constitutional in the context of the prepublication review process. Def's Memo at 25. Its' rationale is based on the fact that it retains the authority, in general, to "protect substantial government interests by imposing reasonable restrictions on employee activities that in other contexts might be protected by the First Amendment." <u>Snepp</u>, 444 U.S. at 510. Thus, according to the CIA, a disclaimer is constitutional because ensuring that current *and former* employees who had "access to sensitive national security information do not publish personal documents appearing to be official Agency records" qualifies as a "substantial government interest." Def's Initial Memo at 25 (emphasis added).[41]

---

[40] In any event, the constitutionality or restrictiveness of a disclaimer in relation to the prepublication review process was not considered in <u>Weaver</u> and therefore provides no support to the CIA's argument that its disclaimer is constitutionally valid.

[41] Contrary to the CIA's belief, Boening has no desire to "cloak himself in the CIA's mantle while producing supposedly personal writings". Def's Renewed Memo at 14. More importantly, the CIA proclaims, without support, that a failure to include its disclaimer somehow "heightens the unacceptable risk that readers and foreign

The CIA's argument constitutes a considerable expansion of what the <u>Snepp</u> Court considered to be a "substantial government interest." 444 U.S. at 511-12. Rather than even attempt to articulate an actual substantive reason for the necessity of national security to require the disclaimer, the CIA speculates that preventing publication of documents by former employees that *could* be mistaken as official CIA records is an equivalent "substantial government interest" in such a manner as preventing the unauthorized disclosure of classified information and even to the extent of ensuring that the publication of unclassified information does not compromise classified information or sources.[42] <u>See</u> Def's Initial Memo at 25 ("Hence, a reader might easily mistake the Memorandum as having been created as part of official Agency business"). This argument is contrary to the CIA position expressed numerous times in FOIA litigation concerning the official "worth" of a former employee's writings. Courts have repeatedly held that merely because a former employee, even if previously a high level official, states a fact that this does not constitute an official acknowledgment of anything.[43]

---

intelligence services would wrongly construe his unsourced speculations as statements of classified fact and official agency position." <u>Id</u>. For one thing, it would seem just as unlikely that foreign intelligence services are as unintelligent as the CIA would imply. Nevertheless, were this such a grave concern to the CIA, which has required prepublication review for at least 40 years, it would include such an obligation in its secrecy agreements or at least would have mandated the requirement long before 2005.

[42] It should be noted that the CIA's argument also attempts to expand the quoted language from <u>Snepp</u> to include the activities of former employees, as opposed to just current employees. Def's Memo at 25.

[43] <u>See e.g.</u> <u>Afshar v. Department of State</u>, 702 F.2d 1125, 1133 (D.C. Cir. 1983) (information reported in book by former CIA official did not constitute official acknowledgment); <u>Phillippi v. CIA</u>, 655 F.2d 1325, 1330-31 (D.C. Cir. 1981)(same, regarding information reported in book by former Director of Central Intelligence). It seems somewhat disingenuous then for the CIA to ascribe additional credibility to Boening simply to support its own argument when, in fact, Boening's position with the CIA added no substantive value to his "M Complaint".

Nor is the CIA's argument consistent with the law. The courts have consistently held

that regulations which burden--even if they do not completely restrict--employees' speech

nonetheless may run afoul of the Constitution. See e.g., NTEU, 513 U.S. at 475; Sanjour

v. EPA, 56 F.3d 85 (D.C. Cir. 1995)(en banc). In those cases where the government

restricts the speech of its employees, it must show that the harms from reducing

employees' speech are outweighed by the government's interest in efficiently carrying

out its mission by minimizing harms that "are real, not merely conjectural." NTEU, 513

U.S. at 475. The CIA has failed to meet this test.

### C. The CIA Has No Authority Or Control Over the Format That Boening Chooses To Utilize Whether It Accurately Reflects The Original State Of The Document Or Even As A Journalistic Tool

Boening drafted the "M Complaint" using the same memorandum format learned in

grade school: headings of "To", "From" and "Subject". Exhibit "2". The CIA complains

that this format "incorrectly suggests the memorandum was drafted as part of his official

CIA duties." Def's Renewed Memo at 14. Therefore, according to the CIA, portions of

the document are "classified" when written in this format. Id. at 14-15. This is the crux of

the CIA's argument. See Koch Decl., Ex. "G" ("If you rewrite your [Foreign Individual's

name] story in a different format, outside the official-looking memo-type it is currently

in; and attribute those statements to open sources in the new format (*as you basically*

*have*), there should be no problem with you getting your message out. *The deletions*

*noted in our letter pertain to the information as presented in the old format and not to the*

*information itself*")(emphasis added).

This argument is baseless. Beyond the legal interpretation that "confusion", to the

degree it would even exist, is not tantamount to a determination that the information is

classified, thereby rendering the CIA's authority over the format of a document authored by former employees to be null and void, just one simple fact illustrates the absurdity. The CIA approved the release of Boening's other memoranda that were styled in a similar if not identical format to that of the "M Complaint". <u>See</u> Exhibit "4".

To that point all the CIA can do is counter-assert that this argument is a "red herring", Def's Renewed Memo at 14, and cite to some generic – irrelevant – conclusions from FOIA decisions. <u>Id</u>. at 15. This is a First Amendment case, and Boening's interests are at their height. If the *information* in Boening's "M Complaint" is <u>not</u> classified, that is the end of the story. The CIA has no authority over its former employee beyond that aspect, and that includes the formatting of the document (which, of course, does not change the classification status of the underlying *information*).

### III. BOENING POSSESSES STANDING TO CHALLENGE THE CIA'S FINAL DECISION THAT HE WAS NOT AN AUTHORIZED HOLDER UNDER ITS REGULATIONS

Pursuant to Section 1.9 of EO 12,958 (now Section 1.8 in EO 13,292), Boening sought to challenge the CIA's overclassification of any documents that might exist relating to "M" and certainly with respect to his "M Complaint".

The CIA argues that Boening lacks standing to raise an APA claim on his ability to raise a classification challenge because the "M Complaint" was (1) drafted in his personal, as opposed to official, capacity, and (2) because the CIA did not arbitrarily determine that Boening was not an "authorized holder" of the "classified" information in his "M Complaint". Def's Initial Memo at 19, 23; Def's Renewed Memo at 24.

### A.  Boening Can Demonstrate That He Has Incurred Substantive Harm Sufficient For Purposes Of Standing

It is undisputed that mere allegations of error, untethered from any substantive harm, are insufficient to satisfy Article III for purposes of standing.  See Center for Law and Educ. v. Dep't of Educ., 396 F.3d 1152, 1160 (D.C. Cir. 2005). The CIA argues that Boening has conceded that he drafted the "M Complaint" in his personal capacity by virtue of his statement that the document consisted of Boening's "personal assessment of the individual." Def's Initial Memo at 20. Thus even if CIA committed a procedural error by erroneously determining that Boening was not an "authorized holder," he has still failed to allege any substantive harm and concrete injury following from the erroneous determination and therefore lacks standing. Id.

To clarify, all Boening has conceded is that he *personally* drafted the "M Complaint". See Exhibit "7" ("I do not agree with OIM's assertion that these documents are unofficial but I am willing to submit them to your branch on the chance that they will be approved for release"). He submitted the "M Complaint" in his official capacity as an employee of the CIA pursuant to Section 17(d)(5) of the CIA Act, 50 U.S.C. § 403q(d)(5).

The CIA has chosen to construe Boening's arguments concerning substantive harm as an attempt to raise two new APA claims not addressed by his Complaint. Def's Renewed Memo at 28. However, Boening's arguments are appropriately before this Court. The CIA brought this issue to the Court when it challenged Boening's standing. It cannot now complain when Boening responds. In evaluating issues of jurisdiction under Rule 12(b)(1), the court must construe the complaint liberally, and give the plaintiff the benefit of all reasonable inferences. See Tozzi v. EPA, 148 F. Supp. 2d 35, 41 (D.D.C. 2001), citing Scheuer v. Rhodes, 416 U.S. 232 (1974). Moreover, complaints do not have to

39

"plead law or match facts to every element of a legal theory." <u>Krieger v. Fadely</u>, 211 F.3d 134, 136 (D.C. Cir. 2000).

    1.   *The CIA's Determination That Boening Pursued His Classification Challenge In His Personal Capacity Violated The APA*

The CIA argues that a whistleblower complaint is, by its nature, "a personal communication between a federal employee, the IG, and/or Congress," and that because it represents the federal employee's personal views, it cannot be construed as "facilitating agency business." Koch Decl. ¶27. This view too narrowly interprets the important role that whistleblowers play in contributing to governmental functions. The submission of an ICWPA complaint is more than a mere "personal communication". It should be held to constitute facilitation of CIA business because the ICWPA was specifically designed for current government employees to raise issues of "urgent concern" to Congress.

The ability to submit ICWPA complaints is limited to a select group – federal employees – and necessarily and logically involves topics regarding which the federal employee would be uniquely qualified to view as a potential matter of "urgent concern" due to the employee's training and experience. To attempt to label ICWPA complaints as "personal documents" merely because the issue could expose the CIA to embarrassment does not serve as a justification for the CIA to denigrate their importance.

Although the arguments contained in the "M Complaint" may not represent the CIA's official position that has no bearing on whether the document or the views expressed therein facilitate official CIA business. The entire purpose of the ICWPA was to provide a secure and protected line of communication between federal employees and Congress concerning matters of "urgent concern." This protection was deemed to be necessary because of the fear that federal employees would otherwise not raise such concerns

without some form of protection from retaliatory action. The notion that drawing the attention of the CIA's OIG and Congress to such matters does not constitute facilitation of official CIA business merely because it is the not official CIA *position* evidences a fundamental lack of understanding of the purpose behind the ICWPA.

Section 1.9 of EO 12,958 provides additional support to the idea that ICWPA complaints are both drafted by "authorized holders" of information in their official capacity and that the act of drafting and submitting such complaints constitutes a facilitation of official CIA business. It notes that "[a]uthorized holders of information who, in good faith, believe that its classification status is improper are encouraged *and expected* to challenge the classification status of the information …")(emphasis added). This is not a legislatively adopted statute. It is not an agency regulation. This language emanates directly from an order of the President of United States. One can not find higher authority for the designation of official policy as to how federal employees, such as Boening, are to act under these types of circumstances.

> 2. *The CIA's Determination Concerning The Capacity In Which Whistleblower Complaints Are Drafted Constitutes A Violation Of The APA's Notice-And-Comment Rulemaking Provisions*

The ICWPA does not address, explicitly or implicitly, whether whistleblower complaints were to be considered as "personal" or "official" documents for purposes of classification challenges under Section 1.9 of EO 12958. See Public Law No: 105-272. When a statute is silent or ambiguous as to the intended construction of a particular piece of statutory language and does not explicitly leave a gap for an agency to fill, the reviewing court must decide whether the agency's interpretation of the statute was reasonable and permissible. See Chevron v. Natural Resources Defense Council, 467

U.S. 837, 843 (1987); Nat'l Ass'n. of Clean Air Agencies v. EPA, 489 F.3d 1221, 1228

(D.C. Cir. 2007) . If the interpretation is reasonable and permissible, it must be upheld

unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with the law. 5 U.S.C. §706(2)(A); Nat'l Ass'n. of Clean Air Agencies,

489 F.3d at 1228; Wright, 2006 U.S. Dist. LEXIS at *32.

The CIA's interpretation is unreasonable, arbitrary and "not in accordance with the

law" in that the CIA failed to abide by the APA's notice-and-comment rulemaking

provisions. See 5 U.S.C. §552(a); 5 U.S.C. §553(b). When the CIA chose to interpret

ICWPA complaints as being drafted in a "personal capacity" and thereby removed the

ability of authorized holders to challenge the classification status of the information in

such complaints, the CIA in effect prescribed a "substantive rule" and subsequently was

obligated to undertake notice-and-comment rulemaking. See Chrysler Corp. v. Brown,

441 U.S. 281, 301 (1979).

Although there are three exceptions to the notice-and-comment rulemaking

requirement, namely if the agency action constitutes "interpretative rules, general

statements of policy, or rules of agency organization, procedure or practice," 5 U.S.C.

§ 553(b)(A), the only potentially applicable exception is the "interpretative rule"

exception.[44] "Interpretative rules" are limited to "administrative construction of a

---

[44] The CIA's determination can not constitute a "general statement of policy," as "[a]gency action can not be a general statement of policy if it substantially affects the rights of persons subject to agency regulations." Pickus v. United States Bd. of Parole, 507 F.2d 1107, 1112 (D.C. Cir. 1974); Syncor Int'l Corp. v. Shalala, 127 F.3d 90, 94 (D.C. Cir. 1997). The CIA's unilateral construction of ICWPA complaints for purposes of classification challenges under Section 1.9 of EO 12958 substantially affects Boening's rights, as well as those of every current and former CIA employee, to raise an important classification challenge. The CIA's determination also cannot constitute a "rule of agency organization, practice, or procedure," as matters relating to "practice or

statutory provision on a question of law reviewable in the courts." <u>Air Transport Association of America, Inc. v. FAA</u>, 291 F.3d 49, 55 (D.D.C. 2002).[45]

Unlike an "interpretative rule," a "substantive rule" modifies or adds to a legal norm based on the agency's own authority, and since that authority flows from a Congressional delegation to engage in supplementary lawmaking, the APA requires compliance with notice and comment. <u>Syncor</u>, 127 F.3d at 95. The CIA's construction of the status of ICWPA complaints constitutes a substantive regulation, as it "interprets" the CIA's obligations in a manner that carries the "force and effect of law" and does not merely provide guidance concerning a duty "fairly encompassed" within EO 12958, as amended, or the ICWPA, as neither addresses the notion of affording authority to agencies to determine what documents are "official" for purposes of classification challenges.

Even if the CIA's construction could be considered as an "interpretative rule," it would still be subject to notice-and-comment rulemaking as it would constitute a modification of an existing rule. <u>Air Transport Association</u>, 291 F.3d at 56. As the CIA's Motion and supporting declarations make quite clear, prior to the appointment of a new Executive Secretary of the ARP ("ES/ARP") in 2002, the CIA had considered whistleblower complaints as "official" documents within the jurisdiction of the ARP to consider for purposes of classification challenges. <u>See</u> Def's Initial Memo at 9-10; Koch.

procedure" have not been found to include any action which goes beyond formality. <u>Pickus</u>, 507 F.2d at 1113.

[45] <u>See also</u> <u>Paralyzed Veterans of Am. v. D.C. Arena L.P.</u>, 117 F.3d 579, 588 (D.C. Cir. 1997)("If the statute or rule to be interpreted is itself very general, using terms like "equitable" or "fair," and the "interpretation" really provides all the guidance, then the latter will more likely be a substantive regulation"); <u>Pickus</u>, 507 F.2d at 1113 (finding that agency's action was not mere interpretation of statute's meaning but rather consisted of "self-imposed controls over the manner and circumstances in which the agency will exercise its plenary power," and had effect of law and not reviewable except for arbitrariness).

Decl. at ¶¶23-25. Even if Boening is apparently the first, and so far only, CIA employee to have raised this issue and received the contradicting interpretations, the CIA's initial decision to view the "M Complaint" as being drafted in Boening's "official capacity" and then reversing that decision constitutes a modification of an existing interpretation and necessitates that the CIA undertake notice and comment rulemaking.

Of course, there is no dispute that an agency enjoys a manner of informed discretion as to whether it can undertake adjudication rather than rulemaking. <u>SEC v. Chenery Corp.</u>, 332 U.S. 194 (1947). Additionally, Boening recognizes that this very Court issued a ruling touching upon this issue in favor of an agency. <u>Shays v. FEC</u>, 511 F. Supp. 2d 19, 31 (D.D.C. 2007)("It is not surprising, therefore, that plaintiffs have been unable to cite any case where a court, absent a clear directive from Congress, required an agency to institute rulemaking in the place of adjudication. This Court will not be the first."). However, the Supreme Court also recently acknowledged that a window is open for courts to retain authority to exercise judicial review over an agency's decision to utilize adjudication rather than rulemaking. <u>Massachusetts v. EPA</u>, 127 S. Ct. 1438, 1459 (2007). While the Supreme Court noted that any such judicial review would be "extremely limited" and "highly deferential", judicial review nonetheless is permissible. <u>Id</u>.[46] Therefore, the CIA's failure to abide by the APA's notice-and-comment rulemaking

---

[46] Furthermore, unlike in previous cases where the agency's decision to utilize adjudication related to an issue that was more aptly suited for a case-by-case determination, <u>Shays</u>, 511 F. Supp.2d at 25 (lending support to the practice of agency adjudication when the "problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule"); <u>American Gas Assn' v. FERC</u>, 912 F.2d 1496, 1519 (D.C. Cir. 1990)("The Commission seems on especially solid ground in choosing an individualized process where important factors may vary radically from case to case."), the CIA's decision in the instant case will have the effect of depriving every CIA employee who retains "authorized holder" status over

requirements constituted conduct that was arbitrary and "not in accordance with the law," and thereby demonstrates that Boening has incurred substantive harm.

### 3. Boening Can Demonstrate That There Is Still Meaningful Relief He Can Obtain From The Court

Assuming that Boening can demonstrate a concrete injury, the CIA argues that his injury is not redressable because there is no meaningful relief Boening could obtain from this Court. Def's Initial Memo at 21. The proper remedy, asserts the CIA, would be to remand the matter to the CIA so that the ARP could adjudicate the merits of the classification challenge. Id. Given that both the ARP and the Executive Director of the ISCAP, the entity to which ARP determinations may be appealed, has already concluded that the "M Complaint" was properly classified, any remand, according to the CIA, would be a "hollow, meaningless exercise." Id. at 21-22.

Yet the CIA never completed the process it was required to follow. As the CIA itself explains in considerable detail, on July 2, 2001, Boening submitted the "M Complaint" to the ARP for a classification challenge. Id. at 9. The ARP referred the Memorandum to the ACRMP, which, on July 25, 2001, agreed that the paragraphs marked classified (save one) were properly labeled as such. Id. The ACRMP met again on September 4, 2001, to consider specific issues identified by Boening in his July 2, 2001 letter and reaffirmed its initial determination that the "M Complaint" was properly classified. Id. at 9-10. On

---

"classified" information from ever submitting an ICWPA complaint as part of their official duties. Presumably even the CIA itself would concede that a categorical rule stating that ICWPA-related whistleblower complaints are to be considered "personal" documents for purposes of classification challenges would more effectively avoid the prospect of confusion, as was the case here with the ARP. See Public Citizen, Inc. v. Mineta, 427 F. Supp.2d 7, 13-14 (D.D.C. 2006)(upholding the issuance of categorical rules instead of case-by-case adjudications on the basis that the latter would undermine the agency's ability to implement the regulations).

September 12, 2001, the ACRMP wrote to the Chair of the ARP, setting forth its

decision, and Boening promptly appealed the ACRMP's decision to the ARP. Id.

Although the ARP scheduled a formal appeal, it was at this point that the ES/ARP and

the CIA made the decision that whistleblower complaints drafted pursuant to the ICWPA

were not official CIA documents and therefore not within the jurisdiction of the ARP. Id.

Because of the CIA's arbitrary decision, Boening was deprived of the administrative

appeal to the ARP.

In addition, while the statements by the Executive Secretary of the ISCAP, ISOO

Director William Leonard ("Leonard"), are informative they are in no way authoritative

or conclusive, as they do not represent a formal decision by the ISCAP.[47]  The ISCAP

does not consist merely of the Executive Secretary, but rather consists of senior-level

representatives from the Departments of State, Defense, and Justice, as well as the CIA,

the National Archives, and the Assistant to the President for National Security Affairs.

Exec. Order 12,958, as amended, § 5.3(a)(1); 32 C.F.R. § 2001.83(A)(defining the

membership of the ISCAP as the appointments made under Section 5.3(a) of Executive

Order 12958). The regulations and the Executive Order do not, at any point, accord

authority to the Executive Secretary to make a conclusive and authoritative determination

outside of the established framework. Id. at § 5.3(b); 32 C.F.R. § 2001.83(E)-(F)

(stipulating that the Executive Secretary must notify the senior-level representatives of

---

[47] It should be noted that Mr. Leonard's letter focused solely on the issue of whether
Boening was an "authorized holder" and did not address the CIA's interpretation of
whistleblower complaints drafted pursuant to the ICWPA as they pertain to classification
challenges. Def's Initial Memo at 21. Furthermore, Mr. Leonard's interpretation of
"authorized holder" incorrectly relied upon the ISOO definition and not the applicable
CIA definition, which differed significantly in scope. Compare 32 C.F.R. § 1907.2 (CIA
reg) to 32 C.F.R. § 2001.14 (ISOO reg).

the relevant agencies of the existence of the appeal, present those representatives with an appeal file, and that the ISCAP as a whole must vote to either affirm, reverse or remand the matter).

As a supplemental matter, there has been no evidence provided to demonstrate what information was provided to Mr. Leonard by the CIA prior to his determination. 32 C.F.R. § 2001.83(E)(stating that the appeal file will include "*all records pertaining to the appeal*")(emphasis added).

4. *Boening Can Demonstrate That The CIA Arbitrarily And Erroneously Determined That He Was Not An "Authorized Holder" Of The Information In The Memorandum*

The CIA counters that even if it is determined that Boening can demonstrate a concrete injury and that the injury is redressable, thereby satisfying the requirements for standing, the Court should still dismiss his claim under Rule 12(b)(6), or in the alternative award summary judgment to the CIA, because the CIA did not err in determining that Boening is not an "authorized holder" of the classified information in the "M Complaint". Def's Initial Memo at 22.

The CIA cites to three different sources for definitions of what constitutes an "authorized holder" and what is required to permit "access to specific classified information." Id. The CIA's regulations define an "authorized holder" as one who "holds a security clearance from or has been authorized by the Central Intelligence Agency to possess and use on official business classified information." Id. citing 32 C.F.R.

§ 1907.02(b).[48] ISOO's regulations contradictorily define an "authorized holder" as "any individual, including an individual external to the agency, who has been granted access to specific classified information." Id., citing 32 C.F.R. § 2001.14. Finally, the CIA points to EO 12,958, as amended, wherein it sets forth three prerequisites that must be met before a person may *access* specific classified information. Def's Initial Memo at 22.[49]

The CIA argues that because there was never any need-to-know determination awarding Boening access to the specific "classified" information contained in the "M Complaint" then Boening does not meet the definition of an "authorized holder". Id. at 23.[50] However, this argument is flawed for the simple reason that it relies on the ISOO regulation's narrow definition of "authorized holder" rather than the CIA's own more expansive and applicable definition.

While per the ISOO regulation an individual is apparently required to have had access to the specific information that is being challenged, the CIA's regulation is simply not as narrow. A plain reason of the provision reflects that an "authorized holder" need only possess a valid security clearance or otherwise be authorized by the CIA to "possess and use" classified information in general. 32 C.F.R. § 1907.01(b). Nowhere in the CIA's

---

[48] A "challenge" under this provision is defined as "a request in the individual's official, not personal, capacity and in furtherance of the interests of the United States; 32 C.F.R. § 1907.02(d). The CIA fails to distinguish that a document can be written in an individual's "personal" capacity, i.e., away from the office and on his own time, but still submitted in his "official" capacity.

[49] "A person may have access to classified information provided that: (1) a favorable determination of eligibility for access has been made by an agency head or the agency's head designee; (2) the person has signed an approved nondisclosure agreement; and (3) the person has a need-to-know the information." EO 12,958 § 4.1(a).

[50] Ironically, the CIA's decision to classify information within the "M Complaint" but then later grant Boening access to the unredacted document during internal proceedings constitutes the issuance of a "need-to-know" determination.

regulation does it indicate that the individual must have had access to the specific classified information that is being challenged. Given that Boening, as a CIA employee, indisputably possessed a valid security clearance and was authorized by the CIA to "possess and use" classified information, he met the parameters of the CIA's definition.

Therefore, the CIA's determination that Boening lacked "authorized holder" status was indeed arbitrary and erroneous and is without merit.

## IV. BOENING'S APA CLAIM CONCERNING THE CIA'S FAILURE TO ADJUDICATE THE PREPUBLICATION REQUEST WITHIN 30 DAYS IS NOT MOOT AND THE EXCESSIVE UNDUE DELAY IS UNCONSTITUTIONAL

The CIA continues to argue that this Court lacks jurisdiction over Boening's APA claim concerning the CIA's failure to adjudicate Boening's prepublication request within 30 days because it is moot. Def's Renewed Memo at 21. Under Article III of the Constitution, federal courts are courts of limited jurisdiction that can only decide "'actual, ongoing controversies.'" Honig v. Doe, 484 U.S. 305, 317 (1988). Even if an action poses a live controversy when filed, the mootness doctrine requires "a federal court to refrain from deciding it if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" Transwestern Pipeline Co. v. FERC, 897 F.2d 570, 575 (D.C. Cir. 1990). The test for mootness comprises two requirements: (1) there is "no reasonable expectation … that the alleged violation will recur," and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." County of Los Angeles v. Davis, 440 U.S. 625, 632 (1979).

### A.  Boening's Case Demonstrates The Circumstances Surrounding The CIA's Prepublication Review Process Is Capable Of Repetition Yet Evading Review

Although this Court recently ruled on a similar argument set forth in <u>Stillman</u>, Boening's case presents a slightly different set of circumstances.[51] For one thing, Boening's submission has not been properly reviewed through the ARP process. Additionally, Boening plans to continue submitting writings to the CIA PRB for classification review. Second Boening Decl. at ¶29. Thus, this is the type of case where the injury is "capable of repetition yet evading review".

This exception waives the mootness doctrine when "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration" and "there was a reasonable expectation that the same complaining party would be subjected to the same action again." <u>Alliance for Democracy v. FEC</u>, 335 F. Supp. 2d 39, 44 (D.D.C. 2004).[52]

The CIA's contentions to the contrary, this case is more than appropriate to invoke the "capable of repetition yet evading review" exception. It would seem reasonable to presume that a 30 day period constitutes too short a period to gain meaningful judicial relief. <u>See</u> <u>e.g.</u>, <u>Burlington Northern Railroad Co. v. Surface Transportation Bd.</u>, 75 F.3d 685, 690 (D.C. Cir. 1996)(noting that agency conduct of less than two years duration will

---

[51] Plaintiff's "APA claim is moot because there is no further relief that this Court can provide as to that claim. Stillman has already received the final classification decision that he sought from the defendant agencies. Accordingly, this Court lacks subject matter jurisdiction over Stillman's APA claim and dismisses it as moot under Rule 12(b)(1) of the Federal Rules of Civil Procedure." <u>Stillman</u>, 2007 U.S. Dist. LEXIS 24206, *9-10.

[52] <u>See also</u> <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Services, Inc.</u>, 528 U.S. 167, 174 (2000)("[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case."); <u>Boag v. MacDougall</u>, 454 U.S. 364, 364 (1982)(transfer to another prison did not moot prisoner's damages claim arising from his allegedly being placed in solitary confinement without notice or hearing); <u>Jersey Cent. Power & Light Co. v. New Jersey</u>, 772 F.2d 35, 41 (3d Cir. 1985)("The availability of damages or other monetary relief almost always avoids mootness….").

ordinarily evade review). And as stated, Boening continues to submit documents for review. Second Boening Decl. at ¶29.[53]

In this case, the CIA has offered no evidence to establish a "reasonable expectation" that it will not employ the same tactics in the future. Indeed, all past evidence indicates that the PRB's excessive delays and reversals constitute a routine pattern and practice. See Second Zaid Rule 56(f) Decl. at ¶7. Certainly, the CIA's continuing refusal to grant permission to publish the other portions of the "M Complaint" – which it even admits are in the public domain – strongly indicates that the same violation may recur as it is ongoing now.

