## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRANZ BOENING           *

                        *

     Plaintiff,          *

                        *      Civil Action No. 07-0430 (EGS)

     v.               *

                        *

CENTRAL INTELLIGENCE AGENCY   *

                        *

     Defendant.       *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DEFENDANT TO PROVIDE ACCESS TO "CLASSIFIED" DOCUMENTS TO PLAINTIFF AND HIS COUNSEL[1]

In bringing before this Court the important issue of whether plaintiff Franz Boening ("Boening") and his counsel are lawfully entitled to review alleged classified documents, he very clearly defined the two distinct questions that he was raising:

> First, to what extent and when, if ever, is a plaintiff and his counsel permitted to gain access to the specific "classified" documents at issue in the litigation when both plaintiff and counsel *already possess the specific knowledge* of the "classified" contents through either having had actual prior access to the document and/or by reason of the authorized dissemination of the contents through the execution of a secrecy agreement?

> Second, to what extent and when, if ever, are either the plaintiff and/or his counsel permitted to gain access to the "classified" declaration submitted by the defendant agency to support the Government's position in the litigation?

Plaintiff's Motion to Compel Defendant to Provide Access to "Classified" Documents to Plaintiff and His Counsel at 5 (filed November 19, 2007)(Dkt. No. 11)("Pl's Memo").

---

[1] This filing and its attachments were submitted to and reviewed by the CIA for classification purposes. As a result it has been approved for public filing in its present form. To the extent any information has been redacted as "classified", the filing of this document does not denote Boening's, or his counsel's, agreement with any classification decisions and he reserves the right to challenge these decisions at the appropriate time. Moreover, depending upon the extent of information redacted, this Court should review an unredacted version in order to ensure Boening receives full due process during these proceedings.

The answer to these two questions may ultimately be identical, but they also need not be as both a matter of law and fact. The opposition response (Dkt No. 17) filed by the defendant Central Intelligence Agency ("CIA"), however, not only unnecessarily muddles the two arguments but it legally and factually distorts the matter at hand as well.[2]

## I.  THE D.C. CIRCUIT'S DECISION IN STILLMAN v. CIA IS CONSISTENT WITH THE RELIEF REQUESTED BY BOENING

The D.C. Circuit's decision in Stillman v. CIA et al., 319 F.3d 546 (D.C.Cir. 2003), provided guidance to this Court as to how to handle prepublication review challenges. It stated:

> Precisely because it is often difficult for a court to review the classification of national security information, "we anticipate that *in camera* review of affidavits, followed if necessary by further judicial inquiry, will be the norm." McGehee v. Casey, 231 U.S. App. D.C. 99, 718 F.2d 1137, 1149 (D.C. Cir. 1983). Here, however, the district court did not wait to evaluate the pleadings and affidavits to be submitted by the Government in defense of its classification decision. Rather, the court plunged ahead to resolve the constitutional question.

> Therefore, we remand this case to the district court to determine first whether it can resolve the classification *ex parte*. The district court should

---

[2] The CIA has tied the issue of access with its Motions to Dismiss and Summary Judgment (Dkt. No. 18). While Boening does agree that it is necessary to at least have the Summary Judgment issues briefed so that the Court can contemporaneously review the CIA's filings (especially its' *in camera*, *ex parte* declaration), there is no need, and it does not make sense if the access issue is decided in favor of Boening, to render a decision on either the Motions to Dismiss or Summary Judgment (unless it were in favor of Boening as that would eliminate the need for a ruling on the instant Motion). This Court addressed the identical issue once before and noted:
> However, it would defeat the purpose of plaintiff's First Amendment challenge for this Court to independently determine whether the information is properly classified in order to decide the motion to compel access, as the reason plaintiff needs to give his attorney access is to argue that the classification decisions were improper. To hold that the First Amendment issue of whether plaintiff's attorney is entitled to access turns on whether the information at issue was properly classified would put the cart before the horse.
Stillman v. DoD et al., 209 F.Supp.2d 185, 225 (D.D.C.2002), rev'd on other grounds, Stillman v. CIA et al., 319 F.3d 546 (D.C.Cir. 2003).

first inspect the manuscript and consider any pleadings and declarations filed by the Government, as well as any materials filed by Stillman, who describes himself an "expert in classification and declassification." The court should then determine whether it can, consistent with the protection of Stillman's first amendment rights to speak and to publish, and with the appropriate degree of deference owed to the Executive Branch concerning classification decisions, resolve the classification issue without the assistance of defense counsel. If not, then the court should consider whether its need for such assistance outweighs the concomitant intrusion upon the Government's interest in national security. Only then should it decide whether to enter an order granting Mr. Zaid access to the manuscript and, if similarly necessary, to the Government's classified pleadings and affidavits. If the court enters such an order, then the Government may appeal and we will have to resolve the constitutional question.

Id. at 548-49.

The CIA complains that Boening seeks to have this Court issue a decision similar to that issued in the Stillman litigation, and that such an exercise is simply "to force the government to appeal such a ruling, at which time he hopes to obtain a ruling on the constitutional arguments his motion raises." Defendant's Opposition to Plaintiff's Motion to Compel at 3 (Dkt. No. 17)(Def's Opp."). In actuality, Boening seeks for this Court to do exactly what the D.C. Circuit proscribed – either resolve the classification issue on its own or decide that it is constitutionally appropriate for counsel to have access to the documents in question (and perhaps the CIA's *ex parte* in camera declaration if necessary) before a substantive ruling is rendered. However the ultimate ruling, if this Court decides to initially rule in Boening's favor, there would be nothing inconsistent, as the CIA amply implies, with the Circuit's rationale in Stillman. If, as the D.C. Circuit duly noted, the government wishes to appeal such a ruling that is certainly its prerogative.