### A. The Repeated And Continuing Excessive Undue Delays Experienced By The CIA's PRB Constitutes Unconstitutional Suppression Of Protected Speech

Alternatively, the CIA further argues that if the claim is not found to be moot the Court should nonetheless dismiss it pursuant to Rule 12(b)(6), or award summary judgment, because "there is no regulation requiring the CIA to adjudicate all prepublication requests within 30 days, and because the CIA did not unreasonably delay action on [Boening's] submission." Def's Initial Memo at 18. Boening's secrecy

---

[53] The CIA challenges Boening's claim of suffering similar delays in the future by virtue of the fact that his November 12, 2007 submission – which Boening identified in his initial declaration as evidence of the likelihood of future harm – was reviewed, process and approved for publication by the PRB by November 15, 2007, four days before Boening even filed his declaration with this Court. Def's Renewed Memo at 22-23. The CIA conveniently fails to indicate that the submitted document was not even two pages in length. Second Boening Decl. at ¶29. The CIA also asserts that this is proof that the PRB "acts expeditiously to process submissions" but that the process is slowed "when an author fails to provide adequate citations" and it was "only after it became clear that plaintiff would not provide the information requested by the PRB that the Board issued its final determination." Def's Renewed Memo at 23 n.14. The CIA's recollection of the timeline is flawed. It took more than one year before the PRB ever contacted Boening about his submission. Second Boening Decl. at ¶18. What "slowed" the PRB process during that time period?

agreement states that the CIA will respond to submissions within a "reasonable time". Koch Decl., Ex. "A". What constitutes a "reasonable time" is undefined, but whatever it might be the CIA violated that period in the instant matter by taking 16 months to render a decision. Furthermore, while it is true that the CIA's regulations do not explicitly require that it abide by a thirty day deadline, this is not the policy that has been previously adopted by other courts adjudicating prepublication review challenges or, more importantly, what the PRB itself broadcasts.

Moreover, the CIA's argument that it did not unreasonably delay the processing of Boening's submission is factually flawed. The CIA seeks to muddy the waters by pointing to the "complex" process that ensued prior to Boening's submission of the Memorandum to the PRB; namely, his submission to the ARP for a classification challenge and the debate over whether Boening was an "authorized holder". Def's Initial Memo at 19. The CIA also notes that following Boening's submission of the "M Complaint" negotiations ensued with the PRB, and that only after those negotiations failed did the PRB issue its final decision. Id.

As the 30 day deadline applies from the date upon which Boening submitted his "M Complaint" to the PRB, the CIA's reference to the ARP process is completely irrelevant. Furthermore, the CIA's depiction of the delay in beginning the commencement of negotiations distorts the facts. Boening submitted his "M Complaint" to the PRB on November 22, 2004. See Koch Decl. ¶ 33. On November 25, 2005, a full year after his submission, Boening requested a status update. Id. ¶ 34. By letter dated January 5, 2006, *nearly 16 months* later the PRB Chairman responded that the CIA "*requires* that you rewrite your 'M Documents' outside of a government memo format stating in your own

words what you desire to communicate" and that Boening include "specific, open source citations." Id.(emphasis added).

Whether or not this constitutes "negotiations" is questionable, but what remains relevant is that nearly 16 months passed without a word from the PRB. Even conceding that the 30 day deadline is an "aspirational" goal, for the CIA to argue that 16 months does not constitute an unreasonable delay defies logic.

The Fourth Circuit held that the prepublication review process was constitutional *provided* the agency acted on, and responded to, the request quickly.

> Because we are dealing with a prior restrain upon speech, we think the CIA must act promptly to approve or disapprove any material which may be submitted to it by Marchetti. Undue delay would impair the reasonableness of the restraint, and that reasonableness is to be maintained if the restraint is to be enforced. *We should think that, in all events, the maximum period for responding after the submission of material for approval should not exceed thirty days.*

Marchetti, 466 F.2d at 1317 (emphasis added).

In fact, the PRB routinely leads submitters to believe that the 30-day deadline is, in fact, a legally binding deadline. In 2003, then PRB Chairman Paul Noel-Chrétien distributed copies of unclassified briefing slides that he used to explain the PRB process to CIA employees. See Exhibit "8". These slides very clearly acknowledge the existence of a firm 30-day deadline (including referring to court authorization). Id. Although one slide references that the PRB is increasingly finding it "difficult to meet" the 30-day deadline, nowhere is it mentioned that the CIA can take longer than the 30-days, request an extension of time or that this "deadline" is nothing more than "administrative guidance".

Moreover, the CIA's own unclassified journal unequivocally asserts that the CIA faces a 30-day deadline for compliance in reviewing a submitted publication. In an article written by then PRB Chairman John Hollister Hedley, it states:

The courts have held that this signed agreement is a lifetime enforceable contract. The courts also have noted that the secrecy agreement is a prior restraint of First Amendment freedom. But they ruled it a legitimate restraint, provided it is limited to the deletion of classified information and so long as a review of a proposed publication is conducted and a response given to its author within 30 days.[54]

In fact, although the D.C. Circuit has noted that a "time lag" does not amount to a violation of law *per se*, Weaver, 87 F.3d at 1443, the Supreme Court has recognized that a constitutional violation may occur when the review period is unreasonable. FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 228 (1990)(agency must issue "license for a First Amendment-protected business … within a reasonable period of time, *because undue delay results in the unconstitutional suppression of protected speech*.")(emphasis added) Boening challenges the excessive delay perpetrated by the CIA and that this conduct repeats itself time and time again. See Second Zaid Rule 56(f) Decl. at ¶7.[55]

For these reasons, the CIA's argument that Boening's APA claim is moot, or that it should be dismissed pursuant to Rule 12(b)(6), or alternatively be awarded summary judgment, is without merit and should be denied.

## V. ALTERNATIVELY BOENING AND HIS CLEARED COUNSEL ARE ENTITLED TO SEE THE CLASSIFIED MATERIALS IN THIS CASE

On October 15, 2007, Boening and his cleared counsel requested access to the "M Complaint" in order to substantively respond to the CIA's Motion. Exhibit "9". This

---

[54] The article can be retrieved online at *https://www.cia.gov/library/center-for-the-study-of-intelligence/csi-publications/csi-studies/studies/spring98/Secret.html*. The footnote to this sentence reads "[t]he 30-day time constraint was set forth by the circuit court decision in US v. Marchetti, 466 F2d 1309, 1317 (4th Cir. 1972). It was reiterated in US v. Snepp, 595 F2d. 934 (4th Cir. 1979), and it has been adopted as the standard by the Department of Justice."

[55] See also Weaver, 87 F.3d at 1441 ("The primary burden on employees from the regulation is simply the delay associated with submitting to the review process prior to publication. If the prior review were extensive, of course, it might delay constitutionally protected speech to a time when its only relevance was to historians.").

request was denied, see Exhibit "10", and the denial hampered Boening's ability to fully

respond to the CIA's Motion. Therefore, the "M Complaint" should be made available to

Boeing and his counsel, as well as the CIA's "classified" declaration in order to allow

"criticism and illumination by [the] party with the actual interest in forcing disclosure,"

McGehee, 719 F.2d at 1148-49. Boening filed a Motion to Compel Access to Classified

Information for Plaintiff and His Cleared Counsel (filed November 19, 2007)(Dkt. No.

11) and incorporates herein the facts and arguments expressed therein.

## **CONCLUSION**

Based on the foregoing, the defendants' Motion should be denied and summary

judgment should be granted to the plaintiff instead. Alternatively, both motions should be

denied without prejudice and the plaintiff should be permitted to conduct discovery.

Date:   February 11, 2008

<div style="margin-left:40%">

Respectfully submitted,

/s/
_____
Mark S. Zaid, Esq.
DC Bar #440532
Bradley P. Moss, Esq.
D.C. Bar #975905
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036

Attorneys For Plaintiff

</div>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FRANZ BOENING | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No: 07-430 (EGS) |
| v. | * | |
| | * | |
| CENTRAL INTELLIGENCE AGENCY | * | |
| | * | |
| Defendant. | * | |

*    *    *    *    *    *    *    *    *    *    *    *

**SECOND DECLARATION OF FRANZ BOENING**

The undersigned hereby declares as follows:

1.  I am a person over eighteen (18) years of age and competent to testify. I am the plaintiff in this action and make this Declaration on personal knowledge. This Declaration is submitted in support of my Opposition to Defendants' Motion to Dismiss.[1]

2.  I was formerly employed by the Central Intelligence Agency (CIA) from 1980 – 2005. After learning Arabic in the early 1980s, I spent nearly one dozen years in agent operations, primarily in the Middle East. I worked declassification issues from 1995 – 1999, and ultimately retired from the Agency after working at the Foreign Broadcast Information Service where I handled Internet exploitation and training. I have held a Top Secret/Sensitive Compartmented security clearance for nearly 25 years. As a result of the matters addressed herein I became a whistleblower and suffered employment retaliation. This included not being sent to Foreign Country "A" despite my having volunteered and possessing needed the language skills.

---

[1] Per the requirements of my secrecy agreement, this document has been submitted for classification review and the contents, unless noted otherwise, have been deemed unclassified and approved for public filing.

3.  In 1980, I signed a secrecy agreement in which I agreed to submit for pre-publication review any intelligence related documents that I might author after leaving government service. I agreed not to reveal any CIA classified information and I have observed the agreement. However:

- ◆  I did not agree to any specific type of CIA formatting for my documents;

- ◆  I did not agree to append tortuously worded disclaimers;

- ◆  I did not agree to never criticize the CIA;

- ◆  I did not agree to withhold reporting of apparently felonious activity by CIA that is publicly discussed in declassified documents that originated with other federal agencies;

- ◆  I did not agree to never write a whistleblower complaint;

- ◆  and I did not agree to refrain from citing and quoting published newspaper and magazine articles in my criticism.

My secrecy agreement deals strictly with properly classified CIA information. I made no other legal promises to CIA.

4.  This lawsuit primarily pertains to my whistleblower complaint of May 10, 2001, which I will refer to as the "M Complaint" (a designation that the CIA and I have utilized with approval in unclassified correspondence). I drafted the "M Complaint" in the spring of 2001 after reading a number of publicly available newspaper and magazine articles since autumn 2000 about political scandals in "M's" country [**six words redacted by the CIA**]. I have long taken a personal interest in Latin American developments and in

2

human rights issues.  I have visited several countries in the area and speak serviceable

Spanish.

5.   As I read the domestic and international news accounts I became angered not just

by the level of narco-corruption in this particular country and the hidden brutality of the

regime in question, but also by the constant reminder that, according to the scores of

credible published media accounts, my employer, the CIA, had nurtured and supported

"M" for years.

6.   **[Eight lines deleted by CIA. The deleted text can be found in my original**

**declaration dated November 12, 2007].**

7.   According to the same media accounts I read, many of which are attached to my

declaration as Exhibits "A" through "OOO" (these documents were ultimately submitted

to the CIA's Publication Review Board (PRB) as part of the review process), **[seven lines**

**deleted by CIA. The deleted text can be found in my original declaration dated**

**November 12, 2007]**.

8.   I decided to monitor, during my own personal time, the unfolding political scandal

because of my strong sense of civic responsibility combined with my personal irritation. I

did this because I knew that if what I had read was even 50% true, I would take it upon

myself to document an apparently gargantuan intelligence failure.

9.   Why would a CIA officer do this when it had little or nothing to do with his

present assignment? Because by 2001, I had devoted over 20 years of my life to the CIA

and I owed it to the American taxpayers to call my employer to account. It made me livid

that CIA was so inept, that it may have been party to human rights violations and, even

worse, that it seemed entirely possible that CIA had been criminally involved with "M".

After all, for whom did I work? The American taxpayer or for an organization that might engage in criminal activity and hide behind the flag? Was it not my civic duty to draft a professional complaint in which I outlined my credible evidence of intelligence failure and wrongdoing?

10. It is important to note that during this period I worked in the Foreign Broadcast Information Service (FBIS) as a Mideast media analyst (I did the original mapping of the Arabic-language network of jihadist bulletin boards). I had absolutely no professional responsibility whatsoever for Latin American affairs nor did I have computer or other access to any type of classified, compartmented CIA operational information on Latin America.

11. I can swear that not one word of my May 10, 2001 memorandum is based on any classified CIA document on "M", or on any information I received as a result of my employment with the CIA. Indeed, in my entire life I have never read a single classified CIA document (apart from official responses to my complaint which classified publicly available newspaper and magazine articles) wherein "M" was mentioned. Everything in my May 10, 2001 memo is based on open source information from newspaper or magazine accounts, or officially declassified information from other federal agencies that I obtained via the Internet. Additionally, the "classified annex" that accompanied the "M Complaint" was styled that way as a precaution, and not because I actually believed it did contain classified information. In fact, I explicitly challenge that it does not.

12. The CIA operates an extremely rigid, compartmented data system that prevents anyone without a need to know to access sensitive information. Thus, the insinuation that

I may have surreptitiously entered into CIA's Latin America databases is completely baseless and utterly irresponsible. The CIA knows full well that accessing databases, at least undetected, in such a manner is virtually impossible and was beyond my technical reach. Such an allegation, even if just an insinuation, further demonstrates the level at which the CIA will sink in order to cover-up its embarrassing conduct. Moreover, if the CIA even believed this to be true it never once raised the allegation during the four years (2001-2005) I spent inside the CIA discussing the "M Complaint". It never sought to discipline me for a security violation, or revoke my clearance. Nor did it interfere with the transfer of my security clearance, which the CIA continues to hold, for contracting work after I retired.

13. About a year after writing the "M Complaint", I was allowed to formally challenge its classification under rules established by EO 12,958 (or so I thought at the time). CIA informed me that it had formally accepted my challenge in Summer 2002, and implicitly acknowledged that the "M Complaint" was an official document. By Fall 2002, however, after the process had run its course inside the Agency and the latter had refused to declassify any material, I requested, in keeping with rules established by the EO as I understood them, to have the document forwarded to the Inter-Agency Security Classification Appeals Panel (ISCAP) in Washington, D.C., then chaired by William Leonard, which supposedly had jurisdiction over the challenge.

14. Significantly, within weeks of making this request, on December 12, 2002, CIA annulled my official classification challenge in its entirety. Beginning in December 2002, CIA suddenly asserted that my "M Complaint" was not really an official document; rather, it was a personal document. And, according to the CIA, personal documents could

not be submitted to ISCAP, nor could they be published while the author remained an employee.

15. I protested the cancellation of the challenge to the ISCAP. Ultimately, the ISCAP Panel agreed with me and ordered CIA to deliver the document to it. CIA refused to do so.  Sometime later, ISCAP chairman William Leonard visited the CIA where officials apparently persuaded him that I did not really have the right to write a whistleblower complaint on Latin America since I did not work in that field and was not an "authorized holder" of the specific classified information. Moreover, it was my understanding they falsely insinuated to him that I may have broken into databases in order to obtain material contained in the document. The result was that ISCAP seemingly relented and changed its position.

16. No doubt anyone reading this declaration is likely saying to themselves "why in the world would the CIA be so determined to withhold a series of overt newspaper and magazine articles and claim they were classified?" Why did my writing a memorandum alleging government misconduct based solely on public sources cause the CIA such consternation? I was provided the answer in May 2002 during a conversation with the then Information Release officer of the CIA's Directorate of Operations, William McNair. He told me privately in his office the real reason he would continue to classify the "M Complaint". With his voice tinged by exasperation he said something very close to the following:

> "*Look, Franz, do you think I care about ["M's" name]?  This is not about 'source protection,' this is about CIA's reputation. We don't want you to have any credibility. The problem with the "M" memorandum is that what you've written is all true.*"

McNair also privately acknowledged during the same conversation that my May 10, 2001 memo was based solely on open source information and that it seemed to be reasonably well-sourced.

17. Contrary to CIA's assertions that I did not source my May 10, 2001, memo, the document is actually sourced in quite amount of detail, although perhaps not according to the academic standards of Harvard University. At no time was I ever informed by the PRB that I needed to source my document in a specific manner or utilizing a particular method. Anyone who reads the document carefully will find a specific source and a date attached to most entries in the chronology and a full list of sources in the bibliography. The body of the "M Complaint" is based on the chronology. Moreover, as can be plainly seen in the e-mail June 30, 2006, the CIA privately conceded that I did demonstrate that my sources were all overt.

18. I personally delivered source documents to the PRB in the Autumn of 2004 and in Summer 2005. I was under the clear impression that I needed only to prove that my sources were overt and I wanted the documents released after I retired in August 2005. I discovered only a few days before retiring in August 2005 that absolutely no one in PRB had taken the time to review the materials I had submitted nearly one year earlier! As far as I know, they did absolutely nothing with the documents at all during that time. At my last meeting with the PRB on August 10, 2005, they now asserted that not only must I demonstrate that the sources were unclassified (which they privately acknowledged was the case) but that everything should be rewritten in a non-official format, that I must add their formal disclaimer, and that every entry in the chronology must be formatted to their

specifications (which are explained nowhere in their regulations). These concerns had never been raised before.

19. As a result of the August 10, 2005 meeting, I provided to the PRB a four centimeter-thick stack of open source documents for purposes of demonstrating that the information contained in the "M Complaint" was not based on any classified information. In order to ensure that the open source documents could be easily referenced in accordance with the actual "M Complaint", I numbered each open source document and then numbered the section of the "M" chronology that related to the open source material.

20. It was not until November 1, 2005 that I was made aware by then-Acting PRB Chairman Richard Florence that the PRB was under the impression that I would be rewriting the "M Complaint" in order to provide "specific citations" for the statements made in the "M Complaint". I made it very clear to Mr. Florence that the understanding I had of my discussions with former PRB Chairman Paul Noel was that I simply had to demonstrate that I could provide open source documents, which I believed I had in August 2005, and not that I had to provide "specific citations". I also expressed confusion as to how I could be expected to provide additional citations when the supporting documentation I had provided was still in the hands of the PRB. Interestingly, this was the last time I received any comments about the possible "insufficiency" of the citations and sourcing which I had provided.

21. The CIA's primary concern, at least as how I interpreted their e-mail to me of June 30, 2006 and now their arguments before this Court, pertains to formatting design. For reasons they best understand the CIA does not want me to "publish" the memorandum in an official looking format, whatever that might be. Of course, the format

I used for the May 10, 2001, is <u>exactly</u> the format I used for my March 24, 2003 and May 20, 2004 memorandums which have since been declassified and released in full (other than names of certain CIA officials). Mr. Florence made it clear that the formatting issue was the prime concern in his June 30, 2006 email, going so far as to state that I had pretty much already demonstrated that the statements in the "M Complaint" could be attributed to open sources. Interestingly, he implicitly suggested that the formatting issue related to the notion that the statements were derived from classified information by asserting that individuals with access to classified systems can access classified information on subjects which had no relevance to their area of work. This assertion directly conflicts with my understanding of the restrictions imposed upon access to classified information.

22. Let me provide some explanatory information surrounding my source documentation for the "M Complaint". In understanding the sourcing of the "M Complaint" it is important to comprehend the specific sections of the document. Pages 1-8 contain a narrative description of the various crimes that I believed, based on my public source documentation, "M", and possibly CIA, committed. It is in a narrative format. Pages 9-21 comprise a historical chronology of the "M" situation listing 87 entries. Not one page of this section has been publicly released but I understand the Court has been provided with an unredacted copy it can review. Pages 22-23 are final comments by me and a call for investigation. Page 24-25 is a bibliography with 55 different listings plus an "about the author" statement. There is then a two page "Unclassified Annex: Myths Surrounding CIA's Relationship with "M"", and a two page "Unclassified Annex: Was "M" an Agent?". Finally, there is also a "Classified Annex" which remains classified in its entirety.

23. The chronology set forth within pages 9-21 is a key section for this Court to review. Nearly all entries in the chronology follow the same general format: First, the date of the incident or development in the "M story is identified. Second a summary of incident, development, or pertinent fact in the "M" story is noted. Finally, a parenthetic remark containing usually two elements: a) the specific media source of the fact, development or incident and b) the author's comment and/or analysis of the fact or development. It was my belief that the chronological unfolding of the "M" debacle was easier to comprehend and digest in his chronological format. The format was very simple: date, development, source, author's comment. Most parenthetic entries contain a source and a comment. Some contain simply the source with no comment; a very small number contain a comment only. The full names of all of the media sources are listed in the bibliography. I should specifically note that all source documents were reviewed by CIA and all documents were linked to specific entries in the chronology. All of the source documents were eventually returned to me by the PRB.

24. All of the supporting documents that are attached as Exhibits "A" through "OOO" to this declaration are annotated according to the entry date in the chronology of the "M Complaint" or the paragraph number in the body of the document. For instance, some documents might say "para one". This means that it is a general fact that supports paragraph one of the "M Complaint", which asserts that the press claimed [one word deleted by CIA] had a relationship with CIA. Other supporting documents might say "44", "37", or "79". This means that the cited document corresponded to the 44th, or 37th or 79th entry in the "M Complaint" chronology. Additionally, for example, the first entry in the chronology is from a long article written by **[four words deleted by CIA. The**

10

**deleted text can be found in my original declaration dated November 12, 2007]**. I provided the PRB with a copy of the **[one word deleted by CIA. The deleted text can be found in my original declaration dated November 12, 2007]** article and in the "M Complaint", I provided a brief explanation of who **[one word deleted by CIA. The deleted text can be found in my original declaration dated November 12, 2007]** is. Throughout the document I wrote "source: **[one word deleted by CIA. The deleted text can be found in my original declaration dated November 12, 2007]**" to refer to the article as the source for information within a particular paragraph. Many entries within the "M Complaint" state "source: **[one word deleted by CIA. The deleted text can be found in my original declaration dated November 12, 2007]**, various." **[one word deleted by CIA. The deleted text can be found in my original declaration dated November 12, 2007]** refers to the organization "**[one word deleted by CIA. The deleted text can be found in my original declaration dated November 12, 2007]**" and I submitted only one document from **[one word deleted by CIA. The deleted text can be found in my original declaration dated November 12, 2007]** as a source. Thus, by referencing this specific document I was identifying information from within the "M Complaint" as having primarily originated from that article, although there may also have been support from other sources that I submitted for the same factual assertion.

25. Finally, this Court should also be aware that after I drafted the "M Complaint", I was forced to author a series of follow-up complaints alleging that the CIA had retaliated against me. These complaints are also formal whistleblower memorandums and dated March 24, 2003 and May 20, 2004, as well as internal grievances dated January 16, 2003 and November 7, 2003. During the period after I drafted and submitted the "M

Complaint", as just an example of some of the conduct, I was variously told by a number of different CIA managers that:

- I lacked the qualifications to serve abroad. Yet prior to submitting these whistleblower memorandums I had served successfully in a half-dozen different CIA foreign postings;

- I volunteered to serve in a particularly sensitive country in 2003. I happened to speak the language, which was in very short supply, particularly among CIA officers. I was informed I was not fit to serve in that country because the CIA did not wish to read memorandums regarding any of its activities that I would find fault with. As it turned out, several very public scandals emerged from the CIA's activities in this country;

- I was grilled on the polygraph about my contacts with Congress, a practice that could be considered retaliation given that such contacts are a protected activity;

- I was very worthy of promotion to GS-14 – that is, if only I would keep my mouth shut. My supervisor at the time said I could do one thing to improve my chances for promotion - keep my mouth shut as "this would help a lot";

- I should consider keeping my mouth shut in order to avoid further problems or conflicts within the CIA. In fact, one of the OIG investigators actually said this to me during an interview about my March 24, 2003 complaint;

- I should not talk to younger CIA officers and that I should be given a separate office in order to limit my contact with them. The supervisor who made this comment said she feared that I might criticize CIA's historical conduct to impressionable young officers;

12

- ◆ I was accused of allegedly threatening an office colleague by leaving a yellow Post-it note asking that she be consistent in her editing. CIA's Office of Security investigated and found no merit in the charge. This baseless accusation was nothing more than an intentionally designed form of harassment; and

- ◆ I was publicly humiliated by the head of a CIA office when he attributed work to another employee that he knew I had undertaken.

26. Was I retaliated against? From 1980 to 1993, I was promoted on average once every 2.5-3.0 years. After filing my first informal human rights complaint in 1994, and the series of whistleblower complaints in later years, I never once received another promotion during the time I served with the CIA. Not once in 12 years, from 1993-2005.

27. I strongly believe, based on my over 25 years of CIA experience, that CIA wants to keep my May 10, 2001, memorandum classified because its contents reveal an undeniable intelligence failure involving illegal actions (and despicable human rights violations) by an individual with whom the CIA had close relations and disclosure of this information would prove excruciatingly embarrassing to the organization.

28. The "M" case in 2007, minor as it may seem to some observers, is an outrageous example of the lengths to which CIA will go to extinguish criticism and to negate my First Amendment rights. In the process the CIA will classify scores of media articles, all of which were produced by non-CIA (and even non-governmental and non-American) authors.

29. Finally, I should also note that I fully intend to continue submitting writings to the PRB for classification review. In fact, I submitted a document for review on November 12, 2007. While it is true this document was approved by the PRB just several days later that should not be considered surprising given that it was not even two pages in length.

30. In closing, when I retired from the CIA in August 2005, I received a warm personal letter from then Director of Central Intelligence Porter Goss that said, in part:

> . . . It takes the conscientious efforts of many people to do the important work of this Agency. You leave with the knowledge that you have personally contributed to our success in carrying out our mission. Your dedication and loyal support has measured up to the high ideals and traditions of the Federal service. May I express to you my appreciation and extend my best wishes for the years ahead."

I do solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge.

Date:   February 11, 2008

Franz Boening

# Second Declaration of Franz Boening

# EXHIBITS
## "A" – "OOOO"

## Classified And Withheld
## By The CIA

# EXHIBIT "2"

# May 10, 2001 Memorandum

Unclassified

May 10, 2001

To:    Office of the Inspector General, Central Intelligence Agency

Info:   Director of Central Intelligence
        Executive Director, Central Intelligence Agency
        Office of Congressional Relations
        Deputy Director for Operations
        Chief, Latin America Division, Directorate of Operations
        Counter-Narcotics Center

From:  **Franz Boening**, Central Intelligence Agency

Subject: The[        ]Affair: **Possible Violations of US law, Scandal, and
Counterintelligence Failure** during CIA's relationship with[
        ](action filed under Title Seven, "*The Whistleblower
Provision*" of the 1999 Intelligence Authorization Act)

1. **Introduction:** This unclassified memorandum, (accompanied by one brief classified
and two unclassified annexes), constitutes an ***urgent concern*** under Title Seven *("the
Whistleblower Provisions," sections 701 and 702)* of the 1999 Intelligence Authorization
Act. I wish to call to your attention several very serious issues, including possible
violations of US laws, related to CIA's alleged operational relationship with[
        ](1)   You will recall that

I allege that:

   • **CIA may have violated US laws** during its 10+ year relationship with
     [        ](paragraph five);
   • **CIA's professional behavior** was so scandalous that it **seriously
     damaged American prestige and credibility** (paragraph six);
   • the relationship continued because of an **egregious counterintelligence
     failure** (paragraph eight)

(1) On November 13, 2000 I urged CIA management to investigate our
relationship with[        ] I received no acknowledgement

CL BY: [        ]
CL REASON: [        ]
DECL ON: [        ]
DRV FROM: UA1-05

Unclassified

2. I will demonstrate that my *urgent concerns* are validated by the language of the *whistleblower* provisions (sections 701 and 702 of the FY 1999 IA Act, passed October 1998) and by section 502 of the 1947 National Security Act. The relevant portions of these acts read, respectively, as follows:

> • *the term "urgent concern" means any of the following:* ***A serious or flagrant problem, abuse, violation of law or Executive order, or deficiency related to the funding , administration, or operations of an intelligence activity involving classified information***…(bolded italics the author's)

> • …*the Director of Central Intelligence and the heads of all departments, agencies, and other entities of the United States Government involved in intelligence activities shall—(1) keep the intelligence committees fully and currently informed of all intelligence activities…****including any significant intelligence failure****….* (bolded italics the author's)

3. I contend that from 1990-2000, the period (according to news reports) of CIA's most recent relationship with [        ] that the latter not only violated [        ] laws—allegations whose truth is becoming axiomatic according to overt reporting—*but that CIA itself may have violated US laws.* CIA's possible violations were the unfortunate by-product of CIA's conscious policy not to act on clear indicators of [        ] criminal activity. CIA pursued this passive policy in order to prolong the relationship with [        ] which it considered useful.