**A. Boening And His Counsel Possess A Need-To-Know The Information Within The Documents He Created And This Court Has The Authority To Render Such A Determination**

In his Motion, Boening set forth various legal precedents that stand for the unequivocal proposition that this Court can render a "need-to-know" determination with respect to private counsel's access to allegedly classified information. Pl's Memo at 2-5. As the CIA consciously chose not to respond to this argument it should be treated as conceded. Day v. D.C. Dep't of Consumer & Regulatory Affairs, 191 F. Supp. 2d 154, 159 (D.D.C. 2002)("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.").

**B. Boening's Counsel Already Possesses Authorized Access To The Alleged Classified Information In The "M Complaint" And Granting Access To The Document Does Not Expand His Access**

In an effort to defeat the pending Motion, the CIA commingles its answer to the two questions raised by Boening in an effort to defeat each of them by claiming that the granting of the Motion would "expand the access to which plaintiff and his counsel were previously afforded to the government's classified submissions." Def's Memo at 4. Of course, Boening has never claimed otherwise with respect to the CIA's *ex parte*, *in camera* submission, which is exactly why the issues were addressed separately. However, in regards to the allegedly classified information from within the "M Complaint", both plaintiff *and* counsel have had full access to the information.

For more than one decade Boening's counsel has had authorized access to classified CIA information during both administrative and litigation proceedings. Second Declaration of Mark S. Zaid, Esq. at ¶3 (dated February 9, 2008)("Second Zaid Decl."), attached at Exhibit "1". During that time the CIA repeatedly seeks to abuse the clearance system by playing games with Boening's counsel's access by granting it in one instance, and then denying access in another instance – sometimes involving the identical information. Id. at ¶4. Often times the gamesmanship surrounds the determination of

whether counsel possesses the requisite "need-to-know", or is serving an alleged "lawful and authorized governmental function". Def's Memo at 6.

According to the CIA, Boening's counsel has been granted a "limited security access approval." Def's Memo at 4-5 fn. 3. This term does not exist anywhere within the controlling documents that govern access to classified information. See Executive Orders 12,968 & 13,292. It does not even exist in the CIA's own operating regulations. Exhibit "2".[3] Nor can it be found anywhere within the Secrecy/Non-Disclosure documentation that the CIA requires to be executed by counsel. Second Zaid Decl., Ex. "A". It is a term concocted by the CIA's Office of General Counsel as a means by which to primarily impede, if not outright interfere with, private counsel's ability to represent current and former CIA employees, especially when in litigation.[4]

Boening's counsel has had, and continues to have, authorized access to the information within the "M Complaint". Declaration of Franz Boening at ¶¶4-7 (dated February 8, 2008)("Boening Decl.") attached at Exhibit "3"; Second Zaid Decl. at ¶5, attached at Exhibit "1". Boening has determined that his counsel has a "need-to-know" the information. Boening Decl. at ¶5. What he has not been granted by the CIA, however, despite having requested it, is simply access to the actual document. This is a complete

---

[3] AR 10-1 (dated September 9, 2005) is the current internal CIA operating regulation pertaining to "Security Clearances, Accesses and Approvals". It was recently released as part of litigation under the Freedom of Information Act in James Madison Project v. CIA, Civil Action No. 07-1154 (D.D.C.)(RMU). As the CIA routinely notes, it has provided Boening's counsel with a so-called "limited security access approval". This term is not found within the relevant regulation. There is listed an "access approval" as well as a "security approval" (and one unknown classified designation), but which of these is applicable, or whether either is applicable, is a mystery. Exhibit "2" at 2.

[4] The CIA notably fails to identify any case law, statute, Executive Order or internal regulation for its premise that Boening's counsel does not maintain a security clearance or defining what constitutes a "limited security access approval". Instead, as in Stillman, the CIA relies solely on the self-serving declaration of the Chief of its Litigation Division, John McPherson, who holds the same position as that previously of Robert J. Eatinger, Jr. (who submitted supporting declarations in Stillman).

abuse of authority of the clearance system which speaks to the circumstances under which "classified" information can be disseminated to authorized individuals. In fact, there is absolutely <u>no</u> legal distinction between authorized dissemination of classified information contained within a written record versus that which is provided verbally. <u>See</u> <u>e.g.</u>, Executive Order 13,292, § 4.1 (discussing parameters permitting access to "information", not records). The CIA's refusal to allow access to records containing "classified" information for which Boening and his counsel have been granted authorized access is an abuse of the clearance/classification system, and designed solely to impede Boening's ability to litigate this case.[5]

### C. Boening's Counsel Is Performing A Lawful And Authorized Government Function And To The Extent The CIA Believes Otherwise This Court Need Not Provide That Opinion Any Deference

As in <u>Stillman</u>, the CIA argues that Boening's counsel is not performing or assisting a governmental function. Def's Memo at 6. "A denial of access based on this determination presents a very different question than a denial of access based on the predicted risk to national security caused by release of the information." 209 F.Supp.2d at 196. There has been no allegation that counsel lacks the requisite "need-to-know" wholly because of the risk to national security posed by release of the information, particularly because he already possesses the information.[6]

---

[5] "Denying plaintiff's counsel access to information in order to gain advantage in litigation in which a plaintiff asserts a First Amendment claim, while allowing counsel access to information at the administrative level smacks of retaliation for the assertion of First Amendment rights. Such a justification can not be said to be unrelated to the suppression of free expression." <u>Stillman</u>, 209 F.Supp. 2d at 224 fn. 26.