4. CIA's seeming disregard for the criminal reporting and other requirements of US law and its relentless lack of true curiosity about [        ] activities calls into question the professionalism—and indeed ethics—of CIA officers and their management. So prevalent was CIA's policy of dismissing criminal and counterintelligence indicators that even a casual observer can legitimately wonder if CIA's officers ever attempted to seriously vet [        ] information and activities; to question his motivation; to corroborate serious criminal charges made against him by others or; to take seriously its US crimes reporting responsibilities. CIA's conduct also calls into question how seriously it took its responsibilities vis-à-vis other elements of the USG.

5. **The Possible Violations of US Laws:**    It is likely that CIA has violated one or all of the laws in the sub-paragraphs below. (Note: CIA's unfortunate and mendacious habit of seeking "*deniability*" before the requirements of *US law* seems to have contributed to the possible violations.  While seeking deniability in the face of the law— *foreign laws*—is wholly appropriate when a CIA officer operates in a foreign capital, it would seem completely inappropriate for CIA to seek *deniability before US laws.* Indeed, in the [        ] relationship, CIA's extraordinarily poor appreciation for political risk and its tendency to "hike near the edge of the cliff" may have caused it to err legally.)

Unclassified

Unclassified

**a. The 1952 Immigration and Naturalization Act.** It is now clear, based on numerous overt accounts and considerable physical evidence, that [      ] was ineligible for the US visa. (A glance at the tough questions on the NIV application, OF-156, demonstrates this.) Moreover, CIA had good reason to believe that [      ] was ineligible. So...how did he obtain the visas? If contemporaneous allegations of [      ] involvement in narcotics trafficking had been taken seriously, they would almost certainly have made him ineligible to receive a visa. (2)

**b. US Customs Service financial declaration requirements, the Bank Secrecy Act, and CIA's duty to report possible crimes to the Financial Crimes Enforcement Network of the US Treasury Department.** Was [      ] guilty of money-laundering in the United States? Did CIA assist [      ] to launder money here or abroad, whether intentionally or unintentionally? (See classified annex and April 13, 2001 entry in chronology.)

**c. The Foreign Assistance Act of 1961.** According to news accounts, CIA provided years of support to [      ] CIA did this at a time when [      ] was a regular violator of human rights. (See classified annex.) [      ]

[      ] Given the overall requirements of the Foreign Assistance Act, it would seem that CIA's support to [      ] organization may have violated the law. (3)

(2) I do not believe that a visa to [      ] was even possible without a waiver from the State Department. The second bullet of question 29 of the OF-156 reads, "Have you ever been arrested or convicted of any offence or crime, even though subject of a pardon, amnesty, or other similar legal action? Have you ever distributed or sold a controlled substance?" *CIA knew*, for example, that [      ] Did he obtain a visa without a waiver? [      ] US visa was revoked [      ] See classified annex.

(3) Few knowledgeable observers would consider [      ] during the [      ] years to have been an oasis of liberal human rights practices. It is well worth noting that the State Department itself was critical of [      ] human rights record during the [      ] Moreover, the [      ] Congress, completely controlled by [      ] after its initial dissolution in [      ]

[      ] Can CIA, or anyone else, possibly assert that [      ] did not have a human rights problem during the [      ] Did CIA take the Foreign Assistance Act seriously?

Unclassified

d. **Executive Order 13107** (December 10, 1998) on the **Implementation of Human Rights Treaties**; specifically, USG obligations under the **Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment.** According to overt accounts,

it would appear that Article nine of the **Convention Against Torture** obligates the USG (and CIA) to *"afford one another the greatest measure of assistance in connection with criminal proceedings brought in respect of any of the offences referred to in article 4, including the supply of all evidence at their disposal necessary for the proceedings."*

e. *The Torture Victim Protection Act of 1991.* Based on overt information, it would appear that [        ] was detainable under this act during any possible travel to the US after 1991. (Note: See classified annex. The author acknowledges that [        ] was not taken to task under this law during the [        ] Nevertheless, the simple fact that he was probably prosecutable under it is both significant and embarrassing.)

f. The *CIA's own 1995 human rights guidelines* for agent and liaison relationships. (Note: The guidelines, which appear to be ignored as often as observed, do not have the force of law. The guidelines are a response to the *Harbury, Bamaca, Alpirez, Constant* et.al. scandals of 1993-94.)

6. **The (quiet) Foreign Policy Scandal and its Cost:**    Notwithstanding the seriousness of the above allegations, I must also emphasize that CIA's relationship with [        ] was extraordinarily scandalous, at the political level. **In effect, during the 1990s, CIA pursued a type of separate foreign policy vis-à-vis**

Yet, during the same period, the stated policy of the USG was to promote human rights, democracy, and to fight narco-trafficking. As a result of CIA's irresponsible behavior, USG credibility was seriously compromised. It is doubtful that [        ] policymakers will take seriously the USG's stated policies when [        ] conduct—obvious to astute [        ] but not to CIA—had so effectively undermined them. *Had CIA been the equivalent of the "lawyer for Tony Soprano" during* [        ] What was the political cost?

(4) Although primary authorship of the scandal belongs to the CIA, other elements of the USG—that tolerated the relationship for too long—must share blame.

Unclassified

7. As is now known[⎯⎯⎯⎯]secretly undermined important USG policy
objectives—on an industrial scale—over a 10-year period. *Indeed, CIA's dubious
support for[⎯⎯⎯⎯⎯⎯⎯]suggests a political scandal of the first order—
comparable in magnitude, and exceeding in duration and titillating variety, the Iran-
Contra Scandal.* Did CIA share with other elements of the USG all aspects of its
confidential relationship?  Was CIA even aware of the overall foreign policy of the
USG? (5)    This question can be largely addressed by examining what I hold to be the
main cause of the scandal. (6)

**8. The Decade-long Counterintelligence Failure:**  Numerous domestic and foreign
news accounts (in Asia, Europe, North and South America), including those sourced to
the USG, allege that CIA both supported and apologized for[



                                                                      ] In virtually all cases,
CIA's special friend[⎯⎯⎯⎯]played the central role in personally suborning
individuals.  Although corruption schemes were undoubtedly complicated, endorsed by
[⎯⎯⎯⎯]and involved more than one seducer, it remains nevertheless true that
[⎯⎯⎯⎯]held center stage.  This fact is clearly and conclusively demonstrated in the
hundreds of videotapes[⎯⎯⎯⎯⎯]currently in the possession of the[⎯⎯⎯]
judicial authorities.

9.   According to various newspaper accounts,[

                                                                                          ]

(5) Generally speaking, US foreign policy, summarized in annual reports to
Congress, stresses national security issues and the promotion of free trade, free markets,
*democracy and human rights* (italics the author's).

(6) According to domestic news reporting, all other elements of the USG gradually
grew to oppose CIA's relationship with[⎯⎯⎯⎯]n fact, DEA appears to have viewed
[⎯⎯⎯⎯]as an outright narcotics trafficker for years.

(7) For those who may be irritated by the rhetorical question, please consider
the reverse: **Is accidentally working with and supporting the narco-corrupter of an
entire society some sort of CIA success?**

Unclassified

[

are
either strongly suspected, under investigation, have been arrested, have fled the county,
or have admitted to corruption charges, since[          ] **In literally all cases,**
[          ]'s viewed as the ringleader of civil corruption—by the[

](8)

10.  So...large swaths of the political and military classes of an entire nation were
suborned and corrupted....   Is an objective observer to believe that CIA, (after all, *an
intelligence agency*) was completely unaware of[          ]efforts to suborn, bribe or
blackmail?  How can this be?

11.  Those whom[          ]could not suborn, he harassed or intimidated.  Journalists,
newspapers, individuals, and opposition politicians were subjected to all forms of
pressure[          ]Among other things,[          ].

]

12.  On the human rights front[

]

(8) These names have been reported in the[

...

]

Unclassified

*1*
*2*
*3*

⌐

] Indeed, the only way that CIA could have not known about these serious human rights violations, especially torture, was if its officers never read the newspaper, listened to the radio, or watched television. Since I consider this unlikely, it is safe to say that CIA simply ignored the problem, perhaps *in keeping with CIA's unfortunate history of ignoring rights problems*. (9)  In sharp contrast ⌐

*7*
*8*
*10*
*11*

]**For this reason, I contend that CIA actually pursued (*the functional equivalent of*) its own foreign policy during the** ⌐      **years.  For only CIA could have warned the USG about the true nature of** ⌐        **was reportedly CIA's special friend—not State's, not DEA's, not FBI's, not DIA's, not USIS', not Commerce's, not the US Ambassador's, not anyone else's.  CIA singularly failed to take its counterintelligence duties seriously.**  (See classified annex.)

*18*

13.  **But...why?:**  The failure outlined above occurred because CIA chose to ignore or downplay obvious criminal indicators.  Quite simply, if CIA incorrectly assesses the core motivations of its liaison partner or its secret agent, as the case may be ⌐        ] arguable *agent of influence* status represents elements of both), CIA will operate at its peril...and its conduct may jeopardize US foreign policy and erode USG credibility.

*21*

This is roughly what happened in the ⌐        case.  In its effort to combat drug traffickers, CIA deluded itself into believing—despite a mountain of freely available,

*23*
*24*

contrary evidence—that ⌐            was sincerely helping to further USG policy goals.  What it didn't take into account is that men like ⌐        ] if fundamentally misunderstood, can subvert whole aspects of US foreign policy.  The counterintelligence failure was exacerbated and prolonged by CIA's hubris and apparent tendency towards secrecy, even with USG colleagues.  ***CIA's hubris, secretiveness, disinclination to accept contrary assessments and evidence, its lax management, and its desire to avoid embarrassment, all proved to be a smoldering recipe for disaster.***

14. The counterintelligence process demands vigilance and a constant reexamination of one's operational assumptions.  Perhaps the best known (albeit least common), type of counterintelligence failure occurs when a USG official is secretly recruited by a foreign power and operates undetected for years.  Professional CIA officers know, however, that there are other types and levels of counterintelligence failure—some of which can inflict the same magnitude of damage to America.  (In truth, aspects of the *Iran-Contra Scandal* were exacerbated by counterintelligence failures.)  *In the foreign field, an important type of CI failure occurs when it is discovered that a foreign agent or liaison service has an entirely different—and malicious—agenda from*

*29*

*that which he/she/it describes to CIA.* ⌐        ]engthy (and not so) concealed anti-human rights, anti-democracy, and narco-trafficking activities fall into this category.

(9) CIA's tendency to ignore or downplay rights concerns has been criticized even in reports from CIA's own Office of the Inspector General.

*39*
Unclassified

Unclassified

15  As is now becoming apparent⌐     ⌐almost certainly acted as only one in a small galaxy of Latin American narco-traffickers—but one who enjoyed the unique political protection inside the USG of CIA.  *I contend this was an important aspect of the* ⌐                                    ⌐**almost certainly used CIA tools and bureaucratic support to facilitate his crimes.**  (See classified annex.)

16  In addition to almost single-handedly undermining⌐

⌐

17.  As we now know from the newspapers, CIA's relationship with⌐
⌐                        ⌐At that time, even CIA became convinced that
⌐        ⌐had participated in a scheme⌐

Even CIA was finally persuaded that⌐        ⌐could no longer be trusted. ⌐

⌐                        ⌐How substandard had been CIA's counterintelligence performance?  How much would need to be spent in order to counter the strengthened ⌐    ⌐reinforced with arms supplied by⌐        ⌐

18.  In order to understand the foreign policy scandal, the counterintelligence fiasco, and CIA's performance, it is helpful to review a chronology of the contemporaneously available information and developments (i.e. the criminal and counterintelligence indicators) that should have alerted CIA to⌐        ⌐character and agenda.  Did CIA overlook or ignore compelling evidence of a problem?  Or, is the author unfair to suggest that CIA presided over a counterintelligence disaster and precipitated a scandal?  I invite readers to judge for themselves.  (My comments are enclosed in brackets.  Most entries can be traced to multiple media sources.)  (10)

(10)  Of course, according to the newspapers, other USG departments—probably employing nothing more sophisticated than common sense—did not ignore the criminal and counterintelligence indicators.  At various times, they warned CIA that the relationship with⌐        ⌐was counter-productive.  Their warnings went unheeded.

Unclassified

Delete all of pages
41-53

Unclassified

**1⁰. Analysis:** Since newspaper accounts report that CIA remained in professional contact with[          ]until the late summer of[    ]it is not unfair to say that until that time none of the developments described above were considered serious enough to justify severing the relationship. (See classified annex.) Readers are asked to use their common sense to decide whether CIA exercised appropriate political judgment or counterintelligence sensitivity. (Personally, I do not believe that a degree in criminology is necessary to assess this case.)  Was CIA simply not paying attention or had it chosen to willfully disregard indications of criminality?  Or…was something more sinister at play?  What could explain such relentlessly unprofessional behavior?

**20.** It is worth noting that the relationship with[       ]ostensibly endured through
[                                                                            ]Fair

questions might be:

- Is CIA on autopilot?
- Do case officers occasionally read newspapers and apply independent judgment or do they rely exclusively on information from *special friends*?
- Does a re-examination of aggregate counterintelligence evidence ever occur?
- Will CIA do absolutely anything to maintain a prestigious covert relationship?  including working at cross purposes to America's stated foreign policy?
- At the US public policy level, is it wise to allow CIA to handle contacts at the policy level of a foreign country?
- And, the two most frightening questions: ***Did CIA maintain a relationship with*[       ]**
- ***Did CIA help to establish a unit*[          ]*which engaged in human rights violations?***

**21.** Whatever the stated reasons were for CIA's failure,[          ]*seems to be an extraordinary example of how not to conduct operations.* Frankly, I must agree with late Senator Cranston; it is all embarrassingly reminiscent of[          ](See classified annex.)

**22. Conclusion:** As a 20-year employee of CIA with considerable agent-handling experience, I find[       ]personally distasteful, professionally inexplicable, and quite possibly legally indefensible. Consequently, I have initiated this whistleblower action. The need for accountability, especially before the elected officials of the House Permanent Select Committee on Intelligence, the Senate Select Committee on Intelligence, other congressional committees, and the incoming US Drug Coordinator strongly suggests that a detailed explanation be given for the counterintelligence failure, the foreign policy scandal, *and that possible violations of law be thoroughly investigated.* Let us hope that CIA chooses not to invoke the overworked excuse of *sources and methods* to avoid embarrassment and accountability. (Or, to protect whom—the most

Unclassified

Unclassified

wanted man in[     ] 11) Secrecy—in this instance—is the enemy of accountability.

Fortunately, since DCI Tenet spoke of the need for accountability during his 1997 confirmation hearing, it is hard to believe that he will allow CIA to hide behind the mantra of *sources and methods*. Therefore, I have no doubt that he will support a thorough investigation of this matter.

23. Should you have any questions concerning this memorandum, please do not hesitate to contact me. In the meantime, I remain,

Yours Sincerely,

Franz. Boening

**Postscript:** Given my previous whistle-blowing experience with CIA in 1998-99, I plan to track CIA's response to the best of my limited ability. Naturally, I shall be most disappointed if I incur any bureaucratic retaliation as a result of this memorandum. Should any such retaliation occur, it shall be swiftly reported to the appropriate congressional committees.

My hope is that an investigation of this matter will help the USG to restore some of its badly damaged credibility in the[     ]*Drug Wars*. This is an important issue to me and other Americans. *A fresh wind blowing over the landscape can help us to achieve this...*

On a separate issue—and in order to be helpful—I will make my personal, unclassified file on[     ]available to CIA and/or law enforcement investigators.

(11[     ]

the Website of the[     ]                                      [     ]Details are available at

Unclassified

Unclassified

## Bibliography :

1. Amnesty International
2. Associated Press
3. BBC News
4. Bogota Cambio
5. Bogota El Tiempo
6. Bogota Semana
7. CBS News
8. CNN
9. Committee to Free Lori Berenson
10. Covert Action Quarterly
11. Cornell University
12. University of Colorado
13. University of Minnesota
14. UCLA (Daily Bruin)
15. Caracas Venezuela Online News WWW
16. Desaparacidos (latin American human rights org.)
17. Derechos (latin American human rights org.)
18. DEA Website
19. DEA report (available from National Security Archive)
20. declassified DIA reports (National Security Archive)
21. EGroups
22. Global Spy Magazine
23. Gustavo Gorriti (various WWW sources; outstanding reportage)
24. Human Rights Watch
25. Interview with Coletta Younger on the WWW
26. Lima Radio Programas del Peru
27. Lima Gestion
28. Lima La Republica
29. LATimes
30. Madrid EFE
31. Madrid RNE Radio
32. Madrid El Pais
33. Medillin El Columbiano
34. Mexico City NOTIMEX
35. Mexico City Reforma
36. Miami Herald
37. Moscow Segodnya
38. Narco News
39. New York Times
40. New Yorker Magazine (outstanding reportage by Isabel Hilton)
41. Panama City El Panama America
42. Peru Ministry of Interior Website
43. Paris AFP
44. Radio Netherlands



57
Unclassified

24

Unclassified

*/*

45. Revolutionary Worker
46. Swiss Info WWW
47. San Jose Mercury News
48. Observatoire Geopolitique Des Drogues, Paris
49. US Department of State Website
50. Sao Paulo Folha De Sao Paulo WWW
51. Tel Aviv Yedioth Aharonot, Shiv'a Yamim supplement (13 April 2001)
52. Washington Post
53. Workers World
54. Washington Office on Latin America
55. World Socialist Website

## About the author:

Franz Boening is a 45 year-old CIA employee who entered on duty in 1980. After
learning Arabic in the early 1980s, he spent 10-12 years in agent operations, primarily in
the Middle East. However, shortly after protesting privately to the DDO in 1994 of
CIA's paid relationship with                                      Boening was asked to
return permanently from abroad. Upon return from abroad in 1995, Boening was asked
to work in declassification, where he worked from summer 1995-spring 1999. (Note:

In fall 1998, Boening filed CIA's first Title Seven action over testimony and comments
made by the CIA's information release officer, Lee Strickland, to Congressman Dennis
Kucinich, (D, Ohio).   Boening protested what he interpreted to be highly misleading
remarks made by Strickland with regard to whether or not the CIA protects human rights
violators.  Strickland's comments were made to "clarify" CIA's position on the Human
Rights Information Act, which CIA opposed.  The Human Rights Information Act did
not become law.

As a result of Boening's action, DCI Tenet "regretted" Strickland's comments to the US
Congressman. Boening, in turn, was allowed to consult directly with the congressman
regarding the legislation.

Since spring 1999, Boening has worked at the Foreign Broadcast Information Service,
where he does Internet exploitation and training.

Unclassified

unclassified

Unclassified Annex:

## Myths Surrounding CIA's Relationship ⌈with⌈         ⌉

It is useful to address, at least cursorily, what the USG/CIA got from ⌈
⌈in return for CIA's relationship with him.⌉ Was the seeming
counterintelligence failure and the political scandal worth it?  Let's take a very brief look
at a few myths surrounding this unusual character.  Newspaper accounts usually assert
that CIA worked with⌈         ⌉in some fashion or other, against terrorism and the
drug trade.⌉ So....how much did actually⌈      ⌉help us?

1. **Myth:**⌈                                      ⌉ **Fact:**  Not according to Washington
                                                    ⌉ Rather, it
Post reporting or that of⌈
was the⌉

                                                              ⌟

2. **Myth:**⌈
         ⌉ **Fact:**  Not entirely true.⌈                    ⌉played an
equal, if not greater role, in the planning of the operation.  He was fired,⌈

      ⌟

3. **Myth:**  There was no good evidence that⌈                    ⌉were involved in
criminal activities.  **Fact:  The author considers this claim to be complete and utter
nonsense (see chrono).**  Those who make this claim probably mean to say that they
personally are unaware of a smoking gun.  In fact, if one takes the long view and⌈
examines the anti-democracy activities and the anti-human rights activities of⌈  ⌉the
evidence of criminality becomes overwhelming.  Why the focus only on⌈
seeming drug activities *(where the criminal indicators were still extremely strong)?*
Why did CIA not also focus its intelligence efforts on anti-human rights activities or the
intimidation of journalists, for example?    These sorts of activities are themselves
criminal and counterintelligence indicators.  Does CIA not realize this obvious fact?
*For any system that is willing to engage in the gross violations of democratic practices
and the massacre of innocents is also quite willing to engage in narco-trafficking.*
⌈

                                                    ⌉*Did CIA ignore literally*
*everything?*
        Finally, why would any thoughtful person assume that the standard for severing
an intelligence relationship must be legal evidence of wrongdoing?  Why did CIA

58

unclassified

apparently bend over backwards to defend[        ]  *Did CIA consider itself*
[        ] *lawyer?*  Practically speaking, *did CIA work on behalf of the citizens of*
*Idaho and Iowa or for*[        ]?  In foreign policy, the intelligence standard for
severing a relationship should simply be whether a heavy preponderance of the evidence
indicates that a partner is unsuitable or undermines the broad mix of US foreign policy
objectives.

4. **Myth:** [        ] helped America in the [        ] Drug Wars.  After all,
[        ] acreage declined markedly after [        ] and many drug seizures took place.
**Fact:**  True and true.  **Unfortunately, the real measure of success is not coca plantings
but whether cocaine production or shipments to North America actually declined.
This is far more difficult to determine.**  After all, human beings don't consume coca
plants, they consume cocaine.  What is known, moreover, is that yields in the remaining
acres under cultivation appear to have increased somewhat even as total acreage under
cultivation declined (according to the *Observatoire Geopolitique des Drogues* in Paris
and *DEA* analysis).  Likewise, some overt reporting indicates that while acreage was
declining in[        ]                              ] Let's face it-[

     ]  **Secondly, it seems possible that at least some of the cocaine seized by the**

[
                              ] if current DEA theories are valid.  A recent news
service report suggests that[        ] alleged front man in[        ] allegedly shipped
[        ] was the man to whom[
seized drugs for resale.  (This would seem to explain the occasional stories in the
[        ] press[        ] of missing drugs from government warehouses.)  While it may
be true that[        ] is innocent of the charge, it is undeniably true that he could not be
found as of early[        ]                              ]
     Thirdly, if[
          ] this sure didn't help America.  The author would note in this regard that
the[                              ]
apparently became military contractors for the[        ]
     Finally, this author understands that the street price of cocaine in the US market
has been on a downward glide path from the mid-1990's to 2000.  Unfortunately, since
price is a generally a function of supply and demand (even for cocaine)—and demand
remains reasonably strong in this country—this would seem to indicate that cocaine
remains quite plentiful.

59

Unclassified

Unclassified Annex: **Was [    ] an Agent?**

This question deserves closer examination. I suggest that as you read my personal analysis below, you ask yourself the following questions:

**Does anyone seriously expect CIA to do anything other than minimize the extent of this embarrassing relationship?**

The corrupter of [    ] a human rights violator, a narcotics and weapons trafficker, a blackmailer, a briber, a money-launderer, and arguably the most wanted man in [        ] who, in his right mind, **would admit that they had been** [    ] **friend?**

As we are now aware, the man in question [    ]

Of course, the contention by the USG that [        ] was not *"an agent"* is somewhat strained and, unfortunately, typical of CIA's hair-splitting mendacity. What CIA actually means to assert—now that its judgment has been so discredited—is that [    ]

Viewed from another optic, every professional case officer knows that it is not necessary for a person to take a formal salary in order for CIA to view him/her as "special." And, rest assured, CIA viewed [    ] as unique, useful, and often responsive. CIA may indeed have fretted about its limited ability to influence this prickly

60

Unclassified

Unclassified

personality but the strange sense of bonhomie, emotional obligation, shared history, and support still provided considerable forward momentum on various issues.
Besides, _____ did not brag openly about his relationship with CIA. This is one of the behavioral characteristics that every case officer seeks to establish in any "special" person.

CIA will argue, probably out of embarrassment, that _____ was not paid a cash salary and not always responsive so, ipso facto, he could not have been an agent. I would respond that no one, paid or unpaid is ever fully responsive. **Yet the fact remains that neither CIA nor** _____ **broke off the relationship—no matter what the provocation—until** _____. In other words, it was generally friendly, supportive, and exceedingly durable.   CIA was able to overlook virtually any "malicious rumor" about _____ and the latter, in turn, tried not to get too annoyed when CIA asked him the occasional tough question. The relationship endured. (Note: The apparent, albeit largely ephemeral, decrease in _____ production after _____ also helped to reinforce CIA's belief in _____ utility.)

Both sides got what they wanted: CIA, the psychic rewards of a warm welcome by the _____ the very useful political insurance policy that only CIA could provide.

*CIA, the lawyer for Tony Soprano?*    Judge for yourself.

Unclassified

# EXHIBIT "3"

# December 12, 2002 APR Memorandum

UNCLASSIFIED//AIUO

CIO/IMS 0108-02
12 December 2002

MEMORANDUM FOR:  Franz W. Boening
                 Foreign Broadcast Information Service, DS&T

FROM:            Herbert O. Briick
                 Executive Secretary, Agency Release Panel

SUBJECT:         Consideration of Appeal of ACMRP Decision.


        1.   This is in response to your request that the Agency
Release Panel (ARP) consider your appeal of the decision of the
Agency Classification Management Review Panel (ACMRP), the
successor to the Classification Management Review Group
Augmented Panel, regarding the classification of your complaint
made under the Intelligence Community Whistleblowers Protection
Act of 1998 (the Act).

        2.   Background:  On 10 May 2001, you initiated a
whistleblower complaint regarding a classified matter which you
deemed to be an "urgent concern" that you had a right under the
Act to complain about to Congress.  Since the Act applies to
"urgent concerns" involving classified information, Central
Intelligence Agency (CIA) procedures implementing the Act, as
set forth in the Attachment to AN 7-2-1, require that the
appropriate CIA officials be consulted to determine whether any
information contained in an employee complaint is classified.
After such consultation was undertaken, it was determined that
your complaint did contain classified information, and your
complaint was marked so that you, and any CIA and Congressional
officials involved in the review of your complaint, would be
alerted to the specific portions of your complaint containing
classified information.

        3.   After your complaint was submitted to the CIA Office
of Inspector General and appropriate Congressional officials in
accordance with the Act, you indicated that you wanted to
publish your complaint by providing it to the National Security
Archives, a nongovernmental public interest advocacy group.

All Portions are Marked
UNCLASSIFIED//AIUO

UNCLASSIFIED//AIUO

UNCLASSIFIED//AIUO

SUBJECT:  Consideration of Appeal of ACMRP Decision


Since you further indicated that you believed your complaint
was, in fact, unclassified, on 2 July 2001 you requested that
your complaint be reviewed under the classification challenge
provisions of Executive Order 12958 and CIA implementing
regulations.