[6] As this Court noted in <u>Stillman</u>, "the government has been less than straightforward as to why it denied Mr. Zaid access to this information. Defense counsel has consistently argued a position that is belied in part by the evidence defendants have submitted to this Court. In light of the serious allegations that DOD and the CIA are intentionally denying plaintiff's counsel access in order to retaliate against plaintiff for asserting his First Amendment rights, n7 such inconsistencies by the government in explaining its decision are, to say the least, suspect." 209 F.Supp.2d at 197.

In that regard, this situation is no different from that disposed of by this Court in Stillman (and which was not substantively addressed or rejected by the D.C. Circuit). Thus, the CIA's interest and expertise in asserting it has denied counsel access because it determined that he was not performing a "governmental function" as required by the Executive Order's definition of "need-to-know," is "neither compelling nor deserve deference by this Court." Id. at 197.

> These conclusions about the importance of plaintiff's attorney to the prosecution of plaintiff's claims deserve no deference from this Court. Mr. Aly's assumptions about the importance of counsel conflict with Supreme Court and D.C. Circuit precedent holding that plaintiff's interest in conferring with counsel is legitimate and fundamental. The assertion that Mr. Zaid can as effectively assist plaintiff in challenging the legality of specific classification determinations without access to the information at issue is, to say the least, unpersuasive. An attorney's role is not limited to informing the court about the general contours of classification law and instructing his client on the procedures for making court filings. While at the end of the day whether the First Amendment *requires* access to this information depends on a balancing of the interests at stake here, the Court refuses to accept the suggestion by defendants that Mr. Zaid's assistance is somehow irrelevant to plaintiff's ability to meaningfully assert his constitutional rights. Regardless of the opinion of defendants' declarant, plaintiff's legitimate and fundamental interest in consulting with his attorney and the corresponding right of meaningful access to the courts have indeed been infringed by defendant's actions here.

Id. at 216.[7]

---

[7] The CIA seemingly insinuates in its legal briefs that something inappropriate occurred by Boening and his counsel having "attempted to file on the public record the large quantity of materials that, he claims, supported the assertions in his memorandum deemed classified by the CIA." Defendant's Opposition to Plaintiff's Motion to Compel at 5 & fn.4 (Dkt. No. 17). This is nothing less than disingenuous and goes to the heart of why the CIA asserts the undersigned counsel is not performing a "governmental function", i.e., the actions taken by plaintiff's counsel undercut the position espoused by the CIA. Second Zaid Decl. at ¶¶7-9, attached at Exhibit "1"

## **CONCLUSION**

Based on the foregoing, the plaintiff and his counsel should be permitted access to the

unredacted copies of the "M Complaint" and, if appropriate, the classified DiMaio

declaration.

Date:   February 11, 2008

Respectfully submitted,

/s/
_____

Mark S. Zaid, Esq.
DC Bar #440532
Bradley P. Moss, Esq.
D.C. Bar #975905
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036

# EXHIBIT "1"

# Second Declaration of Mark S. Zaid, Esq.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FRANZ BOENING            *

                               *

        Plaintiff,          *

                               *       Civil Action No: 07-430 (EGS)

        v.                   *

                               *

CENTRAL INTELLIGENCE AGENCY    *

                               *

        Defendant.        *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**SECOND DECLARATION OF MARK S. ZAID, ESQ.**

I, MARK S. ZAID, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1. I am a person over eighteen (18) years of age and competent to testify. I make this Declaration on personal knowledge and in further support of the plaintiff's Motion to Compel Defendant to Provide Access to "Classified" Documents to Plaintiff and his Counsel.

2. I am the attorney of record for plaintiff Franz Boening ("Boening"). I am admitted to practice law in the States of New York, Connecticut and the District of Columbia, as well as the D.C. Circuit, Second Circuit and Fourth Circuit Court of Appeals, and the United States District Courts for the District of Columbia, Maryland, Eastern District of New York, Northern District of New York and the Southern District of New York. I have been litigating cases pertaining to national security since 1993.

3. For more than a decade I have been representing members of the Intelligence, Military and Law Enforcement Communities which has required me to have authorized access to classified information. While the vast majority of these cases only involve SECRET information, I have also been officially authorized at least once by the CIA to receive TOP SECRET/SENSITIVE COMPARTMENTED INFORMATION (otherwise known as TS/SCI). Given the large number of clients I represented I have notified the CIA, in particular, on numerous occasions that I am likely receiving higher than SECRET

information, and that I am able to piece together multiple facets of SECRET information to form TS or even TS/SCI information. Notwithstanding the fact that I have affirmatively requested educational training and tools, such as an office safe or secure telephone line (both of which are often provided to defense contractors working on CIA projects), to help ensure the protection of classified information, the CIA refuses to cooperate. Additionally, the CIA has even refused to permit me to draft court filings at their offices in cases involving classified information – such as this one in fact – and would rather have me type documents on my own computers even while knowing they are continuously connected to the Internet. Plaintiff's Motion to Compel Defendant to Provide Access to "Classified" Documents to Plaintiff and His Counsel at Exhibits "3" and "4" (filed November 19, 2007)(Dkt. No. 11).

    4.    When I am retained by a former or current CIA employee whose relationship to the CIA was/is classified or whose work was classified, I am required and I willingly execute a Secrecy/NonDisclosure Agreement. A copy of the document I routinely execute is attached at Exhibit "A'. Additionally, the CIA provides me with a copy of its "Security Guidance for Representatives", a copy of which is attached at Exhibit "B". No other documentation is ever provided. No other guidance is ever provided. No other instructions are ever provided. Once this documentation is submitted, there is usually very little or no discussion between my office and the CIA with respect to the scope of representation or the client's ability to disclose classified information to me. I am not, however, usually ever permitted to review specific documents even if when I have either already had authorized access to the document or at least authorized access to the information therein. For example, I once was permitted in a case to review an internal classified CIA regulation pertaining to its Office of Inspector General. During a subsequent representation I requested to review that same regulation, but the request was denied as the CIA determined I had no "need-to-know" its contents.