4.  Upon receipt of your complaint by the predecessor
Executive Secretary of the Agency Release Panel (ES/ARP) for
review under the classification challenge provisions of the
Executive Order and CIA implementing regulations, it was
assumed, without further analysis, that your complaint met the
threshold legal criteria necessary for a classification
challenge to take place.  Based upon this assumption, an initial
review of your complaint was commenced under 32 CFR, Part 1907
and AR 70-3 by the ACMRP.  After completing its review, the
ACMRP determined that, with the exception of one item, the
information in your complaint which had been previously
identified as classified was, in fact, properly classified.

5.  Upon being informed by the Executive Secretary (ES)/ARP
of the decision of the ACMRP regarding your complaint, you
appealed the Panel's decision to the ARP.  During the pendency
of your appeal, informal efforts were undertaken to assist you
in revising your complaint so that it would express your
personal opinions without revealing classified information.
When these efforts proved unavailing, your appeal to the ARP was
formally scheduled for consideration.  Meanwhile, the individual
serving as ES/ARP was selected for another assignment, and I was
appointed as the new ES/ARP.

6.  In the process of preparing for consideration of your
appeal, I focused on your strongly expressed views that your
complaint was not an official expression of the CIA.  This, in
turn, caused me to question whether a whistleblower complaint
made under the Act is actually reviewable under the
classification challenge provisions of the Executive Order and
CIA implementing procedures.  As a result of my concerns, I
requested the Office of General Counsel's (OGC) legal opinion
regarding whether the requisite jurisdiction exists for CIA
employee complaints under the Act to be reviewed pursuant to the
classification challenge provisions of Executive Order 12958 and
CIA implementing regulations.

2

UNCLASSIFIED//AIUO

SUBJECT:  Consideration of Appeal of ACMRP Decision


7.   In response to my request, OGC has advised the ARP that
a CIA employee whistleblower complaint is a "personal record"
created by the employee acting in his personal capacity, and
therefore, in accordance with the classification challenge
provisions of Executive Order 12958 and other relevant legal
guidance, the requisite jurisdiction does not exist for CIA
employee complaints under the Act to be reviewed pursuant to the
classification challenge provisions of Executive Order 12958 and
CIA implementing regulations (32 CFR, Part 1907, as procedurally
supplemented by AR 70-3).  OGC has also advised that while there
is no jurisdiction to review your complaint in the context of a
classification challenge, your complaint is reviewable under the
AR 6-2/Employee Bulletin 0003-02 procedures that apply to any
writing by a current employee about the Agency that is intended
for nonofficial publication.  Please note that AR 6-2i(2)
prohibits CIA from denying permission to publish "solely because
the statement may be embarrassing or critical of the Agency."

8.   Conclusion: Based on the foregoing, since your
complaint is not reviewable under the classification challenge
provisions of Executive Order 12958 and CIA implementing
regulations, neither the ACMRP nor the ARP has the jurisdiction
to review the classification of your complaint.  As a "personal
record" created by you in your personal capacity, the
classification of your complaint must be reviewed under the AR
6-2/Employee Bulletin 0003-02 procedures that apply to any
writing by a current employee about the Agency that is intended
for nonofficial publication.

9.   Please accept my profound apologies for the incorrect
processing of your complaint, and the time that that incorrect
processing has entailed.  I stand ready to help facilitate the
expedited processing of the review of your complaint through
your supervisory chain of command, if you desire my assistance
in that regard.  No further action will be taken by the ARP on
this matter.

Herbert O. Briick

3

SUBJECT:  Consideration of Appeal of ACMRP Decision


Distribution:
  Orig - Addressee
    1 - D/IMS
    1 - DD/IMS
    1 - C/IRRG
    1 - Bruce Burke
    1 - Lisa Studtmann
    1 - Richard Puhl
    1 - Laura Shea
    1 - Kristi Kenniston
    1 - AC/PPRD/IRRG
    1 - D/History Staff
    1 - ARP Members
    1 - Fred Manget (DGC)
    1 - Nancy Fortenberry (GC/EA)
    1 - CIO/IMS/FO File Subject
    1 - ARP File

**4**

# EXHIBIT "4"

## PRB Submissions

**UNCLASSIFIED//AIUO**

16 January 2003

Memorandum For: Melda[    ] C/HRS/FBIS

Information:  Douglas[    ] Director, FBIS

Subject: **Record of Grievance Against FBIS Managers**

1. Introduction: I wish to record a grievance against senior managers at FBIS. I allege
that certain supervisors continue to judge me not by objective performance but by my
"attitude" toward the CIA and by critical opinions that I have allegedly shared with
younger officers and/or new EOD's. I shall describe my allegations in the following
paragraphs and explain why they are improper. *I request any and all reasonable
redress—to include counseling and possible reprimand of the offending officers.*

2. Two FBIS officers, in particular Joyce Forrest, C/ENEAG, but to a lesser extent
Michael[    ] C/TNEP, have told me that they "are concerned" by "negative
comments" about CIA that I have allegedly made to unnamed "young officers and new
EOD's." Despite their "concern" neither Forrest nor[    ] have described to me, nor
documented in any way, a specific instance where these alleged comments were made.
Yet, it is clear from one "PAR feedback session" with Forrest and several other
conversations with[    ] including "PAR signing discussions" that both officers assess
my well-known critical views of CIA (and in Forrest's case other criteria) as barriers to
career advancement. Moreover, my alleged views continue to factor prominently into
their assessment of my performance and were negatively commented on in my most
recent, December 2002 PAR—despite a complete absence of documentation.

3. I contend that taking anyone's privately-held opinion of CIA's general effectiveness
into account in a performance appraisal report seems contrary to the Agency's policy on
diversity, is not permitted by any CIA regulation, can be plausibly interpreted (in my
case) as a form of retaliation against a *whistleblower*, and is a probable violation of one's
First Amendment rights. I am greatly disappointed that these senior managers seem
obsessed with controlling personal opinions and an employee's possible sharing of them
with "young officers." This unprofessional conduct is equally disappointing because it
subordinates all other contributions that a person may have made to the intelligence
mission (in my case, very substantial, pioneering contributions), to these managers'
obsession with an employee's private views and "how to control" them.

4. I discovered the phenomenon described above during a revealing PAR feedback
session with Joyce Forrest on the afternoon of 25 October, at 1500 hours. After a give
and take criticism, in which Forrest criticized my "poor writing" and my "bad judgment,"
I detected a previously unknown, yet profound subtext to the conversation. Forrest
proceeded to make multiple undocumented criticisms, which clearly had played a role in
her assessment of me—and had been recorded nowhere, hitherto. Among other things,
Forrest noted that she and[    ] (but especially[    ] she claimed) were "concerned"
about my comments to "young officers." Dumbfounded, I joked that perhaps FBIS

62
**UNCLASSIFIED//AIUO**

UNCLASSIFIED//AIUO

( should give me a comfortable, private office to keep me from contact with them."
Forrest calmly responded, to my great surprise, "actually, we are considering just that."
She noted that it was for this reason that I was not allowed "to mentor any young officer."
When I pointed out to her that I was already mentoring, for all practical purposes, one
5 young EOD, Wesley[    ] and that the results seemed quite positive, she offered no
comment. She proceeded to make other undocumented observations about my alleged
behavior, *which revealed a level of psychological bias that I have never witnessed before
in the CIA*. She asserted that the reason "FBIS has no video program" was because Ken
Hughes, the former head of FBIS/CTU, had not been able to call on me to manage the
*Blue View* Web research initiative because Hughes felt that my "attitude towards *Blue
12 View* was negative." Consequently, "FBIS managers had to make our video lead, Joe
[    ]the *Blue View* manager." Thus, Forrest continued, "Franz, you the reason FBIS
does not have a video program." To this unusual, undocumented (and inane) argument, I
responded that Ken had never offered the *Blue View* project to me, that he had not spoken
with me orally (or telepathically), and that, in the event, FBIS managers had inadvertently
made the correct decision to allow me to continue work on militant Islamic issues, as my
contributions had been indeed pioneering. Nonetheless, I acknowledged to Forrest
private doubts about *Blue View's* efficacy, given my background as one of only two
regular FBIS speakers on Internet exploitation issues, and my taxpayer's awareness of the
20 project's considerable cost (eight million dollars). I reminded Forrest that it is any
employee's right to harbor private reservations about any untested research program—but
that I had expressed these reservations to no more than 1-2 people, in any case. In one
final, undocumented assertion, Forrest asserted that I had "driven away" young FBISer's
24 like Kevin[    ] I vigorously denied this allegation and told Forrest that she clearly
did not know what she was talking about. I noted that perhaps "bad management" had
26 played a role in [    ] departure. The discussion ended inconclusively shortly
thereafter, having lasted for more than one hour.

28 6. On 12 November, during a 45-minute private conversation with[    ]I shared with
him Forrest's comments, in particular, my alleged "unsuitability" to mentor or speak with
young officers. Although a bit surprised, he sympathized with my irritation and
emphasized that he had no problem whatsoever with informal critiques of CIA. He
requested only that I be positive about the FBIS work at hand—which he acknowledged
33 had been my practice with young officers such as Wesley[    ]. He promised to discuss
the issue with Forrest and reluctantly divulged that it was Forrest who did not believe me
suitable to mentor young officers.

36
37 7. However, during two conversations with[    ]in mid-December 2002 to discuss my
PAR,[    ]contended that he also had become "concerned" about my interaction with
young employees, a fact that he recorded in his comments on my PAR. While he
39 acknowledged my great assistance to officers like[    ]he said that "he preferred not to
provide details" to me about my alleged offending remarks.

41 8. As some officers in FBIS are aware, (including[    ]Hughes, Kelly[    ]Rich
42 [    ]and Gina[    ]) I am a former *whistleblower* at the CIA and perhaps enjoy a

63
2

UNCLASSIFIED//AIUO

**UNCLASSIFIED//AIUO**



deserved reputation for outspokenness. Peers seem to have no problem with this fact—very many routinely ask me for advice—and I get along with everyone in the organization quite well (except for 1-2 managers).  Moreover, a handful of other CIA supervisors find my views refreshing.  Yet, whatever may be managers' privately held opinion of my critiques of the CIA—the following facts are undeniably true:

a.[＿  ]and Forrest expressed no criticism whatsoever of my outspokenness during the previous PAR period.

b. Neither[   ]nor Forrest documented their "concern" in any way; nor do they describe the alleged incident(s) that seem to trouble them.  In other words, there is no written record of their reported "concern."  *(Comment: But their "concern" most certainly played a role at the 2002 panel and will play another important role at the 2003 panel.)*

c. Forrest and[      ]did not feel strongly enough about their "concern" to contact the Office of Security.  If they were so "concerned,' they made their views known to no one.  Moreover, it seems likely that[      ]did not even discover his "concern" until he was reminded of the need to comment on his "concern" in my December 2002 PAR.  *(Comment: Am I required to guess managers' thoughts?)*

d. Neither[      ]nor Forrest allege that I am fundamentally wrong in any criticism of CIA.  Neither claims that my alleged comments—whatever they were—lack factual basis.  [     ]also acknowledges no problem with criticizing CIA's performance to "mature" employees.  *(Comment: Should I ask an employee's age before venturing comments that an overly sensitive manager might construe as "negative?"  Are all young employees immature?)*

e.[     ]freely acknowledges that I have been of great service to young EOD's like Wesley[    ]  Both[    ]and Forrest acknowledge that I am above average in initiative and productivity and exceptional in expertise.

f.[    ](and perhaps Forrest) are "concerned" only with my comments to young officers and new EOD's, not to all CIA employees.  In other words, I am "unfit" to discuss the Agency at large with only one group—the young.

g. Agency regulation AR 20-16, which governs PAR writing, does not list "political correctness" or "willingness to sing CIA's praises to young officers" as factors that can be considered in a performance appraisal report.  Nor were these two factors listed in my 2001 "goals and expectations" statement. *(Comment: Agency practice also does not permit taking into account whether a person smokes.  Why?  Because smoking is a personal choice.  Yet, smoking in front of "young people" could easily be construed as "negative."  Therefore, would it be proper to put in a PAR "he smokes and is a bad role model for young people?"  Of course not!)*

**UNCLASSIFIED//AIUO**

UNCLASSIFIED//AIUO

**1**
**2**

h. Agency regulation AR 20-16 states clearly that *evaluation factors for managers* (like Forrest and ⎡          ⎤ are, among other things: "Valuing and Managing Diversity" – i.e. . . .the degree to wish a manager views *differences* as assets, and utilizes these *differences* to accomplish organizational goals. . . (my italics).

**10**

i. A rarely applied Agency regulation, AR 51-3, actually encourages critical assessments of the Agency's intelligence performance.  Conversely, no regulation prohibits a CIA employee from sharing with colleagues his/her private assessment of Agency performance. *(Comment: In view of AR 51-3, why would a manager object when an experienced employee informally critiques CIA's performance in the presence of a less experienced employee?)*

j. The CIA's policy on diversity, first promulgated in Feburary 1999, specifically states that every employee should be treated with "integrity and respect" and that "everyone's voice should be heard." *(Comment: Except mine?)*

k. No employee signs away all aspects of his First Amendment rights when he accepts employment at CIA. I certainly didn't. *Do certain FBIS managers consider it their duty to police their subordinates' informal comments to colleagues?  Comments that are unrelated to FBIS' work?*

**20**
**22**

l. Based on her lengthy comments on 25 October, it is clear to me that Forrest most certainly did factor in my personal criticisms of the Agency to young officers (and other inane, undocumented criteria) during her "defense" of me at the GS-13 panel in early October 2002.  Similarly, ⎡          ⎤ was critical of my comments to young employees in my recent PAR from mid-December 2002. *(Comment: With overwhelmingly biased "advocates" like Forrest at the panel, who needs enemies?  See paragraph 5 above.)*

**9. The Context:** As many people are aware, I am a former whistleblower and I have been quite critical of CIA's intelligence performance, particularly in the run-up to the 9/11 attacks.  I do not deny or apologize for this nor do not hesitate to share my opinion with co-workers.  (But I do not give seminars!)  I have also described to several young employees instances of undeniable corruption at CIA. *What of it?* These days, as everyone is aware, it seems every second congressman is critical of CIA's intelligence performance and two investigatory committees have been established to examine it.  So, why is it illegitimate for an experienced CIA officer to privately share opinions voiced by elected officials such as Senator Shelby or Congressman Porter Goss, both of whom have been critical of CIA? *(Whether managers consider my outspokenness "negative behavior" is up to them—but they cannot make it a criterion for advancement.  I prefer to describe myself as "critical" of CIA and believe government bureaucracies need such people to offer contrary and constructive criticism.  If others refuse or disdain this role, that is their choice.*

65

**UNCLASSIFIED//AIUO**

*Incidentally, according to a recent article in Time magazine, the majority of Americans believe that whistleblowers perform a useful role.)*

10. It is worth noting that shortly after 9/11, I was sought out by the Denial and Deception Staff of the National Intelligence Council to speculate over possible reasons why CIA had been unable to warn of the attacks. Similarly, I was summoned for a lengthy interview with the US Congress' 9/11 Investigatory Committee headed by Eleanor Hill in late spring 2002. During the interview with Hill's staff, I made a large number of criticisms of the performance of CIA's Directorate of Operations, as I am a former Arabic-speaking case officer with considerable agent-handling experience. During the two-hour meeting, the investigators specifically requested a report that I had written several years ago documenting CIA's inability to predict attacks from one terrorist group. They thanked me for the report and for my observations about how the DO operates. *Why do I relate this?* Because I have made identical comments and observations to young officers like Wesley\_\_\_\_ \_\_\_\_(with no discernable "negative" effect). Therefore, is it proper, wise, or legal for CIA to make this a matter of negative comment in a PAR? Is it proper for a senior manager like Forrest to take such criticisms of CIA into account? Did not George Tenet say that no one would suffer retaliation for speaking his mind to congressional investigators? *If so, how can CIA publicly encourage employee feedback to the 9/11 Investigatory Committee in one venue and how can Congress pass the Whistleblower provision of the 1999 Intelligence Authorization Act—and simultaneously punish the same employee for making identical remarks to young employees in an internal setting? What is going on here?* (Comment: *Wesley\_\_\_\_ knows of the existence of my whistleblower action re "M" but has not read the complaint. Does Title Seven prohibit sharing of a whistleblower experience with cleared employees? No, it does not. Are my comments to\_\_\_\_ about M the mysterious "negative comments" of which Forrest speaks?)*

11. In the event of an unsatisfactory resolution to the matter, I will pursue it with the Office of the Inspector General. It seems to me that there had better be an excellent reason why the only person in FBIS told not to share critical opinions of CIA with young officers—indeed, who is privately considered unsuitable to have contact with them—just happens to be FBIS' only former whistleblower. All a coincidence?

12. The situation described above is unbecoming of a great public institution and demands an explanation. Thank you for your kind attention to this matter.

**UNCLASSIFIED//AIUO**

Unclassified

subverts not just the provisions of E.O. 12958 *such as the absolute prohibition against covering up possible crimes through classification* but also my First Amendment rights. (By what sort of un-American, Orwellian logic can CIA make an employee's discussion of overt news items secret?)

**7. Action Requested: I kindly request that you contact the CIA, including the Office of the Inspector General John Helgerson, to investigate—and if warranted— rectify the situation described above.** I delivered an electronic version of this letter to CIA/OIG on 13 December. My right to appeal to the ISCAP is being ignored and CIA is in seeming violation of E.O. 12958. Good faith on the part of CIA—OIG being the likely exception—seems to have evaporated.

8. Please feel free to email me                    and/or call me at my office (703-613-5980) or home                    should you desire further information.  For your background, I currently work for the Foreign Broadcast Information Service in Reston, Virginia. At FBIS, I work on militant Islamic issues and related        topics. I entered on duty with the federal government on October 20, 1980 and my SSN is

Thank you for your kind attention to this matter, and . . .

Season's Greetings

Franz Boening

67

March 24, 2003

To:      John L. Helgerson, Inspector General, Central Intelligence Agency

Info:    Buzzy Krongard, Executive Director, Central Intelligence Agency
         Office of General Counsel
         Office of Congressional Affairs

From:    Franz Boening, Foreign Broadcast Information Service

Subject: *Urgent Concern* filed under Title Seven (the *Whistleblower Provision*) of the
         1999 Intelligence Authorization Act - CIA's Record of Retaliation Against a
         Whistleblower

**1. This memorandum is an *Urgent Concern*. It describes the history of CIA
retaliation against an internal whistleblower.** Actions requested (in approximate
order of importance):

- Kindly investigate the history of retaliation described below and provide
  suitable redress.

- Take appropriate action to make CIA an exemplary bureaucracy.

- Enforce the Agency's stated policy on diversity and brief managers about the
  *Whistleblower Provision* and its implications.

- Consider suggesting to the Senate Select Committee on Intelligence and to the
  House Permanent Select Committee on Intelligence that performance
  appraisal reports for whistleblowers be drafted by CIA's OIG.

- Consider reprimanding guilty parties.

- Improve my personal situation by compensating me for past retaliation.

**2. This memorandum alleges that some CIA managers have retaliated against me in
a series of incidents over the years because of separate *Urgent Concerns* submitted
in both October 1998 and again in May 2001. I have suffered discrimination in
assignments, promotions, and training as a result.** As your office is aware, Title
Seven (the *Whistleblower Provision*) of the 1999 Intelligence Authorization Act,
expressly prohibits retaliation against a whistleblower for submitting an *urgent concern*.
Yet, a whistleblower's fair treatment ultimately depends not so much on the law or an
organization's stated policies, but on the quality, integrity, awareness, and goodwill of the
senior officials who administer the bureaucracy.[1] Given that the law allows the

---

[1] If the *Whistleblower Provision* of the 1999 Intelligence Authorization Act, the Lloyd-LaFollette Act of
1912, the USG's code of ethics, other regulations, and CIA's stated *policy on diversity* actually ensured fair
treatment and non-retaliation, then a whistleblower would have absolutely nothing to worry about.

CL BY: 0711(3)
CL REASON: 1.4(C)
DECL ON: 20300304
DRV FROM: UA 1-03
         Coc 2-03

CL REASON: 1.5(C)
DECL ON: X1
DRV FROM: M(S1-87

UNCLASSIFIED//AIUO

whistleblower, and not the bureaucracy, to decide when he believes that retaliation has occurred and report it to appropriate authorities, I have drafted this memorandum.

3. Background: As some senior CIA managers are aware, in October 1998, I alleged in an *urgent concern* that Lee Strickland, at the time CIA's publicly identified information release officer, had consciously misled Congressman Dennis Kucinich (D-Ohio) in his testimony regarding the failed Human Rights Information Act. Although no OIG investigation ensued, DCI George Tenet privately apologized—apparently very profusely—to Congressman Kucinich for Strickland's conduct.[2] Tenet denied, however, that "criminal intent" had existed on the part of Strickland. In a separate complaint in May 2001, I alleged that CIA had likely violated US law in its overtly reported "relationship" with⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯[3] You will recall that⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯[3]In a word, there was strong prima facie evidence that both whistleblower actions were justified. The two *urgent concerns* were not frivolous.

4. (Historical Note: CIA did not investigate either complaint formally. Although this aspect of CIA's conduct is an interesting counterpoint to the subsequent retaliation that I allege, the organization's seeming apathy about the *urgent concerns*, albeit perhaps inexplicable from the public policy standpoint, is not the purpose of this memorandum. It does call into question, though, CIA's general willingness to abide by the spirit of Title Seven, the *Whistleblower Provision*. In fact, CIA's demonstrated disinclination to actually investigate an *urgent concern* formally has been criticized by some in Congress.[4])

5. The following paragraphs shall describe in detail a series of incidents, decisions, actions, and conversations that, while perhaps individually excusable or understandable, constitute, in the aggregate, a history and pattern of CIA retaliation against a whistle-

---

Unfortunately, private attitudes are more important than laws, regulations, and stated policies. Managers are too often guided by the former and ignore the later.

[2] Congressman Kucinich had been angered by Strickland's misleading information and by other CIA officials. He told me personally about the DCI's apology.

[3] I read about the alleged "relationship" in the newspapers. Consequently, this *urgent concern* does not constitute official CIA acknowledgment that⎯⎯⎯⎯⎯had a "relationship" with CIA. I speak for myself on this issue and only CIA knows the truth of the matter. I remind readers that I enjoyed no official access whatsoever to any USG document, which dealt with⎯⎯⎯⎯⎯(except those available at the *National Security Archive* after their official release).

[4] Other USG departments, including the FBI, the Defense Department, and the Department of Transportation, actually investigate whistleblower complaints. However, CIA's proven reflex in response to any hint of official wrongdoing in an *urgent concern* is to exonerate itself without any formal investigation. CIA does this by simply asserting, "an investigation of this matter is not needed." Yet, the non-investigation of a credible *urgent concern* accompanied by retaliation against the whistleblower is simply not too impressive from the public policy perspective. (For added insight, see Iden cc's comment in "classified" appendix.)



blower. It is the story of an organization whose managers will retaliate even years after a whistleblower has submitted his *urgent concern*. Although I consider myself a tolerant and reasonably easy-going person, and not one to jump to conclusions, egregious incidents at the Foreign Broadcast Information Service in particular have confirmed my belief that de facto CIA retaliation exists, and has existed for several years. (It has taken years of careful observation to make sense of the individual events.[5]) The retaliation has been sometimes quiet or oblique and other times not so quiet; sometimes coordinated and other times seemingly uncoordinated. Although I do not allege that all CIA managers have retaliated, it is most certainly true that some managers have retaliated—and I have paid a tangible cost for their inappropriate actions. Therefore, I remind the most senior levels of CIA that they are responsible for the conduct of all, repeat all, CIA managers.

*6. It has become time to catalog the irritating history of retaliation for posterity and, I freely admit, possible legal action. For if the incidents are not listed, explained, and dealt with, the law guaranteeing whistleblowers freedom from retaliation (Title Seven of the 1999 Intelligence Authorization Act) will continue its transmutation into an object of quiet contempt—and mockery—by CIA managers. The law will lose all practical meaning and, I fear, some CIA managers will remain tempted to retaliate against the next whistleblower.[6] And, if this happens, what good is the law?* Nevertheless, basic fairness demands that CIA be allowed to respond to the allegations. My employer is entitled to attempt to rebut every single allegation of retaliation—which I do not consider even remotely possible—*or to take constructive corrective action.* It is my hope that OIG will investigate this issue fairly and expeditiously and will realize that my allegations have merit.

**The Chronology of Retaliation:[7]**

---

[5] But, nearly 23 years as an intelligence officer prepares a person for such observation and analysis.
[6] The American public, according a to a poll appearing in *Time* magazine over the New Year, generally believes that whistleblowers play a positive role, (notwithstanding the bureaucracy's opinion of them). Several whistleblowers, including Coleen Rowley of the FBI, made the cover of the magazine only a few months ago. In a word, only bureaucracies dislike whistleblowers. That's why blowing the whistle is not just legally defensible but it is also morally and politically defensible.

[7] Or, more accurately, of *visible* retaliation. The high likelihood of passive retaliation—such as never being offered a management opportunity in 22+ years of service—is an extremely difficult phenomenon to detect and to "prove." Therefore, I will not engage in non-credible speculation on this issue in the absence specific evidence.

A few instances of visible retaliation have been omitted. Why? For various reasons: a) I sensed the person who could corroborate my allegation fears to talk to OIG, b) OIG may not protect his/her identity c) CIA may retaliate against them for assisting me d) I do not wish to be so paranoid as to assume that every tiny slight is an instance of retaliation. (In fact, my thick skin is the reason why it has taken be so long to write this memorandum. Besides, I do not like to take USG time to draft *urgent concerns* without good reason. Yet, it is striking that some employees are so afraid of managerial retaliation that they do not want even to be seen to corroborate a whistleblower's allegation of retaliation. This, in itself, is an interesting comment on CIA's corporate culture.)




UNCLASSIFIED//AIUO

7. (Background note: Paragraphs 9-17 were drafted largely in February 1999, only a
few months after my first *urgent concern*. They were passed to Identity a (Iden a) of the
Office of the Inspector General, as an informal "draft 3rd Whistleblower Urgent
Concern." I observed to Iden a at the time that I was prepared to take legal action
against CIA if the issues described were not addressed. As a result of the draft, Idens a
and b generously helped to overcome Foreign Broadcast Information Service's
resistance to my employment described in paragraphs 9-10. Both officers were helpful,
professional, and very fair-minded. Paragraphs 18-37 were drafted in January-March
2003, after I learned new information that made it clear to me, beyond a shadow of a
doubt, that some CIA managers continued to view negatively my whistle-blowing
activities in their promotion, assignment, training, and travel decisions. The realization
that the issue of continuing retaliation would not just "go away" without confronting the
bureaucracy is what prompted me to write this memorandum.[*] It is worth noting that the
fact of the first whistleblower action was not tightly held within CIA in fall 1998 and was
openly discussed in DO staff meetings. Therefore, it is safe to assume that the second
*urgent concern* was also freely discussed, particularly within LA Division of the DO and
on the Seventh Floor.)

8. (Second background comment: Where I use quotes below, I do so for emphasis and
not because I recall the exact words used, unless otherwise noted. As all readers are
aware, personal recording devices are not permitted on CIA property and the
conversations below could not be recorded. Therefore, unless described otherwise, my
words attempt to capture the essence of what was said. The conversations had no other
participants besides myself and one other person. In some cases, I described to others
the content of conversations so that they could vouch for their veracity—but in all cases I
quickly made informal, contemporaneous notes of what was said. Finally, separate
attachments for identities and related documentation are provided. True names have been
listed separately for privacy reasons and other identities and facts because I believe they
are classified or classifiable.)