5.   As part of my representation of Mr. Boening, I have executed a Secrecy/NonDisclosure Agreement (the same document attached as Exhibit "A") which permits me authorized access up to and including SECRET level information (and the same applies to my associate Bradley P. Moss, Esq.). I have, in fact, participated in classified meetings with Boening and the defendant Central Intelligence Agency ("CIA") to review specific documents at issue in this case, or at the very least discuss the information that is contained within the documents.

6.   In handling cases involving classified information I make every reasonable effort (and then some) to safeguard the information from inadvertent disclosure. That means that I never intentionally include classified information in my filings. However, that does not mean that, despite my best efforts, the CIA does not ultimately consider certain information within my documents to be classified and requests that I redact the information from those documents which will be publicly filed with the Court. This often happens in cases, such as the instant matter, where the very subject matter in dispute is the classification of information.

7.   The CIA complains that Mr. Boening and I intentionally declined to "accept the government's offer of assistance in making such an *in camera* filing. Instead, he attempted to file on the public record the large quantity of materials that, he claims, supported the assertions in his memorandum deemed classified by the CIA." Defendant's Opposition to Plaintiff's Motion to Compel at 5 & fn.4 (Dkt. No. 17). Such an assertion is completely disingenuous. For one thing, as far as we are concerned, there are no documents submitted in this case by our side that required an *in camera* filing. Mr. Boening and I reasonably drafted our respective documents and prepared the accompanying filings to be completely unclassified.

8.   As one example, Exhibits "A" – "OOOO" which were attached as part of Mr. Boening's declaration filed in support of his Opposition to Defendant's Motion to Dismiss and Plaintiff's Cross-Motion for Summary Judgment (Dkt. Nos. 9-10) consist

3

entirely of published newspaper and magazine articles and officially declassified government documents. That the CIA chose to "classify" these publicly available documents speaks for itself, and the CIA will now have to justify its action before this Court and the public. Of course, this Court has access to any document as part of its consideration that the CIA "classifies" so this is of no concern to the plaintiff. All that I am required to do is make every reasonable effort to exclude classified information from my filings, which I did, and to submit the documents for classification review before filing, which I did.

9.  Mr. Boening and I met every obligation that was imposed upon us by virtue of our respective Secrecy/NonDisclosure Agreements, and the CIA – until the insinuation by its lawyers in a legal filing – has still never claimed otherwise.

I do solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true to the best of my knowledge.

Date:   February 9, 2008

/s/

_____

Mark S. Zaid

4

# EXHIBIT "1-A"

# CIA Secrecy/NonDisclosure Agreement

## SECRECY/NONDISCLOSURE AGREEMENT

1. I hereby consent to the terms of this agreement in consideration of being granted access to certain official information that is classified or otherwise legally protected (hereinafter referred to as "National Security Information") in accordance with Executive Order 12958, as amended or superseded, and/or which is protected from disclosure pursuant to statutory authority. I understand that, by granting me access to National Security Information, the United States Government (USG) reposes special confidence and trust in me, and that I am obligated to protect this information from unauthorized disclosures.

2. In consideration of being provided National Security Information pursuant to this agreement, I agree that I will never divulge, publish, or reveal, either by work, conduct, or any other means, such information unless specifically authorized to do so by an appropriate official of the USG.

3. The provision of National Security Information pursuant to this agreement does not constitute any waiver by the USG of any statutory, evidentiary, common law, or other privilege.

4. I understand that my obligation not to further disclose National Security Information provided me pursuant to this agreement without USG approval will not prevent my representation of or the lawful enforcement of my client's rights. I agree, however, that before filing any court pleading or other documents on behalf of my client which may contain this National Security Information, I will notify the USG so that appropriate security protection can be sought by the USG prior to such filings being made.

5. These restrictions are consistent with, and do not supersede, conflict with, or otherwise alter the employee obligations rights or liabilities created by Executive Order 12958; section 7211 of title 5, United States Code (governing disclosures to Congress); section 1034 of title 10, United States Code, as amended by the Military Whistleblower Protection Act (governing disclosure to Congress by members of the military); section 2302(b)(8) of title 5, United States Code, as amended by the Whistleblower Protection Act (governing disclosures of illegality, waste, fraud, abuse or public health or safety threats); the Intelligence Identities Protection Act of 1982 (50 U.S.C. section 421 et seq.) (governing disclosures that could expose confidential Government agents), and the statutes which protect against disclosure that may compromise the national security, including sections 641, 793, 794, 798, and 952 of title 18, United States Code, and section 4(b) of the Subversive Activities Act of 1950 (50 U.S.C. section 783(b)). The definitions, requirements, obligations, rights, sanctions, and liabilities created by said Executive Order and listed statutes are incorporated into this Agreement and are controlling.

6. I understand that this agreement will remain binding upon me after the termination of my involvement with the USG.


_DATE_ _____          _SIGNATURE_ _____

                                          _Printed Name_ _____

                                          _SSN_ _____

                                          _Address_ _____

_DATE_ _____          _WITNESS_ _____

                                          _Printed Name of Witness_ _____

# EXHIBIT "1-B"

# CIA Security Guidance for Representatives

# SECURITY GUIDANCE FOR REPRESENTATIVES

*As you may be representing a client who is affiliated with the Central Intelligence Agency, the Office of Security, is providing the following guidance for your review. This guidance answers typical questions that you may have about working with classified information. The guidance assumes that you have been approved to receive a Secret level approval in conjunction with your anticipated representation of an Agency-affiliated client. If you have any questions about the guidance, please telephone your designated Agency security officer, named in the cover letter.*

## What does my Secret level approval mean, in general?

You have been granted a Secret level approval in anticipation that representing your client may involve classified information. In fact, the mere association of your client with the Agency may be classified. As a result, you may be authorized access to certain information classified up to and including Secret, provided that an appropriate Agency official has first determined you have a bona fide need-to-know for the information.