9. The first incident occurred about three and a half months after my first whistleblower
*urgent concern*. During a 15-20 minute telephonic conversation late on the afternoon of
18 February 1999, Iden c, then employed by the Foreign Broadcast Information Service,
informed me that I was unsuitable for a position as an analyst (Iden d), a job for which I
had formally applied during the first week of January 1999. I had applied for the
position about two months after my first whistleblower action. With perceptible
nervousness in his voice, Iden c contended that my writing skills were "not good enough"
for FBIS, that my analytical skills were poor, that despite my acknowledged fluency in
Arabic, extensive agent-handling experience, strong area knowledge, and the fact that I
was the *only applicant*, I would simply not be a "good fit" at FBIS.

---

[*] It is better to deal with the problem of retaliation definitively, to include possible legal action, rather than
for the rest of my career. This is not just good for me but for the next well-intentioned guy who wishes to
invoke Title Seven.


SECRET



10. But, it was Iden c's additional remarks that really caught my attention and which I
found particularly irritating—as they almost certainly constituted a form of retaliation.
In a memorable exchange, Iden c characterized me as *"enthusiastic, aggressive, perhaps
abrasive, and the classic lone wolf"* (I recorded for posterity Iden c's exact words
immediately after the conversation). He maintained that it was simply "too risky" for
FBIS to employ me and that he feared that I would prove to be like an earlier employee
who, although brilliant, had just left Iden c's component because of his apparent lack of
interpersonal skills. Yet, he could cite little evidence in support of my alleged lack of
"interpersonal skills." At the same time, Iden c contended that if he could write a
description of the *"ideal employee"* for Iden d, that employee would have all of my
objective qualifications. He quickly asserted, however, that he didn't want me and that
*"it would be better to have no one in Iden d rather than you."* Shortly thereafter,
superficial "pleasantries" were exchanged and the conversation ended. (At the time of
the conversation, I enjoyed good personal relations with members of my old component
and numerous friendly contacts in the building. My PARs reflected my competence and
most people thought that I had an excellent sense of humor.)

11. Interpretation: As I have mentioned, the incident described above occurred about
three and a half months after my first *urgent concern*. Is it not possible that Iden c
considered whistle-blowing of any sort the action of a *"lone wolf?"* Could a reasonable
person not interpret Iden c's seeming fixation with my personality as a form of
retaliation?[9] (Ironically, I did not object to the adjectives Iden c used to describe me.
But it is improper to deny a qualified person a job opportunity, especially when he is the
only applicant, based on selective and anti-diversity criteria.) Would Iden c have
preferred that I possess the opposite qualities—that I be unaggressive, unenthusiastic,
docile, and possess all the personality of a domesticated sheep? What had triggered Iden
c's reaction, as he did not know me personally?

12. For the record, I was not interviewed by Iden c in January or February 1999. I had
met Iden c, however, in the summer of 1997 when I applied for a different position at
FBIS. At that time, there was no perceptible tension of any sort between Iden c, his staff,
and myself. In fact, during our only meeting, Iden c had given me the strong impression
that he was eager to have me.

13. I believe that Iden c's cursory judgments concerning my "poor writing ability"
apparently stemmed from a subordinate's assessment of a lengthy non-commissioned

---

[9] The astute reader will detect in this memorandum a recurring CIA concern with my "personality " or my
"opinions." This is a perfidious (and deniable) way for a bureaucracy to engage in retaliation without
publicly acknowledging that it has a "philosophical problem" with the whistleblower. Yet, I ask, do non-
whistleblowers get this type of scrutiny? What certain managers do not understand is that this strange
concern is not permitted by any CIA regulation, the policy on diversity, the USG's code of conduct, the
DCI's stated views, or any US law (including the First Amendment and the Lloyd-LaFollette Act) as long
as these same employee's opinions do not impinge on good security or on professional performance. *Of
course a whistleblower is critical of CIA conduct! What of it?* Yet, in my case, CIA cannot possibly claim
that I have been professionally unproductive.



SECRET

UNCLASSIFIED//AIUO

1997 report I wrote on a sensitive issue in Middle Eastern terrorism, although it is equally likely that he was aware of the Lee Strickland *urgent concern*. This terrorism report had received very considerable in-house praise, at very senior levels, for its objectivity, boldness, and honesty. Indeed, Tom Newcombe, then in charge of HUMINT for the House Permanent Select Committee on Intelligence, told me that the terrorism report—and CIA's considerable reluctance to allow Congress to see it in fall 1997 and January 1998—had figured prominently into Congress' desire to establish the Whistleblower Provision in the 1999 Intelligence Authorization Act. Newcombe thanked me for the report and congratulated me, on behalf of HPSCI, for bringing it to their attention.[10]

14. The second incident occurred in mid-February 1999 when my immediate supervisor, Iden e, informed "certain members" of my component, Iden f of IMS, that IMS had instituted a policy to henceforth "severely limit overtime and/or compensatory time to IMS employees." Iden e proceeded to inform me that I would no longer be eligible for compensatory time but that my two colleagues, Idens g and h, *with whom I shared an office and job descriptions*, would continue to be eligible for overtime. When I formally complained about this apparent imbalance on 8 March 1999, Iden e could not explain the decision to my satisfaction and contacted Iden i. Iden i reiterated that only I would be ineligible for compensatory time.

15. Interpretation: Although there may be a reasonable explanation for this incident, it certainly isn't obvious to me. *I stress that I was the only member of my branch to be affected by the "new T/A policy," which had been introduced ostensibly to limit fraud.* In addition, I had regularly worked a small number of compensatory hours in my position and no one had accused me of any form of malfeasance or fraud. After checking with other IMS employees I learned that many were not even aware of the new policy and that, if it existed, it was enforced apparently only selectively. Therefore—and I am not one to jump to hasty conclusions—a neutral observer could easily conclude from the IMS action that I had been placed in a special category of "suspect employees," probably because of my whistle-blowing. The practical effect of the "new" TA policy was to deny *only me* a privilege enjoyed even by branch independent contractors.[11]

---

[10] After 9/11, I was contacted by CIA's National Intelligence Council and by Eleanor Hill's 9/11 Investigative Committee to discuss the report. In 1997, Newcombe told me that he had had to spent "all afternoon on the phone to the Seventh Floor" in order to warn CIA management against the temptation to retaliate. The prospect of retaliation was very real in Newcombe's view and could occur despite HPSCI's praise for the report. In hindsight, though, it is not so clear that Newcombe's effort succeeded. Because in 1998, I had applied for a routine GS-12 position in the CIA ops center, primarily in order to go to a flexible schedule. I was a GS-13 at the time. Another candidate was selected. Although I have not retained the details of this application, clearly, a junior officer "with broader experience" must have been chosen.

[11] Obviously, I did not begrudge compensatory time to my supervisor, Iden e, as his wife suffered from a serious medical condition that had forced him to exhaust his sick leave. Nevertheless, there was no excuse for management not to treat me like other IMS employees in my branch who retained their eligibility to earn CT/OT. Was this a form of retaliation? As I edit this footnote in early 2003, I remain convinced that it was.



SECRET

UNCLASSIFIED//AIUO



16. The third incident occurred on 1 March 1999 when I was informed by Iden j of the Office of Military Affairs that I would *"under no circumstances"* be allowed to be CIA's TDY representative in Iden k. This was during the period immediately before NATO's military deployment to Albania the same spring. I had volunteered to go to Iden k in early February 1999 at a time when CIA's volunteers could be counted on one hand. According to Iden j, a person calling on behalf of Iden l, then a senior official in CE Division, had informed the former that CE Division *"would 'go to the mat' to prevent Boening's deployment to Iden k."* The CE Division caller did not detail to Iden j why I was "unsuitable" but noted that *"Boening has done things abroad that we are concerned about..."* (Comment: What had I done?[12]) Iden j told me later that he was quite confused by his conversation with CE Division and remarked that, as far as he was concerned, I was not only well-qualified to deploy to Iden k, but that he considered me his *"number one candidate,"* an opinion he reiterated even after I apprised him of my whistleblower urgent concern. He told me, with some irritation, that CE Division had supplied absolutely no volunteers for this possibly risky deployment and that he did not have any other suitable candidates.

17. Interpretation: What was it that set off managers in CE Division when they heard my name? Was their refusal to allow me to go to Iden k a form of CIA retaliation? You will recall that the first *urgent concern* took place approximately four months earlier. Moreover, I had not been overseas with CIA in years, having returned from Iden m in summer 1995.

18. Spring 1999: Upon eventual assignment to FBIS, I was asked to work on a separate, non-traditional project, unassisted by any other member of iden n. The project consisted of single-handedly mapping a given constellation of websites. Upon completion of the project in summer 2000, FBIS took no action on the data compiled, despite the intelligence potential it represented. (In late October 2002, a personal friend at FBIS, iden o, having been appraised of the incident described in paragraph 29, confided to me privately that branch employees in Iden n *"had been cautioned about excessive contact*

---

[12] Although retaliation for whistle-blowing is the leading candidate given the timing, there is a second possible theory: I was recalled short of tour in 1995 almost certainly for having protested privately in fall 1994, in a one-page cable to the DDO, CIA's alleged relationship with_____ which I had read about in the *International Herald Tribune*. (This was before CIA's enlightened *"policy on diversity,"* which was first promulgated in February 1999.) According to the press,

*Important Note: This short footnote does not constitute CIA acknowledgment that_____ worked for CIA. I had no access to any classified information on this issue and I don't speak officially for the organization. I am simply relating what I read in the newspapers.* It is perhaps significant, though, that after I returned to CIA Headquarters in 1995, I was asked to begin a new and interesting career in the basement of Headquarters as a declassification worker.





UNCLASSIFIED//AIUO

*with me*" in spring 1999. He observed, however, that since that time, nearly everyone had grown to like me! In fairness to FBIS, by summer 2000 the manager of Iden n, Iden c, who had initially rejected me, seemed to appreciate my work very much, probably grew to like me, and was unhappy that FBIS had taken no action with the Internet data.[13])

19. Interpretation: While it may be justifiable to have a new employee work separately, for a limited period, is it ever appropriate for CIA managers to actually warn other employees about new ones? Is this the CIA's *"policy on diversity"* in action?[14] Or do only whistleblowers get this special treatment? Is not the net effect to prejudice everyone in advance against the whistleblower?

20. Late summer 2000: FBIS management denied me the opportunity for half-time (online) study in computer technology/management with the Rochester Institute of Technology. My supervisor at the time, Iden p, who had encouraged me to apply and with whom I had an excellent relationship, told me that she considered approval of the request to be "pro-forma." (Note: I regret that I do not have a copy of the denied application. Presumably, it is available from FBIS/HRS. Iden p will vouch for the fact of the application.)

21. Interpretation: A form of retaliation? In hindsight, it certainly seems likely. It is worth remembering that other FBIS officers, some of them with less experience or at a lower grades, had been granted sometimes expensive study opportunities, including the officer who denied the request, Iden q, and the officer who is investigating my grievance (see paragraph 31), iden u. Moreover, FBIS has sponsored employees even when the proposed field of study (i.e., journalism, business, or international relations) bore only a superficial relationship to FBIS' intelligence needs.

22. Summer 2000: During an out-of-cycle polygraph, I was subjected to an inordinate number of probing questions about my contact with Congressmen regarding my *urgent concerns*. The repeated questions—and suggestions that I was not being forthcoming—finally resulted in my warning the examiner that I, *"was beginning to view his incessant questions about strictly whistleblower activities as a possible form of CIA retaliation."* I

---

[13] Iden c's personal experience with me is an excellent reason why the policy on diversity should be enforced. Iden c initially rejected me and then discovered that I was very productive.

[14] The words of CIA's *Statement on Diversity* are indeed something everyone can be proud of. But, CIA's general non-enforcement of the policy is not so admirable. An excerpt from the policy reads, "We *must ensure that those with different perspectives have a seat at the table and a meaningful voice in the discussion . . . each and every one of us . . . can find a ways to help make our offices vibrant places where diversity is welcome, where a variety of views is sought and heard, where equal opportunities for training and advancement are afforded, where people are valued for the content of their characters and rewarded for the value of their work . . . the higher your rank, the more accountable you will be for ensuring that this Agency and Community are inclusive institutions . . . that differences are regarded as organizational assets rather than liabilities, and that every employee is treated with fairness and dignity."* (Comment: Noble sentiments, indeed. Unfortunately, CIA does not like to hold managers responsible for their intolerance or occasional vindictiveness. This is one reason why blowing the whistle is so unwelcome.)



SECRET

SECRET
UNCLASSIFIED//AIUO

reminded him of Title Seven, asked if he had read it (he had not), and informed him firmly that we should "change the subject." I told him I would answer no further questions dealing with my congressional contacts or related *urgent concerns*.

23. Interpretation: I believe that it is an arguable form of retaliation when a whistleblower gets raked over the coals about his *urgent concerns* during a polygraph. Do all CIA officers get this treatment? Why was CIA so obsessed with whistleblower activities over a year and a half after the *urgent concern*? Was this proper? What was the security issue when everyone I had spoken with at Congress had had the requisite security clearances?

24. In early February 2002, shortly before I was to leave on a 10-12 day tdy for Thailand and Pakistan,[15] iden t obliquely signaled to me that FBIS management would be watching my behavior particularly closely. She said, *"this is a big tdy for you, Franz. If you perform well it will 'help a lot.'"* As I considered her comment somewhat odd, I asked what exactly she meant? I observed to her that my personal relations were good; my intelligence production in the element had been exemplary and pioneering; my briefings on militant Islam and Internet exploitation had been well-received around the Intelligence Community and beyond; that no one had ever complained about their content; that I had been on numerous, often successful foreign tdys for CIA and; that briefing FBIS foreign bureaus seemed to me a rather simple task. "What's to be worried about?" I asked. She remarked, *"some people will be watching your performance closely, Franz. Do well."* (Note: Gina␣␣␣␣the former Director of FBIS, stopped me in the hall later in the spring of 2002 to tell me personally how well she thought I had done on the tdy. She told me,␣␣␣␣Bureau could not say enough good things about you!" I thanked her for her kind remarks but observed that my briefing duties had been simple enough.)

25. Interpretation: Iden t's remarks do not represent any personal retaliation against me although, upon reflection, they certainly clarified an irritating phenomenon, namely a more insidious form of managerial retaliation. *I assert that iden t had signaled to me CIA management's extreme reluctance to ever send me abroad again for any extended period of time.* CIA seems to prefer it when I don't travel . . . in order to keep an eye me, perhaps? In this regard, kindly note that Iden t's remarks were completely consistent with the incident described in paragraph 15 when CE Division had said, *"We will go to the mat to prevent Boening's deployment to iden k."* They are also consistent with the DO's denigration of my qualifications in response to a routine job application described in paragraph 32 (*which would require an extended period abroad*); they are consistent with the fact that *I have not been allowed an orientation/training tdy to FBIS' Mideast␣␣␣␣bureaus* (like all new officers receive) and; they are consistent with iden o's background comments on how FBIS viewed me when I was first assigned to␣␣␣␣Yet, what had I done to irritate CIA—that is, apart from blowing the whistle? Had I ever been disciplined for insubordination? No. Did I lack professional competence, experience, speaking, writing, analytical, or linguistic ability? No. Had I had weak

---

[15] My first trip abroad on official business in about seven years.

SECRET

performance appraisal reports? No. Did I have no sense of humor? Again, no. But, I had been a whistleblower.[16]

26. During an outrageous incident on 1 March 2002, my immediate supervisor at FBIS, Iden r, informed me that she had no complaints at all about my professional performance and that she considered me "*very worthy of promotion to GS-14.*" The 45-minute conversation began at 1300 hours in her office in 3S-11 _____ during a routine PAR counseling/feedback session. Nevertheless, she remarked that I could do "*one thing*" that would "*greatly help my chances.*" With noticeable hesitation, she asked me to "*keep my mouth shut.*" She explained, "*this would help a lot.*" (Note: Iden r used rather inelegant language here; she did not say, "remain silent" or "be quiet." I recall that her words were less refined than this although she may have said merely, "*keep your mouth closed.*") As I was completely taken aback by her request, I asked her to repeat her remark. She did so, and I reiterated that I did not understand what she meant by "*keeping my mouth shut.*" I reminded her that I got along with everyone in the element and that no one at the numerous audiences that I had spoken to about militant Islam or Internet exploitation had ever complained about any inappropriate remarks.[17] She acknowledged that this was indeed the case. Consequently, I probed more deeply and asked again exactly what she meant by "*keeping my mouth shut?*" After a long pause and discomfort evident from her body language, she said, "*you know what I mean— memos to the Director etc.*" Then I exclaimed, "Oh, now I understand! You mean whistle-blowing activity, don't you!? Because those are the only 'memorandums' that I have ever sent to the Director's office."[18] Iden r did not dispute my interpretation of her remarks. I firmly reminded Iden r that my whistle-blowing was protected by statute and that she was not allowed to even take it into consideration in professional settings. She responded, "*it may be true that you are protected by law—but I am trying to help you by telling you how the bureaucracy actually works.*" She continued, "*It doesn't matter what the law says—the CIA bureaucracy will never promote someone who seeks to embarrass it. If you desist, you will probably be promoted. However, if we promote you and you engage in further whistle-blowing, you will remain at your grade forever. It is your choice.*" Iden r added, "*you are free to your opinions but you must realize that such activities are tacitly taken into account.*" I reminded her that the purpose of my whistle-

---

[16] A careful study of my career reveals promotions at a statistically average or somewhat above average rate from 1980-93 (once every 2.6 years). From 1993 to the present, however, everything ground to a complete halt (zero in nearly 10 years.) Now, why is this? My professional performance certainly hadn't fallen off; that is, it continued to compare quite favorably with others in my job description. *But it is interesting to note that after the first urgent concern in 1998, the egregious, recurring instances of retaliation really began to multiply.* I assert this is not a coincidence. It is retaliation. (Since the whistleblower actions, I haven't been able to obtain even an interview for a position outside of FBIS! This is "passive retaliation" at work.)

[17] I have given numerous presentations on militant Islam, (and to a lesser extent, on Internet exploitation and globalization issues), within the IC and elsewhere in the USG. Since December 2000, audiences have included the Rand Corporation, the State Department, the Naval Criminal Investigative Service, the National Air Intelligence Center, several Pentagon elements, SACLANT, the FBI, US Customs, NSA, foreign liaison services, and numerous offices within CIA.

[18] The Director of Central Intelligence.



SECRET
UNCLASSIFIED//AIUO

blowing was not to embarrass the CIA per se, but rather to have management investigate apparent wrongdoing. I told her she seemed to me to be making an explicit link between promotions and whistle-blowing and that it was very difficult to interpret her remarks otherwise. Iden r responded, *"Look, I am trying to help you. It is already an 'uphill battle'* (Iden r's exact phrase) *convincing others of your worth. I just want to explain to you how the bureaucracy works. It is reality. Besides, the bureaucracy will never explicitly link getting promoted to not engaging in whistle-blowing. The bureaucracy is more clever than this. Instead, it will say, 'Boening can't communicate effectively.' Listen, I hope that you are not so irritated that 'you want to sue me'."* The conversation ended inconclusively shortly thereafter.[19]

27. The general details of the above conversation—and the fact that Iden r had explicitly linked being promoted to not engaging in whistle-blowing—were shared with Iden s of FBIS on or about 11 March 2002 (first thing in the morning after Iden s's return from tdy), with Iden a of OIG on 12 March (shortly after lunch), with Iden t in April 2002 and again in February 2003, with Iden q (at his request) in July 2002, with iden y in November 2002, and with Iden u on 24 January 2003.

28. Interpretation and summary: A senior manager at CIA, the person who writes my PAR, explicitly linked getting promoted to not engaging in whistle-blowing. She asserted that the bureaucracy takes whistle-blowing into account in promotion decisions and that if I engage in further whistle-blowing, *"you will never be promoted."* She warned me to *"keep my mouth shut"* and not to *"write memos to the DCI"* if I sought advancement. This would *"help a lot."* The same manager expressed the view that the *"law doesn't matter"* and that *"the bureaucracy will not promote anyone who embarrasses it."* Question: **Can any reasonable person not interpret Iden r's remarks as a threat of retaliation? If her remarks are not retaliation, I don't know what is.** Did the congressional drafters of Title Seven intend for whistleblowers to be threatened by their managers? What is this?!?! (Note: I respect the law and do not share Iden r's disdain for the Whistleblower Provision. In mid-July 2002, Iden q, an FBIS manager, immediately disassociated himself from Iden r's remarks after asking to see me. He did not deny Iden r's remarks or defend her in any way. Nonetheless, no other FBIS manager has disavowed her remarks, including Iden r, to this day. Idens s and u, however, found iden r's comments inexcusable. Iden t could not believe that Iden r had actually uttered such words.[20] Iden a speculated that Iden r might deny her remarks if asked.)

29. Early July 2002: Iden r included in the first draft of my PAR, *"Boening has been cautioned not to express his personal views in front of audiences."* I protested her wording and reminded her that no one had ever complained to FBIS management about

---

[19] Actually, I found Iden r's remarks so annoying that I did want to sue her about a half hour later. Yet, if her remarks represent management's general view of the *Whistleblower Provision*, then perhaps CIA needs to start holding orientation seminars on the law. I alluded to this in paragraph one.

[20] "could not believe" in the sense that Iden t couldn't believe that Iden r had said something so inappropriate.

SECRET
11



UNCLASSIFIED//AIUO

any inappropriate remarks made by me so why was I being warned against
*"inappropriate expressions of opinion?"*[21]  Iden r conceded the point, deleted the
phrase—and strengthened language alleging that I could not get along with others.
(Please find attached partial Lotus note documentation of this conversation as well as
Iden r's response. You will observe that Iden r was seemingly very eager to de-link
whistle-blowing from promotion. Kindly observe, however, that she denied no portion
of my account of our 1 March 2002 conversation. Nor did any of the other recipients of
my Lotus note. Iden q, my former supervisor, was particularly eager to distance himself
from Iden r's comments.[22])

30. September 2002: During an informal hallway exchange, Iden r suggested to me that
"being nice" to Iden v might be of benefit to me.  Iden r reminded me that Iden v "will
be your advocate" on the GS-13 panel.  I politely rejected Iden r's suggestion to
ingratiate myself and told her that although I had nothing against Iden v, I did not see the
need for sycophancy. I reminded her that CIA was supposed to be a meritocracy and that
my objective performance (outstanding by any measure), spoke for itself.[23]

31. During a serious incident on 25 October 2003, the senior officer in question, Iden v
(my "advocate" on promotion panels) made it clear to me that she *"was concerned"* about
my effect on young people and privately believed I should have *a separate office in order
to limit my contact with them (!).*[24]  This issue, described at length in the attached
grievance action, took place during a feedback session I had requested after being denied
promotion.  At the very least, Iden v's attitude illustrated her disdain for CIA's policy on
diversity.  At the worst, it can be reasonably interpreted, certainly in my case, as
retaliation against a whistleblower.  *Can CIA cite any other employee who has been told
he is not fit to talk to young people?  (Who might even deserve to be "quarantined?!?!")
What is this?!  Is it just a "coincidence" that the only person who is told he shouldn't
share critical opinions about CIA's intelligence performance with young people is also
the only person in FBIS who has shared his opinions—quite vigorously—to members of
Congress on issues of seeming wrongdoing by CIA?  How is it possible to be allowed by
CIA and/or Congress to make critical statements in an urgent concern or to the 9/11
Investigative Committee and be punished when one makes identical statements to "young
people?"*   Therefore, kindly consider all portions of the grievance to be part of this

---

[21]Given Iden r's remarks on 1 March 2002, I assert that she considers whistle-blowing the *"inappropriate
expression of opinion."*  Otherwise, why had she threatened me? Unfortunately, her opinion is almost
certainly shared secretly by most members of the bureaucracy.  This is the real problem.

[22] I was being polite to Iden r in my Lotus note when I wrote, *"probably out of genuine concern for me."* I
wrote this before the events of October 2002.

[23] Iden bb, a second manager named in the grievance described in paragraph 31, objected to this
characterization of CIA.  In mid-December 2002, he threw up his hands during a private PAR meeting with
me and exclaimed in exasperation, "Who ever said that CIA was a meritocracy?"  (Answer:  George Tenet
in his 1997 confirmation hearing.) Please see classified appendix for further comment on my professional
performance.

[24] Iden v has been accused of mistreating employees in multiple grievance actions.



UNCLASSIFIED//AIUO

urgent concern. This is retaliation.[25]   (Note: Idens a, o, p, s, t, u, y, z, aa, and bb are
aware of the gist of Iden v's comments.   Iden bb, in particular, confided to me that Iden v
told him I was unfit to mentor any young person.)

32. In late October 2002, I was told by the Near East Division of the DO that my
qualifications for DO work are *"below our threshold for necessary skills and being
current in terms of training/experience"* after I had applied for a mid-level, non-
managerial position in an Arab country—that did not even require language ability at the
time of application. The position was a routine job as Iden w. The DO refused to explain
its negative decision despite two requests for clarification. It is worth noting that I
remain a strong speaker and reader of Arabic (a skill in extremely short supply in the
Intelligence Community), that I speak passable French and German, that I have 10+ years
of agent-handling and liaison experience, that I have been asked to lecture to DO
audiences on intelligence issues, that I have been a regular trainer in the avant-garde field
of Internet exploitation, and that the DO had employed my skills as an interpreter in 2001
and 2002.   My PARs have been generally strong—often outstanding—and I have never
been accused of insubordination.[26]

33. Interpretation: This was clearly an instance of retaliation against a whistleblower, in
my view.   The type of job that I had applied for is routinely filled by 2nd or 3rd tour
officers—and I have considerably more experience than this.   In fact, if the press is to be
believed, even non-DO officers have headed DO stations.[27]   Therefore, I theorize that
certain officers in the DO did not appreciate my allegation of possible criminal
wrongdoing in my second *urgent concern* (May 2001) and that its extreme irritation
manifested itself in the DO's response to my job query—the same way it exhibited itself
in 1999 (paragraph 16).   It is one thing to say, "we are sorry but this position has been
assigned to a more qualified person."   It is an entirely different thing to clarify nothing
and to tell someone with my professional background that I no longer meet "DO
standards."   I contend that as there is an extreme shortage of officers who combine
strong Arabic-language skills, strong operational backgrounds, and a strong knowledge of
terrorism issues, perhaps the handful of officers who possess all three attributes should be
considered qualified, in principle, for DO positions.   Moreover, those officers, like
myself, who lecture routinely on the intelligence issue of the hour, who have assisted the
DO in recent years, and who pioneer whole new intelligence sources for CIA, might even
be considered very qualified.   (Note: Copies of the Lotus note exchange with NE
Division are attached.)

---

[25] It is nothing short of infuriating to be told by one's supervisor—after having risked one's neck in Beirut
and Iraq in the past, as I have, and after having developed an entirely new set of intelligence sources for the
IC—"You know what? Personally, I don't even think you're fit to talk to young people." This is CIA's
reaction to a whistleblower and the organization's "diversity policy" in action. Moreover, FBIS has not
resolved the grievance, to date. Regrettably, this too, is predictable.

[26] Then again, the bureaucracy probably considers any form of whistle-blowing a type of insubordination.
In any event, their actions certainly suggest this.