Your Secret level approval is for you alone and is limited to your representation of your client in this particular case. *It is not transferable* to other cases involving your client, to other cases involving other Agency-affiliated individuals, or to matters involving other US Government organizations unconnected with your client. **If you are retained to represent other Agency-affiliated personnel other than your present client, you will need to complete a separate Secrecy/Non-disclosure Agreement for each client.** *Unless you are specifically authorized by the Agency*, your Secret level approval does not allow you to access Agency facilities, interview other Agency-affiliated personnel, discuss classified information with anyone (including persons in your office) who lacks a security approval and a bona fide need-to-know, and access and/or store any classified documents or other classified information in any form.

## What if I need to discuss this case or share information with others in my office?

You may discuss this case or share case-relevant information with others in your office, provided that you do not divulge classified information, including, but not limited to, your client's name and association with the Agency, if this association is classified. If you believe that others in your office will need access to classified information, contact your designated Agency security officer and request that those requiring access also be approved. The Agency determines who has a need-to-know for classified information and who will be submitted for a Secret level approval. You may not discuss or otherwise share classified information with other people until the Agency advises you that they have received their approval and have completed all the steps you are being asked to complete as a security approved representative. If you have questions about whether you may discuss or otherwise share classified information with someone, please contact your designated Agency security officer.

How do I know when information is classified?

Your client should not be providing you with classified information in any form unless
the appropriate security arrangements have been made by your designated Agency
security officer. If you are in doubt as to the classification of information you have
received or wish to receive, your designated Agency security officer will assist you in
determining the information's classification status. If your client provides you with
information, such as the first and last names (vice first names and last initials) of Agency-
affiliated individuals, intelligence sources or methods, site names or specific locations,
summaries or details of Agency operations, detailed Agency organizational structures,
statistics, and/or technologies, the information is most likely classified. You should
handle and protect any and all such information as classified until your designated
Agency security officer determines the classification status of the information.

What rules must I follow when working with information that may be classified?

The most important rule is that you may only discuss or otherwise share classified
information with people who have an Agency-provided Secret level approval, at a
minimum, and an Agency-determined need-to-know for the information. You also may
not undertake discussions of classified information in the presence of unapproved persons
or security approved persons lacking need-to-know.

A second important rule is that you may only review, create, store, and/or otherwise work
with or handle classified information in an Agency secure area. The Agency secure area
will be an office-like environment where you may more freely discuss classified or other
sensitive details of the case with your client or other approved members of your office,
review classified information, create documents based upon this information, and store
any documents or notes based upon this information. The Agency will provide you with
paper and pens/pencils, stand-alone information processing equipment (e.g., a personal
computer), and storage facilities. Only Agency-provided equipment and facilities may be
used to create documents containing classified information. As an alternative, your
designated Agency security officer can arrange for classified documents to be redacted
into unclassified form for use at your office. You, however, may neither create classified
documents at your office, nor may you reconstruct classified documents from redacted,
unclassified documents stored at your office.

When working in the Agency secure area, you will be escorted by your client or a cleared
person unaffiliated with the case. Your designated Agency security officer will have any
documents or notes you wish to remove from the secure area reviewed for classification
purposes. If the documents or notes are classified, they must be sanitized before removal
or remain in the secure area. Due to the difficulty with reviewing information in forms
other than hardcopy, only unclassified hardcopy documents may be removed after
approval. *Appropriate arrangements will be made to ensure that attorney-client privilege
is preserved during the Agency's review of documents for classification purposes.*

.3

For security reasons, you, like everyone else working at or visiting in the Agency, are
subject to inspection by an Agency security officer. Do not bring into Agency buildings
items capable of storing or otherwise recording classified information, such as personal
computers, tape recorders, or data storage media, and items capable of transmitting such
information, such as telephones, modems, or facsimile equipment. If you need to use
such media or equipment, please contact your designated Agency security officer to
arrange for Agency-provided media or equipment for use only in the Agency secure area
and only in a secure manner. If you need to transfer unclassified information from your
office's information processing equipment to the Agency-provided information
processing equipment, please contact your designated Agency security officer to make
arrangements. Depending upon the items and the manner in which they are used, if
brought into Agency facilities, these items may have to remain under Agency control.
Please note that automobiles with mobile telephones are permitted on Agency facilities;
however, the telephones must remain inside the automobiles.

What restrictions are there on how I handle my client's information at my office?

You and others security approved at your office may not work with classified information
at your office or anywhere else outside of an Agency secure area. This includes
reviewing, creating, storing, and/or otherwise working with or handling such information.
Fortunately, in most cases, classified information does not need to be included in the text
of motions, briefs, or correspondence relating to any proceedings. For example, you may
refer to Agency locations as "domestic location A" or "overseas location B." For another
example, if your client's association with the Agency is classified, you may be provided
with an alias for use with your client. In this case, your designated Agency security
officer will arrange for you to be briefed on the alias and associated procedures. You also
may be able to refer to your client and other Agency employees by generic job title or by
first name and last initial.

If your client's association with the Agency is classified, do not divulge his or her
Agency association to any unapproved persons. For example, do not use your client's
full name on the phone in any conversation linking him or her with the Agency. In
addition, create and store any unclassified documents or notes referring to your client's
true name separately (i.e., in separate documents in separate hardcopy or electronic case
files, at a minimum) from any documents or notes that might suggest an Agency
association. Use care not to associate the two. When paired with information such as
Agency-unique forms, Agency letterhead, or Agency telephone numbers, such a client's
true name is classified.