[27] The press has reported that an analyst used to head the



SECRET

UNCLASSIFIED//AIUO

34. On 18 November and 12 December 2002, the CIA changed the ground rules regarding my declassification challenge to documents I authored in the second *urgent concern*. From summer 2001 until spring 2002, CIA had requested a series of edits to the documents but also had acknowledged my ultimate right of appeal to the Inter-Agency Security Classification Appeals Panel (ISCAP). Believing that flexibility on my part would lead to document release, I tried to make the requested changes. "Negotiations" over editing changes were ended in May 2002, however, when it became clear to me that CIA really wanted me to rewrite the entire document collection, in order to limit public embarrassment.[28] I considered this demand unacceptable and initiated a formal classification challenge, an action permitted and encouraged by Executive Order 12958. CIA officially informed me, however, on 12 December 2002 that the challenge would not be allowed to move forward to the ISCAP, an action I contended is a likely violation of the E.O. The above disagreement with CIA, and the seeming illegality of CIA's course of action, was sufficiently serious that the Office of the Inspector General accepted it as a target of investigation on 13 December 2002. Moreover, the ISCAP has informed me preliminarily that it will seek the documents in question.

35. Interpretation: Was the abrupt "rule change" a form of general harassment of a whistleblower (i.e., a form of retaliation?)—or was the rules flip-flop simply innocent bureaucratic ineptitude? Although both interpretations are possible, it seems to me that there was never an intention to deal fairly with me on the classification challenge. CIA's intention was always to stonewall. Also, did Iden x, who remains an influential official in declassification and who was accused of wrongdoing in the first *urgent concern*, play any role in CIA's decision to derail the classification challenge (i.e., the documents in the *second urgent concern*)? Did Iden x recuse himself? While I don't have all the answers to these questions, a reasonable observer would have to admit that CIA's seeming harassment with regard to the classification challenge could be interpreted as a form of retaliation.

36. Summary: The documented history of retaliation, my superior performance at FBIS and elsewhere over the last decade, and the fact that I have remained at the same grade for over 40% of my career (itself an unusual statistic), has persuaded me conclusively that I will continue to be judged by a different set of standards than other employees. My objective performance will never be sufficient to please CIA—as it is not the main criterion in my case.[29] I assert this state of affairs is the direct result of whistle-blowing

---

[28] I did not simply deduce this. In May 2002, a senior CIA officer, Iden cc, told me point-blank that the real issue surrounding release was not the protection of "*sources and methods*." Rather, it was to protect the CIA's reputation. I guess this is why CIA was so determined to "classify" the news stories, which had formed the backbone of my second *urgent concern*. Of course, when any USG office sees fit to classify a series of press stories mainly to avoid embarrassment and accountability, in seeming contravention of Executive Order 12958, it is a serious public policy issue.

[29] For instance, in just a one-month period, October 2002, I was told by one senior manager—without a shred of explanation or documentation—that she was "concerned" about my contact with "young people." Later in the same month, the DO called my professional qualifications sub-standard—and explained nothing. These assertions were juxtaposed against a very strong professional performance on my part.

SECRET



and the "negative character traits" some CIA managers perceive to be associated with whistle-blowing.[30]  I believe that I have demonstrated this persuasively in the paragraphs above.  For this reason, the whistleblower must remain ever vigilant.  And, it is the reason for this memorandum.  **I have been denied promotions, training opportunities, and assignments over the years as an almost certain result of whistle-blowing. This is a violation of the letter and the spirit of the *Whistleblower Provision* and other USG policies. No USG organization, department, office—or concerned taxpayer— should tolerate it when an individual manager, no matter what his rank or motivation, retaliates against a whistleblower.[31]**

37.  I look forward to a fair resolution of this *urgent concern*.  However, if the very serious public policy issue of direct and indirect retaliation against a whistleblower cannot be resolved satisfactorily inside the bureaucracy, then perhaps it would be best to change the venue.  (Fortunately, the playing field is reasonably level inside a courtroom.)  I regret that I must be warn you of this possibility as it is not meant to be a threat, but it seems only fair that you be made aware of how seriously I view this problem.

I thank you for your kind attention to this matter and await your reply.[32]

Respectfully,
Franz Boening

---

[30] It is particularly striking that when a USG office, such as many within CTC, the DI, at the State Department, the Rand Corporation, the Pentagon, the National Air Intelligence Center, the NSA, or at SACLANT, hasn't an inkling of my previous whistle-blowing, I am invited to speak, to correspond, to travel, and always receive thanks for my intelligence contribution.  (I have had more invitations to travel from non-CIA offices than from CIA itself.)

[31] It is quite easy to demonstrate that USG bureaucracies do retaliate.  CIA is not uniquely guilty and the fate of whistleblowers is always problematic.  Indeed, the expectation of retaliation, even among courageous officers like Coleen Rowley at FBI, explains the paucity of whistleblowers.  When it comes to whistle-blowing, the fear of retaliation permeates the workforce.  For instance, few officers privately believe that the lack of internal whistle-blowing is due to the lack of incompetence, under-performance, and malfeasance at CIA.  These all exist in reasonable quantities at CIA the same way they do in any government bureaucracy.  If you don't believe this assessment of the perils of whistle-blowing, just ask the CIA employee sitting next to you.  (Then again, why do Inspectors General exist if not to ensure that bureaucracies obey established rules, procedures, policies, and the law?)

[32] Do not be irritated at receipt of this memo as bureaucratic retaliation is a virtual fact of nature.  Besides, irritation tempts some to engage in even further retaliation.  Obviously, this is something I will attempt to monitor.  And, if new instances of credible retaliation occur, evidence will be presented inside a courtroom.

Please assume that I am a level-headed, normally easy-going guy who believes in your goodwill and who is always willing to discuss, explain, and clarify anything you request.  Moreover, I hope that you sense I have tried to present this issue coolly, carefully, and, most importantly, accurately.  At the same time, of course, I am very critical of CIA retaliation.  This is because the intent of the law is clear: no retaliation against whistleblowers is to occur, period.  Besides, what good is the law if retaliation is tolerated?





**UNCLASSIFIED//AIUO**

**Attachments:**

1. FOUO Identities list
2. "Classified" Identities list
3. Lotus Note exchange with Iden r
4. Lotus Note exchange with NE Division
5. Copy of grievance against Iden v

**SECRET**

16

SECRET

UNCLASSIFIED//FOUO

**Identities**

(e) 1. Iden a: George W.          DIG
    2. Iden b: Pat          HRS
    3. Iden c: Dave          FBIS
    4.
    5. Iden e: Gerald          IMS
    6.
    7. Iden g: Nancy          IMS
    8. Iden h: Barbara          IMS
    9. Iden i: Tom          IMS
    10. Iden j: Peter
    11.
(c) 12. Iden l: John          covert
    13.
    14.
    15. Iden o: Youssef          FBIS
    16. Iden p: Bonnie          FBIS
    17. Iden q: Ken Hughes, FBIS
    18. Iden r: Kelly          FBIS
    19. Iden s: Joe          FBIS
    20. Iden t: Hollis          FBIS
    21. Iden u: Melda          FBIS
    22. Iden v: Joyce Forrest, FBIS
    23.
    24. Iden x: Ed
    25. Iden y: Jim          FBIS
    26. Iden z: Sylvia
    27. Iden aa: Tom          FBIS
    28. Iden bb: Michael          FBIS

SECRET

17

UNCLASSIFIED//FOUO

SECRET//X1

### Identities

(C) 4. Iden d:  HU-110, a position in FBIS/Gulf-Med as an open source analyst/linguist

(C) 6. Iden f: Initial Review Branch, DO/IMS

11. Iden k:  Kosovo/Albania

S  (S) 13. Iden m: ▌▌▌▌▌DO

14. Iden n:  Gulf-Med Team, FBIS

7  (S) 23. Iden w: ▌▌▌▌▌▌▌DO

(C) 27. Iden cc:  Bill McNair, DO/IRO  (McNair's comment: The DO/IRO told me in
May 2002 that, in addition to fact that the ▌▌▌▌ *urgent concern* would hurt
CIA's reputation, the other problem with the *urgent concern* was that "*it's all
true*."  Now...as I alleged possible criminal wrongdoing in my complaint, am I
to conclude, based on McNair's comments, that CIA did indeed facilitate
▌▌▌▌▌▌▌▌

13

### Performance:

(S) While I have alluded to the regular talks I deliver on militant Islam, this is not my most
substantial contribution to the intelligence mission.  At FBIS I performed pioneering
work in an entirely new set of intelligence sources for the Intelligence Community.  I
was the first officer in CIA—or anywhere in the IC—to ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

beginning in November 2001.  These websites have provided nearly 100 unique and
well-received intelligence reports to date and will be coverage for the foreseeable future.
As a result of my work, FBIS now has 5-6 fulltime employees and subcontractors
monitoring nothing but ▌▌▌▌▌  (Although I established the field, I did not author
all of the reports. FBIS has other fine linguists and analysts.)

(S) The regular, systematic exploitation of the ▌▌▌▌▌▌▌▌▌▌▌▌▌is an
entirely new OSINT field for CIA and FBIS.  Yet, it did not exist before I demonstrated
its intelligence value through my reporting.

(S) (In other words, for 60 years, from 1941-2001, FBIS exploited TV, radio, newspapers,
periodicals, and some Internet sites, primarily those representing the professional media.
However, since November 2001 and increasingly throughout 2002, the organization has
begun the regular ▌▌▌▌▌▌▌▌▌▌▌ These are one of the few places
where collectors can watch ▌▌▌▌▌▌▌

**SECRET**

/8

CL BY: 0718647
CL REASON: 1.5 (c)
DECL ON: X1
DRV FROM: COV 2-87

SECRET/X1

1
2

SECRET
19
SECRET/X1



**SECRET**

May 20, 2004

To:            Inspector General, Central Intelligence Agency

Information:    Executive Director, Central Intelligence Agency

From:          Franz Boening, Foreign Broadcast Information Service, CIA

Subject:       *Urgent Concern* – Prohibited Personnel Practices at CIA:
               Continuing Bureaucratic Retaliation Against a Whistleblower (U)

Refs:          a. 24 March 2003 *Urgent Concern* (Chronology of
                  retaliation/prohibited personnel practices through spring 2003).
               b. 10 May 2001 *Urgent Concern* (details probable CIA misconduct vis-a-
                  vis 'M').
               c. 5 February 2004 Classification Challenge filed by Franz Boening
                  (Challenged CIA classification of interviews and clarification resulting
                  from ref a.)
               d. Grievance against Iden h, 7 November 2003
               e. Grievance against Iden o, 16 January 2003. (U//AIUO)

**1. Introduction:** This memorandum constitutes an *Urgent Concern*, filed under Title
Seven of the 1999 Intelligence Authorization Act (the *Whistleblower Provision*). It is the
second *Urgent Concern* that alleges that some CIA managers have engaged in *prohibited
personnel practices* as a result of previous *urgent concerns* I have filed. Such practices,
when directed at a protected federal whistleblower, are violations of federal law. This
memorandum will recount the history of illegal treatment detected since ref a. (U)

2. I contend that some CIA managers have not treated me in accordance with the federal
laws established to protect whistleblowers. Some have done this by improperly basing
their personnel decisions on my "hall file" rather than my objective professional
performance, and no offending manager has been called to account. I ask that you
investigate the incidents described below, bring yourself to take appropriate disciplinary
or corrective action, and ensure that no further retaliation or threats take place.[1]  I remind
you that any form of bureaucratic retaliation, reprisal, or threat against a protected federal
whistleblower constitutes—if proven—a violation of the United States Code.[2]  This

---

[1] You may also wish to compensate me in some way for the virtually indisputable fact that some managers
have taken into account my previous whistleblowing in their professional treatment of me. This has caused
me to be denied training, promotions, travel, and internal job opportunities over the years. (U//AIUO)
[2] See USC Title 5, Part III, Subpart A, Chapter 23, section 2302 (a)(2)(A) subsection (e)(3)(B) and 5 USC
section 2302 (8) and (9). Section 2302 is entitled "Prohibited Personnel Practices." See also Title 50,
chapter 15, 403q. As OIG is aware, I retained the law firm of Krieger & Zaid in early fall 2003 because I
remain unconvinced that CIA wishes to address my concerns equitably or even takes the law seriously. As
addressees are aware, as of the date of this memorandum, no normative, corrective, disciplinary, or
compensatory action has been taken. Other than to undertake an opaque investigation that has moved at a
glacial pace, there is little evidence that CIA wishes to address my concerns equitably. Therefore, I remain
determined to seek legal redress if necessary. (U//AIUO)

**SECRET**

*20*

CL BY: 0711132
CL REASON: 1.4 (c)
DECL ON: 20300304
DRV FROM: COL 5-03,



includes viewing negatively or taking into account any whistleblower complaint I have written in any internal CIA personnel decision that affects me. They are *prohibited personnel practices*—violations of federal law that seem to have occurred so frequently in my case that they verge on being accepted management behavior at CIA. (U)

## The History of Illegal Retaliation and *Prohibited Personnel Practices* Since 24 March 2003.[3] (U)

3.  December 2002 (rpt 2002) - At approximately this time, I was the target of a special security inquiry to determine if I had passed classified information to unauthorized parties.[4] Such actions are not just contrary to internal CIA regulations and the *Statement on Diversity* but are almost certainly a violation of Federal law, specifically 5 USC 2302 (8) and (9), which describe *prohibited personnel practices* vis-à-vis federal whistleblowers.[5] The extraordinary inquiry was a direct result of a vigorous classification challenge that I had pursued with regard to ref b, itself a separate *Urgent Concern* that had alleged probable violations of law by CIA. The late 2002 security inquiry determined that there was no evidence that I had passed classified information to unauthorized parties.[6] (U//AIUO)

---

[3] I.e. Generally speaking, a *prohibited personnel practice* under federal law is when a whistleblower is denied opportunities by the bureaucracy simply because he is/was a whistleblower. In essence, it is when management takes into account the fact that an employee has been a whistleblower and views it negatively in its personnel and management decisions. In ref a, dated 24 March 2003, I attempted to document this illegal phenomenon from the late 90s until early 2003. In the current *Urgent Concern*, I attempt to capture what was discussed during a series of conversations and will describe why I believe CIA has engaged in *prohibited personnel practices* more than once. (U//AIUO)

As the conversations were not taped, I can only describe or paraphrase what my interlocutor and I said, to the best of my memory and my contemporaneous notes. Where I use quotes, I do so for emphasis, unless otherwise noted. Please also be aware that at least one suspect incident has not been described in this memorandum. This is because documentation was weak and/or I refuse to interpret every strange interaction with a manager as a personal slight or a legal issue. (U//AIUO)

[4] Although the special security inquiry pre-dates ref a, I only learned of it in December 2003. For this reason it was not included in ref a. The improper security inquiry was briefly described in footnote 5 of Ref c. (U//AIUO)

[5] Internally, the applicable CIA regulation governing classification challenges is AR 70-3i, paragraph 17. CIA formally accepted my original challenge of ref b under AR 70-3i. Within the framework of the USG, all federal whistleblowers enjoy specific legal protections that are not to be violated. 5 USC 2302 (8) (9), the basic Federal statute concerning national security whistleblowers, makes it illegal to, *"take or fail to take, or threaten to fail to take any personnel action against employee or applicant for employment because of a) the exercise of any appeal, complaint, or grievance right granted by any law, rule, or regulation . . ."* In other words, in this specific instance I took advantage of a regulation allowing me to challenge classification (section 1.9 of EO 12958) and CIA mounted a special security inquiry. This seems patently illegal to me. (U//AIUO)

[6] I wish to emphasize that I have not passed classified information to unauthorized parties. It is unclear where the documentary evidence of the special inquiry lurks. It was not in my security file, which I reviewed in spring 2004. Also, during this same time period, i.e. December 2002, my wife was told that she would no longer be allowed to process FOIA requests that dealt with 'M.' This was "for her own good," according to OIM where she worked from spring 1996 until May 2003. Yet, why was CIA's apparent suspicion of me extended to my wife? Was this warranted? What was this about? (U//AIUO)

21  SECRET                                                                    X



4. I learned of the inquiry directly from Iden a, who told me personally of the special personnel action during private conversations I had with her on 23 and 24 December 2003 repeat 2003 and again in January 2004. Iden a herself conducted the inquiry. She had approached me privately because she did not feel that it had been justified and wanted me to know what had happened the previous year—unbeknownst to me. She told me that she had uncovered no evidence whatsoever of wrongdoing on my part and that idle speculation and suspicion on the part of some manager(s) seemed to be what had triggered the request for the inquiry in the first place. I told her that I appreciated her candor, that she was only doing her job given her lack of context, and that she seemed to have been placed in a difficult position by CIA managers. In January 2004, she went further, *"I can tell you this, Franz. I doubt if the Office of Security would pursue such an inquiry again. You had done nothing wrong."*[7] (U//AIUO)

5. Comment: Who in CIA thought it proper to mount a special security inquiry? Iden a did not know exactly but speculated that it was either the Office of Information Management, the *Interagency Security Classification Appeals Panel*, or the FBIS front office. But the real question is whether a CIA manager was seeking "dirt" on a whistleblower simply because he challenged the classification of a document in accordance with section 1.9 of Executive Order 12958? Do some CIA managers quietly suggest a security inquiry based on nothing more than idle speculation and/or their dislike of someone who challenges the bureaucracy? Could a normal person not credibly interpret a special security inquiry—based on zero evidence of misconduct—as an attempt to harass a whistleblower? Is it not a *"prohibited personnel practice"* when directed at a federal whistleblower?[8] (U//AIUO)

6. April 28, 2003-late spring 2004: CIA's Office of Information Management, the office that manages declassification, has continued to deny me the opportunity to challenge the classification of three documents. They are: (U//AIUO)

- ref a, the first *urgent concern* alleging illegal retaliation.
- a Lotus Note dated 28 April 2003 in which OIM explained how a classification challenge in accordance with section 1.9 of EO 12958 would not be allowed.
- ref c, an OIG account of an interview of Franz Boening. (U//AIUO)

---

[7] Iden a added, "I have seen CIA go after a person for time and attendance fraud when they wish to discredit someone."

[8] CIA really ought to lighten up. How fragile is the organization if it can't tolerate a few classification challenges? Unfortunately, it is a common practice within most bureaucracies to attempt to defame the whistleblower and/or deny him rights. This phenomenon is not peculiar to CIA. Actually, I don't mind routine security investigations—good security is very important—*but a security inquiry triggered by a classification challenge?* I mean, *a classification challenge*?! This sort of bureaucratic behavior is unwarranted, smacks of reprisal, and is almost certainly a *prohibited personnel practice*. This is because it is patently illegal for a federal bureaucracy to engage in unwarranted personnel actions—such as a special security inquiry—in response to an employee having merely invoked a federal law, rule or regulation. See 5 USC Sec 2302 (8) and (9). I challenged classification under section 1.9 of Executive Order 12958 and I got a special security inquiry as a result.



CIA's continuing practice of denying most formal classification challenges forces me to ask why I am being denied a right granted to all "authorized holders."[9] Can I not reasonably construe the denial of the right to challenge classification as a "personnel action"—which would make it a *prohibited personnel practice*? Under Executive Order 12958, all documents that have been classified by CIA—even when the document was not solicited by CIA—are challengeable. (U//AIUO)

7. In late spring-early summer 2003 I was denied the opportunity to ⌐          ¬
⌐          ┐ On or about 1 May 2003, a senior CTC officer, Iden aa, asked me if I would
be available to ⌐                              ¬ from a very prominent Middle Eastern group.
Iden aa, who has known me for about 15 years, chanced into me in an OHB hallway and quickly asked if I could "still speak good Arabic" and whether I would be interested in doing ⌐          ¬ After I immediately expressed my willingness to assist, he explained that there was a critical need for experienced officers who could speak fluent Arabic and said that his subordinate, Iden aaa, would be in contact with me. Some weeks later, during the ensuing exchange with Iden aaa, it was decided that I would not be allowed to ⌐                    ¬ although I remained eager to assist. No persuasive explanation for CTC's change of attitude was ever offered. (U//AIUO)  (C ) COL S-C3

8. Comment: The exchange with CTC was particularly odd given that Iden aaa had given me the distinct impression that he did not want my participation, even though it had been his superior Iden aa who had suggested the idea. But why the about-face? Had someone in CTC decided that a person with my background would not be suitable for the sensitive task of ⌐                    ¬ Even if the officer was particularly well qualified [on paper] to engage in ⌐          ¬ Had any CTC manager taken into account my previous whistleblowing in determining my suitability? If so, it would probably constitute a violation of law. Although I admit that I don't have conclusive answers, I found it quite striking that an opportunity to ⌐          ¬ which had come from a senior CTC officer had been so quickly withdrawn. I ask that you investigate this issue and ensure that my previous whistleblowing was not taken into account in this personnel decision.[10] (U//AIUO)  (C) COL S-03

9. Iden b incident: On August 28, 2003, I had a job interview with Iden b, a branch chief in CTC.[11] Iden b and his deputy, Iden c, said to me that the real issue with taking me into their branch was my "hall file." [exact words][12] Admittedly, Iden b did not use the word "whistleblower" but indicated to me his concern with my previous actions in

---

[9] I am an "authorized holder" with regard to these documents. I have enjoyed S/TS clearances, granted and renewed by CIA itself, for 23+ years.

[10] In spring 2004, numerous news accounts have appeared that deal with the treatment of detainees, including those from al-Qa'ida, in US custody. Many of the apparent abuses appear to have occurred in 2003. (U//AIUO)

[11] This paragraph should be read in conjunction with a summary of the interview that was reported to OIG in a Lotus Note on 9 September 2003. (U//AIUO)

[12] Iden b seems like a decent guy although I don't know him well. Iden c is an old friend of mine and an honest, competent officer—very solid. He spoke candidly in August 2003 and later told me during a private phone conversation on the afternoon of 17 October 2003, "The whole system is based on hall files. Still, it is not the way the bureaucracy should run." (U//AIUO)



another way. After remarking that he expected bureaucratic resistance at the PMC to getting me into his branch, I asked out loud why this would be the case? Iden b said very slowly: *"Let's just say that everyone knows your name and what 'Franz Boening' has done. But, we are willing to take a 'chance' with you."*[13]  He continued, *"The PMC is too careful to say anything directly about your 'activities,' but it can always simply claim that you are 'not qualified' and you will not be able to prove anything."*[14]  Iden c immediately chimed in, *"Let's say that it is more a matter of your 'hall file.'"*[15]  Asked whether I could tdy, in principle, for his branch, Iden b responded, *"If you do OK, after about three months, we'll try to 'sneak you out' on a tdy and see if anyone complains."*[16] (U//AIUO)

10. It was clear to me that Iden b was making decisions based on the "hall file." The hall file, as some are aware, refers to the informal reputation that an officer acquires at CIA and is usually separate from his/her objective qualifications, achievements, and overall performance. **Given the fact that I have a pretty consistent record of strong professional performance (some of it outstanding), does CIA expect me to believe that no manager takes into account my whistleblowing when it comes to me? Especially after remaining in grade for nearly 11 years?[17]  Only a fool would believe this. Because the main component of my "hall file" is the fact that I have been a whistleblower several times. This has caused the "hall file" to assume—for some managers—an importance far greater than my objective professional performance. It has had a determining effect on their attitude toward me. (U//AIUO)**

11. On 11 September 2003, I inquired from Iden d about the possibility of assisting in a tdy capacity in Iraq and included a brief summary of my career and my qualifications.[18] A personal friend, Iden e, had spoken with Iden d by telephone in advance of my contact with her. He told me that Iden d had been enthusiastic about finding someone with my

---

[13] Or "risk." One of these two words was uttered. (U//AIUO)

[14] This sentence was inadvertently not recorded in my 9/9/2003 Lotus Note to OIG. I recalled it later and wish to include it in this memorandum. It was definitely uttered by Iden b and I encourage you to ask him about it.

[15]Iden b decided he wanted me in his branch anyway, "baggage" and all. He offered me a job with no particular responsibilities, one that could easily be filled by any new career trainee. I thought about it very briefly and declined. (U//AIUO)

[16] Compare with paragraphs 16, 24, and 25 of ref a and with Iden g's remarks in this complaint. CIA managers have signaled to me more than once over the years that they are very careful about allowing me to travel. Now, what had I possibly done wrong that has caused some managers to be skittish? When I was a case officer, (that is, before I had ever written a whistleblower complaint), I never encountered any such hesitancy to allow me to travel. (U//AIUO)

[17] Nearly eleven years and counting.  This time-in-grade figure is almost four times longer than my average promotion rate from EOD to 1993.  Significantly, it is also approximately 200% longer than average Agency time-in-grade for a GS-13.  Juxtapose this figure against a professional reputation that includes regular speaking engagements around the intelligence, foreign policy, and law enforcement community and fluency in a hard language/agent experience that few DO officers can match.  (U//AIUO)

[18] I remain a fluent Arabic speaker (3+, 3+, 3+), experienced agent handler, and pioneered for CIA the intelligence exploitation of certain⎰⎰⎰⎰⎰⎰⎰⎰ I also tdy'd to Iraq a couple of times after the first Gulf War. (U//AIUO)



qualifications.[19] Yet, during my ensuing Lotus Note correspondence with Iden d—after she had had time to review my file—she claimed that NE Division preferred to send only officers "who could spend one year in Iraq" and that there was no need for any tdy services.[20] As I was serious about assisting, I told her that I knew for a fact that NE Division and the CIA continued to send officers to Iraq on three-month tdys and asked her for a fuller explanation. Obviously embarrassed, she referred me to Iden g to discuss the issue directly.[21] (U//AIUO)

12. I assert that Iden d had almost certainly reflexively discriminated against me after she had learned of my professional history. Yet, such discrimination is a *prohibited personnel practice*.[22] Under federal law, it is illegal to "*discriminate for or against any employee or applicant for employment on the basis of conduct which does not adversely affect the performance of the employee or applicant.*" Therefore, from my perspective, how did my previous whistleblowing diminish my ability to serve in a tdy capacity in Iraq? How was this relevant? How did whistleblowing disqualify me from debriefing an Arabic-speaking agent or handling any other debriefing? Would a US Army officer not pay attention to me because I had been a whistleblower? Why was a fluent Arabic speaker with years of operational experience—in an organization where such individuals are in precious short supply—seemingly intentionally misled? Why? (U//AIUO)

13. The answer came later. At 1330 on 23 September I met alone with Iden g for about 40 minutes in the latter's Hqs office. After exchanging pleasantries and inquiring about one another's families, I asked whether I could tdy to Iraq to assist NE Division and reminded him of my skills. I told him that I knew for a fact that what Iden d had told me about "no more three-month tdy's" was untrue and that it irritated me that I had been lied to. After pausing and shifting in his seat, Iden g said: "*Franz, you're right. It is not true that we no longer send officers on 90-day tdys to Iraq and Iden d should not have claimed this. You have to understand, though, you have an absolutely 'horrible reputation'* [exact words used by Iden g] *in NE Division. But I want you know that I have always held you in 'good stead'* [exact words] *and have always had a high professional opinion of you.*" With irritation in my voice, I responded to Iden g's assertion about my supposed 'horrible reputation': "*Based on what?!* [my exact words]. *My performance appraisal reports have always been good to excellent and I developed a*

[19] Iden e was initially skeptical about my evaluation of CIA's willingness to engage in *prohibited personnel practices*. He came to be a believer, however. During this period, I also spoke with Iden f directly about the possibility of travel to Iraq and the latter confirmed to me that NE Division continued to send officers on 60-90 day tdys.   Separately, I have spoken with other officers who have returned from Iraq and who told me that "the office is filled with tdyers--" the vast majority of whom know no Arabic!  Thus, it is exceedingly easy to confirm that Iraq is filled with tdy-ers. (U//AIUO)

[20] Again, tdy officers are the norm in Baghdad. (U//AIUO)

[21] The issue was discussed via Lotus Notes with Iden d.  As for Iden g, we served in the Middle East together 20 years ago and became fast and solid friends.  Although we fell out of contact over the years, our time there obviously made Iden g much more inclined to level with me.  He is a pretty honest guy. (U//AIUO)