If you have any doubt about whether hardcopy or electronic notes or documents you will
be creating or discussions you will be holding are classified, contact your designated
Agency security officer. If you mistakenly created such classified notes or documents or
discussed classified information with an unapproved person or an approved person
lacking need-to-know, contact your designated Agency security officer immediately.

4

In what forum may I present classified information, if necessary?

Presentation of classified information in a public forum is never permitted. Most cases do not require the presentation of classified information. However, the Equal Employment Opportunity administrative proceedings are conducted in a classified setting up to the Secret level. If your client requests an administrative hearing under 29 C.F.R. 1614.108(f), either party may present classified information at the hearing. In most cases, it is not necessary to include classified information in the text of motions, briefs, or correspondence relating to the proceeding.

What procedures do I follow prior to submitting a court filing or otherwise promulgating anything related to or based upon my client's case, regardless of the classification?

Prior to submitting a court filing or otherwise promulgating anything related to or based upon your client's case, provide a copy of the filing or other information to your designated Agency security officer, unless you have made other arrangements with the Agency to ensure that classified information is not publicly disclosed. Your designated Agency security officer will ensure that an appropriate Agency representative unaffiliated with the case conducts a prepublication review of the information. This review will ensure that classified information is not disseminated to persons lacking appropriate clearances or approvals.

What do I do if my client fails to gain Agency approval prior to releasing classified information to me or provides me such information outside of an Agency secure area?

If your client fails to gain Agency approval prior to releasing classified information or provides such information outside of an Agency secure area, contact your designated Agency security officer immediately.

What are the penalties for failing to adhere to this guidance?

When you read and sign the Nondisclosure/Secrecy Agreement and the Acknowledgment of Security Requirements form, you agree to adhere to this guidance as well as any other requirements noted in the agreement or form. Your failure to adhere to these requirements may result in the Agency withdrawing your security approval and/or your breach being referred to the Department of Justice for possible criminal prosecution. The Agency also reserves the right to withdraw your security approval should it receive any information indicating that you should not have continued access to classified information.

## ACKNOWLEDGMENT OF SECURITY REQUIREMENTS

My signature below serves to acknowledge that I will abide by the security requirements associated with my representing a Central Intelligence Agency-affiliated individual. These requirements are set forth in the Secrecy/Nondisclosure Agreement and the Security Guidance for Representatives. I was afforded a security briefing to discuss these requirements. During or prior to the briefing, among other things, I read and signed the Secrecy/Nondisclosure Agreement, read the Security Guidance for Representatives, and reviewed the provided Executive Order, federal statutes and regulations relating to the protection of classified information.

I have been provided an opportunity to ask questions about the information presented during the briefing, and I affirm that I understand the security requirements fully. **If you are retained to represent other Agency-affiliated personnel other than your present client, you will need to complete a separate Secrecy/Non-disclosure Agreement for each client.** I also understand that my failure to abide by these requirements may result in the revocation of my Secret clearance or additional administrative sanctions or criminal prosecution.

_____          By: _____

Date                                          Signature

                                              _____

                                              Printed Name

                                              _____

                                              Address

_____

Date                                          Signature of Witness

                                              _____

                                              Printed Name of Witness

# EXHIBIT "2"

# 2007 CIA PRB REGULATIONS

UNCLASSIFIED

(b)(2)
(b)(3)

UNCLASSIFIED

**Date:** 09/09/2005

**Category:** 10 - Security **OPR:** SC

**Title:** AR 10-1 (U) SECURITY CLEARANCES, ACCESSES, AND APPROVALS

---

**REVISION SUMMARY:** 09 September 2005

This regulation supersedes AR 10-1, dated 23 March 2005.

AR 10-1 is revised to update organizational titles. This revision reflects the Agency's organizational restructuring that resulted from the D/CIA's decision, effective 4 January 2005, to abolish the Mission Support Offices and establish the Directorate of Support. This revision also reflects the title change for the External Operations and Cover Division in the Directorate of Operations to the Global Deployment Center.

*Boldfaced text in this regulation indicates revisions.*

*This regulation was written by the Security Center (SC)/Security Policy Staff,*

## 1. (U) SECURITY CLEARANCES, ACCESSES, AND APPROVALS

**(U) SYNOPSIS. This regulation sets forth the authority and policies governing CIA security clearances, security approvals, and access approvals.**

a. **(U) AUTHORITY.** The authority for this regulation is contained in the National Security Act of 1947, as amended; the Central Intelligence Agency Act of 1949, as amended; Executive Orders 10450, 12333, 12958, and 12968; Director of Central Intelligence Directive No. 6/4; and other applicable law.

b. **(U) DEFINITIONS.** For purposes of this regulation, the following definitions apply:

(1) A **"security clearance"** is a formalization of a security determination that an individual is authorized access, on a "need-to-know" basis, to a specific level of classified

APPROVED FOR RELEASE
DATE: JAN 2008

UNCLASSIFIED

information (that is, TOP SECRET, SECRET, CONFIDENTIAL).

(2) An **"access"** or **"access approval"** is a formalization of a security determination that an individual is authorized access, on a "need-to-know" basis, to a specific type of classified information, such as Sensitive Compartmented Information (SCI), that imposes safeguarding and access requirements that exceed those normally required for information at the same classification level.

(4) A **"security approval"** is a security determination that is more restrictive in scope than a security clearance or access. A security approval only grants authorization on a need-to-know basis to an individual for access to specific Agency activities, information, or facilities at a specified classification level for a specific purpose. Security approvals generally apply to non-staff personnel, contractor personnel, service-type personnel requiring facility access, liaison contacts, and authorized contacts with persons who may be able to provide information of interest to the Agency.