[22] Reread Section 2302 (8) and (9) which describes in detail prohibited personnel practices vis-à-vis federal whistleblowers.  For the record, Iden e considered Iden d's claim "breathtaking in the literal sense" as he had learned officially from NE Division that it remained in dire need of qualified officers on the ground in Iraq. (U//AIUO)

*whole new field of intelligence exploitation for CIA. Few people have done this. Instead of relying on hearsay, why don't you allow me to tell you directly why I have this 'reputation.'"* I then proceeded to tell Iden g, in very broad outline, of CIA's apparent lies to a congressman in 1998, for which the DCI later apologized.[23] I reminded Iden g that I had broken no laws in filing my complaints and that the bureaucracy should not take them into account. Iden g listened intently, in seemingly non-judgmental fashion, then said: *"Look, there are ways to express your displeasure inside the bureaucracy and then there is 'your way. [24] I think I have been able to resist bad conduct. That said, in your case, I think that you have suffered from bad managers."* Iden g continued, **"The real problem with sending you to Iraq, though, is we can't have someone who might write a memorandum because of something he sees or doesn't like while in country. The war on terrorism has changed the ground rules. We need people who obey immediately—not after 10 minutes of reflection."**[25] I responded: *"I know that* [i.e. that there is a new determination to fight terrorism]—*but remember, the law permitted me to write urgent concerns. Besides, I am volunteering. Did you know that in fall 2002 NE Division actually told me that I was 'beneath the current standard for NE officers in terms of training and experience?'"* Iden g responded, *"That is not true* [i.e., that you are beneath NE's skill level]. *The truth is there are a lot of places where you could be of great assistance given your skills. Perhaps we could use you in a place like Mosul. There are mostly young officers serving in Iraq and experience is needed."* (U//AIUO)

14.  Iden g tried to reduce the significance of what I had been told by Iden d, perhaps in an attempt to reduce my irritation.  Speaking slowly and carefully while shifting in his chair, he said, *"Look, Franz, when someone around here hears your name, even if they don't know the exact details of your past—maybe they only know a little bit about you* [Iden g raised his hand and gestured with his thumb and index finger]—*they just reflexively shun you."*  Although Iden g tried to empathize, his demeanor suggested that he found Iden d's reaction to be as understandable and "no big deal."  He continued, *"I have to be honest . . . no one here wants you. I do not agree with them, though. I would like nothing better than to bring you back to the division, to prove to your many critics that you are a good officer, and possibly to give you a double promotion if you do well. Give me a few days to think about it—I plan to pray for guidance—and I will get back to you by Friday* [26 September] *with my decision. If you go to Iraq, you will be granted no supervisory role and I will brief your superior about you accordingly.  If you do well,*

---

[23] This *Urgent Concern* was written immediately after the passage of the Whistleblower Provision.
[24] Compare with paragraph 26, ref a.  In the above conversation, Iden g was signaling to me that he did not believe writing an *urgent concern* was an acceptable way to voice disagreement.  Yet, if CIA does not think whistleblowing is an 'acceptable way,' I suggest CIA raise the issue with Congress and the President. After all, they make the law.  Read further.  (U//AIUO)

[25] Perhaps it is well and good that some people are willing to write about "things they don't like."  In May 2004, numerous stories have appeared in the world press, including the *Washington Post,* the *New York Times* and *USA Today,* about abuse of Iraqi prisoners by US personnel at Abu Ghrayb Prison outside Baghdad.  The *Washington Post* stated that CIA's Inspector General's Office was investigating CIA's possible connection to these incidents.  Yet, one thing is certain—if I had witnessed clear violations of accepted international conduct vis-à-vis prisoners of war and civilians, I would have reported it immediately to CIA authorities.  (U//AIUO)



*we'll bring you back to the NE Division.*[26] The conversation ended in friendly fashion
shortly thereafter. Iden g got back to me several weeks later via a friendly Lotus Note.
He said that I could serve in Iraq but only if I agreed to stay 6-12 months.[27] (U//AIUO)

15.  Comment:  Did Iden g engage in a *prohibited personnel practice*?  Judge for
yourself.[28]  A basic federal whistleblower protection says that it is illegal to, *"take or fail
to take or threaten to fail to take any personnel action against any employee or applicant
for employment because of a) the exercise of any appeal, complaint, or grievance right
granted by any law, rule, or regulation. . . "*  Now, whistleblowing is legal under the law
. . . I am a whistleblower. . . and an assignment to Iraq is a personnel action.  Plus, scores
of CIA officers are or have been considered for 90-day assignments (or even less; this is
exceedingly easy to prove).  Yet clearly, my previous whistleblowing did enter into Iden
g's calculations in a big way.  He said so unambiguously.  Iden g did indeed "fail to take
an action"—such as allowing a tdy without conditions—simply because I had been a
whistleblower.  Iden g's remarks are one of the clearest indications yet that I am not
imagining this problem and that violations of federal whistleblower protections are
endemic inside the bureaucracy.  In addition, I claim that Iden d's intentionally
misleading statement to me about "no more 90-day tdy's" was in keeping with NE
Division's longer policy of denying me opportunity based on my "hall file."  She too
engaged in a *prohibited personnel practice*.  The law says that it is illegal to
*"discriminate for or against any employee or applicant for employment on the basis of
conduct which does not adversely affect the performance of the employee . . ."*  Yet, how
could my previous whistleblowing make me ineligible for 90-day tdy's (that is, without
violating the law)?  Why did Iden d seek to mislead me?  Remember, Iden g directly
contradicted Iden d about the possibility and length of tdy's to Iraq and he directly
contradicted NE Division's claim in October 2002 that I was *"below our threshold for
necessary skills and being current in terms of training/experience."*  His candid remarks
put into context paragraphs 32-33 of ref a—and I appreciated his honesty.[29] (U//AIUO)

---

[26] This revealing conversation with an old friend—even an honest, capable guy like Iden g—speaks
volumes about how CIA really works.  "Hall files," not objective performance, decide employee futures.
Iden g's comments mirrored Iden c's.  And, years of operational experience, fluent Arabic, developing an
entirely new set of intelligence sources for CIA, mentoring young officers, and being a recognized expert
around the IC in an esoteric field, all counted for nothing.  Moreover, Iden g, a former human resources
manager (!), signaled to me that he needed to "rehabilitate" me despite being reminded of the law, the
occasional appropriateness of whistleblowing, and of my productivity at FBIS!  His further comment that
he would "pray for guidance" was particularly annoying.  (What's next, tea leaves?)  In view of above,
how can CIA possibly think that my whistleblowing has never been taken into account by some managers?
As far as I am concerned, it is axiomatic that it has been taken into account.  And, lest we forget, Iden d
consciously sought to mislead me.  (U//AIUO)

[27] I was initially happy that Iden g did not rule me out completely, as some other officers had done.  He
opened a door—albeit only part way.  Yet, upon reflection, even this solid officer proved to me that he was
willing to take extraneous and illegal factors into account in his personnel decision.  (U//AIUO)

[28]  Here it is necessary for me to detach myself from my earlier warm friendship with Iden g.  Our time
abroad inclines me to treat him gently, yet the conduct in question is almost certainly illegal.  Despite this,
Iden g is much more honest than most officers and he occupies his current position mostly due to
competence.  Although he is a good person, he appears either ignorant of the law or unwilling to take it
seriously.  (U//AIUO)

[29] It is worth noting here that the OIG investigators who investigated the October 2002 assertion by NE
Division that I was 'below their current standards in terms of training and experience" clearly were either



16. On 26 September 2003, Iden h publicly humiliated me during a visit by the Executive Director of CIA to ▮▮▮▮▮▮ This incident is described in detail in ref d. In a nutshell, Iden h publicly told a number of officers, while I stood 10 feet away, that a junior officer with one year of experience had done "the groundbreaking work" in a promising new intelligence field and had developed a "whole new product line." Neither claim was true—I had pioneered the entire new field for CIA, had mapped and assessed the constellation of sources, and had suggested the new product.[30] Thus, this act of public humiliation of federal whistleblower almost certainly constituted a *prohibited personnel practice* under Section 2302. The law says that it is illegal to *"discriminate for or against any employee or applicant for employment on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others . . ."* (U//AIUO) ~~(e) (U//AIUO)~~

17. Iden h's treatment of me was one of several extremely irritating incidents that I have endured since 1998 and demonstrates to me, beyond a shadow of a doubt, that some managers will discriminate against employees whose personal views and criticisms of CIA they do not like.[31] Iden h knew that I was a whistleblower—I had told him so—and had responded to me both orally and in written comments in June 2003, that he takes into account my criticisms of CIA in his management decisions. Moreover, he partially bases his promotion decisions on the "hall file" of FBIS employees, in clear contradiction of

---

too credulous or didn't dig deep enough. On August 13, 2003, they told me informally that NE Division's written comment about my "lack of qualifications" was actually a "routine reply." This contention is nonsense. I did not believe this then and I do not believe it now—it was not at all a "routine reply." I think it is clear from my conversation with Iden g that the OIG investigators were misled by NE Division, perhaps as a way for the latter to escape or deflect culpability for illegal behavior. Iden g's comments directly demonstrate that the OIG investigators must be more vigilant and less gullible. Because when all is said and done, a written reply from an area division should make sense. (U//AIUO)

In fact, on 13 August 2003, the OIG investigators gave me the distinct impression of seeking to minimize the significance of conduct (including threats) that they had preliminarily determined had taken place—even if such threats against federal whistleblowers are, in themselves, *prohibited personnel practices* and thus violations of law. For instance, OIG acknowledged to me that Iden k had made most of the threatening remarks that I had alleged in ref a but "may have wanted to help you." Shortly thereafter, a well-meaning OIG investigator even told me that that she could personally understand why Iden k had told me to "shut up," which the OIG officer considered sound advice! My description of the 13 August OIG meeting is recorded in a Lotus Note dated 15 August 2003.

Finally, I find it striking that in general, the tendency of NE Division (and FBIS) to take into account my background is greater than among other elements of CIA. This is because CIA is a big place and my name is better known in certain offices than in others. In other words, where people know me, they do seem to take my previous whistleblowing into account in their personnel decisions. (U//AIUO)

[30] See ref d grievance. My irritation assumes we ignore the unseemliness of choosing a junior employee with one-year of experience over the veteran officer who developed the program to give the briefing. Iden h did this intentionally, as he knew the truth of the matter. (U//AIUO)

[31] Other extremely irritating incidents at FBIS have included Iden k explicit threat on 1 March 2002 to never promote me if I engaged in further whistleblowing. This was a clear *prohibited personnel practice* under federal law. Likewise, Iden o's suggestion on 25 October 2002 that I was not fit to talk to young officers was extremely annoying. She repeated the same general suggestion on 10 March 2004, without supplying details of my alleged remarks. (U//AIUO)



CIA human resources policies and Agency regulation[32] (If CIA wants to understand why I retained lawyers only ca 1 October 2003, I invite you to reread this and paragraph 16.) (U//AIUO) (C) (M(s 1—03)

18. On 10 March 2004, I was accused by Iden o, against whom I had filed a grievance in January 2003, of creating a "negative atmosphere" for unnamed young officers and—in the most outrageous piece of chicanery experienced since 1998—of "threatening a colleague with a little yellow 'Post-it' note."[33] The history of this strange story, which includes the insinuation that I had physically threatened a colleague, is contained in several Lotus Notes dated 12 March 2004, in a 6 January 2004 memorandum, and in a memorandum for the record/with rebuttal. It suffices to say that a senior FBIS manager insinuated to me, in essence, that I was "disrupting" the minds and morale of unnamed young officers based on unspecified comments I had made. Moreover, maybe Franz Boening was a closet felon! The "disruption of young officers' morale" allegedly occurred as a result of "negative" assessments I have made about various aspects of CIA's performance.[34] Likewise, the Post-it note form of Franz Boening's "negative behavior" rested on the thinnest of "evidence" combined with a healthy dose of sophistry. Consequently, could a person in my position not reasonably ask whether FBIS management sought to intentionally harass me? (U//AIUO)

19. The Case of the Yellow Post-it Note: The note in question was addressed by me to Iden p on 10 December 2003, a senior editor/analyst at FBIS, who reported to Iden o her "perception" that I had physically "threatened" her with the note below. I invite the reader to judge for himself/herself. The exact text of the note follows in italics. My elucidating comments are in brackets: (U//AIUO)

[Begin text]
- *Iden p, 10:15 am, 12/10/2001* [The note was addressed to Iden p; the date of 2001 was due to my bad writing. I meant to write 2003.]
- *This is what I described to you yesterday.*
- *I think it is formatted the way want it* [sic].
- *Notes: Let's do one set of edits (not 2-3).*
- *Be consistent; (I'll try to be).*

---

[32] I will try to produce a Powerpoint from Iden h, which suggests that he considers "hall files" carefully. Yet, if this is the case, it necessarily means that a powerful psychological bias will always exist against a whistleblower.

How does CIA explain such improper managerial conduct? Also, since the paragraph 16 incident, Iden h has denied me the opportunity to travel to brief three foreign liaison services that had requested me by name. This occurred in early 2004. While this latter decision may be his management prerogative, it seems equally possible that it was a direct response to the grievance I filed against him in ref d. (U//AIUO)

[33] You know, those little yellow notes made by 3M with the sticky backs? Please do not laugh; the accusation was quite serious. Iden o endorsed the remarks of Iden r who called the note an example of my "negative behavior." (U//AIUO)

[34] I admit that I have perhaps influenced how young officers understand the intelligence business. But, what of it? Personally, my morale has been "disrupted" by CIA's recurring intelligence failures abroad, the ineptitude of some managers, and the fact the so few senior officers speak Arabic in a world where this skill is critical. In fact, it seems that the US Congress cannot stop talking about US intelligence failures. In fact, what can be possibly be wrong with examining the reasons for intelligence failure? (U//AIUO)

29



- *Let's get it out by Friday.*
- *Franz.*

[End text] (U//AIUO)

After receiving this note, Iden p complained to Iden o that she had felt "threatened" by me. Iden o and Iden r in turn tacitly endorsed Iden p by calling it an example of my "negative behavior" towards others in the office. Iden o said that she felt compelled to "address the issue" with me because it was her duty "as a manager." I vigorously denied to all parties aware of this issue that I had threatened anyone. During a follow-up meeting on 15 March, both Idens o and r declined to disassociate themselves from Iden p's ominous interpretation of the Post-it even though I gave both officers two opportunities to do so. Both said, "we don't know the context," (ergo, maybe Iden o's interpretation is accurate). I immediately challenged both officers to take the Post-it note to CIA's Office of Security—or better yet to the Loudoun County Police Department—if they felt strongly about the "threat" it contained. They declined, without comment.[35] (U//AIUO)

20. Comment: What is next? To be accused by management of planning an assault because I keep a plastic butter knife in the drawer? Of robbing the coffee fund? Because if certain FBIS managers tacitly subscribed to Iden o's silly and paranoid interpretation of the Post-it note—and they did—it is no longer management. Leveling baseless accusations of what amounts to criminal conduct is very serious matter. It can rightly be called intentional harassment, from my optic. It suffices to say that I do not like CIA managers to insinuate that I am a violent person or that I would commit a criminal act. This is malicious character assassination when done without a shred of evidence. (U//AIUO)

21. The Negative Effect on the Intelligence Mission: After the weird incident described in paragraphs 19 and 20, Iden p compounded the phenomenon of seeming harassment by refusing to allow four draft reports I had submitted for edit to be released as formal FBIS intelligence reports. All of her de facto refusals occurred after I had vigorously challenged her paranoia in late March 2004 and showed the Post-it note to the Office of Security.[36] The draft reports dealt with high-priority designated USG terrorist groups, to include al-Qa'ida and HAMAS. In all cases, other offices of CIA or substantive experts within FBIS had endorsed the value of the drafts. In the most egregious case, Iden p, almost certainly out of personal pique, nixed the production of an important report that was to be used by Federal Bureau of Investigation. Moreover, she did this even after I

35

39

---

[35] Of course, nothing prevented me from sharing the note with the security officer at____ Iden t. I gave her some background to my case on 12 March and a copy of the text of the Post-it note, as well as an accompanying memo, on 17 March 2004. A few days later, on or about 25 March, she indicated to me that she could discern no "threat" in note and was surprised that anyone else could. (U) LOC 1-03
[36] I have written literally scores of reports, foreign media analyses, ____ monitor reports, and operational alerts (OA's) since I came to FBIS in 1999. (I proposed the concept of the OA in late spring 2002, which FBIS then adopted some months later and which has become a useful product for the IC.) Most of them were required to pass through Iden p's editing. Yet, prior to spring 2004 it had been extremely rare for iden p to fundamentally question the intelligence value of a draft that I had submitted. (U//AIUO)

had specifically told her that the information demanded a formal report because the FBI planned to use it to launch an investigation.[37]  (U//AIUO)

22.  Action Requested: Kindly investigate and solve the problems described above—and finish CIA's investigation of ref b.  It is painfully clear to me that the CIA bureaucracy does not function the way it is supposed to, insofar as it has allowed some managers to engage in seeming *prohibited personnel practices* vis-à-vis a federal whistleblower.  My previous whistleblowing has been quietly, yet illegally taken into account in numerous personnel decisions over the years.[38]  I contend that some managers think it is OK to discriminate against a whistleblower because they have "deniability" and because such cases can be difficult to prove.[39]  (U//AIUO)

23.  CIA will not be let off the hook until it resolves this problem equitably.  I have been threatened, told that I am unfit to talk to young officers, publicly humiliated, "prayed for," and denied other opportunities too many times for all these incidents to be coincidences.  Moreover, two CIA staff officers have done this with explicit reference to my previous whistleblower complaints and several others have made negative allusions to my supposed "hall file."  This has all taken place while I have made important intelligence contributions that have been largely ignored and within a framework of formal laws that are designed to protect federal whistleblowers.[40]

24.  I ask you that resolve this complaint fairly and with a certain measure of urgency.[41]  In the meantime, please know that I appreciate your attention to this matter.

Respectfully,
Franz Boening

---

[37] On the very day that she did this John Brennan of Terrorism Threat Integration Center sought to reassure the 9/11 Congressional Commission that CIA was doing everything possible to work with other elements of the government.  Therefore, if CIA management worries about nothing else in the memorandum, I hope that it appreciates the lunacy of allowing a vindictive manager to harass an employee—out of pure personal pique—to the point that the intelligence mission is tangibly damaged.  Such managerial conduct is absolutely unconscionable.  It is even worse when other FBIS managers who witnessed the incident did not intervene to facilitate the production of actionable intelligence.  Significantly, after I recorded my intention to report to outside CIA authorities the unconscionable hindering of intelligence reports—seemingly based on nothing more than Iden p's irritation—the ill-conceived practice stopped.  By 30 April, I was again able to produce formal intelligence.  (U//AIUO)

[38] Moreover, nearly all CIA employees know intuitively that whistleblowing entails professional risks and friends have acknowledged to me privately that they believe my allegations have merit.  (U//AIUO)

[39] If certain managers believe this, then I will do my level best to prove them wrong.  After all, if we do not attempt to enforce federal law, what good is it?  Do we wish to ignore the law of the land?  For my part, I will not hesitate to document other *prohibited personnel practices* should they occur.

[40] In late April 2004, I obtained a position in TTIC.  The military officer who recommended me for the position as a senior analyst hired me without any hesitation, almost certainly because he was unaware of my previous whistleblowing and thus focused, appropriately, on objective qualifications.  I ask you to contrast this officer's behavior with that of some of the CIA officers described in this memorandum.

[41] I apologize for the dense prose of this complaint.  There was much to say and I did not want to ignore important details or context.

*3/*

# EXHIBIT "5"

# 2007 CIA PRB Regulations

(b)(2)
(b)(3)

### UNCLASSIFIED//~~AIUO~~

**Date:** 05/30/2007

**Category:** ☐ - Public Affairs    **OPR:** ☐

**Title:** ☐ (U) AGENCY PREPUBLICATION REVIEW OF
CERTAIN MATERIAL PREPARED FOR PUBLIC DISSEMINATION

*This regulation was written by* ☐

2. (U//~~AIUO~~) **AGENCY PREPUBLICATION REVIEW OF CERTAIN
MATERIAL PREPARED FOR PUBLIC DISSEMINATION**

> **(U//~~AIUO~~) SYNOPSIS: This regulation sets forth CIA policies and
> procedures for the submission and review of material proposed for
> publication or public dissemination by current and former employees and
> contractors and other individuals obligated by the CIA secrecy agreement to
> protect from unauthorized disclosure certain information they obtain as a
> result of their contact with the CIA. This regulation applies to all forms of
> dissemination, whether in written, oral, electronic, or other forms, and
> whether intended to be an official or nonofficial (that is, personal)
> publication.**

a. **(U//~~AIUO~~) AUTHORITY.** The National Security Act of 1947, as amended, the
   Central Intelligence Agency (CIA) Act of 1949, as amended, and Executive Order
   12333 require the protection of intelligence sources and methods from unauthorized

APPROVED FOR RELEASE
DATE: JAN 2008

disclosure. Executive Order 12958, as amended, requires protection of classified information from unauthorized disclosure. 18 U.S.C. section 209 prohibits a federal employee from supplementation of salary from any source other than the U.S. Government as compensation for activities related to the employee's service as a Government employee. The *Standards of Ethical Conduct for Employees of the Executive Branch* (5 C.F.R. 2635) are the Government-wide ethics regulations that govern Federal employees. Those regulations include restrictions on outside activities and compensation for teaching, speaking, and writing related to official duties. In Snepp v. U.S., 444 U.S. 507 (1980), the Supreme Court held that individuals who have been authorized access to CIA information, the public disclosure of which could harm the national security, hold positions of special trust and have fiduciary obligations to protect such information. These obligations are reflected in this regulation and in CIA secrecy agreements.

b. **(U//AIUO) GENERAL REQUIREMENTS AND DEFINITIONS**

(1) The CIA requires all current and former Agency employees and contractors, and others who are obligated by CIA secrecy agreement, to submit for prepublication review to the CIA's Publications Review Board (PRB) all intelligence-related materials intended for publication or public dissemination, whether they will be communicated in writing, speeches, or any other method; and whether they are officially sanctioned or represent personal expressions, except as noted below.

(2) The purpose of prepublication review is to ensure that information damaging to the national security is not disclosed inadvertently; and, for current employees and contractors, to ensure that neither the author's performance of duties, the Agency's mission, nor the foreign relations or security of the U.S. are adversely affected by publication.

(3) The prepublication review requirement does not apply to material that is unrelated to intelligence, foreign relations, or CIA employment or contract matters (for example, material that relates to cooking, stamp collecting, sports, fraternal organizations, and so forth).

(4) Agency approval for publication of nonofficial, personal works (including those of current and former employees and contractors and covered non-Agency personnel) does not represent Agency endorsement or verification of, or agreement with, such works. Therefore, consistent with cover status, authors are required, unless waived in writing by the PRB, to publish the following disclaimer:

"All statements of fact, opinion, or analysis expressed are those of the author and do not reflect the official positions or views of the Central Intelligence Agency (CIA) or any other U.S. Government agency. Nothing in the contents should be construed as asserting or implying U.S. Government authentication of information

or CIA endorsement of the author's views. This material has been reviewed by the CIA to prevent the disclosure of classified information."

(5) Those who are speaking in a nonofficial capacity must state at the beginning of their remarks or interview that their views do not necessarily reflect the official views of the CIA.

(6) A nonofficial or personal publication is a work by anyone who has signed a CIA secrecy agreement (including a current and former employee or contractor), who has prepared the work as a private individual and who is not acting in an official capacity for the Government.

(7) An official publication is a work by anyone who has signed a CIA secrecy agreement, (including a current employee or contractor), such as an article, monograph, or speech, that is intended to be unclassified and is prepared as part of their official duties as a Government employee or contractor acting in an official capacity.

(8) "Publication" or "public dissemination" in this context means:

   (a) for nonofficial (that is, personal) works -- communicating information to one or more persons; and

   (b) for official works -- communicating information in an unclassified manner where that information is intended, or is likely to be, disseminated to the public or the media.

(9) Covered non-Agency personnel means individuals who are obligated by a CIA secrecy agreement to protect from unauthorized disclosure certain information they obtain as a result of their contact with the CIA.

c. (U//AIUO) THE PUBLICATIONS REVIEW BOARD

(1) The PRB is the Agency body charged with reviewing, coordinating, and formally approving in writing all proposed nonofficial, personal publications that are submitted for prepublication. It is also responsible for coordinating the official release of certain unclassified Agency information to the public. The Board consist of a Chair and an Executive Secretary -- designated by and reporting directly to the Chief, Information Management Services (IMS) -- with the rest of the Board membership composed of senior representatives from the Director of CIA Area, the National Clandestine Service (NCS), the Directorate of Support, the Directorate of Science and Technology, the Directorate of Intelligence, the **Office of Security**, and the NCS's Global Deployment Center, who are designated by the appropriate Director, or Operating Official with C/IMS concurrence. The Office of General Counsel (OGC) provides a nonvoting legal advisor.

Case 1:07-cv-00430-EGS    Document 25-7    Filed 03/10/2008    Page 5 of 11

(2) The PRB shall adopt and implement all lawful measures to prevent the
publication of information that could damage the national security or foreign
relations of the U.S. or adversely affect the CIA's functions or the author's
performance of duties, and to ensure that individuals given access to classified
information understand and comply with their contractual obligations not to
disclose it. When the PRB reviews submissions that involve the equities of any
other agency, the PRB shall coordinate its review with the equity-owning agency.

(3) The PRB Chair is authorized unilaterally to represent the Board when disclosure
of submitted material so clearly would not harm national security that additional
review is unnecessary or when time constraints or other unusual circumstances
make it impractical or impossible to convene or consult with the Board. The
Chair may also determine that the subject of the material is so narrow or technical
that only certain Board members need to be consulted.

## d. (U//AIUO) CONTACTING THE PRB

(1) Former employees and contractors and other covered non-Agency personnel must
submit covered nonofficial (personal) materials intended for publication or public
dissemination to the PRB by mail, fax, or electronically as follows:

(2) Current employees and contractors must submit covered nonofficial and official materials intended for publication or public dissemination to the PRB by mail, fax, or electronically as follows:

Internal Mail:
Classified Facsimile:
Email: Lotus Note to:
Secure Phone:

(3) Current employees and contractors intending to publish or speak on a nonofficial, personal basis must also complete and submit to the PRB an electronic cover memorandum identifying their immediate supervisor or contracting officer. The PRB will notify the appropriate Agency manager or contracting officer, whose concurrence is necessary for publication.