(5) The term **"Operating Official"** has the same meaning as specified in AR[____] but also includes "Heads of Independent Offices" as also identified in [____]

c. **(U//FOUO) POLICY**

(1) All individuals employed by, affiliated with, or utilized by the Agency, excluding persons requiring operational approvals ([_____] must possess a security clearance, security approval, or access approval consistent with the sensitivity of the proposed use. The C/SC, or designee is responsible for granting or determining eligibility to receive CIA security clearances, accesses (to include SCI access approvals), and security approvals to individuals under the security cognizance of the Agency.

(3) Individuals who do not have a need-to-know classified information and who are unlikely to be exposed to classified information during the course of their official duties (for example, groundskeepers, certain visitors to Agency premises, and so forth) may receive

UNCLASSIFIED

UNCLASSIFIED

a limited FAA from the SC (see paragraph g of this regulation for a description of a full
FAA).[2]

[2] The SC may grant limited FAAs to individuals who require escorted access to Agency buildings
on a recurring basis. The SC Security Protective Service (SPS) may grant individuals (for
example commercial delivery personnel) access to Agency premises on a non-recurring basis
without additional SC coordination or approval. Investigations for Limited FAAs and escorted
access granted by the SPS will be limited to examining federal, state, and local records as
permitted by law. The limited investigations associated with these types of authorizations are
conducted for the protection of Agency personnel and property rather than to determine
eligibility to receive access to classified information. Denials of limited FAAs or SPS visitor
requests are not subject to appeal under AR [          ] or any other Agency regulation.

(4) SC policies for the acceptance of security clearances and access approvals granted by
other federal agencies and departments will be consistent with standards for the reciprocal
acceptance of access eligibility determinations established by Executive Order 12968.

(5) The Agency does not discriminate on the basis of race, color, religion, sex, national
origin, disability, age (40 and over), or sexual orientation in granting, denying, or
revoking security clearances, accesses, or security approvals.

(6) The SC will not approve an individual for access or continued access to classified
information if the individual, a member of the individual's immediate family as defined
in DCID No. 6/4, or an immediate family member of the individual's spouse or
cohabitant as defined in DCID No. 6/4, has ever been affiliated with the intelligence
service or security service of a foreign country.

(7) The SC will not approve an individual for access or continued access to classified
information if the individual's spouse or cohabitant is a foreign national currently
employed by a foreign government unless the spouse or cohabitant resigns such foreign
government employment. If the spouse or cohabitant is a U.S. citizen working for a
foreign government, the SC will determine on a case-by-case basis whether resignation of
the foreign government employment is a necessary precondition for the individual to be
considered for access or continued access to classified information.

d. **(U) ADJUDICATIVE GUIDELINES AND INVESTIGATIVE STANDARDS USED
BY CIA.** The investigative standards and adjudicative guidelines used by CIA for granting,
denying, or revoking security clearances, accesses, and approvals are those national standards
and guidelines approved by the President in accordance with Executive Order 12968. These
guidelines and standards are set forth in DCID No. 6/4 and are hereby incorporated into this
regulation.

e. [                                                                                    ]

f. **(U) NON STAFF-LIKE ACCESS.** The clearance level (that is, TOP SECRET, SECRET,
CONFIDENTIAL) and/or other access approvals granted for non-staff-like access will be
consistent with the sensitivity of assigned duties, the information accessed, and/or the
facilities which house sensitive information. As deemed appropriate, C/SC or designee may

UNCLASSIFIED

• •    •                                    UNCLASSIFIED

require completion of more stringent investigative requirements than required by the
applicable Government-wide investigative standards, including the use of the polygraph. In
some cases, due to the sensitivity of certain operations, a SC security approval at or below the
SECRET level may be required before contacting individuals who will be requested to
perform services for the CIA.

**j. (U) DELEGATIONS OF AUTHORITY.** The C/SC is the senior Agency official
designated under section 6.1 of Executive Order 12968 to direct and administer the Agency's
personnel security program. The C/SC is delegated all authority granted by Executive Order
12968 to the **D/CIA**, as head of the Agency, except for the functions and authority set forth in
sections 2.4(b) and 5.2(b), (d), and (e) of the Order which must be exercised by the **D/CIA**, or
the **DD/CIA** acting on the **D/CIA**'s behalf.

**k. (U) AUTHORITY TO REINVESTIGATE, DENY, SUSPEND, REVOKE, OR
ADMINISTRATIVELY TERMINATE SECURITY CLEARANCES, ACCESS
APPROVALS, AND/OR SECURITY APPROVALS.** The C/SC or designee may at any
time deny a request for security clearance, access approval, or security approval. The C/SC
or designee may, at their discretion, initiate reinvestigations of an Agency employee or any
other individual who holds an Agency-sponsored security clearance, access approval, or
security approval to determine continued eligibility for such clearance, access, or approval.
The C/SC or designee may temporarily suspend an individual's security clearance, access

                                           UNCLASSIFIED

UNCLASSIFIED

approval, or security approval during the investigation and until final adjudication of the
individual's eligibility for access to classified information. Suspensions may not be appealed
under this or any other Agency regulation. Upon completion of the reinvestigation or other
inquiry, the C/SC or designee may revoke the individual's security clearance, access
approval, or security approval if doubts remain regarding the individual's continued
eligibility for security clearance, access approval, or security approval. Finally, the C/SC or
designee may administratively terminate any Agency security clearance, access approval, or
security approval when it is determined that the affected individual no longer requires the
clearance, access, or security approval to carry out the individual's official duties.
Administrative terminations may not be appealed under this or any other Agency regulation.