(4) Review Timelines. As a general rule, the PRB will complete prepublication review for nonofficial publications within 30 days of receipt of the material. Relatively short, time-sensitive submissions (for example, op-ed pieces, letters to the editor, and so forth) will be handled as expeditiously as practicable. Lengthy or complex submissions may require a longer period of time for review, especially if they involve intelligence sources and methods issues. Authors are strongly encouraged to submit drafts of completed works, rather than chapters or portions of such works.

e. (U//AIUO) WHAT IS COVERED

(1) Types of Materials. The prepublication review obligation applies to any written, oral, electronic, or other presentation intended for publication or public dissemination, whether personal or official, that mentions CIA or intelligence data or activities or material on any subject about which the author has had access to classified information in the course of his employment or other contact with the Agency. The obligation includes, but is not limited to, works of fiction; books; newspaper columns; academic journal articles; magazine articles; resumes or biographical information on Agency employees (submission to the PRB is the exclusive procedure for obtaining approval of proposed resume text); draft *Studies in Intelligence* submissions (whenever the author is informed by the *Studies* editor that the draft article is suitable for *Studies* Editorial Board review); letters to the

editor; book reviews; pamphlets; scholarly papers; scripts; screenplays; internet blogs, e-mails, or other writings; outlines of oral presentations; speeches; or testimony prepared for a Federal or state or local executive, legislative, judicial, or administrative entity; and Officers in Residence (OIRs) speeches and publications (although oral and written materials prepared by OIRs exclusively for their classroom instructional purposes are not covered, OIRs must take particular care to ensure that any anecdotes or other classroom discussions of their Agency experiences do not inadvertently reveal classified information). Materials created for submission to the Inspector General and/or the Congress under the Whistleblower Protection Act and CIA implementing regulations are nonofficial, personal documents when they are initially created and the author is entitled to seek a review by the PRB to determine if the materials contain classified information and, if so, the appropriate level of classification of the information. If, at any point during or after the whistleblower process, the author wishes to disseminate his whistleblower complaint to the public, the author must submit his complaint to the PRB for full prepublication review under this regulation. If the author is a current employee or contractor who intends to disseminate his whistleblower complaint to the public, the author must also obtain PRB review of his materials under paragraph g below.

(2) Review of Draft Documents. Written materials of a nonofficial, personal nature covered by the regulation must be submitted to the PRB at each stage of their development before being circulated to publishers, editors, literary agents, co-authors, ghost writers, reviewers, or the public (that is, anyone who does not have the requisite clearance and need-to-know to see information that has not yet been reviewed, but may be classified). This prepublication review requirement is intended to prevent comparison of different versions of such material, which would reveal the items that the Agency has deleted. For this reason, PRB review of material only after it has been submitted to publishers, reviewers, or other outside parties violates the author's prepublication review obligation. The Agency reserves the right to conduct a post-publication review of any such material in order to take necessary protective action to mitigate damage caused by such a disclosure. Such post-publication review and action does not preclude the U.S. Government or the CIA from exercising any other legal rights otherwise available as a result of this prepublication violation. Additionally, the Agency reserves the right to require the destruction or return to CIA of classified information found to have been included in earlier versions of a work regardless of the form of the media involved (for example, paper, floppy disk, hard disk, or other electronic storage methods).

(3) Public Presentations.

(a) With respect to current and former employees and contractors and covered non-Agency personnel making intelligence-related speeches, media interviews, or testimony, they must submit all notes, outlines, or any tangible preparatory material to the PRB for review. Where no written material has

been prepared specifically in contemplation of the speech, interview, or oral testimony, the individual must contact the PRB Chair or his representative to provide a summary of any and all topics that it is reasonable to assume may be discussed, and points that will or may be made. Unprepared or unrehearsed oral statements do not exempt an individual from possible criminal liability in the event they involve an unauthorized disclosure of classified information.

(b) In addition, with respect to <u>current employees and contractors</u> making official or nonofficial oral intelligence-related statements to the media or to groups where the media will likely be in attendance, prior to granting interviews or making public appearances, the speaker shall contact the PRB for guidance. The PRB will coordinate the review of proposed speeches or media interviews with the component involved, the Office of Public Affairs for guidance regarding media or press relations, and other offices as necessary.

(c) <u>Current employees</u> who must make court appearances or respond to subpoenas must contact OGC for guidance.

(4) <u>Official Publications</u>. The publication or public dissemination of official Agency information by any means, including electronic transmissions, such as internet and unclassified facsimile, is subject to prepublication review. In addition to the types of materials listed in paragraph e(1) above, official publications subject to this review include unclassified monographs; organizational charts; brochures; booklets; flyers; posters; advertisements; films; slides; videotapes; or other issuances, irrespective of physical media such as paper, film, magnetic, optical, or electronic, that mention CIA or intelligence data or activities or material on any subject about which the author has had access to classified information in the course of his employment or other association with the Agency.

(6) <u>Additional PRB Guidance</u>. It is not possible to anticipate all questions that may arise about which materials require prepublication review. Therefore, it is the author's obligation to seek guidance from the PRB on all prepublication review issues not explicitly covered by this regulation.

**f.  (U//ALUO) PREPUBLICATION REVIEW GUIDELINES FOR FORMER EMPLOYEES AND CONTRACTORS, AND COVERED NON-AGENCY PERSONNEL**

(1) All material proposed for publication or public dissemination must be submitted to the PRB Chair, as described in paragraph d(1) above.  The PRB Chair will have the responsibility for the review, coordination, and formal approval in writing of submissions in coordination with appropriate Board members.  The PRB Chair will provide copies of submitted material to all components with equities in such material, and will also provide copies to all Board members and, upon request, to any Directorate-level Information Review Officer.

(2) The PRB will review material proposed for publication or public dissemination solely to determine whether it contains any classified information.  Permission to publish will not be denied solely because the material may be embarrassing to or critical of the Agency.  Former employees, contractors, or non-Agency personnel must obtain the written approval of the PRB prior to publication.

(3) When it is contemplated that a co-author who has not signed a CIA secrecy agreement will contribute to a publication subject to prepublication review, the final version of the publication must clearly identify those portions of the publication that were authored by the individual subject to the secrecy agreement.  Where there is any ambiguity concerning which individual wrote a section, and the section was not submitted for review, the Agency reserves the right to consider the section to be entirely written by the individual subject to the secrecy agreement and therefore in violation of the individual's prepublication review obligations.

(4) When otherwise classified information is also available independently in open sources and can be cited by the author, the PRB will consider the fact in making its determination on whether that information may be published with the appropriate citations.  Nevertheless, the Agency retains the right to disallow certain open-source information or citations where, because of the author's Agency affiliation or position, the reference might confirm the classified content.

**g.  (U//ALUO) PREPUBLICATION REVIEW GUIDELINES FOR CURRENT EMPLOYEES AND CONTRACTORS**

(1) All proposed unclassified material must be submitted to the PRB Chair, as described in paragraph d(2) above.  The PRB Chair will have the responsibility for the review, coordination, and formal approval in writing of submissions in coordination with the author's supervisor and other offices as necessary.  The PRB Chair will provide copies of submitted material to all components with equities in such material, and will also provide copies to all Board members and, upon request, to any Directorate-level Information Review Officer.

(2) <u>Additional Review Criteria</u>. For current employees and contractors, in addition to the prohibition on revealing classified information, the Agency is also legally authorized to deny permission to publish any official or nonofficial materials on intelligence-related matters set forth in paragraphs e(1) and e(4) above that could:

   (a) reasonably be expected to impair the author's performance of his or her job duties,

   (b) interfere with the authorized functions of the CIA, or

   (c) have an adverse effect on the foreign relations or security of the U.S.

(3) <u>Outside Activities Approval Request</u>. Current employees and contractors must also complete a [     ] (Outside Activity Approval Request) before undertaking any unclassified publication not officially sanctioned by the CIA [    ]
[    ]

(4) <u>Management Review Process</u>:

   (a) <u>Nonofficial publications</u>. For all nonofficial publications, current employees must complete and submit to the PRB a cover memorandum identifying their immediate supervisor or contracting officer. The PRB will notify these individuals, whose concurrence is necessary for publication.

   (b) <u>Unclassified official publications</u>. For all unclassified official publications (official documents whose dissemination is likely to be broader than the initial, intended Federal Government entity recipient -- for example, unclassified Congressional "constituent replies") that are covered by this regulation, current employees or contractors must first coordinate the document or speech with their management chain. Once initial management acceptance has been made, the employee must then submit the publication to the PRB for final review and approval. (*Classified* official publications are not covered by this regulation and, therefore, are not required to be submitted to the PRB for review.)

h. **(U//AIUO) APPEALS**

    (1) If the PRB denies all or part of a proposed nonofficial publication, the author may submit additional material in support of publication and request reconsideration by the PRB. In the event the PRB denies the request for reconsideration, the author may appeal. PRB decisions involving nonofficial publications may be appealed to the ADD/CIA within 30 days of the decision. Such an appeal must be in writing and must be sent to the PRB Chair. Appeal documentation must include the material intended for publication and any supporting materials the appealing party wishes the ADD/CIA to consider. The PRB Chair will forward the appeal and relevant documentation through the components that objected to publication of the writing or other product at issue. The Director or Head of Independent Office will affirm or recommend revision of the decision affecting his or her component's equities and will forward that recommendation to OGC. OGC will review the recommendations for legal sufficiency and will make a recommendation to the ADD/CIA for a final Agency decision. The PRB Chair is responsible for staff support to the ADD/CIA. The ADD/CIA will render a written final decision on the appeal. Best efforts will be made to complete the appeal process within 30 days from the date the appeal is submitted.

    (2) This regulation is intended to provide direction and guidance for those persons who have prepublication review obligations and those who review material submitted for nonofficial or official publication. Nothing contained in this regulation or in any practice or procedure that implements this regulation is intended to confer, or does confer, any substantive or procedural right of privilege on any person or organization beyond that expressly stated herein.

i. **(U//AIUO) BREACH OF SECRECY AGREEMENT.** Failure to comply with prepublication review obligations can result in the imposition of civil penalties or damages. When the PRB becomes aware of a potential violation of the CIA secrecy agreement, it will notify OGC and the **Office of Security (OS)**. After the **OS** review and investigation of the case is completed, if further action is deemed warranted, the **OS** will refer the matter to OGC, which will report all potentially criminal conduct to the Department of Justice (DoJ) and consult with DoJ regarding any civil remedies that may be pursued.

# EXHIBIT "6"

# Second Rule 56 (f) Declaration of Mark S. Zaid, Esq.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FRANZ BOENING | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No: 07-430 (EGS) |
| v. | * | |
| | * | |
| CENTRAL INTELLIGENCE AGENCY | * | |
| | * | |
| Defendant. | * | |

*     *     *     *     *     *     *     *     *     *     *     *

**SECOND RULE 56(f) DECLARATION OF MARK S. ZAID, ESQ.**

I, MARK S. ZAID, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.  I am a person over eighteen (18) years of age and competent to testify. I make this Declaration on personal knowledge and in support of the plaintiff's Opposition to Defendant's Motion for Summary Judgment.

2.  I am the attorney of record for plaintiff Franz Boening ("Boening"). I am admitted to practice law in the States of New York, Connecticut and the District of Columbia, as well as the D.C. Circuit, Second Circuit and Fourth Circuit Court of Appeals, and the United States District Courts for the District of Columbia, Maryland, Eastern District of New York, Northern District of New York and the Southern District of New York. I have been litigating cases pertaining to national security since 1993. As part of my representation of Boening, I have executed a Secrecy/NonDisclosure Agreement providing me access to up to and including SECRET level information (and the same applies to my associate Bradley P. Moss, Esq.). I have, in fact, participated in classified meetings with Boening and the CIA to discuss or review the specific documents at issue in this case.

3.  This action was filed on March 5, 2007 to challenge the conduct of the defendant Central Intelligence Agency ("CIA") with respect to the processing by the Publication Review Board of a memorandum drafted by Boening dated May 10, 2001. The

memorandum detailed perceived violations of law and policy mistakes surrounding the alleged relationship between the CIA and a foreign government official – "M". [**14 words redacted by the CIA**].

4.   If the CIA is claiming that Boening did not exclusively derive the information within his "M Complaint" from publicly available newspaper and magazine articles, or other federal agencies' declassified documentation retrieved from the Internet, then discovery is essential prior to the granting of summary judgment for the CIA. This goes to the heart of the legal and factual questions in this case, i.e., whether Boening's "M Complaint" was based on open sources. Discovery could be undertaken to demonstrate that no evidence exists that Boening ever accessed – either in an authorized or unauthorized manner – information contained within the "M Complaint", or that the CIA had any control over the information in the document. Boening's personnel and security files would reveal whether the CIA ever suspected him of inappropriately accessing classified information on "M", as well as whether any aspect of "M's" situation fell within Boening's scope of employment.

5.   Additionally, discovery would be appropriate to demonstrate that the CIA has improperly claimed the information in the "M Complaint" is classified solely in order to cover up embarrassment and/or a violation of law. The comment by William McNair, the former Information Release officer of the CIA's Directorate of Operations, justifies further exploration on this point. Mr. McNair would specifically be deposed to discuss his concession of:

> *Look, Franz, do you think I care about ["M's" name]?  This is not about 'source protection,' this is about CIA's reputation. We don't want you to have any credibility. The problem with the "M" memorandum is that what you've written is all true.*

6.   Finally, discovery would be relevant on the matter of past agreements and understandings between Boening and the PRB as to whether specific pinpoint citations were required to support the unclassified nature of the "M Complaint" or whether simply

providing copies of the open source documentation was sufficient. Thus, depositions of former PRB Chairman Paul Noel Chrétien, current PRB Chairman Richard Puhl, and PRB staffer Richard Florence, among others, would be sought.

7.    Over the last decade I have handled more than a dozen prepublication review cases, particularly with the CIA, both at the administrative and litigation stages. <u>See e.g.</u> <u>Sterling v. CIA</u>, Civil Action No: 03-0603 (D.D.C.)(TPJ); <u>Wendy Lee v. CIA</u>, Civil Action No. 03-0206 (D.D.C.)(TPJ); <u>Waters v. CIA</u>, Civil Action No: 06-383 (D.D.C.)(RBW); <u>Stillman v. CIA</u> 209 F. Supp. 2d 185 (D.D.C. 2002), <u>rev'd on other grounds</u>, 319 F.3d 546 (D.C. Cir. 2003). Personally, I will openly concede that – notwithstanding the fact that the PRB sends conflicting messages to its current and former employees regarding whether a specific deadline exists for a response – a 30 day requirement is often unrealistic given the manner in which the current process has been structured for reviews. However, my experiences have revealed that delays that extend one to two years before a final response occurs have become a common routine pattern and practice with the CIA. The excessive delays have a significant impact on the submitter, especially since there is often a publication deadline involved or an important public interest underlying the contents. Moreover, at times the final response is negotiated to such an extent, i.e., that "classified" information all of a sudden becomes unclassified, it makes a mockery of the classification system in general.

I do solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true to the best of my knowledge.

Date:    February 10, 2008

/s/

_____

Mark S. Zaid

# EXHIBIT "7"

# November 22, 2004 PRB Submission Memorandum

22 November 2004

To: Publications Review Branch/CIA

From: Franz Boening, Terrorism Threat Integration Center (National Counter-Terrorism Center from 6 December 2004)

Subject: Review of "personal" documents for possible publication

Refs:  a.  10 May 2001 Whistleblower Complaint and addendums dealing with "M"
       b.  24 March 2003 Whistleblower Complaint alleging retaliation
       c.  20 May 2004 Whistleblower Complaint alleging retaliation.
       d.  16 January 2003 Grievance Against FBIS managers. (U/AOUO)

1. Please process the referenced documents for official release and/or approval.  If full release is not possible, please recommend edits in order to effect the documents' release. Please review the documents as quickly as you review other documents for publication (which, I understand, normally have a round-turn time of 30 days or less). (U/AOUO)

2. Observations about the documents, in no particular order. (U/AOUO)

   a.  CIA has classified all of the above documents except ref d.  OIM has assured me, however, that all of the above manuscripts are "unofficial personal documents." As a result, OIM has not allowed me to challenge their classification under section 1.9 of Executive Order 12958. (I do not agree with OIM's assertion that these documents are unofficial but I am willing to submit them to your branch on the chance that they will be approved for release.) (U/AOUO)

   b.  Ref a contains no classified material whatsoever.  It is based entirely on open source research and I had no access whatsoever to official classified traffic on M, notwithstanding CIA assertions to the contrary.  I request that this document be released in full--in keeping with CIA's stated belief in the First Amendment rights of employees. (Note: CIA spokesmen have recently cited the "First Amendment" as the reason for allowing former CIA employee Mike Scheuer to publish *Imperial Hubris* even though he had been a former chief of the CTC's Bin Ladin Branch and he spoke of secret CIA operations. Therefore, it seems to me that if PRB applies the "Scheuer standard" to refs a-c, my documents will released in full as they contain no classified information whatsoever.) (U/AOUO)

   c.  CIA has not allowed me to challenge the classification of ref b. (U/AOUO)

   d.  CIA has not allowed me to challenge the classification of ref c. Fyi, CIA Asserts that        VA is a "classified" facility of CIA and that CIA's presence is Iraq is "classified." Both assertions are mistaken, in my view.  The former DCI officially confirmed CIA's presence in Iraq during his message to the CIA workforce in early June 2004 and in a letter to Porter Goss later the same month. Please see CIALink for



background. In addition, CIA spokesman Mark Mansfield officially confirmed that an
investigation of CIA's conduct at Abu Ghrayb prison in Iraq is ongoing. Finally,
VA is marked as the FBIS production point on literally 100s of CIRAS open-source
messages produced every month. All these documents have the word "unclassified"
written across the top. (A copy of one such unclassified cable is attached.) (U/AOUO)

    e. Ref d has not been classified by CIA. Please approve it for release.
    (U/AOUO)

3. I appreciate your consideration of this matter and remain available for possible
questions (Lotus Notes or telephone is fine). My work phone number, when I am on
duty, is 16010. (U)

Sincerely,
Franz Boening

# EXHIBIT "8"

# PRB Briefing Slides



## Nonofficial Publication? What's That?

- "Publication" means communicating information to one or more persons.
- "Nonofficial publication" is a work the author prepares as a private individual, not as a government employee or a contractor acting in an official capacity.



## The Requirement

". . . all current and former Agency employees, and others obligated by contract [are required] to submit for prior review by CIA all materials . . . intended for nonofficial publication."

(AR 6-2)



## Who Reviews My Resume?

- According to AR 20-28, HRM's Transition Center reviews resumes; IRO offices are now handling resumes.
- Seek guidance from the Transition Center and IRO office on what a resume can and cannot contain.
- Employees under cover have special considerations covered in the regulation.



## Why a Publications Review Board?

In fewer than 20 words:

- "The PRB reviews nonofficial publications to ensure that they do not disclose information damaging to US national security."



## Prepublication Review:
### Your Rights and Responsibilities



## Fundamental Questions

- Who reviews my resume?
- What is prepublication review?
- What does the Publications Review Board do?
- How does this affect me?

2

## Prepublication Review Applies to:

- Former employees
- Others with access to classified information (former DCIs, Presidents, Cabinet officers, Congressional staffers)
- Current employees, at corporate's request — normally done through chain of command to assess effect on performance of duties, Agency functions, foreign relations

## What Does the Board Do?

- Assists the DCI in his statutory responsibility to protect intelligence sources and methods.
- Helps individuals meet their prepublication review obligations.
- Ensures that information damaging to national security is not disclosed inadvertently.

## Is There a Loophole?

- Oral statements—like interviews—are not subject to prepublication review if an individual does not prepare notes, outlines, or memoranda beforehand.
- But, the individual is still liable if he or she discloses classified information!
- Notify Public Affairs (703) 482-7677 of press contacts; it can give guidance.

## The Obligation Is Contractual

- The obligation arises from the secrecy agreement.
- The US Supreme Court has said in *United States v. Snepp* that the obligation is contractual and arises regardless of classification issues.

## When Does the Obligation Arise?

When a writing, script, or oral presentation (even a work of fiction):
- Contains any mention of CIA
- Intelligence data or intelligence activities
- or deals with topics to which the author had access to classified information during his or her employment with CIA.

## What Is Covered?

- Books, book reviews, articles, scripts, outlines of oral presentations, letters to the editor, any form of electronic dissemination (Internet)
- Even term papers, video games, and cookbooks [that] contain any mention of the CIA, intelligence data or intelligence activities, or material on any subject which the author has had access to classified information in the course of his or her employment...

PRB

## What Does the Board Not Do?

- **Does not declassify** Agency information
- **Does not release** Agency information
- **Does not endorse** or verify authors' information

PRB

## Who Serves on the Board (or whom do I blame if my article is not approved)?

- PRB is an independent board comprising senior representatives from the DI, DO, DS&T, MSOs, EOCD, and a legal advisor.
- October 1991 IG report recommended that all PRB members—including alternates—be SIS officers.

PRB

## The First Amendment Balancing Act

- DCI's authority by statute, Executive Order, Agency regulations
- Individual's First Amendment rights
- Court authorization of "prior restraint" with 30 days for review and response to author

PRB

## What Is the Standard for Review?

- PRB can redact material only if disclosure would damage national security.
- PRB cannot redact embarrassing or critical statements, nor does it correct factual errors.
- The Agency can prevent former employees from writing about topics others can write about freely.
- Fictional accounts and non-experts have more leeway.
- "Sourcing" allows authors more freedom.

PRB

## What Is the Process?

- The process is not adversarial, although sometimes it seems so to some authors.
- Chairman's job is to reconcile differences where they can be reconciled.

PRB

## Process Summary

- Author submits a manuscript.
  - PRB has 30 days to complete its review.
- Board reviews for classified information.
- Author notified in writing of Board's decision.
- Author can contest and negotiate.
- Board reconsiders, but decision on reconsideration is final Board action.

PRB

## What If an Author Disagrees With the Board?

- Author can appeal to the Executive Director.
- Author can litigate Executive Director's decision.

PRB

## What Happens If I Don't Comply?

The Agency can, through the Department of Justice, either:

- Seize any royalties your publication generates (like Snepp case) or
- Seek an injunction to restrain you from publishing unless you comply with the terms of you secrecy agreement.

PRB

## Trends in Reviewing

- Steady volume of submissions:
  - [illegible] manuscripts in FY [illegible]
  - 22,467 pages in FY [illegible]
- More writing on operations.
- More complex, time-consuming reviews make 30-day deadlines more difficult to meet.

PRB

## What Are My Chances for Approval?

- In FY 2002, the Board had "no objection" to 82% of manuscripts.
- In the past five fiscal years, the appeal rate has been less than 1%—which means that the Board and authors were able to reach a satisfactory resolution 99% of the time!

PRB

## Contact Information:

Central Intelligence Agency
Publications Review Board
[illegible] IP Building
Washington, D.C. [illegible]
([illegible]) [illegible]; ([illegible]) [illegible] (fax)
If sending via UPS or FED EX, use:
CIA Gate 5
Publications Review Board
[illegible] IP Building
1000 Colonial Farm Road
McLean, VA 22101

4

# EXHIBIT "9"

# Zaid Letter To DOJ
# Dated October 15, 2007

# MARK S. ZAID, P.C.
### Attorney-At-Law

1250 CONNECTICUT AVENUE, N.W.
SUITE 200
WASHINGTON, DC 20036
——————

TELEPHONE (202) 454-2809
FACSIMILE (202) 330-5610

October 15, 2007

<u>VIA E-MAIL</u>

Michael P. Abate
Trial Attorney, Civil Division
U.S. Department of Justice
P.O. Box 883
20 Massachusetts Avenue, N.W.
Room 7302
Washington, D.C. 20530

Re: <u>Boening v. CIA</u>, Civil Action No. 07-430 (D.D.C.)(EGS)

Dear Mr. Abate:

I am writing to take you up on your offer of July 26, 2007, to cooperate and ensure that any "classified" submission by my client will be filed <u>in camera</u> for the Court's review. To be perfectly candid, we have no intention of filing, much less creating, a classified submission but, of course, I cannot claim to know whether the CIA will consider certain information we intend to include in a declaration, especially in light of the current posture of this case, to be classified.

Therefore, in order to properly ascertain whether any declaration (and any accompany materials) to be submitted by my client contains alleged classified information – and therefore necessitates an <u>in camera</u> filing – I am respectfully requesting that the CIA arrange for a date/time for my client and I to use a secure computer at an Agency facility (wherever that might reasonably be) in order to draft a factual declaration for his signature. We can then submit the document(s) for classification review and act accordingly following a determination. As we have no interest in even inadvertently disclosing what may or may not be legitimately classified information, this method will ensure no potential problems arise.

The alternative is to proceed how I normally handle these types of cases and – in complete good faith with no intention to include classified information – draft any intended filings on our own computers and then submit the document(s) for classification review. We would then delete any material – despite our good faith efforts to exclude – designated as classified by the Agency and request that the unredacted version be submitted to the Court for its <u>in camera</u> review.

We are comfortable with either option but offer both to the Government in order to ensure no concerns arise.

Furthermore, in order to ensure we can present an appropriate response consistent with my client's First Amendment rights, I would also like to make immediate arrangements for my client and I to re-review the "classified" documents he created that are the subject of this litigation. As you know, I participated in the IG process wherein these documents were created, reviewed and discussed.

Please note I am not asking the Government for permission to review any of the Agency's classified submissions for which I have never had prior access. That dispute will be directed towards the Court. I am only addressing those documents for which I had unfettered prior authorized access (and for which the substantive information contained therein I continue to have authorized access).

I appreciate your cooperation in this matter, and await your timely response. Should you wish to discuss any of the above with me, please contact me at (202) 498-0011.

Sincerely,

/s/

Mark S. Zaid

# EXHIBIT "10"

# DOJ Letter To Zaid
# Dated October 26, 2007



**U.S. Department of Justice**

Civil Division

Federal Programs Branch

20 Massachusetts Ave., NW

Room 7302

Washington, DC 20530

---

Michael P. Abate                                 Tel: (202) 616-8209 — Fax: (202) 616-8470

Trial Attorney                                       Email: michael.abate@usdoj.gov

October 26, 2007

VIA FIRST-CLASS MAIL AND E-MAIL

Mr. Mark S. Zaid

Mark S. Zaid, P.C.

1250 Connecticut Ave., N.W., Suite 200

Washington, DC 20036

Re: *Boening v. Central Intelligence Agency*, Civil Action No. 07-0430 (D.D.C.)

Dear Mark:

I write in response to your October 15, 2007 letter.

The Central Intelligence Agency ("CIA") has advised me that it has no objection to you or your client preparing draft legal pleadings on your personal computers, as long as the draft pleadings do not contain any classified information and you submit them to the CIA for classification review before filing.

Additionally, the CIA further advised me that it has denied your client's request for access to classified documents he created in connection with the proceedings before the Office of Inspector General ("OIG") referred to in your letter. Access to classified information is governed by Executive Order 12958, as amended, which includes a requirement that the prospective recipient has a "need to know" the information. Section 6.1(z) defines "need to know" as "a determination made by an authorized holder of classified information that a prospective recipient requires access to specific classified information in order to perform or assist in a lawful and authorized governmental function." As noted in the Declaration of Scott A. Koch, filed along with the Motion for Summary Judgment, the CIA has determined that your client does not have a need to know the classified information contained in those materials. *See* Koch Decl. ¶ 32 n.6.

Moreover, the CIA has advised me that it also denied your request for access to these classified materials created by your client. The CIA has determined that you do not have a need to know this information because your representation of a private client in civil litigation against the United States does not constitute performing or assisting in a lawful and authorized governmental function. This determination that pursuing civil litigation against the United States does not constitute performing or assisting a lawful governmental function is distinct from and supercedes any limited access to certain classified information that you may have been given in connection with the proceedings involving the CIA's OIG.

Sincerely,

Michael P. Abate
Trial Attorney
United States Department of Justice

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRANZ BOENING             *
                                      *

      Plaintiff,            *

                                      *      Civil Action No: 07-430 (EGS)

      v.                     *

                                      *

CENTRAL INTELLIGENCE AGENCY   *

                                      *

      Defendant.          *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>ORDER</u>

     Upon consideration of Defendant's Motion to Dismiss and Plaintiff's Cross-Motion for Summary Judgment, and the entire record herein, it is this _____ day of

_____ 2008, hereby

     ORDERED, that defendant's Motion is denied; and

     FURTHER ORDERED, that plaintiff's Cross-Motion is granted and he is permitted to publish his May 10, 2001, Memorandum in its entirety.


                          _____

                           UNITED STATED DISTRICT JUDGE