**l.  Not Used.**

UNCLASSIFIED

will provide Agency BI-related information to DSS. Unless otherwise directed, overt employees should list the Chief, Human Resources as their supervisor. Overt and covert employees must not list any other Agency personnel on the packet.

**p.** **(U) RESERVATION OF AUTHORITY.** Nothing in this regulation shall be deemed to limit or preclude the **D/CIA** or the **DD/CIA** from taking any actions regarding an Agency sponsored security clearance, access approval, or security approval with or without the procedures set forth in this or any other regulation. In addition, neither this nor any other regulation limits or precludes the **D/CIA** or **DD/CIA** from suspending, revoking, or administratively terminating any individual's access to SCI, with or without procedures, regardless of the individual's affiliation or lack of direct affiliation with the Agency.

**q.** **(U) NO ADDITIONAL RIGHTS CONFERRED.** Neither this nor any other Agency regulation or policy statement creates for or confers on any person or entity any right to administrative or judicial review of Agency security clearance, access approval, or security approval determination procedures, their implementation, or decisions or actions rendered there under. Also, neither this nor any other Agency regulation or policy statement creates or confers any right, benefit, or privilege, whether substantive or procedural, for access to classified information or facilities. Finally, neither this nor any other Agency regulation or policy statement creates or confers any substantive or procedural right, benefit, or privilege enforceable by any party against the Agency, any Agency instrumentality, or any Agency officer or employee, or any other person acting for or on behalf of the Agency.

UNCLASSIFIED

# EXHIBIT "3"

# Declaration of Franz Boening

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FRANZ BOENING | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No: 07-430 (EGS) |
| v. | * | |
| | * | |
| CENTRAL INTELLIGENCE AGENCY | * | |
| | * | |
| Defendant. | * | |

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

## DECLARATION OF FRANZ BOENING

The undersigned hereby declares as follows:

1.  I am a person over eighteen (18) years of age and competent to testify. I am the plaintiff in this action and make this Declaration on personal knowledge. This Declaration is submitted in support of my Reply to Defendant's Opposition to Plaintiff's Motion to Compel Defendant to Provide Access to "Classified" Documents to Plaintiff and His Counsel.[1]

2.  I was formerly employed by the Central Intelligence Agency (CIA) from 1980 – 2005. After learning Arabic in the early 1980s, I spent nearly one dozen years in agent operations, primarily in the Middle East. I worked declassification issues from 1995 – 1999, and ultimately retired from the Agency after working at the Foreign Broadcast Information Service where I handled Internet exploitation and training. I have held a Top Secret/Sensitive Compartmented security clearance for nearly 25 years.

---

[1] Per the requirements of my secrecy agreement, this document has been submitted for classification review and the contents, unless noted otherwise, have been deemed unclassified and approved for public filing.

3.   I retained Mark S. Zaid, Esq. in the Fall of 2003 to assist me with pursuing several

grievances against the CIA and to specifically facilitate the declassification/release of my

whistleblower complaint of May 10, 2001, which I will refer to as the "M Complaint" (a

designation that the CIA and I have utilized with approval in unclassified

correspondence). I drafted the "M Complaint" after reading a number of publicly

available newspaper and magazine articles since autumn 2000 about the factual events I

describe in the "M Complaint". I have long taken a personal interest in Latin American

developments and in human rights issues.  I have visited several countries in the area and

speak serviceable Spanish.

4.   At no time was I ever asked by the CIA to sign any documentation that informed

me that the scope of Mr. Zaid's representation was limited in any way (and the same

applies for Mr. Zaid's associate Bradley P. Moss). At no time was I ever verbally

informed by the CIA that the scope of Mr. Zaid's representation was limited in any way,

other than he was only cleared to receive up to and including information classified at the

SECRET level. It was and has always been my understanding that I was permitted to

verbally convey to Mr. Zaid all the information relevant to my grievances and the "M

Complaint", to include the actual contents of the "M Complaint". The bottom line is that

it was and is my understanding that Mr. Zaid's access extended to all facets of my

situation and that I personally determined when or whether he possessed a "need-to-

know" certain "classified" information.

5.   As part of his representation of my legal interests, Mr. Zaid participated in

meetings with the CIA's Office of Inspector General ("OIG"). At those meetings Mr.

Zaid was permitted to review at least two of my grievances, which were at the time

classified in part. My grievances were directly connected to the creation of the "M Complaint". That is to say that it was impossible to distinguish the matters from one another, which is why at the OIG meetings (before, during and after) we discussed the specific contents of the "M Complaint". Thus, I specifically determined that Mr. Zaid had a "need-to-know" the contents of my grievances and the "M Complaint"; a fact the CIA was more than aware of since it was a topic of the OIG meetings.

6.    As the author of the "M Complaint", I can categorically state that there is no information within that document, much less any classified information (given that every piece of information was taken from publicly available newspaper/magazine articles and declassified government documents), that was not imparted to Mr. Zaid. Of course, given that his representation of my interests has spanned more than four years I would not expect him to have been able to memorize all of the information, which is one reason why it was requested that Mr. Zaid have access to the "M Complaint" in order to uphold my First Amendment rights in this litigation.

7.    The CIA's refusal to allow Mr. Zaid to review the very documents I created which are at the heart of this litigation further tramples upon my First Amendment rights. There is no doubt in my mind, nor was there any doubt expressed by the OIG, that Mr. Zaid was authorized to be told very facet of the alleged "classified" information at issue in this litigation. Why he was allowed to possess such information when I was simply pursuing administrative remedies but now cannot apparently have access while in litigation (thereby obviously impeding his ability to properly and fully represent my views) is nothing less than disingenuous and makes a mockery of our system.

I do solemnly affirm under the penalties of perjury that the contents of the foregoing

paper are true to the best of my knowledge.

Date:   February 8, 2008

_____
Franz Boening